**Nos. 24-9516, 24-9532, 24-9538**

# In the United States Court of Appeals for the Tenth Circuit

---

No. 24-9516

---

TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.,
PETITIONER,

V.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT.

---

BASIN ELECTRIC POWER COOPERATIVE, MOUNTAIN PARKS ELECTRIC,
INC., UNITED POWER, INC., LA PLATA ELECTRIC ASSOCIATION, INC.,
NORTHWEST RURAL PUBLIC POWER DISTRICT,
INTERVENORS.

---

No. 24-9532

---

UNITED POWER, INC.,
PETITIONER,

V.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT.

---

BASIN ELECTRIC POWER COOPERATIVE, NORTHWEST RURAL PUBLIC
POWER DISTRICT, MOUNTAIN PARKS ELECTRIC, INC.,
INTERVENORS.

---

No. 24-9538

---

TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.,
PETITIONER,

V.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT.

————————————

On Petition for Review

————————————

# APPENDIX VOLUME 1

————————————

Oral Argument Requested

[Counsel listed on inside cover]

FREDRICK WILSON
RUSSELL KOOISTRA
ANTONIA M. DOUGLAS
TROUTMAN PEPPER
HAMILTON SANDERS LLP
401 9TH STREET NW, SUITE 1000
WASHINGTON, DC 20004
(202) 274-2813
fredrick.wilson@troutman.com
russell.kooistra@troutman.com
antonia.douglas@troutman.com

KENNETH F. ROSSMAN, IV
LEWIS ROCA ROTHGERBER CHRISTIE LLP
1601 19TH STREET, SUITE 1000
DENVER, CO 80202
(303) 623-9000
krossman@lewisroca.com

MISHA TSEYTLIN
*Counsel of Record*
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 759-1939 (fax)
misha.tseytlin@troutman.com

Jeff P. Johnson
TROUTMAN PEPPER
HAMILTON SANDERS LLP
1001 Haxall Point, Suite 1500
Richmond, VA
(804) 697-1480
jeff.johnson@troutman.com

*Attorneys for Petitioner Tri-State Generation and Transmission Association, Inc.*

# TABLE OF CONTENTS

*Tri-State Generation & Transmission Ass'n, Inc.*, Certified
Index to the Record ........................................................ V1-001

Record Item No. 167, Exhibits to Tri-State Direct Testimony
WESC Exhibit TGT-005 ............................................ V1-099

Record Item No. 167, Exhibits to Tri-State Direct Testimony
Rate Schedule No. 281, Exhibit TGT-0018 ............... V1-120

Record Item No. 167, Exhibits to Tri-State Direct Testimony,
Bylaws, Exhibit TGT-0019 ........................................ V1-132

Record Item No. 167, Exhibits to Tri-State Direct Testimony,
Excerpts from O'Flaherty Direct Testimony, Exhibit TGT-
0056 [19-21] ................................................................ V1-148

Record Item No. 169, Exhibits to Tri-State Revised
Testimony, Highley Direct Testimony, Exhibit TGT-0001
REV ............................................................................. V1-154

Record Item No. 202, Exhibits to Tri-State Revised
Testimony, Nebergall Direct Testimony, Exhibit TGT-
0003 REV ................................................................... V1-193

Record Item No. 202, Exhibits to Tri-State Revised
Testimony, Excerpts from Bladow Direct Testimony,
Exhibit TGT-0009 REV [8-13] .................................... V1-236

Record Item No. 202, Exhibits to Tri-State Revised
Testimony, Bridges Direct Testimony, Exhibit TGT-0016
REV ............................................................................. V1-246

## CERTIFICATE OF COMPLIANCE

Pursuant to Tenth Circuit Rule 30.1(D) I certify the following:

This appendix complies with requirements of Federal Rule of Appellate Procedure 30 and Tenth Circuit Rule 30.1. All required privacy redactions have been made per 10th Cir. R. 25.5; if required to file additional hard copies, the ECF submission is an exact copy of those documents; and the ECF submissions have been scanned for viruses with Windows Defender Advanced Threat Protection Antivirus, Version 1.393.1471.0, last updated October 7, 2024, and, according to the program, they are free of viruses.

Dated: October 7, 2024

/s/Misha Tseytlin
MISHA TSEYTLIN
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 759-1939 (fax)
misha.tseytlin@troutman.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of October, 2024, I filed the foregoing brief with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

Dated: October 7, 2024

/s/Misha Tseytlin

MISHA TSEYTLIN
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 759-1939 (fax)
misha.tseytlin@troutman.com

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| Tri-State Generation and Transmission Association, Inc., | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Nos. 24-9516 and 24-9538 |
| | ) | |
| Federal Energy Regulatory Commission, Respondent. | ) | |
| | ) | (Consolidated) |
| | ) | |
| United Power, Inc., | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 24-9532 |
| | ) | |
| Federal Energy Regulatory Commission, Respondent. | ) | |

## CERTIFIED INDEX TO THE RECORD

Pursuant to the provisions of section 313(b) of the Federal Power Act,

16 U.S.C. § 825*l*(b), the provisions of 28 U.S.C. § 2112, and Rule 17 of the

Federal Rules of Appellate Procedure, the Federal Energy Regulatory Commission

hereby certifies that the materials listed and described below are:  (1) the orders

complained of, "Order on Initial Decision," 185 FERC ¶ 61,201, issued December

19, 2023, "Notice of Denial of Rehearing by Operation of Law and Providing for

Further Consideration," 186 FERC ¶ 62,071, issued February 20, 2023, and "Order

Addressing Arguments Raised on Rehearing and Granting Clarification, in Part,"

187 FERC ¶ 61,101, issued May 23, 2024, in *Tri-State Generation & Transmission Ass'n, Inc.*, FERC Docket Nos. ER21-2818, EL21-53, EL21-75, and EL22-4; and

(2) the complete record upon which such orders were entered.

**Record**
**Item No.**    **Description**

**Docket Nos. ER21-2818, EL21-53, EL21-75, EL22-4**

1.          Filed By:  Wheat Belt Public Power District, et al.
            Filed Date:  02/26/2021
            Accession No.:  20210226-5423
            Description:  Complaint, et al. of Wheat Belt Public Power District, et
            al. under EL21-53.

2.          Issued By:  Secretary Of The Commission, FERC
            Filed Date:  03/01/2021
            Accession No.:  20210301-3047
            Description:  Notice of Complaint re Wheat Belt Public Power
            District et al. v. Tri-State Generation and Transmission Association,
            Inc. under EL21-53.

3.          Filed By:  Basin Electric Power Cooperative
            Filed Date:  03/09/2021
            Accession No.:  20210309-5043
            Description:  Motion to Intervene of Basin Electric Power
            Cooperative under EL21-53.

4.          Filed By:  Tipmont REMC
            Filed Date:  03/11/2021
            Accession No.:  20210311-5082
            Description:  Motion to Intervene of Tipmont REMC under EL21-53.

5.          Filed By:  Tri-State Generation and Transmission Association, Inc.
            Filed Date:  03/18/2021
            Accession No.:  20210318-5274
            Description:  Tri-State Generation and Transmission Association, Inc.
            submits Motion to Dismiss and Answer under EL21-53.

6.          Filed By:  Poudre Valley Rural Electric Association, Inc.
            Filed Date:  03/18/2021
            Accession No.:  20210318-5029
            Description:  Motion to Intervene of Poudre Valley Rural Electric
            Association, Inc. under EL21-53.

3

| **Record Item No.** | **Description** |
|---|---|
| 7. | Filed By:  Tipmont REMC<br>Filed Date:  03/18/2021<br>Accession No.:  20210318-5189<br>Description:  Tipmont Rural Electric Membership Corporation submits Comment under EL21-53. |
| 8. | Filed By:  Tri-State Generation and Transmission Association, Inc.<br>Filed Date:  03/26/2021<br>Accession No.:  20210326-5201<br>Description:  Answer in Opposition to the Motion to Intervene of Tipmont Rural Electric Membership Corporation under EL21-53. |
| 9. | Filed By:  Wheat Belt Public Power District, et al.<br>Filed Date:  04/02/2021<br>Accession No.:  20210402-5268<br>Description:  Joint Complainants' Motion for Leave to Answer and Answer to Tri-State Generation and Transmission Association, Inc.'s Motion to Dismiss and Answer under EL21-53, et al. |
| 10. | Filed By:  United Power, Inc.<br>Filed Date:  04/02/2021<br>Accession No.:  20210402-5263<br>Description:  Reply of United Power, Inc. in Opposition to Tri-State Generation and Transmission Association, Inc.'s March 18, 2020 Motion to Dismiss under EL21-53, et al. |
| 11. | Filed By:  United Power, Inc.<br>Filed Date:  04/06/2021<br>Accession No.:  20210406-6183<br>Description:  Motion to Intervene, Motion to Reject or in the Alternative Consolidate, and Protest of United Power, Inc. under ER21-1449, et al. |

| Record Item No. | Description |
|---|---|

| | |
|---|---|
| 12. | Filed By:  Northwest Rural Public Power District<br>Filed Date:  04/06/2021<br>Accession No.:  20210406-6189<br>Description:  Protest, Motion to Reject, Alternative Motions to Consolidate, and for Maximum Suspension, and Motion for Summary Judgement of the Indicated Tri-State Members under ER21-1449, et al. |
| 13. | Filed By:  Northwest Rural Public Power District<br>Filed Date:  04/07/2021<br>Accession No.:  20210407-5137<br>Description:  Errata to April 6, 2021 Protest, et al. to Correct Technological Error in Exhibit No. ITSM-0001 of the Indicated Tri-State Members under ER21-1449, et al. |
| 14. | Filed By:  Tri-State Generation and Transmission Association, Inc.<br>Filed Date:  04/22/2021<br>Accession No.:  20210422-5062<br>Description:  Motion for Leave to Answer and Answer of Tri-State Generation and Transmission Association, Inc. under EL21-53. |
| 15. | Filed By:  Northwest Rural Public Power District<br>Filed Date:  05/10/2021<br>Accession No.:  20210510-5167<br>Description:  Answer to Motion, Motion for Leave to Answer, and Answer of the Indicated Tri-State Members under ER20-1559, et al. |
| 16. | Issued By:   Secretary Of The Commission, FERC<br>Filed Date:  06/17/2021<br>Accession No.:  20210617-3154<br>Description:  Notice of Order to Show Cause, Instituting Section 206 Proceeding and Refund Effective Date re Tri-State Generation and Transmission Association, Inc. under EL21-75. |

| **Record Item No.** | **Description** |
|---|---|

17.      Issued By: Commissioners & Immediate Staff (The Commission), Secretary Of The Commission, FERC
Filed Date: 06/17/2021
Accession No.: 20210617-3074
Description: Order to Show Cause re Tri-State Generation and Transmission Association, Inc. under EL21-75.

18.      Filed By: Northwest Rural Public Power District
Filed Date: 06/21/2021
Accession No.: 20210621-5040
Description: Motion to Intervene of Northwest Rural Public Power District under EL21-75.

19.      Filed By: Springer Electric Cooperative, Inc.
Filed Date: 06/21/2021
Accession No.: 20210621-5041
Description: Motion to Intervene of Springer Electric Cooperative, Inc. under EL21-75.

20.      Filed By: Poudre Valley Rural Electric Association, Inc.
Filed Date: 06/21/2021
Accession No.: 20210618-5037
Description: Motion to Intervene of Poudre Valley Rural Electric Association, Inc. under EL21-75.

21.      Filed By: Basin Electric Power Cooperative
Filed Date: 06/22/2021
Accession No.: 20210622-5054
Description: Motion to Intervene of Basin Electric Power Cooperative under EL21-75.

22.      Filed By: San Miguel Power Association, Inc.
Filed Date: 06/23/2021
Accession No.: 20210623-5001
Description: Motion to Intervene of San Miguel Power Association, Inc. under EL21-75.

| **Record Item No.** | **Description** |
| --- | --- |

23.    Filed By:  La Plata Electric Association, Inc.
Filed Date:  06/24/2021
Accession No.:  20210624-5028
Description:  Motion to Intervene of La Plata Electric Association, Inc. under EL21-75.

24.    Filed By:  San Isabel Electric Association
Filed Date:  06/28/2021
Accession No.:  20210628-5044
Description:  Motion to Intervene of San Isabel Electric Association under EL21-75.

25.    Filed By:  High Plains Power, Inc.
Filed Date:  07/01/2021
Accession No.:  20210701-5057
Description:  Motion to Intervene of High Plains Power, Inc. under EL21-75.

26.    Filed By:  United Power, Inc.
Filed Date:  07/02/2021
Accession No.:  20210702-5050
Description:  Motion to Intervene of United Power, Inc. under EL21-75.

27.    Filed By:  Utilities District of Western Indiana REMC
Filed Date:  07/06/2021
Accession No.:  20210706-5129
Description:  Motion to Intervene of Utilities District of Western Indiana REMC in EL21-75.

28.    Filed By:  Dakota Energy Cooperative, Inc.
Filed Date:  07/07/2021
Accession No.:  20210707-5071
Description:  Motion to Intervene of Dakota Energy Cooperative, Inc. under EL21-75.

**Record
Item No.**     **Description**

29.     Filed By:  Wheat Belt Public Power District
Filed Date:  07/08/2021
Accession No.:  20210708-5016
Description:  Motion to Intervene of Wheat Belt Public Power District
under EL21-75.

30.     Filed By:  Tipmont REMC
Filed Date:  07/08/2021
Accession No.:  20210708-5017
Description:  Motion to Intervene of Tipmont REMC under EL21-75.

31.     Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  07/19/2021
Accession No.:  20210719-5168
Description:  Response to Order to Show Cause and Motion for
Abeyance of Tri-State Generation and Transmission Association, Inc.
under EL21-75.

32.     Filed By:  Tipmont Rural Electric Membership Corporation
Filed Date:  08/03/2021
Accession No.:  20210803-5136
Description:  Answer of Tipmont Rural Electric Membership
Corporation to Order to Show Cause and Motion for Abeyance of Tri-
State Generation and Transmission Association, Inc. under EL21-75.

33.     Filed By:  Poudre Valley Rural Electric Association, Inc., Wheat Belt
Public Power District
Filed Date:  08/03/2021
Accession No.:  20210803-5114
Description:  Joint Comments of Poudre Valley Rural Electric
Association, Inc. and Wheat Belt Public Power Association in Reply
to Tri-State Generation and Transmission Association, Inc.'s Response
to Order to Show Cause under EL21-75.

**Record
Item No.**   **Description**

34.        Filed By:  United Power Inc.
           Filed Date:  08/03/2021
           Accession No.:  20210803-5115
           Description:  Answer of United Power, Inc. to Order to Show Cause
           and Motion for Abeyance of Tri-State Generation and Transmission
           Association, Inc. under EL21-75.

35.        Filed By:  La Plata Electric Association, Inc.
           Filed Date:  08/03/2021
           Accession No.:  20210803-5116
           Description:  Answer of La Plata Electric Association, Inc. to Order to
           Show Cause and Motion for Abeyance of Tri-State Generation and
           Transmission Association, Inc. under EL21-75.

36.        Filed By:  Northwest Rural Public Power District
           Filed Date:  08/03/2021
           Accession No.:  20210803-5117
           Description:  Answer of Tri-State Generation and Transmission
           Association Members to Order to Show Cause and Motion for
           Abeyance of Tri-State Generation and Transmission Association, Inc.
           under EL21-75.

37.        Issued By:  Secretary Of The Commission FERC, Commissioners
           And Immediate Staff (The Commission)
           Filed Date:  08/19/2021
           Accession No.:  20210819-3063
           Description:  Order Denying Motion to Hold Proceeding in Abeyance
           re Tri- State Generation and Transmission Association, Inc. under
           EL21-75.

38.        Filed By:  Tri-State Generation and Transmission Association, Inc.
           Filed Date:  09/01/2021
           Accession No.:  20210901-5171
           Description:  Tri-State Generation and Transmission Association, Inc.
           submits tariff filing per 35.13(a)(2)(iii): Revisions to Rate Schedule
           FERC No. 281 (Modified CTP Methodology) to be effective
           11/1/2021 under ER21-2818 Filing Type: 10.

| Record Item No. | Description |
|---|---|
| 39. | Issued By:  Deputy Secretary Of Energy<br>Filed Date:  09/02/2021<br>Accession No.:  20210902-3043<br>Description:  Combined Notice of Filings #1, September 02, 2021: This notice contains information concerning multiple filings received by FERC. |
| 40. | Filed By:  Tri-State Generation and Transmission Association, Inc.<br>Filed Date:  09/02/2021<br>Accession No.:  20210902-5031<br>Description:  Response to Order to Show Cause of Tri-State Generation and Transmission Association, Inc. under EL21-75. |
| 41. | Filed By:  The Midwest Electric Cooperative Corporation<br>Filed Date:  09/03/2021<br>Accession No.:  20210903-5159<br>Description:  Comments of The Midwest Electric Cooperative Corporation in support of Tri-State Generation and Transmission Association, Inc. under EL21-75, et al. |
| 42. | Filed By:  K.C. Electric Association<br>Filed Date:  09/07/2021<br>Accession No.:  20210907-5102<br>Description:  Motion to Intervene of K.C. Electric Association under ER21-2818 et al. |
| 43. | Filed By:  United Power Inc.<br>Filed Date:  09/07/2021<br>Accession No.:  20210907-5115<br>Description:  Motion to Intervene of United Power Inc. under ER21-2818. |
| 44. | Filed By:  Tipmont REMC<br>Filed Date:  09/08/2021<br>Accession No.:  20210908-5094<br>Description:  Motion to Intervene of Tipmont REMC under ER21-2818. |

**Record
Item No.**        **Description**

45.        Filed By:  Highline Electric Association
           Filed Date:  09/09/2021
           Accession No.:  20210909-5143
           Description:  Motion to Intervene, Comments and Answer of Highline
           Electric Association under ER21-2818, et al.

46.        Filed By:  Southeast Colorado Power Association
           Filed Date:  09/09/2021
           Accession No.:  20210909-5148
           Description:  Southeast Colorado Power Association's Motion to
           Intervene, Comments, and Answer in Support of Motions to
           Consolidate under ER21-2818.

47.        Filed By:  Springer Electric Cooperative, Inc.
           File Date:  09/13/2021
           Accession No.:  20210913-5055
           Description:  Motion to Intervene of Springer Electric Cooperative,
           Inc. under ER21-2818.

48.        Filed By:  Morgan County Rural Electric Association
           Filed Date:  09/13/2021
           Accession No.:  20210913-5097
           Description:  Motion to Intervene, Comments, and Answer in Support
           of Motions to Consolidate of Morgan County Rural Electric
           Association under ER21-2818, et al.

49.        Filed By:  Empire Electric Association, Inc.
           Filed Date:  09/13/2021
           Accession No.:  20210913-5066
           Description:  Comments of Empire Electric Association, Inc. under
           EL21-75, et al.

50.        Filed By:  Socorro Electric Cooperative
           Filed Date:  09/14/2021
           Accession No.:  20210914-5086
           Description:  Comments of Socorro Electric Cooperative under EL21-
           75-000, et al.

**Record
Item No.**       **Description**

51.        Filed By:  Basin Electric Power Cooperative
           Filed Date:  09/15/2021
           Accession No.:  20210915-5062
           Description:  Motion to Intervene of Basin Electric Power
           Cooperative under ER21-2818.

52.        Filed By:  Mountain View Electric Association, Inc.
           Filed Date:  09/15/2021
           Accession No.:  20210915-5015
           Description:  Mountain View Electric Association, Inc. submits
           comments in support of the amendments to Rate Schedule FERC No.
           281 of Tri-State Generation and Transmission Association, Inc. under
           ER21-2818 et al.

53.        Filed By:  Mountain View Electric Association, Inc.
           Filed Date:  09/15/2021
           Accession No.:  20210915-5016
           Description:  Mountain View Electric Association, Inc. submits
           comments in support of the Tri-State Generation and Transmission
           Association, Inc. filings under EL21-75 et al.

54.        Filed By:  Gunnison County Electric Association, Inc.
           Filed Date:  09/15/2021
           Accession No.:  20210915-5012
           Description:  Motion to Intervene, Comments and Answer in Support
           of Consolidation of The Gunnison County Electric Association, Inc.
           under ER21-2818, et al.

55.        Filed By:  Mora-San Miguel Electric Cooperative, Inc.
           Filed Date:  09/16/2021
           Accession No.:  20210916-5187
           Description:  Comments of Mora-San Miguel Electric Cooperative,
           Inc. under ER21-2818.

| **Record Item No.** | **Description** |
|---|---|

56.   Filed By:  Otero County Electric Cooperative, Inc.
Filed Date:  09/17/2021
Accession No.:  20210917-5017
Description:  Comments of Otero County Electric Cooperative, Inc. under EL21-75 et al.

57.   Filed By:  Jemez Mountains Electric Cooperative, Inc.
Filed Date:  09/17/2021
Accession No.:  20210917-5028
Description:  Jemez Mountains Electric Cooperative, Inc. submits Motion to Intervene, Comments, and Answer in Support of Motions to Consolidate under ER21-2818-000, ER20-1559-000, EL21-75.

58.   Filed By:  Wheat Belt Public Power District, Poudre Valley Rural Electric Association, Inc.
Filed Date:  09/17/2021
Accession No.:  20210917-5055
Description:  Motions to Intervene, Joint Comments and Joint Answer in Support of Consolidation of Poudre Valley Rural Electric Association and Wheat Belt Public Power District under ER21-2818 et al.

59.   Filed By:  Wyoming Cooperatives
Filed Date:  09/17/2021
Accession No.:  20210917-5091
Description:  Motion to Intervene and Comments of Wyoming Cooperatives under ER21-2818.

60.   Filed By:  United Power, Inc.
Filed Date:  09/17/2021
Accession No.:  20210917-5096
Description:  Answer of United Power, Inc. to Tri-State Generation and Transmission Association, Inc. Show Cause Response under EL21-75.

**Record
Item No.**        **Description**

61.        Filed By:  La Plata Electric Association, Inc.
           Filed Date:  09/17/2021
           Accession No.:  20210917-5112
           Description:  Answer, and Motion to Intervene and Protest of La Plata
           Electric Association, Inc. under EL21-75-000 and ER21-2818.

62.        Filed By:  Basin Electric Power Cooperative
           Filed Date:  09/17/2021
           Accession No.:  20210917-5131
           Description:  Comments of Basin Electric Power Cooperative in
           Response to Tri-State Generation and Transmission Association, Inc.
           Response to Order to Show Cause under EL21-75.

63.        Filed By:  Tipmont REMC
           Filed Date:  09/17/2021
           Accession No.:  20210917-5161
           Description:  Comments of Tipmont REMC under EL21-75.

64.        Filed By:  Y-W Electric Association, Inc.
           Filed Date:  09/17/2021
           Accession No.:  20210917-5162
           Description:  Supporting comments and Motion to Intervene of Y-W
           Electric Association, Inc. under EL21-75 et al.

65.        Filed By:  Southwestern Electric Cooperative, LLC
           Filed Date:  09/17/2021
           Accession No.:  20210917-5176
           Description:  Southwestern Electric Cooperative, LLC submits
           Supporting Comments and Motion to Intervene under ER21-2818.

66.        Filed By:  Northwest Rural Public Power District
           Filed Date:  09/17/2021
           Accession No.:  20210917-5178
           Description:  Answer to Tri-State Response of the Indicated Tri-State
           Members under EL21-75.

| Record Item No. | Description |
|---|---|

**67.**    Filed By:  Individual
Filed Date:  09/17/2021
Accession No.:  20210917-5179
Description:  Comments of Kristen Taddonio re Tri-State Generation and Transmission Association, Inc.'s revised Contract Termination Payment methodology under EL21-75, et al.

**68.**    Filed By:  Mountain Parks Electric, Inc.
Filed Date:  09/20/2021
Accession No.:  20210920-5017
Description:  Motion to Intervene, Comments, and Answer in Support of Motions to consolidate of Mountain Parks Electric, Inc. under ER20-1559 et al.

**69.**    Filed By:  Individual No Affiliation
Filed Date:  09/20/2021
Accession No.:  20210920-5007
Description:  Comments of Elizabeth McIntyre under EL21-75 et al.

**70.**    Filed By:  Tipmont Rural Electric Membership Corporation
Filed Date:  09/22/2021
Accession No.:  20210922-5058
Description:  Comments of Tipmont Rural Electric Membership Corporation on Tri-State Generation and Tri-State Generation and Transmission Association, Inc.'s Revision to Rate Schedule FERC No. 281 under ER21-2818.

**71.**    Filed By:  White River Electric Association Incorporated
Filed Date:  09/22/2021
Accession No.:  20210922-5076
Description:  Motion to Intervene, Comments, and Answer of White River Electric Association Incorporated in Support of Motions to Consolidate under ER21-2818 et al.

**Record**
**Item No.**          **Description**

72.          Filed By:  Northwest Rural Public Power District
             Filed Date:  09/22/2021
             Accession No.:  20210922-5112
             Description:  Motion to Intervene and Protest of Northwest Rural
             Public Power District under ER21-2818.

73.          Filed By:  United Power, Inc.
             Filed Date:  09/22/2021
             Accession No.:  20210922-5115
             Description:  Protest, Motion to Reject and Replace, Submission of
             Replacement Tariff and Conditional Request for Evidentiary Hearing
             Under Section 206 of the Federal Power Act of United Power, Inc.
             under ER21-2818, et al.

74.          Filed By:  Guzman Energy LLC
             Filed Date:  09/22/2021
             Accession No.:  20210922-5123
             Description:  Motion to Intervene and Protest of Guzman Energy LLC
             under ER21-2818.

75.          Filed By:  Basin Electric Power Cooperative
             Filed Date:  09/22/2021
             Accession No.:  20210922-5128
             Description:  Comments of Basin Electric Power Cooperative in
             Response to Tri-State Generation and Transmission Association,
             Inc.'s Response to Order to Show Cause under ER21-2818.

76.          Filed By:  San Miguel Power Association, Inc.
             Filed Date:  09/22/2021
             Accession No.:  20210922-5057
             Description:  Motion to Intervene of San Miguel Power Association,
             Inc. under ER21-2818.

| Record Item No. | Description |
|---|---|

77.       Filed By:  Springer Electric Cooperative, Inc.
          Filed Date:  09/29/2021
          Accession No.:  20210929-5187
          Description:  Comments of Springer Electric Cooperative, Inc. under
          ER21-2818 et al.

78.       Filed By:  Poudre Valley Rural Electric Association
          Filed Date:  10/01/2021
          Accession No.:  20211001-5360
          Description:  Poudre Valley Rural Electric Association submits update
          to the official the service list under EC21-71 et al.

79.       Filed By:  Wheat Belt Public Power District
          Filed Date:  10/01/2021
          Accession No.:  20211001-5362
          Description:  Wheat Belt Public Power District submits update to the
          service list under EC20-51 et al.

80.       Filed By:  Basin Electric Power Cooperative
          Filed Date:  10/04/2021
          Accession No.:  20211004-5176
          Description:  Motion for Leave to Answer and Answer of Basin
          Electric Power Cooperative under EL21-75.

81.       Filed By:  Tri-State Generation and Transmission Association, Inc.
          Filed Date:  10/05/2021
          Accession No.:  20211005-5122
          Description:  Motion for Leave to Answer and Answer of Tri-State
          Generation and Transmission Association, Inc. under ER21-2818.

82.       Filed By:  Tri-State Generation and Transmission Association, Inc.
          Filed Date:  10/05/2021
          Accession No.:  20211005-5112
          Description:  Motion for Leave to Answer and Answer to Answers of
          Certain Intervenors, and Motion for Abeyance of Tri-State Generation
          and Transmission Association, Inc. under EL21-75.

**Record
Item No.**      **Description**

83.         Filed By:  Basin Electric Power Cooperative
            Filed Date:  10/07/2021
            Accession No.:  20211007-5151
            Description:  Motion for Leave to Answer and Answer of Basin
            Electric Power Cooperative under EL21-75, et al.

84.         Filed By:  Wyoming Cooperatives
            Filed Date:  10/07/2021
            Accession No.:  20211007-5134
            Description:  Answer to Motion to Reject of Wyoming Cooperatives
            under ER21-2818.

85.         Filed By:  Basin Electric Power Cooperative
            Filed Date:  10/13/2021
            Accession No.:  20211013-5202
            Description:  Motion for Leave to Answer and Answer of Basin
            Electric Power Cooperative under ER21-2818.

86.         Filed By:  United Power Inc.
            Filed Date:  10/13/2021
            Accession No.:  20211013-5094
            Description:  Motion for Leave to Answer and Limited Answer of
            United Power Inc. under ER21-2818, et al.

87.         Filed By:  Poudre Valley Rural Electric Association, Inc.
            Filed Date:  10/21/2021
            Accession No.:  20211021-5046
            Description:  Motion for Leave to Answer and Answer of Poudre
            Valley Rural Electric Association, Inc. under ER20-1559, et al.

88.         Filed By:  Poudre Valley Rural Electric Association, Inc.
            Filed Date:  10/21/2021
            Accession No.:  20211021-5160
            Description:  Amended Motion for Leave to Answer and Answer of
            Poudre Valley Rural Electric Association, Inc. under EL21-53, et al.

| Record Item No. | Description |
|---|---|

**89.** Filed By:  Basin Electric Power Cooperative
Filed Date:  10/26/2021
Accession No.:  20211026-5138
Description:  Motion for Leave to Answer and Answer of Basin Electric Power Cooperative under EL21-75, et al.

**90.** Issued By:  Secretary Of The Commission, FERC, Commissioners And Immediate Staff (The Commission)
Filed Date:  10/29/2021
Accession No.:  20211029-3083
Description:  Order Accepting and Suspending Proposed Tariff Revisions, Instituting Section 206 Proceeding, Establishing Refund Effective Date And Establishing Hearing Procedures re Tri-State Generation and Transmission Association, Inc. under ER21-2818 et al.

**91.** Issued By:   Secretary Of The Commission, FERC
Filed Date:  11/01/2021
Accession No.:  20211101-3053
Description:  Notice of Institution of Section 206 Proceeding and Refund Effective Date re Tri-State Generation and Transmission Association, Inc. under EL22-4.

**92.** Issued By:  Administrative Law Judges
Filed Date:  11/02/2021
Accession No.:  20211102-3023
Description:  Order of Chief Judge Designating Presiding Administrative Law Judge and Establishing Track I Schedule re Tri-State Generation and Transmission Association, Inc. under ER21-2818 et al.

**93.** Filed By:  Northwest Rural Public Power District
Filed Date:  11/02/2021
Accession No.:  20211102-5134
Description:  Motion to Intervene of Northwest Rural Public Power District under EL22-4.

| Record Item No. | Description |
|---|---|

**Record**
**Item No.**   **Description**

94.        Filed By:  Wyoming Cooperatives
           Filed Date:  11/05/2021
           Accession No.:  20211105-5073
           Description:  Motion to Intervene of Wyoming Cooperatives under
           EL22-4.

95.        Filed By:  Basin Electric Power Cooperative
           Filed Date:  11/05/2021
           Accession No.:  20211105-5066
           Description:  Motion to Intervene of Basin Electric Power
           Cooperative under EL22-4.

96.        Filed By:  San Miguel Power Association, Inc.
           Filed Date:  11/05/2021
           Accession No.:  20211105-5099
           Description:  Motion to Intervene of San Miguel Power Association,
           Inc. under EL22-4.

97.        Filed By:  Tri-State Generation and Transmission Association, Inc.
           Filed Date:  11/05/2021
           Accession No.:  20211105-5105
           Description:  Notice of Appearance and Request to Update Service
           List of Tri-State Generation and Transmission Association, Inc. under
           ER21-2818, et al.

98.        Issued By:  Administrative Law Judges
           Filed Date:  11/08/2021
           Accession No.:  20211108-3038
           Description:  Order Establishing Prehearing Conference re Tri-State
           Generation and Transmission Association, Inc. under ER21-2818 et
           al.

99.        Filed By:  Springer Electric Cooperative, Inc.
           Filed Date:  11/08/2021
           Accession No.:  20211108-5022
           Description:  Motion to Intervene of Springer Electric Cooperative,
           Inc. under EL22-4.

**Record**
**Item No.**     **Description**

100.        Filed By:  Guzman Energy LLC
            Filed Date:  11/09/2021
            Accession No.:  20211109-5017
            Description:  Motion to Intervene of Guzman Energy LLC under
            EL22-4.

101.        Filed By:  Mountain Parks Electric Inc.
            Filed Date:  11/09/2021
            Accession No.:  20211109-5073
            Description:  Motion to Intervene of Mountain Parks Electric Inc.
            under EL22-4.

102.        Filed By:  Otero County Electric Cooperative, Inc.
            Filed Date:  11/12/2021
            Accession No.:  20211112-5048
            Description:  Motion to Intervene of Otero County Electric
            Cooperative, Inc. under EL22-4.

103.        Filed By:  Highline Electric Association
            Filed Date:  11/12/2021
            Accession No.:  20211112-5052
            Description:  Motion to Intervene of Highline Electric Association
            under EL22-4.

104.        Filed By:  Columbus Electric Cooperative, Inc.
            Filed Date:  11/12/2021
            Accession No.:  20211112-5261
            Description:  Motion to Intervene of Columbus Electric Cooperative,
            Inc. under EL22-4.

105.        Filed By:  Morgan County Rural Electric Association
            Filed Date:  11/12/2021
            Accession No.:  20211112-5229
            Description:  Motion to Intervene of Morgan County Rural Electric
            Association under EL22-4.

| **Record Item No.** | **Description** |
|---|---|

106.      Filed By:  Roosevelt Public Power District
Filed Date:  11/12/2021
Accession No.:  20211112-5050
Description:  Motion to Intervene of Roosevelt Public Power District under EL22-4.

107.      Filed By:  The Midwest Electric Cooperative Corporation
Filed Date:  11/12/2021
Accession No.:  20211112-5173
Description:  Motion to Intervene of The Midwest Electric Cooperative Corporation under EL22-4.

108.      Filed By:  K.C. Electric Association
Filed Date:  11/15/2021
Accession No.:  20211115-5076
Description:  Motion to Intervene of K.C. Electric Association under EL22-4.

109.      Filed By:  Empire Electric Association, Inc.
Filed Date:  11/16/2021
Accession No.:  20211116-5106
Description:  Motion to Intervene of Empire Electric Association, Inc. under EL22-4.

110.      Filed By:  Mora-San Miguel Electric Cooperative, Inc.
Filed Date:  11/17/2021
Accession No.:  20211117-5022
Description:  Motion to Intervene of Mora-San Miguel Electric Cooperative, Inc. under EL22-4

111.      Filed By:  Poudre Valley Rural Electric Association, Inc.
Filed Date:  11/17/2021
Accession No.:  20211117-5115
Description:  Motion to Intervene of Poudre Valley Rural Electric Association, Inc. under EL22-4.

**Record
Item No.**    **Description**

112.    Filed By:  La Plata Electric Association, Inc.
Filed Date:  11/18/2021
Accession No.:  20211118-5085
Description:  Motion to Intervene of La Plata Electric Association,
Inc. under EL22-4.

113.    Filed By:  United Power Inc.
Filed Date:  11/18/2021
Accession No.:  20211118-5158
Description:  Motion to Intervene of United Power Inc. under EL22-4.

114.    Filed By: Wyoming Public Service Commission
Filed Date:  11/18/2021
Accession No.:  20211118-5173
Description:  Notice of Intervention of Wyoming Public Service
Commission under EL22-4.

115.    Filed By:  Individual
Filed Date:  11/18/2021
Accession No.:  20211118-5047
Description:  Motion to Intervene of Joseph M. Herrera under EL22-4
on the behalf of Socorro Electric Cooperative, Inc.

116.    Filed By:  Jemez Mountains Electric Cooperative, Inc.
Filed Date:  11/18/2021
Accession No.:  20211118-5071
Description:  Motion to Intervene of Jemez Mountains Electric
Cooperative, Inc. under EL22-4.

117.    Filed By: Northern Rio Arriba Electric Cooperative, Inc.
Filed Date:  11/19/2021
Accession No.:  20211119-5162
Description:  Motion to Intervene of Northern Rio Arriba Electric
Cooperative, Inc. under EL22-4.

| **Record Item No.** | **Description** |
|---|---|

118.    Filed By:  Sierra Electric Cooperative, Inc.
Filed Date:  11/19/2021
Accession No.:  20211119-5191
Description:  Motion to Intervene of Sierra Electric Cooperative, Inc. under EL22-4.

119.    Filed By:  Colorado Public Utilities Commission
Filed Date:  11/19/2021
Accession No.:  20211119-5264
Description:  Notice of Intervention of Colorado Public Utilities Commission under EL22-4.

120.    Filed By:  Central New Mexico Electric Cooperative, Inc.
Filed Date:  11/19/2021
Accession No.:  20211119-5104
Description:  Motion to Intervene of Central New Mexico Electric Cooperative, Inc. under EL22-4.

121.    Filed By:  Wheat Belt Public Power District
Filed Date:  11/19/2021
Accession No.:  20211119-5051
Description:  Motion to Intervene of Wheat Belt Public Power District under EL22-4.

122.    Filed By:  Poudre Valley Rural Electric Association, Inc.
Filed Date:  11/22/2021
Accession No.:  20211122-5232
Description:  Request to Update Service List Information of Poudre Valley Rural Electric Association, Inc. under EL20-26, et al.

123.    Filed By:  Old Dominion Electric Cooperative
Filed Date:  11/24/2021
Accession No.:  20211124-5179
Description:  Out-of-Time Motion to Intervene of Old Dominion Electric Cooperative under EL22-4.

**Record**
**Item No.**     **Description**

124.    Filed By:  Tri-State Generation and Transmission Association, Inc.
        Filed Date:  11/24/2021
        Accession No.:  20211124-5181
        Description:  Unopposed Joint Motion for Extension of Track I Time
        Standards and Adoption of Procedural Schedule of Tri-State
        Generation and Transmission Association, Inc. under ER21-2818, et
        al.

125.    Issued By:  Administrative Law Judges
        Filed Date:  12/01/2021
        Accession No.:  20211201-3031
        Description:  Order of Chief Judge Extending Track 1 Procedural
        Time Standards re Tri-State Generation and Transmission
        Association, Inc. under ER21-2818 et al.

126.    Issued By:  Administrative Law Judges
        Filed Date:  12/03/2021
        Accession No.:  20211203-3016
        Description:  Order Adopting Procedural Schedule, Uniform Hearing
        Rules, Electronic Hearing Rules, and Remote Hearing Guidance re
        Tri-State Generation and Transmission Association, Inc. under ER21-
        2818 et al.

127.    Filed By:  Tri-State Generation and Transmission Association, Inc.
        Filed Date:  12/03/2021
        Accession No.:  20211203-5214
        Description:  Tri-State Generation and Transmission, Inc. submits
        Unopposed Motion for Adoption of Protective Order under ER21-
        2818 et al.

128.    Filed By:  Associated Electric Cooperative, Inc.
        Filed Date:  12/03/2021
        Accession No.:  20211203-5046
        Description:  Out-of-Time Motion to Intervene of Associated Electric
        Cooperative, Inc. under EL22-4.

**Record
Item No.**      **Description**

129.      Issued By:  Administrative Law Judges
          Filed Date:  12/07/2021
          Accession No.:  20211207-3060
          Description:  Order Adopting Protective Order And Waiving Answer
          Period re Tri-State Generation and Transmission Association, Inc.
          under ER21-2818 et al.

130.      Filed By:  United Power, Inc.
          Filed Date:  12/09/2021
          Accession No.:  20211209-5132
          Description:  United Power, Inc. submits Answer in Opposition to
          Motions to Intervene Out-of-Time filed by Old Dominion Electric
          Cooperative and Associated Electric Cooperative under EL22-4.

131.      Filed By:  Tri-State Generation and Transmission Association, Inc.
          Filed Date:  12/10/2021
          Accession No.:  20211210-5129
          Description:  Request to Update Service Lists of Tri-State Generation
          and Transmission Association, Inc. under ER21-2818, et al.

132.      Filed By:  United Power, Inc.
          Filed Date:  12/14/2021
          Accession No.:  20211214-5284
          Description:  Notice of Intent to Withdraw of United Power, Inc.
          under ER21-2818, et al.

133.      Filed By:  United Power, Inc.
          Filed Date:  12/14/2021
          Accession No.:  20211214-5279
          Description:  Request for Clarification of United Power, Inc. under
          ER21-2818, et al.

**Record
Item No.**      **Description**

134.          Issued By:  Administrative Law Judges
              Filed Date:  12/16/2021
              Accession No.:  20211216-3058
              Description:  Order Granting Late Motion To Intervene re Tri-State
              Generation and Transmission Association, Inc. under ER21-2818 et
              al.

135.          Filed By:  Tri-State Generation and Transmission Association, Inc.
              Filed Date:  12/17/2021
              Accession No.:  20211217-5356
              Description:  Motion for Leave to Answer and Answer of Tri-State
              Generation and Transmission Association, Inc. under ER21-2818, et
              al.

136.          Filed By:  Poudre Valley Rural Electric Association, Inc.
              Filed Date:  12/20/2021
              Accession No.:  20211220-5118
              Description:  Poudre Valley Rural Electric Association, Inc.'s Motion
              for Leave to Answer and Answer in Support of Tri-state Generation
              and Transmission Association, Inc.'s Answer and Request for
              Expedited Resolution under ER21-2818 et al.

137.          Filed By:  Highline Electric Association
              Filed Date:  12/21/2021
              Accession No.:  20211221-5152
              Description:  Comments of Highline Electric Association under
              ER21-2818, et al.

138.          Filed By:  United Power, Inc.
              Filed Date:  12/21/2021
              Accession No.:  20211221-5227
              Description:  Motion for Leave to Answer and Answer of United
              Power, Inc. under ER21-2818, et al.

**Record
Item No.**      **Description**

139.          Filed By:  Springer Electric Cooperative, Inc.
              Filed Date:  12/21/2021
              Accession No.:  20211221-5105
              Description:  Comments of Springer Electric Cooperative, Inc in
              support of Tri-State and Poudre Valley Answers to United Power
              Request for Clarification of right to file conditional intent to
              Withdraw Pursuant to Rate Schedule 281 under ER21-2818.

140.          Filed By:  United Power, Inc.
              Filed Date:  12/21/2021
              Accession No.:  20211221-5264
              Description:  United Power, Inc. submits Motion to Compel Tri-State
              Generation and Transmission Association to produce documents and
              information responsive to the Second Set of Data Requests under
              ER21-2818, et al.

141.          Filed By:  United Power Inc.
              Filed Date:  12/22/2021
              Accession No.:  20211222-5299
              Description:  Request to Update Service List Information of United
              Power Inc. under ER21-2818, et al.

142.          Issued By:  Administrative Law Judges
              Filed Date:  12/23/2021
              Accession No.:  20211223-3008
              Description:  Order Scheduling Oral Argument re Tri-State
              Generation and Transmission Association, Inc. under ER21-2818 et
              al.

143.          Filed By:  The Midwest Electric Cooperative Corporation
              Filed Date:  12/23/2021
              Accession No.:  20211223-5175
              Description:  Comments of Midwest Electric Cooperative Corporation
              in support of Tri-State Generation and Transmission under ER21-
              2818.

**Record**
**Item No.**        **Description**

144.        Filed By:  Wheat Belt Public Power District
            Filed Date:  12/23/2021
            Accession No.:  20211223-5252
            Description:  Motion for Leave to Answer and Answer of Wheat Belt
            Public Power District under ER21-2818, et al.

145.        Filed By:  Tri-State Generation and Transmission Association, Inc.
            Filed Date:  12/27/2021
            Accession No.:  20211227-5062
            Description:  Answer of Tri-State Generation and Transmission
            Association to Motion to Compel Responses to Data Requests under
            ER21-2818, et al.

146.        Filed By:  Wyoming Cooperatives
            Filed Date:  12/27/2021
            Accession No.:  20211227-5217
            Description:  Wyoming Cooperatives' Answer to United Power's
            Request for Clarification and Conditional Motion for Leave to
            Answer and Answer in Support of Tri-State Generation, et al. Motion
            for Leave to Answer and Answer under ER21-2818, et al.

147.        Filed By:  Empire Electric Association, Inc.
            Filed Date:  12/27/2021
            Accession No.:  20211227-5300
            Description:  Empire Electric Association Inc. submits Comments re
            Clarification of the right to file a conditional notice of intent to
            withdraw from Tri-State under rate Schedule No. 281 under ER21-
            2818, et al.

148.        Filed By:  K.C. Electric Association
            Filed Date:  12/27/2021
            Accession No.:  20211227-5146
            Description:  K.C. Electric Association submits Comments under
            ER21-2818, et al.

**Record
Item No.**      **Description**

149.          Filed By:  Morgan County Rural Electric Association
              Filed Date:  12/27/2021
              Accession No.:  20211227-5257
              Description:  Comments of Morgan County Rural Electric Association
              on Tri-State Generation & Transmission Contract Termination
              Payment under ER21-2818, et al.

150.          Filed By:  Gunnison County Electric Association, Inc.
              Filed Date:  12/27/2021
              Accession No.:  20211227-5245
              Description:  Comments of Gunnison County Electric Association,
              Inc. in support of Tri-State Generation & Transmission's and Poudre
              Valley's answers to request by United Power for clarification of the
              right to file a conditional notice of intent under ER21-2818, et al.

151.          Filed By:  Tri-State Generation and Transmission Association, Inc.
              Filed Date:  12/28/2021
              Accession No.:  20211228-5074
              Description:  Request to Update Service Lists of Tri-State Generation
              and Transmission Association, Inc. under ER21-2818, et al.

152.          Filed By:  Southeast Colorado Power Association
              Filed Date:  12/28/2021
              Accession No.:  20211228-5094
              Description:  Comments of Southeast Colorado Power Association
              under ER21-2818 et al.

153.          Filed By:  Southwestern Electric Cooperative Inc.
              Filed Date:  12/28/2021
              Accession No.:  20211228-5272
              Description:  Southwestern Electric Cooperative Inc., submits
              comments in Support of Tri-Sate Generation and Transmission
              Association, Inc. under ER21-2818, et al.

| **Record Item No.** | **Description** |
|---|---|

154.  Filed By:  United Power Inc.
Filed Date:  12/28/2021
Accession No.:  20211228-5034
Description:  Supplemental information of United Power Inc.,
submitted in support of its December 21, 2021 motion to compel data
responses regarding Tri-State Generation and Transmission
Association, Inc. under ER21-2828, et al.

155.  Filed By:  Sierra Electric Cooperative, Inc.
Filed Date:  12/28/2021
Accession No.:  20211228-5271
Description:  Comments of Sierra Electric Cooperative, Inc. under
ER21-2818, et al.

156.  Filed By:  Northwest Rural Public Power District
Filed Date:  12/30/2021
Accession No.:  20211230-5360
Description:  Northwest Rural Public Power District submits Notice
of Withdrawal from Tri-State Generation and Transmission
Association Inc. under ER21-2818, et al.

157.  Filed By:  Otero County Electric Cooperative, Inc.
Filed Date:  12/30/2021
Accession No.:  20211230-5034
Description:  Comments of Otero County Electric Cooperative, Inc. in
support of Tri-State Generation under ER21-2818.

158.  Filed By:  Otero County Electric Cooperative, Inc.
Filed Date:  12/30/2021
Accession No.:  20211230-5037
Description:  Comments of Otero County Electric Cooperative, Inc. in
support of Tri-State Generation & Transmission under EL22-4.

| **Record Item No.** | **Description** |
|---|---|

159.    Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  01/04/2022
Accession No.:  20220104-5161
Description:  Motion for Leave to Answer and Answer of Tri-State Generation and Transmission Association, Inc. under ER21-2818, et al.

160.    Filed By:  San Isabel Electric Association., Inc.
Filed Date:  01/04/2022
Accession No.:  20220104-5084
Description:  Comments of San Isabel Electric Association., Inc. on Tri-State Generation & Transmission Contract Termination Payment under EL22-4, et al.

161.    Issued By:  Administrative Law Judges
Filed Date:  01/05/2022
Accession No.:  20220105-3030
Description:  Order Denying Late Motion To Intervene re Tri-State Generation and Transmission Association, Inc. under ER21-2818 et al.

162.    Filed By:  United Power, Inc.
Filed Date:  01/05/2022
Accession No.:  20220105-5220
Description:  Motion to Lodge and Motion for Leave to Answer, and Limited Answer of United Power, Inc. under ER21-2818, et al.

163.    Issued By:  Administrative Law Judges
Filed Date:  01/05/2022
Accession No.:  20220105-3046
Description:  Order Confirming Bench Ruling re Tri-State Generations and Transmission Association, Inc. under ER21-2818 et al.

| Record Item No. | Description |
| --- | --- |

164.   Filed By:  Guzman Energy LLC
       Filed Date:  01/07/2022
       Accession No.:  20220107-5120
       Description:  Request to Update Information of Guzman Energy LLC
       under ER21-2818, et al.

165.   Filed By:  Northwest Rural Public Power District
       Filed Date:  01/07/2022
       Accession No.:  20220107-5209
       Description:  Northwest Rural Public Power District submits Direct
       Testimony of Chance Briscoe under ER21-2818, et al.

166.   Filed By:  United Power, Inc.
       Filed Date:  01/07/2022
       Accession No.:  20220107-5215
       Description:  United Power, Inc. submits Direct Testimony and
       Exhibits of Dean Hubbuck and Kurt G. Strunk under ER21-2818, et
       al.

167.   Filed By:  Tri-State Generation and Transmission Association, Inc.
       Filed Date:  01/07/2022
       Accession No.:  20220107-5229
       Description:  Tri-State Generation and Transmission Association, Inc.
       submits Prepared Direct Testimony and Exhibits of Duane D.
       Highley, et al. under ER21-2818, et al.

168.   Filed By:  Tri-State Generation and Transmission Association, Inc.
       Filed Date:  01/07/2022
       Accession No.:  20220107-5230
       Description:  Tri-State Generation and Transmission Association, Inc.
       submits Prepared Direct Testimony and Exhibits of Duane D.
       Highley, et al. under ER21-2818, et al.

**Record
Item No.**      **Description**

169.          Filed By:  Tri-State Generation and Transmission Association, Inc.
              Filed Date:  01/11/2022
              Accession No.:  20220111-5151
              Description:  Errata to Prepared Direct Testimony of Duane D.
              Highley submitted on behalf of Tri-State Generation and
              Transmission Association, Inc. under ER21-2818, et al.

170.          Filed By:  Tri-State Generation and Transmission Association, Inc.
              Filed Date:  01/12/2022
              Accession No.:  20220112-5113
              Description:  Motion for Leave to Answer and Answer of Tri-State
              Generation and Transmission Association, Inc. under ER21-2818, et
              al.

171.          Filed By:  Guzman Energy LLC
              Filed Date:  01/18/2022
              Accession No.:  20220118-5211
              Description:  Notice of Withdrawal of Counsel for Guzman Energy
              LLC under ER21-2818 et al.

172.          Issued By:  Federal Energy Regulatory Commission
              Filed Date:  01/21/2022
              Accession No.:  20220121-3093
              Description:   Transcript of the virtual Oral Argument held on
              12/28/2021 re Tri-State Generation and Transmission Association,
              Inc. under ER21-2818.

173.          Issued By:  Federal Energy Regulatory Commission
              Filed Date:  01/21/2022
              Accession No.:  20220121-3049
              Description:  Transcript of the virtual prehearing conference held on
              11/22/2021 re Tri-State Generation and Transmission Association,
              Inc. under ER21-2818, et al.

**Record**
**Item No.**      **Description**

174.      Filed By:  United Power, Inc.
          Filed Date:  01/21/2022
          Accession No.:  20220121-5021
          Description:  United Power, Inc., et al. submits Joint Status Report on
          Motion to Compel Responses to Data Requests under EL22-4-000, et
          al.

175.      Issued By:  Administrative Law Judges
          Filed Date:  01/21/2022
          Accession No.:  20220121-3074
          Description:  Order to Correct and Refile Exhibits re Tri-State
          Generation and Transmission Association, Inc. under ER21-2818 et
          al.

176.      Filed By:  Northwest Rural Public Power District
          Filed Date:  01/24/2022
          Accession No.:  20220124-5189
          Description:   Northwest Rural Public Power District resubmits
          Prepared Direct Testimony of Mr. Chance Briscoe under ER21-2818,
          et al.

177.      Filed By:  Tri-State Generation and Transmission Association, Inc.
          Filed Date:  01/25/2022
          Accession No.:  20220125-5161
          Description:  Tri-State Generation and Transmission Association, Inc.
          submits Corrected Direct Testimony Exhibits under ER21-2818, et al.

178.      Filed By:  Tri-State Generation and Transmission Association, Inc.
          Filed Date:  01/25/2022
          Accession No.:  20220125-5160
          Description:  Tri-State Generation and Transmission Association, Inc.
          submits Corrected Direct Testimony Exhibits under ER21-2818, et al.

| Record Item No. | Description |
|---|---|

179.    Filed By:  Central New Mexico Electric Cooperative Inc.
Filed Date:  01/27/2022
Accession No.:  20220127-0007
Description:   Comments of Central New Mexico Electric Cooperative Inc. on Tri-State Generation & Transmission's Contract Termination Payment under ER21-2818, et al.

180.    Filed By:  United Power, Inc.
Filed Date:  01/28/2022
Accession No.:  20220128-5509
Description:  United Power, Inc. submits Revised Direct Testimony and Exhibits UP-0004, UP-0010, and UP-0024 under ER21-2818, et al.

181.    Filed By:  Northwest Rural Public Power District
Filed Date:  01/28/2022
Accession No.:  20220128-5510
Description:  Northwest Rural Public Power District submits Revised Prepared Direct Testimony of Mr. Chance Briscoe under ER21-2818, et al.

182.    Filed By:  CJT Energy Law, LLC
Filed Date:  02/03/2022
Accession No.:  20220203-5151
Description:  Comments of Jimez Mountains Electric Cooperative, Inc. on Tri-State Generation and Transmission Contract Termination Payments under ER21-2818, et al.

183.    Filed By:  Guzman Energy LLC
Filed Date:  02/04/2022
Accession No.:  20220204-5213
Description:  Guzman Energy LLC submits Prepared Answering Testimony and Exhibits of R. Jeffrey Malinak under ER21-2818, et al.

**Record
Item No.**    **Description**

184.    Filed By:  United Power Inc.
        Filed Date:  02/04/2022
        Accession No.:  20220204-5215
        Description:  United Power Inc. submits Answering Testimony under
        ER21-2818, et al.

185.    Filed By:  Guzman Energy LLC
        Filed Date:  02/04/2022
        Accession No.:  20220204-5212
        Description:  Guzman Energy LLC submits Prepared Answering
        Testimony and Exhibits of R. Jeffrey Malinak under ER21-2818, et al.

186.    Filed By:  United Power Inc.
        Filed Date:  02/04/2022
        Accession No.:  20220204-5214
        Description:  United Power Inc. submits Answering Testimony under
        ER21-2818, et al.

187.    Filed By:  Tri-State Generation and Transmission Association, Inc.
        Filed Date:  02/04/2022
        Accession No.:  20220204-5219
        Description:  Tri-State Generation and Transmission Association, Inc.
        submits Answering Testimony under ER21-2818, et al.

188.    Filed By:  Northwest Rural Public Power District
        Filed Date:  02/04/2022
        Accession No.:  20220204-5239
        Description:  Northwest Rural Public Power District submits Prepared
        Answering Testimony of Mr. Chance Briscoe under ER21-2818, et al.

189.    Filed By:  Tri-State Generation and Transmission Association, Inc.
        Filed Date:  02/04/2022
        Accession No.:  20220204-5220
        Description:  Tri-State Generation and Transmission Association, Inc.
        submits Answering Testimony under ER21-2818, et al.

**Record
Item No.**   <u>**Description**</u>

190.   Filed By:  United Power, Inc.
Filed Date:  02/04/2022
Accession No.:  20220204-5227
Description:  United Power, Inc. submits Company Answering
Testimony under ER21-2818, et al.

191.   Issued By:  Administrative Law Judges
Filed Date:  02/16/2022
Accession No.:  20220216-3052
Description:  Order Scheduling Prehearing Conference re Tri-State
Generation and Transmission Association, Inc. under ER21-2818 et
al.

192.   Filed By:  Commission Trial Staff
Filed Date:  03/04/2022
Accession No.:  20220304-5280
Description:  Direct and Answering Testimony of Gregory Golino
Witness for the Trial Staff of the Federal Energy Regulatory
Commission under ER21-2818, et al.

193.   Filed By:  Commission Trial Staff
Filed Date:  03/04/2022
Accession No.:  20220304-5281
Description:   Direct and Answering Testimony of Gregory Golino
Witness for the Trial Staff of the Federal Energy Regulatory
Commission under ER21-2818, et al.

194.   Filed By:  Commission Trial Staff
Filed Date:  03/04/2022
Accession No.:  20220304-5293
Description:  Commission Trial Staff submits Testimony and Exhibits
under ER21-2818, et al.

| Record Item No. | Description |
|---|---|

195.    Filed By:  Commission Trial Staff
Filed Date:  03/07/2022
Accession No.:  20220307-5288
Description:   The Commission Trial Staff submits motion to accept five exhibits supporting the Direct and Answering Testimony of Trial Staff witness Dr. Gregory Golino under ER21-2818, et al.

196.    Filed By:  Commission Trial Staff
Filed Date:  03/07/2022
Accession No.:  20220307-5039
Description:  Tri-State Generation and Transmission Assoc., Inc. submits Testimony and Exhibits under ER21-2818, et al.

197.    Filed By:  United Power Inc.
Filed Date:  03/08/2022
Accession No.:  20220308-5151
Description:  United Power, Inc. submits Revised Company Answering Testimony under ER21-2818, et al.

198.    Filed By:  United Power Inc.
Filed Date:  03/08/2022
Accession No.:  20220308-5058
Description:  United Power, Inc. submits Revised Direct Testimony and Exhibits under ER21-2818, et al.

199.    Filed By:  United Power Inc.
Filed Date:  03/09/2022
Accession No.:  20220309-5190
Description:  United Power, Inc. submits Revised Economist Answering Testimony and Exhibits under ER21-2818, et al.

200.    Filed By:  United Power Inc.
Filed Date:  03/09/2022
Accession No.:  20220309-5189
Description:  United Power, Inc. submits Revised Economist Answering Testimony and Exhibits under ER21-2818, et al.

| Record Item No. | Description |
|---|---|

201.  Filed By:  Guzman Energy LLC
Filed Date:  03/09/2022
Accession No.:  20220309-5191
Description:  Guzman Energy LLC submits Revised Answering Testimony and Exhibits under ER21-2818, et al.

202.  Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  03/09/2022
Accession No.:  20220309-5192
Description:  Tri-State Generation and Transmission Association, Inc. submits Errata to Direct and Answering Testimony and submits Corresponding New Exhibits under ER21-2818, et al.

203.  Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  03/09/2022
Accession No.:  20220309-5193
Description:  Tri-State Generation and Transmission Association, Inc. submits Errata to Direct and Answering Testimony and submits Corresponding New Exhibits under ER21-2818, et al.

204.  Issued By:  Administrative Law Judges
Filed Date:  03/11/2022
Accession No.:  20220311-3011
Description:  Order Granting Motion to Accept Certain Exhibits Filed Out of Time re Tri-State Generation and Transmission Association, Inc. under ER21-2818 et al.

205.  Filed By:  United Power Inc.
Filed Date:  03/16/2022
Accession No.:  20220316-5078
Description:  United Power, Inc. submits Requests for Issuance of a Subpoena Duces Tecum to non-party, Kit Carson Electric Cooperative, Inc. under ER21-2818, et al.

| Record Item No. | Description |
|---|---|

**206.**    Issued By: Federal Energy Regulatory Commission
Filed Date: 03/18/2022
Accession No.: 20220318-3006
Description: Transcript of the virtual prehearing conference held on 02/24/2022 re Tri-State Generation and Transmission under ER21-2818, et al.

**207.**    Issued By: Administrative Law Judges
Filed Date: 03/21/2022
Accession No.: 20220321-3041
Description: Order Granting Application for Issuance of Subpoena Duces Tecum to Kit Carson Electric Cooperative, Inc. re Tri-State Generation and Transmission Association, Inc. under ER21-2818 et al.

**208.**    Filed By: United Power Inc.
Filed Date: 03/24/2022
Accession No.: 20220324-5205
Description: United Power, Inc. submits Notice of Intent to Depose Daniel J. Aschenbach under ER21-2818, et al.

**209.**    Filed By: United Power Inc.
Filed Date: 03/25/2022
Accession No.: 20220325-5227
Description: United Power, Inc. submits Rebuttal Testimony and Supporting Exhibits under ER21-2818, et al.

**210.**    Filed By: Tri-State Generation and Transmission Association, Inc.
Filed Date: 03/25/2022
Accession No.: 20220325-5228
Description: Tri-State Generation and Transmission Association, Inc. submits Cross-Answering and Rebuttal Testimony and Supporting Exhibits under ER21-2818, et al.

| Record Item No. | Description |
|---|---|

211.    Filed By:  Gunnison County Electric Association, Inc., et al.
Filed Date:  03/25/2022
Accession No.:  20220325-5234
Description:  The Gunnison County Electric Association, Inc., et al.
submits Prepared Cross Answering Testimony of Michael J. McBride
and Supporting Exhibits under ER21-2818, et al.

212.    Filed By:  United Power Inc.
Filed Date:  03/25/2022
Accession No.:  20220325-5226
Description:  United Power, Inc. submits Rebuttal Testimony and
Supporting Exhibits under ER21-2818, et al.

213.    Filed By:  Northwest Rural Public Power District
Filed Date:  03/25/2022
Accession No.:  20220325-5235
Description:  Northwest Rural Public Power District submits Prepared
Rebuttal Testimony of Mr. Chance Briscoe under ER21-2818, et al.

214.    Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  03/25/2022
Accession No.:  20220325-5215
Description:  Tri-State Generation and Transmission Association, Inc.
submits Motion for In-Person Hearing or, in the alternative, that the
hearing be rescheduled under ER21-2818, et al.

215.    Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  03/25/2022
Accession No.:  20220325-5229
Description:  Tri-State Generation and Transmission Association, Inc.
submits Cross-Answering and Rebuttal Testimony and Supporting
Exhibits under ER21-2818, et al.

**Record
Item No.**    **Description**

216.    Filed By:  Gunnison County Electric Association, Inc.
Filed Date:  03/25/2022
Accession No.:  20220325-5179
Description:  Request to Update Service List Information of Gunnison
County Electric Association, Inc. under ER21-2818, et al.

217.    Issued By:  Administrative Law Judges
Filed Date:  03/28/2022
Accession No.:  20220328-3048
Description:  Order of Chief Judge Shortening Answer Period re Tri-
State Generation and Transmission Association, Inc. under ER21-
2818 et al.

218.    Filed By:  United Power Inc.
Filed Date:  03/29/2022
Accession No.:  20220329-5143
Description:  United Power, Inc. submits Notice of Intent to Depose
Lori O'Flaherty under ER21-2818, et al.

219.    Filed By:  Paul Hastings LLP
Filed Date:  03/29/2022
Accession No.:  20220329-5222
Description:  Request to Update Service List Information of Paul
Hastings LLP under ER20-676, et al.

220.    Filed By:  United Power, Inc.
Filed Date:  03/30/2022
Accession No.:  20220330-5237
Description:  United Power, Inc. submits Answer in Opposition to Tri-
State Generation and Transmission Association, Inc.'s Motion for In-
Person Hearing under ER21-2818, et al.

221.    Filed By:  Commission Trial Staff
Filed Date:  03/30/2022
Accession No.:  20220330-5150
Description:  Answer of Commission Trial Staff in Opposition to Tri-
State Motion for In-Person Hearing under ER21-2818 et al.

**Record
Item No.**    **Description**

222.    Filed By:  Poudre Valley Rural Electric Association, Inc.
Filed Date:  03/30/2022
Accession No.:  20220330-5164
Description:  Poudre Valley Rural Electric Association, Inc. submits
Answer in Support of Tri-State Generation and Transmission
Association, Inc.'s Motion for In-Person Hearing under ER21-2818,
et al.

223.    Filed By:  Gunnison County Electric Association
Filed Date:  03/30/2022
Accession No.:  20220330-5218
Description:  Answer to Pleading of Gunnison County Electric
Association to Tri-State Motion for In-Person Hearing under ER21-
2818, et al.

224.    Issued By:  Administrative Law Judges
Filed Date:  03/31/2022
Accession No.:  20220331-3065
Description:  Order of Chief Judge Granting Request for In-Person
Hearing re Tri-State Generation and Transmission Association, Inc.
under ER21-2818 et al.

225.    Filed By:  United Power Inc.
Filed Date:  04/01/2022
Accession No.:  20220401-5267
Description:  United Power, Inc. submits Notice of Intent to Depose
Tri-State Company Witnesses under ER21-2818 et al.

226.    Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  04/01/2022
Accession No.:  20220401-5359
Description:  Notice of Deposition of Tri-State Generation and
Transmission Association, Inc. under ER21-2818 et al.

| Record Item No. | Description |
|---|---|

227.      Filed By:  United Power Inc.
Filed Date:  04/05/2022
Accession No.:  20220405-5186
Description:  United Power, Inc. submits Notice of Intent to Depose Lisa Tiffin under ER21-2818 et al.

228.      Filed By:  Poudre Valley Rural Electric Association, Inc.
Filed Date:  04/05/2022
Accession No.:  20220405-5071
Description:  Request to Update Service List Information of Poudre Valley Rural Electric Association, Inc. under ER21-2818, et al.

229.      Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  04/06/2022
Accession No.:  20220406-5028
Description:  Tri-State Generation and Transmission Association, Inc. submits Unopposed Motion for Extension of Time, to April 22, 2022, to submit Joint Statement of Issues, et al. under ER21-2818, et al.

230.      Issued By:  Administrative Law Judges
Filed Date:  04/07/2022
Accession No.:  20220407-3026
Description:  Order Granting Motion for Extension of Time to Submit Joint Statement of Issues, Joint Stipulations, Joint Witness List, Initial Index of Exhibits etc. re Tri-State Generation and Transmission Association, Inc. under ER21-2818 et al.

231.      Filed By:  Commission Trial Staff
Filed Date:  04/07/2022
Accession No.:  20220407-5193
Description:   Commission Trial Staff submits Motion for Errata to Revise Direct and Answering Testimony and Exhibits, and Request Expedited Action and Shortened One-Day Response Period under ER21-2818, et al.

**Record
Item No.**          **Description**

232.          Filed By:  Commission Trial Staff
              Filed Date:  04/07/2022
              Accession No.:  20220407-5192
              Description:  Commission Trial Staff submits Motion for Errata to
              Revise Direct and Answering Testimony and Exhibits, and Request
              Expedited Action and Shortened One-Day Response Period under
              ER21-2818, et al.

233.          Issued By:  Administrative Law Judges
              Filed Date:  04/11/2022
              Accession No.:  20220411-3041
              Description:  Order Granting Motion for Leave to File Corrected
              Exhibits and Waiving Answer Period re Tri-State Generation and
              Transmission Association, Inc. under ER21-2818 et al.

234.          Issued By:  Administrative Law Judges
              Filed Date:  04/13/2022
              Accession No.:  20220413-3029
              Description:  Order Updating Electronic Hearing Rules and
              Procedural Schedule re Tri-State Generation and Transmission
              Association, Inc. under ER21-2818 et al.

235.          Filed By:  Tri-State Generation and Transmission Association, Inc.
              Filed Date:  04/14/2022
              Accession No.:  20220414-5247
              Description:  Tri-State Generation and Transmission Association, Inc.
              submits Motion to Compel United Power Inc., et al. to produce
              materials and responses under ER21-2818, et al.

236.          Issued By:  Administrative Law Judges
              Filed Date:  04/15/2022
              Accession No.:  20220415-3027
              Description:  Order of Chief Judge Scheduling Oral Argument re Tri-
              State Generation and Transmission Association, Inc. under ER21-
              2818 et al.

**Record
Item No.**     **Description**

237.        Filed By:  Guzman Energy LLC
            Filed Date:  04/18/2022
            Accession No.:  20220418-5532
            Description:  Guzman Energy LLC submits Answer to the Motion to
            Compel filed by Tri-State Generation and Transmission Association,
            Inc. under ER21-2818, et al.

238.        Filed By:  La Plata Electric Association, Inc.
            Filed Date:  04/18/2022
            Accession No.:  20220418-5461
            Description:  Request to Update Service List Information of La Plata
            Electric Association, Inc. under ER20-676, et al.

239.        Filed By:  United Power Inc.
            Filed Date:  04/18/2022
            Accession No.:  20220418-5536
            Description:  Answer of United Power, Inc. to Tri-State Generation
            and Transmission Association, Inc.'s Motion to Compel Data Request
            Responses under ER21-2818, et al.

240.        Filed By:  Northwest Rural Public Power District
            Filed Date:  04/18/2022
            Accession No.:  20220418-5538
            Description:  Northwest Rural Public Power District submits response
            to Tri-State Generation and Transmission Association, Inc.'s
            (TriState) Motion to Compel, in the Alternative, Motions to Compel
            TriState to Produce Documents under ER21-2818, et al.

241.        Filed By:  United Power Inc.
            Filed Date:  04/18/2022
            Accession No.:  20220418-5537
            Description:  Answer of United Power, Inc. to Tri-State Generation
            and Transmission Association, Inc.'s Motion to Compel Data Request
            Responses under ER21-2818, et al.

**Record
Item No.**     **Description**

242.      Issued By:  Secretary Of The Commission, FERC, Commissioners
          And Immediate Staff (The Commission)
          Filed Date:  04/21/2022
          Accession No.:  20220421-3051
          Description:  Order Denying Clarification and Waiver re Tri-State
          Generation and Transmission Association, Inc. under ER21-2818 et
          al.

243.      Filed By:  Tri-State Generation and Transmission Association, Inc.
          et al.
          Filed Date:  04/22/2022
          Accession No.:  20220422-5283
          Description:  Tri-State Generation and Transmission Association, Inc.
          et al. submits Joint Statement of Procedural History under ER21-2818
          et al.

244.      Filed By: Tri-State Generation and Transmission Association, Inc.
          et al.
          Filed Date:  04/22/2022
          Accession No.:  20220422-5301
          Description:  Tri-State Generation and Transmission Association, Inc.,
          et al. submit Initial Joint Exhibit List under ER21-2818, et al.

245.      Filed By:  Tri-State Generation and Transmission Association, Inc.
          et al.
          Filed Date:  04/25/2022
          Accession No.:  20220425-5571
          Description:  Tri-State Generation and Transmission Association, Inc.,
          et al. submit Joint Witness List ER21-2818, et al.

246.      Filed By:  Tri-State Generation and Transmission Association, Inc.
          et al.
          Filed Date:  04/25/2022
          Accession No.:  20220425-5544
          Description:  Joint Statement of Issues of Tri-State Generation and
          Transmission Association, Inc., et al. under ER21-2818, et al.

**Record
Item No.**    **Description**

247.    Filed By:  United Power Inc.
Filed Date:  04/26/2022
Accession No.:  20220426-5268
Description:  United Power, Inc. submits Prehearing Brief under
ER21-2818, et al.

248.    Filed By:  United Power Inc.
Filed Date:  04/26/2022
Accession No.:  20220426-5267
Description:  United Power, Inc. submits Prehearing Brief under
ER21-2818, et al.

249.    Filed By:  Indicated Tri-State Members
Filed Date:  04/26/2022
Accession No.:  20220426-5302
Description:  Pre-Hearing Brief of the Indicated Tri-State Members
under ER21-2818, et al.

250.    Filed By:  Commission Trial Staff
Filed Date:  04/26/2022
Accession No.:  20220426-5300
Description:  The Commission Trial Staff submits Prehearing Brief
under ER21-2818, et al.

251.    Filed By:  Wyoming Cooperatives
Filed Date:  04/26/2022
Accession No.:  20220426-5288
Description:  The Wyoming Cooperatives submit Pre-Hearing Brief
under ER21-2818, et al.

252.    Filed By:  Commission Trial Staff
Filed Date:  04/26/2022
Accession No.:  20220426-5301
Description:  The Commission Trial Staff submits Prehearing Brief
under ER21-2818, et al.

**Record**
**Item No.**      **Description**

253.        Filed By:  Guzman Energy LLC
            Filed Date:  04/26/2022
            Accession No.:  20220426-5269
            Description:  Guzman Energy LLC submits Pre-Hearing Brief under
            ER21-2818, et al.

254.        Filed By:  Tri-State Generation and Transmission Association, Inc.
            Filed Date:  04/26/2022
            Accession No.:  20220426-5272
            Description:  Tri-State Generation and Transmission Association, Inc.
            submits Pre-hearing Brief under ER21-2818, et al.

255.        Issued By:  Administrative Law Judges
            Filed Date:  04/27/2022
            Accession No.:  20220427-3037
            Description:  Order Confirming Bench Ruling re Tri-State Generation
            and Transmission Association, Inc. under ER21-2818 et al.

256.        Filed By:  United Power Inc., et al.
            Filed Date:  04/28/2022
            Accession No.:  20220428-5441
            Description:  United Power, Inc., et al. submits Motion to Strike the
            April 26, 2022 Pre-Hearing Brief filing of the Indicated Tri-State
            Members under ER21-2818, et al.

257.        Filed By:  Northwest Rural Public Power District
            Filed Date:  04/29/2022
            Accession No.:  20220429-5708
            Description:  Northwest Rural Public Power District submits Notice
            of Intent to Withdraw from Wholesale Electric Service Contract and
            Membership in Tri-State Generation and Transmission Association,
            Inc. under ER21-2818, et al.

| Record Item No. | Description |
| --- | --- |

258.  Filed By:  United Power Inc.
Filed Date:  04/29/2022
Accession No.:  20220429-5630
Description:  United Power, Inc. submits Non-Conditional Two-Year Notice of Intent to Withdraw from Tri-State Rate Schedule FERC No. 281 effective May 1, 2024 under ER21-2818, et al.

259.  Filed By:  United Power Inc.
Filed Date:  04/29/2022
Accession No.:  20220429-5463
Description:  United Power, Inc. submits Revised Answering Testimony of Willis Geffert and Exhibits under ER21-2818, et al.

260.  Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  04/29/2022
Accession No.:  20220429-5388
Description:  Tri-State Generation and Transmission Association, Inc. submits Limited Errata to Pre-Hearing Brief, Exhibits, and Initial Joint Exhibit List under ER21-2818, et al.

261.  Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  04/29/2022
Accession No.:  20220429-5389
Description:  Tri-State Generation and Transmission Association, Inc. submits Limited Errata to Pre-Hearing Brief, Exhibits, and Initial Joint Exhibit List under ER21-2818, et al.

262.  Filed By:  United Power Inc.
Filed Date:  04/29/2022
Accession No.:  20220429-5464
Description:  United Power, Inc. submits Revised Answering Testimony of Willis Geffert and Exhibits under ER21-2818, et al.

**Record
Item No.**      **Description**

263.          Issued By:  Administrative Law Judges
              Filed Date:  04/29/2022
              Accession No.:  20220429-3027
              Description:  Order Scheduling Oral Argument and Shortening
              Answer Period re Tri-State Generation and Transmission Association,
              Inc. under ER21-2818 et al.

264.          Filed By:  Poudre Valley Rural Electric Association, Inc.
              Filed Date:  04/29/2022
              Accession No.:  20220429-5635
              Description:  Poudre Valley Rural Electric Association, Inc., et al.
              submits Notice of Intent to Answer Motion to Strike of United Power,
              Inc. et al. under ER21-2818, et al.

265.          Filed By:  Gunnison County Electric Association, et al.
              Filed Date:  04/29/2022
              Accession No.:  20220429-5426
              Description:  Gunnison County Electric Association, et al. submit
              corrected versions of Michael J. McBride's Cross-Answering
              Testimony and Supporting Exhibit under ER21-2818, et al.

266.          Filed By:  San Isabel Electric Association, Inc.
              Filed Date:  04/29/2022
              Accession No.:  20220429-5312
              Description:  Comments of San Isabel Electric Association, Inc. under
              ER21-2818 et al.

267.          Filed By:  Tri-State Generation and Transmission Association, Inc.
              Filed Date:  05/02/2022
              Accession No.:  20220502-5188
              Description:  Answer of Tri-State Generation and Transmission
              Association, Inc. In Opposition To Motion to Strike under ER21-
              2818, et al.

**Record
Item No.**    **Description**

268.        Filed By:  Poudre Valley Rural Electric Association, Inc.
            Filed Date:  05/02/2022
            Accession No.:  20220502-5241
            Description:  The Indicated Tri-State Members submit Answer in
            Opposition to the Motion to Strike filed by United Power, Inc., et al.
            on April 28, 2022 under ER21-2818, et al.

269.        Filed By:  United Power Inc.
            Filed Date:  05/11/2022
            Accession No.:  20220511-5097
            Description:  United Power, Inc. submits Motion for Leave to File
            Limited Supplemental Testimony and Supplemental Testimony of
            Walter C. Hopkins et al. under ER21-2818, et al.

270.        Issued By:  Administrative Law Judges
            Filed Date:  05/11/2022
            Accession No.:  20220511-3100
            Description:  Order Scheduling Oral Argument re Tri-State
            Generation and Transmission Association, Inc. under ER21-2818 et
            al.

271.        Filed By:  Northwest Rural Public Power District
            Filed Date:  05/12/2022
            Accession No.:  20220512-5097
            Description:  Northwest Rural Public Power District submits Errata to
            Testimony of Chance Briscoe under ER21-2818, et al.

272.        Issued By:  Administrative Law Judges
            Filed Date:  05/12/2022
            Accession No.:  20220512-3053
            Description:  Order Confirming Bench Ruling re Tri-State Generation
            and Transmission Association, Inc. under ER21-2818 et al.

**Record
Item No.**      **Description**

273.        Filed By:  Poudre Valley Rural Electric Association, Inc.
            Filed Date:  05/12/2022
            Accession No.:  20220512-5050
            Description:  The Indicated TriState Members submit Answer to
            United Power, Inc.'s May 11, 2022 Motion for Leave to File Limited
            Supplemental Testimony, and Supplemental Testimony under ER21-
            2818, et al.

274.        Filed By:  Tri-State Generation and Transmission Association, Inc.
            Filed Date:  05/12/2022
            Accession No.:  20220512-5051
            Description:  Tri-State Generation and Transmission Association, Inc.
            submits Answer in Opposition to United Power, Inc.'s Motion for
            Leave to File Limited Supplemental Testimony, and Supplemental
            Testimony under ER21-2818, et al.

275.        Filed By:  Otero County Electric Cooperative, Inc.
            Filed Date:  05/13/2022
            Accession No.:  20220513-5001
            Description:  Comments of Otero County Electric Cooperative, Inc.
            under ER21-2818.

276.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  05/18/2022
            Accession No.:  20220518-3033
            Description:  Transcript of the virtual Oral Argument held on
            04/19/2022 re Tri-State Generation and Transmission Association,
            Inc. under ER21-2818.

277.        Issued By:  Administrative Law Judges
            Filed Date:  05/23/2022
            Accession No.:  20220523-3038
            Description:  Order Confirming Bench Ruling re Tri-State Generation
            and Transmission Association, Inc. under ER21-2818 et al.

| Record Item No. | Description |
|---|---|

278.    Filed By: Tri-State Generation and Transmission Association, Inc. et al.
Filed Date: 05/24/2022
Accession No.: 20220524-5187
Description: Final Joint Exhibit List of Tri-State Generation and Transmission Association, Inc. et al. under ER21-2818 et al.

279.    Filed By: Tristate Generation and Transmission Association, Inc.
Filed Date: 05/24/2022
Accession No.: 20220524-5017
Description: Comments of Sierra Electric Cooperative, Inc. under ER21-2818, et al.

280.    Issued By: Federal Energy Regulatory Commission
Filed Date: 05/25/2022
Accession No.: 20220525-3002
Description: Transcript of the 05/03/2022 oral argument held in Washington, DC re Tri-State Generation and Transmission Association, Inc. under ER21-2818, et al.

281.    Filed By: Continental Divide Electric Cooperative, Inc.
Filed Date: 05/25/2022
Accession No.: 20220525-5156
Description: Comments of Continental Divide Electric Cooperative, Inc. under ER21-2818, et al.

282.    Filed By: Southwestern Electric Cooperative Inc.
Filed Date: 05/25/2022
Accession No.: 20220525-5236
Description: Motion to Intervene of Southwestern Electric Cooperative Inc. under ER21-2818.

**Record
Item No.**        **Description**

283.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  05/25/2022
            Accession No.:  20220525-3024
            Description:  Transcript of the 05/03/2022 hearing held in
            Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818 et al.

284.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  05/25/2022
            Accession No.:  20220525-3025
            Description:   Transcript of the 05/03/2022 hearing held in
            Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818 et al.

285.        Issued By:  Administrative Law Judges
            Filed Date:  05/26/2022
            Accession No.:  20220526-3155
            Description:  Order of Chief Judge Extending Initial Decision
            Deadline re Tri-State Generation and Transmission Association, Inc.
            under ER21-2818 et al.

286.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  05/26/2022
            Accession No.:  20220526-3010
            Description:  Transcript of the 05/04/2022 virtual hearing held in
            Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818 et al.

287.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  05/26/2022
            Accession No.:  20220526-3011
            Description:  Transcript of the 05/04/2022 virtual hearing held in
            Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818 et al.

| **Record Item No.** | **Description** |
|---|---|

288.      Issued By:  Administrative Law Judges
Filed Date:  05/26/2022
Accession No.:  20220526-3096
Description:  Order Scheduling Post-Hearing Conference re Tri-State Generation and Transmission Association, Inc. under ER21-2818 et al.

289.      Filed By:  Springer Electric Cooperative, Inc.
Filed Date:  05/26/2022
Accession No.:  20220526-5136
Description:  Comments of Springer Electric Cooperative, Inc. under ER21-2818.

290.      Issued By:  Federal Energy Regulatory Commission
Filed Date:  05/27/2022
Accession No.:  20220527-3037
Description:  Transcript of the 05/05/2022 virtual hearing held in Washington, DC re Tri-State Generation and Transmission Association, Inc. under ER21-2818 et al.

291.      Filed By:  Central New Mexico Electric Cooperative, Inc.
Filed Date:  05/27/2022
Accession No.:  20220527-5108
Description:  Comment Letter filed on behalf of Central New Mexico Electric Cooperative, Inc. in Support of Indicated Tri-State Member Pre-Hearing Brief under ER21-2818, et al.

292.      Filed By:  Jemez Mountains Electric Cooperative, Inc.
Filed Date:  05/31/2022
Accession No.:  20220531-5368
Description:  Jemez Mountains Electric Cooperative, Inc. submits comments re prehearing briefs under ER21-2818, et al.

**Record
Item No.**       **Description**

293.       Issued By:  Federal Energy Regulatory Commission
           Filed Date:  06/01/2022
           Accession No.:  20220601-3009
           Description:  Transcript of the 05/06/2022 virtual hearing held in
           Washington, DC re Tri-State Generation and Transmission
           Association, Inc. under ER21-2818 et al.

294.       Issued By:  Federal Energy Regulatory Commission
           Filed Date:  06/02/2022
           Accession No.:  20220602-3009
           Description:  Transcript of the 05/10/2022 virtual hearing held in
           Washington, DC re Tri-State Generation and Transmission
           Association, Inc. under ER21-2818 et al.

295.       Issued By:  Federal Energy Regulatory Commission
           Filed Date:  06/01/2022
           Accession No.:  20220601-3010
           Description:  Transcript of the 05/06/2022 virtual hearing held in
           Washington, DC re Tri-State Generation and Transmission
           Association, Inc. under ER21-2818 et al.

296.       Issued By:  Federal Energy Regulatory Commission
           Filed Date:  06/02/2022
           Accession No.:  20220602-3010
           Description:   Transcript of the 05/10/2022 virtual hearing held in
           Washington, DC re Tri-State Generation and Transmission
           Association, Inc. under ER21-2818 et al.

297.       Issued By:  Federal Energy Regulatory Commission
           Filed Date:  06/01/2022
           Accession No.:  20220601-3012
           Description:  Transcript of the 05/09/2022 virtual hearing held in
           Washington, DC re Tri-State Generation and Transmission
           Association, Inc. under ER21-2818 et al.

**Record
Item No.**     **Description**

298.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  06/01/2022
            Accession No.:  20220601-3013
            Description:  Transcript of the 05/09/2022 virtual hearing held in
            Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818 et al.

299.        Issued By:  Administrative Law Judges
            Filed Date:  06/02/2022
            Accession No.:  20220602-3040
            Description:  Order Confirming Bench Ruling re Tri-State Generation
            and Transmission Association, Inc. under ER21-2818 et al.

300.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  06/03/2022
            Accession No.:  20220603-3058
            Description:  Transcript of the 05/11/2022 virtual hearing held in
            Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818 et al.

301.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  06/03/2022
            Accession No.:  20220603-3057
            Description:  Transcript of the 05/11/2022 virtual hearing held in
            Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818 et al.

302.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  06/06/2022
            Accession No.:  20220606-3013
            Description:  Transcript of the 05/12/2022 hearing held in
            Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818, et al.

**Record
Item No.**        **Description**

303.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  06/06/2022
            Accession No.:  20220606-3011
            Description:  Transcript of the 05/12/2022 oral argument held in
            Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818, et al.

304.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  06/07/2022
            Accession No.:  20220607-3002
            Description:  Transcript of the 05/13/2022 hearing held in
            Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818, et al.

305.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  06/07/2022
            Accession No.:  20220607-3003
            Description:  Transcript of the 05/13/2022 hearing held in
            Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818, et al.

306.        Filed By:  Tri-State Generation and Transmission Association, Inc.
            et al.
            Filed Date:  06/07/2022
            Accession No.:  20220607-5169
            Description:  Tri-State Generation and Transmission Association, Inc.,
            et al. submits Joint Transcript Corrections under ER21-2818, et al.

307.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  06/08/2022
            Accession No.:  20220608-3006
            Description:  Transcript of the 05/16/2022 hearing held in
            Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818, et al.

**Record
Item No.**     **Description**

308.     Issued By:  Federal Energy Regulatory Commission
         Filed Date:  06/09/2022
         Accession No.:  20220609-3019
         Description:  Transcript of the 05/17/2022 hearing held in
         Washington, DC re Tri-State Generation and Transmission
         Association, Inc. under ER21-2818, et al.

309.     Filed By: Northwest Rural Public Power District
         Filed Date:  06/10/2022
         Accession No.:  20220610-5213
         Description:   Northwest Rural Public Power District submits Post-
         Hearing Brief under ER21-2818, et al.

310.     Filed By: Northwest Rural Public Power District
         Filed Date:  06/10/2022
         Accession No.:  20220610-5214
         Description:   Northwest Rural Public Power District submits Post-
         Hearing Brief under ER21-2818, et al.

311.     Filed By:  Guzman Energy LLC
         Filed Date:  06/10/2022
         Accession No.:  20220610-5217
         Description:  Post-Hearing Initial Brief of Guzman Energy LLC under
         ER21-2818, et al.

312.     Filed By:  United Power Inc.
         Filed Date:  06/10/2022
         Accession No.:  20220610-5218
         Description:  Initial Post-Hearing Brief of United Power Inc. under
         ER21-2818, et al.

313.     Filed By:  United Power Inc.
         Filed Date:  06/10/2022
         Accession No.:  20220610-5219
         Description:  Initial Post-Hearing Brief of United Power Inc. under
         ER21-2818, et al.

| Record Item No. | Description |
|---|---|

314.    Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  06/10/2022
Accession No.:  20220610-5241
Description:  Initial Post-Hearing Brief of the Indicated Tri-State Members regarding Tri-State Generation and Transmission Association, Inc. under ER21-2818, et al.

315.    Filed By:  Commission Trial Staff
Filed Date:  06/10/2022
Accession No.:  20220610-5239
Description:  Initial Post-Hearing Brief of Commission Trial Staff regarding Tri-State Generation and Transmission Association, Inc. under ER21-2818.

316.    Filed By:  Commission Trial Staff
Filed Date:  06/10/2022
Accession No.:  20220610-5240
Description:  Initial Post-Hearing Brief of Commission Trial Staff regarding Tri-State Generation and Transmission Association, Inc. under ER21-2818.

317.    Filed By:  Indicated Tri-State Members
Filed Date:  06/10/2022
Accession No.:  20220610-5242
Description:  Initial Post-Hearing Brief of the Indicated Tri-State Members regarding Tri-State Generation and Transmission Association, Inc. under ER21-2818, et al.

318.    Filed By:  Gunnison County Electric Association, Inc.
Filed Date:  06/10/2022
Accession No.:  20220610-5243
Description:  Initial Post-Hearing Brief of Gunnison County Electric Association regarding Tri-State Generation and Transmission Association, Inc. under ER21-2818, et al.

**Record**
**Item No.**    **Description**

319.    Issued By:  Administrative Law Judges
        Filed Date:  06/14/2022
        Accession No.:  20220614-3037
        Description:  Order Adopting Transcript Corrections re Tri-State
        Generation and Transmission Association, Inc. under ER21-2818 et
        al.

320.    Issued By:  Federal Energy Regulatory Commission
        Filed Date:  06/23/2022
        Accession No.:  20220623-3048
        Description:  Transcript of the virtual post-hearing conference held on
        06/01/2022 re Tri-State Generation and Transmission Association,
        Inc. under ER21-2818 et al.

321.    Filed By:  Guzman Energy LLC
        Filed Date:  06/24/2022
        Accession No.:  20220624-5103
        Description:  Guzman Energy LLC submits Post-Hearing Initial Brief
        under ER21-2818, et al.

322.    Filed By:  Gunnison County Electric Association, Inc.
        Filed Date:  06/24/2022
        Accession No.:  20220624-5105
        Description:  Gunnison County Electric Association submits Initial
        Post-Hearing Brief under ER21-2818, et al.

323.    Filed By:  Indicated Tri-State Members
        Filed Date:  07/01/2022
        Accession No.:  20220701-5390
        Description:  Indicated Tri-State Members' Motion to Strike Portions
        of United Power, Inc.'s Initial Brief under ER21-2818 et al.

**Record
Item No.**      **Description**

324.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  07/06/2022
            Accession No.:  20220706-3063
            Description:  Corrected transcript of the 5/3/2022 virtual oral
            argument held in Washington, DC re Tri-State Generation and
            Transmission Association, Inc. under ER21-2818, et al.

325.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:   07/06/2022
            Accession No.:  20220706-3066
            Description:  Corrected transcript of the 5/3/2022 virtual hearing held
            in Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818, et al.

326.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  07/06/2022
            Accession No.:  20220706-3067
            Description:  Corrected transcript of the 5/3/2022 virtual hearing held
            in Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818, et al.

327.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  07/06/2022
            Accession No.:  20220706-3068
            Description:  Corrected transcript of the 5/4/2022 virtual hearing held
            in Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818, et al.

328.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  07/06/2022
            Accession No.:  20220706-3069
            Description:  Corrected transcript of the 5/4/2022 hearing held in
            Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818, et al.

**Record**
**Item No.**    **Description**

329.    Issued By:  Federal Energy Regulatory Commission
Filed Date:  07/06/2022
Accession No.:  20220706-3070
Description:  Corrected transcript of the 5/5/2022 virtual hearing held
in Washington, DC re Tri-State Generation and Transmission
Association, Inc. under ER21-2818, et al.

330.    Issued By:  Federal Energy Regulatory Commission
Filed Date:  07/06/2022
Accession No.:  20220706-3071
Description:   Corrected transcript of the 5/6/2022 virtual hearing held
in Washington, DC re Tri-State Generation and Transmission
Association, Inc. under ER21-2818, et al.

331.    Issued By:  Federal Energy Regulatory Commission
Filed Date:  07/06/2022
Accession No.:  20220706-3072
Description:  Corrected transcript of the 5/6/2022 hearing held in
Washington, DC re Tri-State Generation and Transmission
Association, Inc. under ER21-2818, et al.

332.    Issued By:  Federal Energy Regulatory Commission
Filed Date:  07/06/2022
Accession No.:  20220706-3073
Description:  Corrected transcript of the 5/9/2022 hearing held in
Washington, DC re Tri-State Generation and Transmission
Association, Inc. under ER21-2818, et al.

333.    Issued By:  Federal Energy Regulatory Commission
Filed Date:  07/06/2022
Accession No.:  20220706-3074
Description:  Corrected transcript of the 5/9/2022 hearing held in
Washington, DC re Tri-State Generation and Transmission
Association, Inc. under ER21-2818, et al.

**Record
Item No.**     **Description**

334.     Issued By:  Federal Energy Regulatory Commission
         Filed Date:  07/06/2022
         Accession No.:  20220706-3076
         Description:  Corrected transcript of the 5/10/2022 virtual hearing
         held in Washington, DC re Tri-State Generation and Transmission
         Association, Inc. under ER21-2818, et al.

335.     Issued By:  Federal Energy Regulatory Commission
         Filed Date:  07/06/2022
         Accession No.:  20220706-3077
         Description:  Corrected transcript of the 5/10/2022 hearing held in
         Washington, DC re Tri-State Generation and Transmission
         Association, Inc. under ER21-2818, et al.

336.     Issued By:  Federal Energy Regulatory Commission
         Filed Date:  07/06/2022
         Accession No.:  20220706-3078
         Description:  Corrected transcript of the 5/11/2022 virtual hearing
         held in Washington, DC re Tri-State Generation and Transmission
         Association, Inc. under ER21-2818, et al.

337.     Issued By:  Federal Energy Regulatory Commission
         Filed Date:  07/06/2022
         Accession No.:  20220706-3079
         Description:  Corrected transcript of the 5/12/2022 oral argument held
         in Washington, DC re Tri-State Generation and Transmission
         Association, Inc. under ER21-2818, et al.

338.     Issued By:  Federal Energy Regulatory Commission
         Filed Date:  07/06/2022
         Accession No.:  20220706-3080
         Description:  Corrected transcript of the 5/12/2022 virtual hearing
         held in Washington, DC re Tri-State Generation and Transmission
         Association, Inc. under ER21-2818, et al.

66

**Record
Item No.**      **Description**

339.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  07/06/2022
            Accession No.:  20220706-3081
            Description:  Corrected transcript of the 5/13/2022 virtual hearing
            held in Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818, et al.

340.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  07/06/2022
            Accession No.:  20220706-3082
            Description:  Corrected transcript of the 5/13/2022 virtual hearing
            held in Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818, et al.

341.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  07/06/2022
            Accession No.:  20220706-3083
            Description:  Corrected transcript of the 5/16/2022 virtual hearing
            held in Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818, et al.

342.        Issued By:  Federal Energy Regulatory Commission
            Filed Date:  07/06/2022
            Accession No.:  20220706-3084
            Description:  Corrected transcript of the 5/17/2022 virtual hearing
            held in Washington, DC re Tri-State Generation and Transmission
            Association, Inc. under ER21-2818, et al.

343.        Filed By:  United Power Inc.
            Filed Date:  07/08/2022
            Accession No.:  20220708-5216
            Description:  United Power, Inc. submits Post-Hearing Reply Brief
            pursuant to December 3, 2021 and amended June 2, 2022 Order under
            ER21-2818, et al.

**Record
Item No.**      **Description**

344.            Filed By:  United Power Inc.
                Filed Date:  07/08/2022
                Accession No.:  20220708-5217
                Description:  United Power, Inc. submits Post-Hearing Reply Brief
                pursuant to December 3, 2021 and amended June 2, 2022 Order under
                ER21-2818, et al.

345.            Filed By:  Poudre Valley Rural Electric Association, Inc.
                Filed Date:  07/08/2022
                Accession No.:  20220708-5102
                Description:  Indicated Tri-State Members submit motion for Judicial
                Notice, that Highline Electric Association serves load in Eastern and
                Western Interconnections under ER21-2818, et al.

346.            Filed By:  Commission Trial Staff
                Filed Date:  07/08/2022
                Accession No.:  20220708-5221
                Description:  Commission Trial Staff submits Reply Brief under
                ER21-2818, et al.

347.            Filed By:  Tri-State Generation and Transmission Association, Inc.
                Filed Date:  07/08/2022
                Accession No.:  20220708-5219
                Description:  Tri-State Generation and Transmission Association, Inc.
                submits Post-Hearing Reply Brief under ER21-2818, et al.

348.            Filed By:  Northwest Rural Public Power District
                Filed Date:  07/08/2022
                Accession No.:  20220708-5218
                Description:  Northwest Rural Public Power District submits Post-
                Hearing Reply Brief, pursuant to December 3, 2021 Order and
                Modified Procedural Schedule under ER21-2818, et al.

**Record
Item No.**　　**Description**

349.　　Filed By:  Indicated Tri-State Members
　　　　Filed Date:  7/08/2022
　　　　Accession No.:  20220708-5220
　　　　Description:  The Indicated Tri-State Members submit Post-Hearing
　　　　Reply Brief, pursuant to December 3, 2021 Order Adopting
　　　　Procedural Schedule, etc. under ER21-2818, et al.

350.　　Filed By:  Wyoming Cooperatives
　　　　Filed Date:  07/08/2022
　　　　Accession No.:  20220708-5203
　　　　Description:  Wyoming Cooperatives submit Reply Brief pursuant to
　　　　the Order Confirming Bench Ruling issued on June 2, 2022 under
　　　　ER21-2818, et al.

351.　　Filed By:  United Power Inc.
　　　　Filed Date:  07/18/2022
　　　　Accession No.:  20220718-5148
　　　　Description:  Answer of United Power, Inc. to Indicated Tri-State
　　　　Members' Motion to Strike under ER21-2818, et al.

352.　　Issued By:  Administrative Law Judges
　　　　Filed Date:  07/20/2022
　　　　Accession No.:  20220720-3063
　　　　Description:  Notice Providing Opportunity to Respond to Request for
　　　　Judicial Notice re Tri-State Generation and Transmission Association,
　　　　Inc. under ER21-2818 et al.

353.　　Filed By:  Indicated Tri-State Members
　　　　Filed Date:  07/22/2022
　　　　Accession No.:  20220722-5090
　　　　Description:  The Indicated Tri-State Members submit Post-Hearing
　　　　Reply Brief in response to Initial Briefs submitted by Commission
　　　　Trial Staff, et al. under ER21-2818, et al.

| Record Item No. | Description |
|---|---|

354.    Filed By:  Northwest Rural Public Power District
        Filed Date:  07/22/2022
        Accession No.:  20220722-5097
        Description:  Northwest Rural Public Power District submits Post-Hearing Reply Brief under ER21-2818, et al.

355.    Filed By:  Wyoming Cooperatives
        Filed Date:  07/22/2022
        Accession No.:  20220722-5121
        Description:  Reply Brief of The Wyoming Cooperatives under ER21-2818, et al.

356.    Filed By:  United Power Inc., et al.
        Filed Date:  08/04/2022
        Accession No.:  20220804-5111
        Description:  United Power, Inc., et al. submits Answer in opposition to the Request for Judicial Notice filed July 8, 2022 by the Indicated Tri-State Members under ER21-2818, et al.

357.    Filed By:  Tri-State Generation and Transmission Association, Inc.
        Filed Date:  08/04/2022
        Accession No.:  20220804-5125
        Description:  Tri-State Generation and Transmission Association, Inc. submits Answer to the Indicated Tri-State Members' Request for Judicial Notice under Docket No. ER21-2818, et al.

358.    Filed By:  Indicated Tri-State Members
        Filed Date:  08/10/2022
        Accession No.:  20220810-5153
        Description:  Motion for Leave to Answer and Answer of the Indicated Tri-State Members to United Power, Inc.'s July 18, 2022 Answer under ER21-2818, et al.

**Record
Item No.**     **Description**

359.      Filed By:  Indicated Tri-State Members
          Filed Date:  08/10/2022
          Accession No.:  20220810-5121
          Description:  The Indicated Tri-State Members' Motion to Strike
          Portions of United Power Inc.'s Reply Brief under ER21-2818, et al.

360.      Filed By:  United Power Inc.
          Filed Date:  08/18/2022
          Accession No.:  20220818-5164
          Description:  United Power, Inc. submits motion to reject the
          Indicated Tri-State Members' Answer to United Power, Inc.'s
          opposition to Tri-State Members' Motion, etc. under ER21-2818, et
          al.

361.      Issued By:  Administrative Law Judges
          Filed Date:  08/30/2022
          Accession No.:  20220830-3030
          Description:  Order Denying July 1, 2022 Motion to Strike, Granting
          August 10, 2022 Motion to Answer, and Granting In Part and
          Denying In Part August 10, 2022 Motion to Strike re Tri-State
          Generation and Transmission Association, Inc. under ER21-2818 et
          al.

362.      Filed By:  United Power Inc.
          Filed Date:  09/06/2022
          Accession No.:  20220906-5106
          Description:  United Power, Inc. submits Revised Post-Hearing Reply
          Brief under ER21-2818, et al.

363.      Filed By:  United Power Inc.
          Filed Date:  09/06/2022
          Accession No.:  20220906-5107
          Description:  United Power, Inc. submits Revised Post-Hearing Reply
          Brief under ER21-2818, et al.

| Record Item No. | Description |
| --- | --- |

364.    Filed By:  Indicated Tri-State Members
Filed Date:  09/21/2022
Accession No.:  20220921-5097
Description:  Indicated Tri-State Members submit Motion to Lodge the opinion of the U.S. Court of Appeals for the District of Columbia Circuit under ER21-2818, et al.

365.    Issued By:  Administrative Law Judges
Filed Date:  09/22/2022
Accession No.:  20220922-3056
Description:  Order Shortening Answer Period re Tri-State Generation and Transmission Association, Inc. under ER21-2818 et al.

366.    Filed By:  United Power Inc.
Filed Date:  09/23/2022
Accession No.:  20220923-5206
Description:  Answer of United Power, Inc. in Opposition to the Indicated Tri-State Members' Motion Lodge re Tri-State Generation and Transmission Association, Inc. under ER21-2818, et al.

367.    Filed By:  Guzman Energy LLC
Filed Date:  09/23/2022
Accession No.:  20220923-5205
Description:  Answer of Guzman Energy LLC in Opposition to the Indicated Tri-State Members' Motion Lodge re Tri-State Generation and Transmission Association, Inc under ER21-2818, et al.

368.    Issued By:  Administrative Law Judges
Filed Date:  09/29/2022
Accession No.:  20220929-3038
Description:  Initial Decision re Tri-State Generation and Transmission Association, Inc. under ER21-2818 et al.

| Record Item No. | Description |
|---|---|

369.    Issued By:  Administrative Law Judges
Filed Date:  09/29/2022
Accession No.:  20220929-3039
Description:  Initial Decision re Tri-State Generation and
Transmission Association, Inc. under ER21-2818 et al.

370.    Issued By:  Administrative Law Judges
Filed Date:  09/29/2022
Accession No.:  20220929-3049
Description:  Certification of Initial Decision and Official Record in
Tri-State Generation and Transmission Association, Inc. under Docket
Nos. ER21-2818-000 and EL22-4-000 (Part 1 of 3 - ADMITTED
EXHIBITS).

371.    Issued By:  Administrative Law Judges
Filed Date:  09/29/2022
Accession No.:  20220929-3050
Description:  Certification of Initial Decision and Official Record in
Tri-State Generation and Transmission Association, Inc. under Docket
Nos. ER21-2818-000 et al. (Part 1 of 3 - ADMITTED EXHIBITS).

372.    Issued By:  Administrative Law Judges
Filed Date:  09/29/2022
Accession No.:  20220929-3051
Description:  Certification of Initial Decision and Official Record in
Tri-State Generation and Transmission Association, Inc. under Docket
Nos. ER21-2818-000 et al (Part 2 of 3 - ADMITTED EXHIBITS).

373.    Issued By:  Administrative Law Judges
Filed Date:  09/29/2022
Accession No.:  20220929-3053
Description:  Certification of Initial Decision and Official Record in
Tri-State Generation and Transmission Association, Inc. under Docket
Nos. ER21-2818-000 and EL22-4-000 (Part 3 of 3 - ADMITTED
EXHIBITS).

**Record Item No.**   **Description**

374.   Issued By:  Administrative Law Judges
       Filed Date:  09/29/2022
       Accession No.:  20220929-3054
       Description:  Certification of Initial Decision and Official Record in
       Tri-State Generation and Transmission Association, Inc. under Docket
       Nos. ER21-2818-000 and EL22-4-000 (REJECTED EXHIBITS).

375.   Issued By:  Administrative Law Judges
       Filed Date:  09/29/2022
       Accession No.:  20220929-3055
       Description:  Certification of Initial Decision and Official Record in
       Tri-State Generation and Transmission Association, Inc. under Docket
       Nos. ER21-2818-000 and EL22-4-000 (REJECTED EXHIBITS).

376.   Issued By:  Administrative Law Judges
       Filed Date:  10/07/2022
       Accession No.:  20221007-3050
       Description:  Errata Notice to the 09/29/2022 Initial Decision; re Tri-
       State Generation and Transmission Association, Inc. under ER21-
       2818 et al. For order see Accession No.:  20220929-3056.

377.   Filed By:  Wyoming Public Service Commission
       Filed Date:  10/28/2022
       Accession No.:  20221028-5383
       Description:  Comments of Wyoming Public Service Commission on
       FERC's Initial Decision of Tri-State and Transmission Assoc., Inc.
       under EL22-4 et al.

378.   Filed By:  Wyoming Cooperatives
       Filed Date:  10/28/2022
       Accession No.:  20221028-5362
       Description:  The Wyoming Cooperatives submit Brief on Exceptions
       to the Initial Decision issued September 29, 2022 under ER21-2818,
       et al.

| Record Item No. | Description |
|---|---|

379.    Filed By:  Wheat Belt Public Power District
Filed Date:  10/31/2022
Accession No.:  20221031-5165
Description:  Wheat Belt Public Power District submits Brief on Exceptions regarding the September 29, 2022 Initial Decision under ER21-2818, et al.

380.    Filed By:  Tipmont Rural Electric Membership Corporation
Filed Date:  10/31/2022
Accession No.:  20221031-5282
Description:  Tipmont Rural Electric Membership submits Brief on Exceptions to the September 29, 2022 Initial Decision under ER21-2818, et al.

381.    Filed By:  Guzman Energy LLC
Filed Date:  10/31/2022
Accession No.:  20221031-5285
Description:  Guzman Energy LLC submits Brief on Exceptions to the September 29, 2022 Initial Decision in Tri-State Generation and Transmission Association, Inc. under ER21-2818, et al.

382.    Filed By:  Poudre Valley Rural Electric Association, Inc.
Filed Date:  10/31/2022
Accession No.:  20221031-5286
Description:  Indicated Tri-State Members submit Brief on Exceptions to the September 29, 2022 Initial Decision under ER21-2818, et al.

383.    Filed By:  United Power Inc.
Filed Date:  10/31/2022
Accession No.:  20221031-5287
Description:  United Power, Inc. submits Brief on Exceptions to the September 29, 2022 Initial Decision in Tri-State Generation and Transmission Association, Inc. under ER21-2818, et al.

| Record Item No. | Description |
|---|---|

**384.**  Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  10/31/2022
Accession No.:  20221031-5291
Description:  Tri-State Generation and Transmission Association, Inc. submits Brief on Exceptions to the September 29, 2022 Initial Decision under ER21-2818, et al.

**385.**  Filed By:  Council of the City New Orleans, Tri-State Generation and Transmission Association, Inc.
Filed Date:  11/02/2022
Accession No.:  20221102-5052
Description:  Tri-State Generation and Transmission Association, Inc., et al. submits Notice of Withdrawal of Counsel under ER21-1756, et al.

**386.**  Filed By:  Guzman Energy LLC
Filed Date:  11/10/2022
Accession No.:  20221110-5218
Description:  Guzman Energy LLC submits Request to Update Service List under EL10-56 et al.

**387.**  Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  11/14/2022
Accession No.:  20221114-5396
Description:  Tri-State Generation and Transmission Association, Inc., et al. submit Motion to Strike portions of Brief on Exceptions filed by United Power, Inc. on October 31, 2022, and request Expedited Action under ER21-2818, et al.

**388.**  Filed By:  United Power Inc., Northwest Rural Public Power District
Filed Date:  11/16/2022
Accession No.:  20221116-5024
Description:  Answer of United Power, Inc. and Northwest Rural Public Power District Opposing Request for Expedited Action under ER21-2818, et al.

**Record
Item No.        Description**

389.        Filed By:  Guzman Energy LLC
             Filed Date:  11/16/2022
             Accession No.:  20221116-5180
             Description:  Answer in Opposition of Guzman Energy LLC to the
             November 14, 2022 Joint Motion to Strike and Request for Expedited
             Action under ER21-2818, et al.

390.        Filed By:  Northwest Rural Public Power District
             Filed Date:  11/21/2022
             Accession No.:  20221121-5208
             Description:  Northwest Rural Public Power District submits Brief
             Opposing Exceptions to the September 29, 2022 Initial Decision of
             the Honorable Renee Terry under ER21-2818, et al.

391.        Filed By:  Wyoming Cooperatives
             Filed Date:  11/21/2022
             Accession No.:  20221121-5201
             Description:  The Wyoming Cooperatives submit Brief Opposing
             Exceptions to the Presiding Judge's Initial Decision under ER21-
             2818, et al.

392.        Filed By:  United Power, Inc.
             Filed Date:  11/21/2022
             Accession No.:  20221121-5203
             Description:  United Power, Inc. submits Brief Opposing Exceptions
             to the September 29, 2022 Initial Decision filed by Tri-State
             Generation and Transmission Association, Inc., et al. under ER21-
             2818, et al.

393.        Filed By:  Guzman Energy LLC
             Filed Date:  11/21/2022
             Accession No.:  20221121-5204
             Description:  Guzman Energy LLC submits Brief Opposing
             Exceptions to the Initial Decision issued by Presiding Administrative
             Law Judge Renee Terry under ER21-2818, et al.

| Record Item No. | Description |
| --- | --- |

**394.**  Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  11/21/2022
Accession No.:  20221121-5205
Description:  Tri-State Generation and Transmission Association, Inc. submits Brief Opposing Exceptions stated by the Indicated Tri-State Members, Guzman Energy LLC, and United Power, Inc. under ER21-2818, et al.

**395.**  Filed By:  Poudre Valley Rural Electric Association, Inc., Highline Electric Association
Filed Date:  11/21/2022
Accession No.:  20221121-5206
Description:  The Indicated Tri-State Members submit Brief Opposing Exceptions to exceptions taken by United Power, Inc. and Guzman Energy LLC, in response to September 29, 2022 Initial Decision under ER21-2818, et al.

**396.**  Filed By:  Commission Trial Staff
Filed Date:  11/21/2022
Accession No.:  20221121-5207
Description:  The Commission Trial Staff submits Brief Opposing Exceptions to Initial Decision filed by Tri-State Generation and Transmission Association, Inc., et al. on October 31, 2022 under ER21-2818, et al.

**397.**  Filed By:  Northwest Rural Public Power District
Filed Date:  11/28/2022
Accession No.:  20221128-5027
Description:  Errata to Brief Opposing Exceptions of Northwest Rural Public Power District under ER21-2818, et al.

**398.**  Filed By:  United Power, Inc.
Filed Date:  11/29/2022
Accession No.:  20221129-5212
Description:  Answer in Opposition of United Power, Inc. to the November 14, 2022 Joint Motion to Strike of Generation and Transmission Association, Inc. et al. under ER21-2818, et al.

**Record
Item No.**     **Description**

399.     Filed By:  Northwest Rural Public Power District
         Filed Date:  11/29/2022
         Accession No.:  20221129-5215
         Description:  Answer in Opposition of Northwest Rural Public Power
         District to the November 14, 2022 Joint Motion to Strike of Tri-State
         Generation and Transmission Association, Inc. et al. under ER21-
         2818, et al.

400.     Filed By:  Tipmont Rural Electric Membership Corporation
         Filed Date:  12/02/2022
         Accession No.:  20221202-5132
         Description:  Motion for Leave to Answer and Answer of Tipmont
         Rural Electric Membership Corporation to the November 21, 2022
         Brief Opposing Exceptions by Trial Staff under ER21-2818 et al.

401.     Filed By:  Tri-State Generation and Transmission Association, Inc.
         Filed Date:  12/14/2022
         Accession No.:  20221214-5065
         Description:  Motion to Leave to Answer and Answer of Tri-State
         Generation and Transmission Association, Inc. to the November 29,
         2022 Answer of United Power, Inc. under ER21-2818, et al.

402.     Filed By:  United Power, Inc.
         Filed Date:  12/16/2022
         Accession No.:  20221216-5255
         Description:  United Power, Inc. submits Request to Reject the
         December 14, 2022 Motion for Leave to Answer and Answer of Tri-
         State Generation and Transmission Association, Inc. under ER21-
         2818, et al.

403.     Filed By:  Individual
         Filed Date:  01/13/2023
         Accession No.:  20230113-5186
         Description:  Request to Update Official Service List and Notice of
         Withdrawal of Wesley J. Heath as Counsel under OR18-7, et al.

| Record Item No. | Description |
|---|---|

**404.** Filed By:  White River Electric Association Inc.
Filed Date:  01/31/2023
Accession No.:  20230131-5264
Description:  Notice of Substitution of Counsel and Request to Update Official Service Lists of White River Electric Association, Inc. under ER20-676, et al.

**405.** Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  02/24/2023
Accession No.:  20230224-5014
Description:  Tri-State Generation and Transmission Association, Inc. submits Motion to Lodge the October 31, 2022 Order in U.S. District Court for the District of ND, Eastern Division under ER21-2818, et al.

**406.** Filed By:  Washington Energy Law LLP
Filed Date:  02/24/2023
Accession No.:  20230224-5225
Description:  Washington Energy Law LLP submits Request to Update Official Service Lists under ER20-1713 et al.

**407.** Filed By:  Northwest Rural Public Power District
Filed Date:  03/13/2023
Accession No.:  20230313-5211
Description:  Protest of Northwest Rural Public Power District to the February 24, 2023, Motion to Lodge of Tri-State Generation and Transmission Association, Inc. under ER21-2818 et al.

**408.** Filed By:  Basin Electric Power Cooperative
Filed Date:  03/13/2023
Accession No.:  20230313-5219
Description:  Answer of Basin Electric Power Cooperative to the February 23, 2023, Motion to Lodge of Tri-State Generation and Transmission Association, Inc. under ER21-2818 et al.

| Record Item No. | Description |
|---|---|

409.    Filed By:  Basin Electric Power Cooperative
Filed Date:  03/28/2023
Accession No.:  20230328-5245
Description:  Motion to Leave to Answer and Answer of Basin
Electric Power Cooperative to March 13, 2023 Protest of Northwest
Rural Public Power District and United Power, Inc. under EL22-4, et
al.

410.    Filed By:  Mountain Parks Electric, Inc.
Filed Date:  04/03/2023
Accession No.:  20230403-5164
Description:  Mountain Parks Electric, Inc. submits Request to Update
Official Service Lists under ER23-1113 et al.

411.    Filed By:  Northwest Rural Public Power District
Filed Date:  04/04/2023
Accession No.:  20230404-5204
Description:  Answer of Northwest Rural Public Power District to the
March 28, 2023 Motion for Leave to Answer of Basin Power
Cooperative under ER21-2818 et al.

412.    Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  04/07/2023
Accession No.:  20230407-5095
Description:  Motion to Lodge of Tri-State Generation and
Transmission Association, Inc. under ER21-2818, et al.

413.    Filed By:  United Power, Inc., Northwest Rural Public Power District
Filed Date:  04/24/2023
Accession No.:  20230424-5253
Description:  Answer of United Power, Inc., et al., in Opposition to
Motion to Lodge filed by Tri-State Generation and Transmission
Association, Inc. under EL22-4, et al.

| **Record Item No.** | **Description** |
|---|---|

414.   Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  05/09/2023
Accession No.:  20230509-5098
Description:  Motion for Leave to Answer and Answer and Supplemental Motion to Lodge of Tri-State Generation and Transmission Association, Inc. to United Power, Inc., et al. Answer Opposing Tri-State's Motion to Lodge Apr. 7, 2023 under ER21-2818, et al.

415.   Filed By:  United Power Inc., Northwest Rural Public Power District
Filed Date:  05/24/2023
Accession No.:  20230524-5221
Description:  Answer of United Power, Inc., et al. Opposing Supplemental Motion to Lodge filed by Tri-State Generation and Transmission Association, Inc. on May 9, 2023, under ER21-2818, et al.

416.   Filed By:  U.S. Senator Cynthia M. Lummis et al.
Filed Date:  06/16/2023
Accession No.:   20230616-4003
Description:  Comments of U.S. Senator Cynthia M. Lummis et al. re the exit fee that is owed by members who opt to prematurely terminate their contractual obligations etc. of Tri-State Generation and Transmission Association under ER21-2818.

417.   Filed By:  United Power Inc.
Filed Date:  06/23/2023
Accession No.:  20230623-5160
Description:  Request of United Power, Inc. to Disregard Untimely and Improper Comments by Legislators on June 2, 2023, under ER21-2818, et al.

**Record
Item No.**    **Description**

418.    Filed By:  Congress Member Ken Buck
Filed Date:  07/13/2023
Accession No.:  20230713-4000
Description:  Comments of Congress Member Ken Buck re the exit
fee dispute between the Tri- State Generation and Transmission
Association and United Power under ER21-2818.

419.    Filed By:  United Power Inc.
Filed Date:  08/22/2023
Accession No.:  20230822-5181
Description:  United Power, Inc. submits Request for Order on Initial
Decision by September 30, 2023, re Exit Fee under ER21-2818 et al.

420.    Filed By:  San Isabel Electric Association, Inc.
Filed Date:  08/28/2023
Accession No.:  20230828-5280
Description:  Comments of San Isabel Electric Association, Inc. re
Request for Order on Initial Decision filed by United Power, Inc.
under EL22-4, et al.

421.    Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  09/05/2023
Accession No.:  20230905-5129
Description:  Tri-State Generation and Transmission Association, Inc.
submits Response to the August 22, 2023, Request for Order on Initial
Decision of United Power under ER21-2818, et al.

422.    Issued By:  Chair And Immediate Staff (FERC)
Filed Date:  09/13/2023
Accession No.:  20230913-4000
Description:  Chairman Phillips' response to United States
Representative Ken Buck's July 11, 2023 letter re the Tri-State
Generation and Transmission Association, Inc. exit fee proceeding
under ER21-2818.

**Record
Item No.**      **Description**

423.        Filed By:  Mountain Parks Electric, Inc.
            Filed Date:  09/20/2023
            Accession No.:  20230920-5037
            Description:  Comments of Mountain Parks Electric, Inc. urging
            FERC to issue an Order on Initial Decision by September 30, 2023,
            under ER21-2818 et al.

424.        Filed By:  United Power Inc.
            Filed Date:  10/13/2023
            Accession No.:  20231013-5200
            Description:  United Power, Inc. submits Request to Update Service
            List under EL20-26, et al.

425.        Filed By:  Guzman Energy LLC, Guzman Western Slope LLC,
            Guzman Energy Partners LLC ,
            Filed Date:  10/16/2023
            Accession No.:  20231016-5110
            Description:  Guzman Energy LLC, et al. submits Request to Update
            Service List under EL10-56, et al.

426.        Issued By:  Chair And Immediate Staff (FERC)
            Filed Date:  11/02/2023
            Accession No.:  20231102-4002
            Description:  Chairman Phillips' response to U.S. Senator Cynthia M.
            Lummis' June 2, 2023 letter re the Tri-State Generation and
            Transmission Association, Inc. exit fee proceeding under ER21-2818.

427.        Filed By:  Paul Hastings LLP
            Filed Date:  11/06/2023
            Accession No.:  20231106-5170
            Description:  Paul Hastings LLP submits Request to Update Service
            List under EC20-99, et al. Part 5 of 5.

**Record
Item No.**    **Description**

428.    Filed By:  Tri-State Generation and Transmission Association, Inc.
        Filed Date:  11/14/2023
        Accession No.:  20231114-5064
        Description:  Tri-State Generation and Transmission Association, Inc.
        submits Request to Update Service List under EL20-25, et al.

429.    Filed By:  United Power, Inc.
        Filed Date:  12/13/2023
        Accession No.:  20231213-5200
        Description:  United Power, Inc. submits Request to Update Official
        Service List under EL21-53, et al.

430.    Issued By:  Secretary Of The Commission, FERC, Commissioners
        And Immediate Staff (The Commission)
        Filed Date:  12/19/2023
        Accession No.:  20231219-3080
        Description:  Order on Initial Decision re Wheat Belt Public Power
        District et al. v. Tri-State Generation and Transmission Association,
        Inc. under ER21-2818 et al. Commissioner Danly is not participating.

431.    Filed By:  Tri-State Generation and Transmission Association, Inc.
        Filed Date:  12/29/2023
        Accession No.:  20231229-5067
        Description:  Tri-State Generation and Transmission Association, Inc.
        submits Request to Update Official Service Lists under ER21-2818, et
        al.

432.    Filed By:  Tri-State Generation and Transmission Association, Inc.
        Filed Date:  01/03/2024
        Accession No.:  20240103-5018
        Description:  Motion of Tri-State Generation and Transmission
        Association, Inc. for Extension of Time, until February 16, 2024, to
        submit compliance filing for December 19, 2023, Order on Initial
        Decision under ER21-2818, et al.

**Record
Item No.**     **Description**

433.     Filed By:  Mountain Parks Electric Inc.
         Filed Date:  01/08/2024
         Accession No.:  20240108-5164
         Description:  Answer of Mountain Parks Electric, Inc. to Tri-State
         Generation and Transmission Association, Inc.'s January 3, 2024,
         Motion for Extension of Time under ER21-2818, et al.

434.     Filed By:  Northwest Rural Public Power District
         Filed Date:  01/08/2024
         Accession No.:  20240108-5188
         Description:  Answer of Northwest Rural Public Power District to the
         Motion of Tri-State Generation and Transmission Association, Inc for
         Extension of Time, et al. under ER21-2818, et al.

435.     Filed By:  United Power Inc.
         Filed Date:  01/08/2024
         Accession No.:  20240108-5195
         Description:  Comments of United Power, Inc. in opposition to Tri-
         State Generation and Transmission Association, Inc.'s Motion for
         Extension of Time under ER21-2818, et al.

436.     Issued By:  Secretary Of The Commission, FERC
         Filed Date:  01/09/2024
         Accession No.:  20240109-3081
         Description:  Notice of Extension of Time re Tri-State Generation and
         Transmission Association, Inc. under ER21-2818 et al.

437.     Filed By:  Guzman Energy LLC
         Filed Date:  01/18/2024
         Accession No.:  20240118-5208
         Description:  Guzman Energy LLC submits Request for Rehearing of
         the December 19, 2023 Order under ER21-2818 et al.

| Record Item No. | Description |
|---|---|

438.    Filed By:  United Power Inc.
Filed Date:  01/18/2024
Accession No.:  20240118-5209
Description:  United Power, Inc. submits Request for Rehearing of the December 19, 2023 Order under ER21-2818 et al.

439.    Filed By:  Mountain Parks Electric, Inc.
Filed Date:  01/18/2024
Accession No.:  20240118-5211
Description:   Mountain Parks Electric, Inc. submits Request for Rehearing and Clarification of the December 19, 2023 Order under ER21-2818 et al.

440.    Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  01/18/2024
Accession No.:  20240118-5212
Description:  Tri-State Generation and Transmission Association, Inc. submits Request for Rehearing of the December 19, 2023 Order under ER21-2818 et al.

441.    Filed By:  Tipmont Rural Electric Membership Corporation
Filed Date:  01/18/2024
Accession No.:  20240118-5213
Description:  Tipmont Rural Electric Membership Corporation submits Request for Rehearing and Clarification of the December 19, 2023, Order under ER21-2818 et al.

442.    Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  01/25/2024
Accession No.:  20240125-5214
Description:  Tri-State Generation and Transmission Association, Inc. submits tariff filing per 35: Revisions on Compliance to Rate Schedule No. 281 to be effective 11/1/2021 under ER21-2818. Filing Type: 80.

| **Record Item No.** | **Description** |
|---|---|

443.   Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  01/25/2024
Accession No.:  20240125-5215
Description:  Tri-State Generation and Transmission Association, Inc. submits tariff filing per 35: Revisions on Compliance to Rate Schedule No. 281 to be effective 11/1/2021 under ER21-2818. Filing Type: 80.

444.   Issued By:  Secretary Of The Commission, FERC
Filed Date:  01/30/2024
Accession No.:  20240130-3093
Description:  Combined Notice of Filings #1, January 30, 2024: This notice contains information concerning multiple filings received by FERC.

445.   Filed By:  McCarter & English, LLP
Filed Date:  02/01/2024
Accession No.:  20240201-5109
McCarter & English, LLP submits Request to Update Service List under ER21-2818, et al.

446.   Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  02/05/2024
Accession No.:  20240205-5165
Description:  Motion for Leave to Answer and Answer of Tri-State Generation and Transmission Association, Inc. to the Limited Request for Rehearing of United Power, Inc, et al. under ER21-2818, et al.

447.   Filed By:  Northwest Rural Public Power District
Filed Date:  02/07/2024
Accession No.:  20240207-5127
Description:  Motion to Answer and Answer of Northwest Rural Public Power District to Tri-State Generation and Transmission Association, Inc.'s Request for Rehearing and Clarification filed on January 18, 2024, under ER21-2818, et al.

**Record
Item No.**    **Description**

448.     Filed By:  United Power, Inc.
         Filed Date:  02/12/2024
         Accession No.:  20240212-5171
         Description:  Protest of United Power, Inc. to Tri-State's Compliance
         Filing of January 25, 2024, under ER21-2818.

449.     Filed By:  La Plata Electric Association, Inc.
         Filed Date:  02/15/2024
         Accession No.:  20240215-5097
         Description:  La Plata Electric Association, Inc. submits Request to
         Update Service List under ER21-2818.

450.     Filed By:  La Plata Electric Association, Inc.
         Filed Date:  02/15/2024
         Accession No.:   20240215-5111
         Description:  Protest of La Plata Electric Association, Inc. to Tri-State
         Generation and Transmission Association, Inc.'s January 25, 2024,
         Compliance Filing under ER21-2818.

451.     Filed By:  Mountain Parks Electric, Inc.
         Filed Date:  02/15/2024
         Accession No.:  20240215-5194
         Description:  Protest and Comments of Mountain Parks Electric, Inc.
         to the Tri-State Generation & Transmission Association's January 25,
         2024, compliance filing re Initial Decision issued December 19, 2023,
         under ER21-2818.

452.     Filed By:  Mountain Parks Electric, Inc.
         Filed Date:  02/15/2024
         Accession No.:  20240215-5195
         Description:  Protest and Comments of Mountain Parks Electric, Inc.
         to the Tri-State Generation & Transmission Association's January 25,
         2024, compliance filing re Initial Decision issued December 19, 2023,
         under ER21-2818.

**Record Item No.**    **Description**

453.    Filed By:  Northwest Rural Public Power District
Filed Date:  02/16/2024
Accession No.: 20240216-5237
Description:  Motion of Northwest Rural Public Power District to accept filing Out of Time, Expedited Action and Waiver of Response Period under ER21-2818, et al.

454.    Filed By:  Northwest Rural Public Power District
Filed Date:  02/16/2024
Accession No.:  20240216-5051
Description:  Response, Protest and Motion to Reject of Northwest Rural Public Power District to Tri-State Generation and Transmission Association, Inc.'s Revisions on Compliance to Rate Schedule filed on January 25, 2024, under ER21-2818, et al.

455.    Filed By:  Northwest Rural Public Power District
Filed Date:  02/16/2024
Accession No.:  20240216-5052
Description:   Response, Protest and Motion to Reject of Northwest Rural Public Power District to Tri-State Generation and Transmission Association, Inc.'s Revisions on Compliance to Rate Schedule filed on January 25, 2024, under ER21-2818, et al.

456.    Issued By:  Secretary Of The Commission FERC
Filed Date:  02/20/2024
Accession No.:  20240220-3022
Description:  Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration re Tri-State Generation and Transmission Association, Inc. et al. under ER21-2818 et al.

457.    Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  02/21/2024
Accession No.:  20240221-5231
Description:  Motion for Leave to Answer and Answer of Tri-State Generation and Transmission, Association, Inc. to comments and protests filed under EC24-41.

90

| **Record Item No.** | **Description** |
|---|---|
| 458. | Filed By:  Basin Electric Power Cooperative<br>Filed Date:  02/29/2024<br>Accession No.:  20240229-5324<br>Description:  Motion for Leave to Answer and Answer of Basin Electric Power Cooperative to Northwest Rural Public Power District's Answer in response to Tri-State Generation and Transmission Association, Inc.'s January 25, 2024 compliance filing under ER21-2818, et al. |
| 459. | Filed By:  Tri-State Generation and Transmission Association, Inc.<br>Filed Date:  03/06/2024<br>Accession No.:  20240306-5186<br>Description:  Motion for Leave to Answer and Answer and Motion to Strike of Tri-State Generation and Transmission Association, Inc. in response to the protests and comments under ER21-2818 et al. |
| 460. | Filed By:  United Power, Inc.<br>Filed Date:  03/11/2024<br>Accession No.:  20240311-5251<br>Description:  Motion to Leave to Answer and Answer of United Power, Inc. to Tri-State Generation and Transmission Association, Inc.'s March 6, 2024, Answer to Protest under ER21-2818, et al. |
| 461. | Filed By:  Poudre Valley Rural Electric Association, Inc.<br>Filed Date:  03/12/2024<br>Accession No.:  20240312-5161<br>Description:  Motion for Leave to Answer and Answer of Poudre Valley Rural Electric Association, Inc. to Address Discrete Aspects of United Power, Inc.'s 2/12/2024 Protest, et al. under ER21-2818 et al. |
| 462. | Filed By:  Tri-State Generation and Transmission Association, Inc.<br>Filed Date:  03/15/2024<br>Accession No.:  20240315-5245<br>Description:  Motion for Leave to Answer and Answer of Tri-State Generation and Transmission Association, Inc. in response to the March 11, 2024, Motion for Leave to Answer and Answer of United Power, Inc. under ER21-2818 et al. |

| **Record Item No.** | **Description** |
| --- | --- |

463.    Filed By:  Northwest Rural Public Power District
Filed Date:  03/18/2024
Accession No.:  20240318-5247
Description:  Motion for Leave to Answer and Answer to Answer of Northwest Rural Public Power District to Tri-State Generation and Transmission Association, Inc.'s Motion for Leave to Answer, et al. file on March 6, 2024, under ER21-2818, et al.

464.    Filed By:  La Plata Electric Association, Inc.
Filed Date:  03/25/2024
Accession No.:  20240325-5316
Description:  La Plata Electric Association, Inc. submits Non-Conditional Two-Year Notice of Intent to Withdraw from Tri-State Rate Schedule FERC No. 281 effective April 1, 2026 under ER21-2818, et al.

465.    Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  03/29/2024
Accession No.:  20240329-5082
Description:  Petition for Review filed in the U.S. Court of Appeals for the Tenth Circuit of Tri-State Generation and Transmission Association, Inc., re December 19, 2023 and February 20, 2024 Orders, under ER21-2818, et al (No Case No.).

466.    Issued By:  Secretary Of The Commission, FERC, Commissioners And Immediate Staff (The Commission)
Filed Date:  03/29/2024
Accession No.:  20240329-3042
Description:  Order Accepting Compliance Filing, Subject to Further Compliance, and Establishing Hearing and Settlement Judge Procedures re Tri-State Generation and Transmission Association, Inc. under ER21-2818.

| Record Item No. | Description |
|---|---|
| 467. | Issued By:  Administrative Law Judges<br>Filed Date:  04/05/2024<br>Accession No.:  20240405-3040<br>Description:  Order of Chief Judge Designating Settlement Judge re Tri-State Generation and Transmission Association, Inc. under ER21-2818. |
| 468. | Filed By:  Tri-State Generation And Transmission Association, Inc.<br>Filed Date:  04/05/2024<br>Accession No.:  20240405-0007<br>Description:  Petition for Review filed in the U.S. Court of Appeals for the Tenth Circuit of Tri-State Generation and Transmission Association, Inc., re 12/19/2023 and 2/20/2024 Orders, under ER21-2818, et al. (Case No. 24-9516). |
| 469. | Filed By:  United Power, Inc.<br>Filed Date:  04/08/2024<br>Accession No.:  20240408-5258<br>Description:  Petition for Review filed in the U.S. Court of Appeals for the District of Columbia Circuit of United Power, Inc. re December 19, 2023, and February 20, 2024, Orders, under ER21-2818, et al. (No Case No.) |
| 470. | Filed By:  United States Court of Appeals For The Tenth Circuit<br>Filed Date:  04/08/2024<br>Accession No.:  20240408-0019<br>Description:  U.S. Court of Appeals for the Tenth Circuit provides notice that Tri-State Generation and Transmission Association's Petition for Review regarding FERC's 12/19/2023 and 02/20/2024 Orders under ER21-2818 et al., has been docketed etc. (Case No. 24-9516). |

| **Record Item No.** | **Description** |
| --- | --- |

471.   Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  04/12/2024
Accession No.:  20240412-5260
Description:  Tri-State Generation and Transmission Association, Inc. submits tariff filing per 35: Revisions on Compliance to Rate Schedule No. 281 to be effective 11/1/2021 under ER21-2818. Filing Type: 80.

472.   Filed By:  Tri-State Generation and Transmission Association, Inc.
Filed Date:  04/12/2024
Accession No.:  20240412-5261
Description:  Tri-State Generation and Transmission Association, Inc. submits tariff filing per 35: Revisions on Compliance to Rate Schedule No. 281 to be effective 11/1/2021 under ER21-2818. Filing Type: 80.

473.   Issued By:  Secretary Of The Commission, FERC
Filed Date:  04/15/2024
Accession No.:  20240415-3063
Description:  Combined Notice of Filings #1, April 15, 2024: This notice contains information concerning multiple filings received by FERC.

474.   Filed By:  Northwest Rural Public Power District
Filed Date:  04/24/2024
Accession No.:  20240424-5202
Description:  Response, Protest, Motion to Reject, and Motion for Order to Show Cause et al. of Northwest Rural Public Power District re 04/12/2024 Revisions on Compliance to Rate Schedule under ER21-2818, et al.

| Record Item No. | Description |
|---|---|

475.   Filed By:  Northwest Rural Public Power District
        Filed Date:  04/24/2024
        Accession No.:  20240424-5203
        Description:  Response, Protest, Motion to Reject, and Motion for
        Order to Show Cause et al. of Northwest Rural Public Power District
        re 04/12/2024 Revisions on Compliance to Rate Schedule under
        ER21-2818, et al.

476.   Filed By: Tri-State Generation and Transmission Association, Inc.
        Filed Date:  04/26/2024
        Accession No.:  20240426-5345
        Description:  Motion for Leave to Answer and Answer of Tri-State
        Generation and Transmission Association, Inc. to the Response,
        Protest, Motion to Reject, Motion for an Order to Show Cause et al.
        filed by Northwest Rural Public Power District under ER21-2818 et.
        al.

477.   Filed By:  Mountain Parks Electric, Inc.
        Filed Date:  04/29/2024
        Accession No.:  20240429-5429
        Description:  Mountain Parks Electric, Inc. submits request for
        Rehearing and Clarification re FERC's 03/29/2024 Order under ER21-
        2818.

478.   Filed By:  Mountain Parks Electric, Inc.
        Filed Date:  04/30/2024
        Accession No.:  20240430-0001
        Description:  Motion to Intervene filed in the U.S. Court of Appeals
        for the Tenth Circuit of Mountain Parks Electric, Inc. re Tri-State
        Generation and Transmission Association, Inc. under ER21-2818, et
        al. (Case No. 24-9516).

**Record
Item No.**          **Description**

479.          Filed By:  Northwest Rural Public Power District
              Filed Date:  05/03/2024
              Accession No.:  20240503-5206
              Description:  Motion for Leave to Answer and Answer of Northwest
              Rural Public Power District to Tri-State Generation and Transmission
              Association's 04/12/2024 Answer re Second Compliance Filing under
              ER21-2818, et al.

480.          Filed By:  Mountain Parks Electric, Inc.
              Filed Date:  05/03/2024
              Accession No.:  20240503-5047
              Description:  Comments of Mountain Parks Electric, Inc. on Tri-State
              Generation & Transmission Association's 04/12/2024 Second
              Compliance Filing re 03/29/2024 Order under ER21-2818.

481.          Filed By:  United Power, Inc.
              Filed Date:  05/03/2024
              Accession No.:  20240503-5192
              Description:  Protest of United Power, Inc. to Tri-State Generation and
              Transmission Association Inc's 04/12/2024 Second Compliance Filing
              under ER21-2818.

482.          Filed By:  La Plata Electric Association, Inc.
              Filed Date:  05/03/2024
              Accession No.:  20240503-5221
              Description:  Comments of La Plata Electric Association, Inc. re Tri-
              State Generation & Transmission Association's 04/12/2024 second
              compliance filing under ER21-2818.

483.          Filed By:  Tri-State Generation And Transmission Association, Inc.
              Filed Date:  05/07/2024
              Accession No.:  20240507-0003
              Description:  Entry of Appearance filed in the U.S Court of Appeals
              for the Tenth Circuit of Mountain Parks Electric, Inc. under ER.21-
              2818, et al. (Case No. 24-9516).

| Record Item No. | Description |
|---|---|

**484.**   Filed By:  Basin Electric Power Cooperative
Filed Date:  05/08/2024
Accession No.:  20240508-0004
Description:  Entry of Appearance filed in the U.S. Court of Appeals for the Tenth Circuit of Basin Electric Power Cooperative under ER21-2818, et al. (Case No. 24-9516).

**485.**   Issued By:  Settlement Judge
Filed Date:  05/08/2024
Accession No.:  20240508-3044
Description:  Order Scheduling Settlement Conference re Tri-State Generation and Transmission Association, Inc. under ER21-2818.

**486.**   Filed By:  United Power, Inc.
Filed Date:  05/15/2024
Accession No.:  20240515-0013
Description:  Entry of Appearance, etc. filed in the U.S. Court of Appeals for the Tenth Circuit of United Power, Inc. under ER21-2818, et al. (Case No. 24-9516).

**487.**   Issued By:  Secretary Of The Commission, FERC, Commissioners And Immediate Staff (The Commission)
Filed Date:  05/23/2024
Accession No.:  20240523-3100
Description:  Order Addressing Arguments Raised on Rehearing and Granting Clarification, in Part re Wheat Belt Public Power District et al. v. Tri-State Generation and Transmission Association, Inc. under ER21-2818 et al.

                    In witness whereof I have hereunto subscribed and caused the seal of the Federal Energy Regulatory Commission to be affixed this 6th day of August, 2024, at Washington, DC.


                    /s/ *Debbie-Anne A. Reese*
                    Debbie-Anne A. Reese,
                    Acting Secretary.

## CERTIFICATE OF SERVICE

I hereby certify that I have, this 6th day of August 2024, served the foregoing via email through the Court's CM/ECF system.

*/s/ Carol J. Banta*
Carol J. Banta
Senior Attorney

Federal Energy Regulatory
  Commission
888 First Street, NE
Washington, DC  20426
Tel.:  (202) 502-6433
Email:  carol.banta@ferc.gov

# Exhibit No. TGT-0005

**Representative Wholesale Electric Service Contract**

**between**

**Tri-State and Big Horn Rural Electric Company**

Docket No. ER21-2818-000

Exhibit No. TGT-0005
Page 1 of 20

---

## U.S. DEPARTMENT OF AGRICULTURE
### RURAL UTILITIES SERVICE

|  |  |
|---|---|
| **RUS BORROWER DESIGNATION** | Wyoming 005 Big Horn |
|  | Colorado 47 Tri-State |

**THE WITHIN**  Wholesale Electric Service Contract between Tri-State Generation

and Transmission Association, Inc. and Big Horn Rural Electric Company

dated July 1, 2007.

**SUBMITTED BY THE ABOVE DESIGNATED BORROWER PURSUANT TO THE
TERMS OF THE LOAN CONTRACT, IS HEREBY APPROVED SOLELY FOR THE
PURPOSES OF SUCH CONTRACT.**

FOR THE ADMINISTRATOR

DATED

October 25, 2007

RUS FORM 28a    REV 5-73
(a computer generated facsimile)

TRI-STATE GENERATION AND TRANSMISSION
ASSOCIATION, INC.
WHOLESALE ELECTRIC SERVICE CONTRACT

This CONTRACT, made this 1st day of July, 2007,
between TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION,
INC. (hereinafter called the "Seller"), a corporation
organized and existing under the laws of the State of
Colorado, authorized to do business in the States of
Wyoming and New Mexico, and domesticated in the State of
Nebraska, and Big Horn Rural Electric Company (hereinafter
called the "Member"), a corporation organized and existing
under the laws of the State of Wyoming;

WITNESSETH:

WHEREAS, Seller presently owns and operates electric
generating plants, a transmission system and associated
facilities, and has entered into contracts with others to
provide for transmission facilities or service or otherwise
obtain electric service for the purpose, among others, of
supplying electric service to borrowers from, including but
not limited to, the United States of America acting through
the Rural Utilities Services, (formerly the Rural
Electrification Administration, hereinafter called the
"RUS"); and

WHEREAS, Seller has financed and may, in the future,
finance new facilities in whole or in part through loans
made or guaranteed by the United States of America
(hereinafter called the "Government") acting through the
administrator of the RUS (hereinafter called the
"Administrator"); and

WHEREAS, the indebtedness created by such loans and
loan guarantees made by the Government is evidenced, and,
with respect to future indebtedness, shall be evidenced by
certain notes (hereinafter collectively called the Notes),
secured by that Master First Mortgage Indenture, Deed of
Trust and Security Contract between Tri-State Generation
and Transmission Association, Inc., and Wells Fargo Bank
West Amended, Restated and Effective as of December 15,
1999, as it may be supplemented, amended and/or restated
from time to time (hereinafter called the "Indenture"); and

1 - 11

WHEREAS, this Contract and payments due to Seller under this Contract will be pledged and assigned to secure the Notes, as provided in the Indenture or other notes pursuant to other financial arrangements; and

WHEREAS, the Member acknowledges that Seller and the Government and other lenders are relying on this commitment from the Member, and similar commitments from all other Members having similar contracts to purchase electric service for its present and future load requirements hereunder and provide for (a) the financing of Seller's facilities, (b) the development of an organization to serve the Member, and (c) for a long-term planning and power supply acquisition program; and

WHEREAS, the Government and other lenders are relying on this Contract and similar contracts between Seller and other borrowers from the Rural Utilities Services to assure that the Notes are paid and the purposes of the Rural Electrification Act of 1936, as amended, are carried out and Seller, and the Member, by executing this Contract, acknowledge that reliance;

WHEREAS, Tri-State and Member are committed to meeting electric utility market challenges, in a competitive environment, during the term of this Contract;

    1.    GENERAL OBLIGATIONS OF THE PARTIES.  The Seller shall sell and deliver to the Member and the Member shall purchase and receive from the Seller all electric service including capacity and energy which the Member shall require for the operation of the Member's system, up to the limit the Member has chosen pursuant to 1 (a.) below, except for sources, such as photovoltaic cells, fuel cells, or others that are not connected to Member's distribution or transmission system.

    (a.)    Member shall have the right to elect to receive from 95% to 100% from Seller, so that up to 5% of its requirements can be obtained from distributed or renewable generation owned or controlled by the Member.  Details concerning the operating requirements of the election shall be set forth in a written policy to be

2 - 11

adopted by Seller's Board of Directors which
shall set forth requirements concerning such
things as the effect of growth, backup
service, nominations to be provided, reports
Member is to provide, rates upon return to
all requirements service, notice periods to
be provided, and other details.  Such
election shall be evidenced by a written
notification, and shall take effect on the
first day of the month following the month
in which the first such election is made.
Thereafter the written policy shall specify
a method for determining the effective date.
Member may cancel this election and receive
all of its requirements from Seller pursuant
to the provisions of the written policy to
be adopted by Seller's Board of Directors.
Unless provided by the prior written
approval of the Seller and the
Administrator, or under the provisions of
this section, the Member agrees that it will
not operate generating plants for the
production of electric service except when
the Seller is unable to supply the Member's
requirements, and then only to the extent
that the Seller is unable to supply such
requirements.

(b.) The Seller shall use reasonable diligence to
     provide a constant and uninterrupted supply
     of electric service hereunder.

     Neither Party hereto shall be considered to
     be in default in respect to any obligation
     hereunder, other than the obligations of the
     Member to make payments of amounts due under
     this Contract, if failure of performance
     shall be due to uncontrollable forces; the
     term "uncontrollable forces" meaning any
     cause beyond the control of the Party
     affected, including, but not limited to,
     failure of facilities, flood, earthquake,
     storm, fire, lightning, epidemic, war, riot,
     civil disturbance, labor disturbance,
     sabotage, inability to obtain permits,
     licenses, right-of-way or authorizations
     from any local, state or federal agency or

3 - 11

person, and restraint by court or public
authority, which by exercise of due
foresight such Party could not reasonably
have been expected to avoid, and which by
exercise of due diligence it shall be unable
to overcome.  Neither Party shall, however,
be relieved of liability for failure of
performance if such failure is due to
removable or remediable causes which it
fails to remove or remedy with reasonable
dispatch.  Nothing contained herein,
however, shall be construed to require
either Party to prevent or settle a strike
against its will.  The failure of
performance of any power supplier to Seller
under an agreement(s) with Seller shall be
deemed to be within the meaning of
"uncontrollable forces" for the purposes of
this Contract.

If Seller's generation and sources of supply
are inadequate to serve all of Member's
demand and Seller is not able to secure
additional sources of supply, then in that
event, Member's service may be interrupted
pursuant to a written policy that has been
adopted by Seller's Board of Directors that
establishes procedures for such
interruptions.

2.    ELECTRIC CHARACTERISTICS AND DELIVERY POINTS.
Electric service to be furnished hereunder shall be
alternating current, three phase, sixty cycle.  The current
points of delivery, delivery voltage, and any special
conditions of service are set forth in the schedule
attached hereto, marked Schedule B and made part hereof.
Schedule B shall be deemed to be amended from time to time
to include such other point or points of delivery as may be
agreed upon by the Seller and the Member.  The obligations
of the parties concerning new delivery points and payment
for facilities to make final connections and extensions to
service shall be as set forth in written policies adopted
by Seller's Board of Directors.  Such policies shall also
address ownership of substation, switching and metering
equipment.

4 – 11

All contracts or agreements entered into by the parties shall be listed in a schedule attached hereto, and marked Schedule A.

Schedules to this Contract shall be kept up to date as they are changed, so that this Contract contains or refers to all agreements between the parties.

3.   RATE

    (a)   The Member shall pay the Seller for all electric service furnished hereunder at the rates and on the terms and conditions set forth in the rate schedule(s), adopted from time to time by Seller's Board of Directors.

    (b)   The Board of Directors of the Seller at such intervals as it shall deem appropriate, but in any event not less frequently than once in each calendar year, shall review the rates for electric service furnished hereunder and under similar agreements with other Members and, if necessary, shall revise such rates so that it shall produce revenues which shall be sufficient, with the revenues of the Seller from all other sources, to meet the cost of operation (inclusive of reasonable reserves), debt and lease service, and equity development of the Seller, all as approved by the Board of Directors of the Seller. The Seller shall cause a notice in writing to be given to the Member and other Members of the Seller and the Administrator which shall set out all the proposed revisions of the rates with the effective date thereof, which shall be not less than ninety (90) nor more than one hundred twenty (120) days after the date of the notice, and shall set forth the basis upon which the rates is proposed to be adjusted and established.  The Member agrees that the rates from time to time established by the Board of Directors of the Seller shall be deemed to be substituted for the rates currently provided and agrees to pay for electric service furnished by the Seller to it hereunder after the effective date of any such revisions at such revised rates.

4.    METER READINGS AND PAYMENT OF BILLS.  The Seller shall
read meters or cause meters to be read at monthly
intervals.  A bill for electric service, shall be presented
to the Member no later than the 20th day of the month
following the month in which the electric service was
consumed.  The date of the bill shall be deemed the date of
presentation.  Electric service furnished hereunder shall
be paid in useable funds at the office of the Seller in
Denver, Colorado (or such other location as Seller may
designate), monthly, no later than the last day of the
calendar month in which the bill is mailed to the Member
provided however, if the date of presentation of the bill
falls after the 20th day of the month, the Member shall
receive one day of delay in payment for each day of delay
in presentation.  If the Member shall fail to pay any such
bill within the above prescribed period, a one percent (1%)
late charge shall be added to the bill and the Seller may
discontinue delivery of electric service hereunder upon
fifteen (15) days written notice to the Member of its
intention to do so.  Should the last day of the month (or
any extended payment due date) fall on a weekend or
Seller's holiday, payment shall be due on Seller's
immediately preceding business day.  Amounts in arrears
will bear interest at the National Rural Utilities
Cooperative Finance Corporation's Line of Credit rate, plus
one percent (1%), applied to late payments on a daily basis
in consideration of a 365-day year.

5.    METER TESTING AND BILLING ADJUSTMENT.  The Seller
shall test and calibrate meters or cause meters to be
tested and calibrated by comparison with accurate standards
at intervals of twelve (12) months.  The Seller shall also
make or cause to be made special meter tests at any time at
the Members' request.  The costs of all tests shall be
borne by the Seller, provided, however, that if any special
meter test made at the Members' request shall disclose that
the meters are recording accurately, the Member shall
reimburse the Seller for the cost of such test.  Meters
registering not more than two percent (2%) fast or slow
shall be deemed to be accurate.  If any meter shall fail to
register for any period, the Member and the Seller shall
agree as to the amount of electric service furnished during
such period and the Seller shall render a bill therefor.
The Seller's Board of Directors shall establish a written
policy concerning notice of meter testing and who shall
have a right to be present.  If at any test, a meter shall
be found to be inaccurate by more than two percent (2%),

6 - 11

fast or slow, an adjustment shall be made in settlement between the Parties to compensate for the effect of such inaccuracy over a preceding period, starting from the date the meter registration became in error, if it can be determined.  If the date when the error in registration began cannot be determined, it shall be assumed that the error has existed for a period equal to one-half (1/2) of the time elapsed since the meter was installed, or one-half of the time elapsed since the past previous test, not to exceed six (6) months.

6.   RIGHT OF ACCESS.  Duly authorized representatives of either party hereto shall be permitted to enter the premises of the other party hereto at all reasonable times in order to carry out the provisions hereof.

7.   RESALE OF ELECTRIC ENERGY.

(a)   The Member shall not sell at wholesale any of the electric energy delivered to it hereunder to any customer of the Member for resale by that customer, unless such resale is specifically approved by the Board of Directors of the Seller or is provided for in the schedule attached hereto marked Schedule C and made a part hereof.

(b)   The Member acknowledges that it is familiar with the provisions of Article 12 in each of Salt Lake City Integrated Projects Contract No. 87-LAO-172 (as amended), and Loveland Area Projects Contract No. 87-LAO-134 (as amended), dated March 10, 1989 and April 28, 1987  respectively, between the United States of America and the Seller and in Contract No. 87-SLC-0025 (as amended) dated March 9, 1989, entitled "Resale of Electric Service," a copy of such Article 12 being attached hereto, marked Schedule D, and made a part hereof.  The Member agrees to comply with and be bound by the provisions of such article 12 and to furnish the information required thereby.

8.   TRANSFER BY THE MEMBER.  The Member agrees that during the term of this Contract, so long as any of the Notes are outstanding, the Member shall not, without the approval in writing of Seller and the Administrator, take or suffer to be taken any steps for reorganization or dissolution, or to consolidate with or merge into any organization, or to

7 - 11

sell, lease or transfer (or make any agreement therefor)
all or a substantial portion of its electric system assets,
whether now owned or hereafter acquired.  Notwithstanding
the foregoing, the Member may take or suffer to be taken
any steps for reorganization or dissolution or to
consolidate or merge into any organization or to sell,
lease or transfer (or make any agreement therefor) all or a
substantial portion of its electrical system assets,
whether now owned or hereafter acquired, so long as the
Member shall pay such pro rata portion of the outstanding
indebtedness on the Notes, as well as other obligations and
commitments of Seller at the time existing, as shall be
determined by Seller with the prior written consent of the
Administrator and shall otherwise comply with such
reasonable terms and conditions as the Administrator and
Seller shall require.  Provided, however, no such approvals
shall be required to take the actions contemplated herein
so long as the purchaser or surviving organization is a
member of Seller and has validly authorized, executed and
delivered a contract for electric service substantially in
the form of this Contract.

9.    SPECIFIC PERFORMANCE OF MEMBER. Seller and the Member
agree that the failure or threatened failure of the Member
to comply with the terms of the immediately preceding
paragraph entitled Transfer by the Member will cause
irreparable injury to Seller and to the Government which
cannot properly or adequately be compensated by the mere
payment of money.  The Member agrees, therefore, that in
the event of a breach or threatened breach by the Member of
the paragraph entitled Transfer by the Member, of this
Contract, that either the Seller or the Government or both
of them, in addition to any other remedies that may be
available to it judicially, shall have the right to obtain
from any competent court a decree enjoining such breach or
threatened breach of said paragraph or a decree providing
for the terms of said paragraph to be specifically
enforced.

10.   SPECIFIC PERFORMANCE OF SELLER.  Seller and the Member
agree that the failure or threatened failure of the Seller
to comply with the terms of this contract concerning supply
of electric service to the Member will cause irreparable
injury to Member and cannot properly or adequately be
compensated by the mere payment of money.   The Seller
agrees, therefore, that in the event of a breach or
threatened breach by the Seller of this Contract concerning

8 - 11

supply of electric service, that Member, in addition to any other remedies that may be available to it judicially, shall have the right to obtain from any competent court a decree enjoining such breach or threatened breach of this Contract and providing for the terms of this Contract to be specifically enforced.

11.   GENERAL PROVISIONS.

11.1 It is agreed that all representations and agreements between the Parties covering the subject matter hereof are expressed herein and in the exhibits hereto and that no other representation of any kind or nature, whether made by the officers or agents of either of the Parties, shall be binding.  Upon the date this Contract shall become binding between the Parties, the Contract and any associated transmission or other service agreements between the Parties heretofore executed shall be deemed cancelled and superseded in entirety by this Contract, except that any such agreement(s) between the Parties designated on Schedule A hereto shall continue in full force and effect.  All schedules annexed hereto are subject to change, alteration and deletion by proper corporate action of the Seller and, as the case may be, by the Member.

11.2 Each Party shall indemnify and save the other Party harmless for liability, loss, costs and expenses on account of injury to persons (including death) or damage or destruction of property occasioned by the negligence of its officers, employees or its contractors, unless it be proven that such injury or damage resulted from the negligence of the other Party.  Provided, however,

    (a)   that each Party shall be solely responsible for the claims or any payments to any employee or agent for injuries occurring in connection with their employment or arising out of any Workmen's Compensation Law, and (b) that neither Party shall be liable for any loss of earnings, revenues, indirect or consequential damages or injury which may occur to the other as a result of outages in delivery of services hereunder by reason of any cause whatsoever.

9 - 11

11.3 A waiver at any time of a right with respect to a default or any other matter shall not be deemed a waiver with respect to any other or a subsequent default or matter.  No delay, short of the statutory period of limitations, in asserting or enforcing any right hereunder shall be deemed a waiver of such right.  Every right and remedy shall be cumulative and in addition to every right or remedy now or hereafter existing at law, in equity, under Seller's bylaws or by statute or contract between the Parties and the pursuit or granting of any right or remedy shall not be construed as an election.  Nothing in this Contract shall be construed to limit or restrict the rights and obligations of either of the Parties [a] under Seller's  bylaws or [b] to grant liens and security interests herein pursuant to mortgage instruments approved by the Administrator.

11.4 This Contract shall in all respects be governed by, and controlled in accordance with, the laws of the State of Colorado.  If any article, section, paragraph, clause or provision of this Contract shall be finally adjudged by a court of competent jurisdiction to be invalid or unenforceable, the remaining provisions of the Contract shall remain in full force and effect as though such article, section, paragraph, clause or provision or any part thereof so adjudicated to be invalid or unenforceable had not been included herein.

12.  Term of Contract.  This Contract shall become effective only upon the approval in writing by the Administrator, and shall remain in effect until December 31, 2050, and thereafter until terminated by either party giving to the other not less than two (2) years' written notice of its intention to terminate.

No later than five (5) years after the execution of this Contract and each succeeding five (5) years thereafter, Seller will establish a committee to review this Contract for the purposes of making recommendations concerning any suggested modifications to its terms and provisions to Seller's Board of Directors.

IN WITNESS WHEREOF, the parties hereto have caused this Contract to be executed the day and year first above written.



(CORPORATE SEAL)

TRI-STATE GENERATION AND
TRANSMISSION ASSOCIATION, INC.

By _____

ATTEST:

_____
      Secretary


Big Horn Rural Electric Company


(CORPORATE SEAL)

By _____

ATTEST:


_____
      Secretary


11 - 11

Docket No. ER21-2818-000

Exhibit No. TGT-0005
Page 13 of 20

## SCHEDULE A REVISION 4

## BIG HORN RURAL ELECTRIC COMPANY

This Schedule A, Revision No. 4, made this __30__ day of ___MARCH___, 2016, is to be effective under and as part of the Wholesale Electric Service Contract, dated July 1, 2007, hereinafter called the "Contract," shall become effective on the date first written above and shall remain in effect until replaced by another revision; Provided that, this or any superseding Schedule A shall terminate upon expiration of the Contract.

**Active Contracts:**

| Tri-State Contract Number | Date of Contract | Expiration Date | Title |
|---|---|---|---|
| TS-14-0165 | 11/26/2014 | 12/31/2024 | AGREEMENT FOR THE SALE OF POWER AND ENERGY FOR RESALE TO THE TOWN OF DEAVER, WYOMING |
| TS-14-0164 | 9/1/2014 | SEE AGREEMENT | MASTER AGREEMENT FOR LARGE COMMERCIAL/INDUSTRIAL PERFORMANCE PRODUCTS |
| TS-14-0113 | 10/27/15 | SEE AGREEMENT | LETTER AGREEMENT FOR ADDITION OF SECOND NAHNE JENSEN TRANSFORMER |
| TS-13-0003 | 1/1/2013 | SEE AGREEMENT | DEMAND RESPONSE & ENERGY SHAPING MASTER AGREEMENT (RESIDENTIAL, SMALL COMMERCIAL AND IRRIGATION) |
| TS-11-0259 | 10/27/2011 | SEE AGREEMENT | LETTER AGREEMENT FOR RESERVED CAPACITY IN TRI-STATE NAHNE JENSEN TRANSMISSION FACILITIES FOR BIG HORN TO WHEEL POWER FOR ROCKY MOUNTAIN POWER |
| TS-11-0168A | 10/1/2015 | CONCURRENT WITH WESC | AMENDED AND RESTATED FACILITIES MANAGEMENT AGREEMENT |
| TS-04-0049 | 11/12/2004 | CONCURRENT WITH WESC | LETTER AGREEMENT FOR REIMBURSEMENT OF COSTS FOR WYMONT DELIVERY POINT PROJECT |
| TS-92-0034 | 4/10/1992 | CONCURRENT WITH WESC | LETTER AGREEMENT– NEW DELIVERY POINT (FRANNIE NO. 2) TO SERVE DAKOTA COAL COMPANY |
| TS-91-0003 | 5/8/1991 | CONCURRENT WITH WESC | LETTER AGREEMENT – USE OF TRI-STATE CURRENT TRANSFORMERS AT THE WAPA BASIN SUBSTATION |
| TS-81-0012 | 12/15/1981 | CONCURRENT WITH WESC | LICENSE AGREEMENT FOR THE INSTALLATION AND MAINTENANCE OF FACILITIES FOR EMS (SCADA) |

[Signature page follows.]

(Legal Approved Template)

Page 1 of 2

Docket No. ER21-2818-000

Exhibit No. TGT-0005
Page 14 of 20

## SCHEDULE A REVISION 4

## BIG HORN RURAL ELECTRIC COMPANY

The Parties have caused this Schedule A, Revision No. 4, to be duly executed the date first above written.

**TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.**

By (signature): _____ FOR JOEL K. BLADOW

Joel K. Bladow_____
Name (print):

Senior Vice President, Transmission_____
Title:

**BIG HORN RURAL ELECTRIC COMPANY**

By (signature): _____

~~Jeff Umphlett~~    Thomas P. Delaney____
Name (print):

~~Manager~~    President_____
Title:

(Legal Approved Template)

**Page 2 of 2**

## SCHEDULE B REVISION 5

### BIG HORN RURAL ELECTRIC COMPANY

This Schedule B, Revision No.5, made this _30_ day of _MARCH_ , 2016, is to be effective under and as part of the Wholesale Electric Service Contract, dated July 1, 2007, hereinafter called the "Contract," shall become effective on the date first written above and shall remain in effect until replaced by another revision; Provided that, this or any superseding Schedule B shall terminate upon expiration of the Contract.

**List of Delivery Points:**

| Delivery Point | Established Under | Nominal Delivery Voltage (kV) | Nominal Measurement voltage (kV) | Adjustment for | | Special Conditions Relating to Service |
|---|---|---|---|---|---|---|
| | | | | Transformer Losses (%) | Off Site Metering (%) | |
| Basin | TS-88-0028 | 34.5 | 34.5 | 0 | 0 | Town of Basin "South" meter readings increased by 2% and deducted coincidentally before billing. Town of Basin "North" meter readings increased by 1.2% and deducted coincidentally before billing. WAPA meters on each circuit. |
| Deaver | TS-14-0165 | 2.4 | 2.4 | 0 | 0 | PacifiCorp meter on 2.4 kV bus of its 34.5-2.4 kV transformer served from Frannie (PACE) Sub. |
| Frannie | ----- | 34.5 | 12.5 | 2 | 0 | WAPA meter. |
| Lovell 12.5 | --- | 12.5 | 12.5 | 0 | 0 | WAPA meter. |
| Lovell 34.5 | 2-07-70-P0284 | 115 | 34.5 | 2 | 0 | This delivery serves only Bentonite Plant load. WAPA meter. |
| Meeteetse | TS-02-0020 | 12.5 | 12.5 | 0 | 0 | Big Horn meter readings for the High Plains Power delivery point on Big Horn's 12.5 kV distribution system deducted coincidentally before billing. WAPA meter. |
| Nahne-Jenson (Greybull) | TS-14-0113 | 34.5 | 34.5 | 0 | 0 | Tri-State T1 & T2 meters summed coincidentally with WAPA's revenue/boundary meter readings for Pacificorp's 34.5 kV delivery point at Bentonite Tap,  increased by 2.6 % for losses and deducted before billing.  (As defined in the Distribution Service Agreement Between BHREC and PacifiCorp). |
| Wymont | TS-04-0049 | 34.5 | 34.5 | 0 | 0 | Replaced Frannie #2 delivery contract. PacifiCorp meter. |

[Signature page follows.]

(Legal Approved Template)

Page **1** of **2**

Docket No. ER21-2818-000

Exhibit No. TGT-0005
Page 16 of 20

## SCHEDULE B REVISION 5

## BIG HORN RURAL ELECTRIC COMPANY

The Parties have caused this Schedule B, Revision No.5, to be duly executed the date first above written.


**TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.**

By (signature): _____

Joel K. Bladow _____
Name (print):

Senior Vice President, Transmission _____
Title:



**BIG HORN RURAL ELECTRIC COMPANY**

By (signature): _____

~~Jeff Umphlett~~    Thomas P. Delaney
Name (print):

~~Manager~~    President
Title:

(Legal Approved Template)

Page **2** of 2

## SCHEDULE C REVISION 1
## BIG HORN RURAL ELECTRIC COMPANY

This Schedule C, Revision No. 1, made this _4ᵗʰ_ day of _September_, 2015, is to be effective under and as part of the Wholesale Electric Service Contract, dated July 1, 2007, hereinafter called the "Contract," shall become effective on the date first written above and shall remain in effect until replaced by another revision; Provided that, this or any superseding Schedule C shall terminate upon expiration of the Contract.

Exceptions to Section 7.(a) of the Contract:

**Resale Customer**

Town of Deaver, Wyoming

**Comments and/or conditions**

Conditions of service are stipulated in Contract No. TS-14-0165 Agreement for the Sale of Power and Energy for Resale to the Town of Deaver, Wyoming between Big Horn and Tri-State.

[Signature page follows.]

## SCHEDULE C REVISION 1
## BIG HORN RURAL ELECTRIC COMPANY

The Parties have caused this Schedule C, Revision No. 1 to be duly executed as of the date first above written.

**TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.**

By: _____

___Joel K. Bladow_____
Name:

___Senior Vice President, Transmission_____
Title:

**BIG HORN RURAL ELECTRIC COMPANY**

By: _____

___Jeff Umphlett_____
Name:

___Manager_____
Title:

(Legal Approved Template)                                    Page 2 of 2

SCHEDULE D

EXCERPT FROM SALT LAKE CITY INTEGRATED PROJECTS CONTRACT NO. 87-LAO-172, DATED MARCH 10, 1989, AND LOVELAND AREA PROJECTS CONTRACT NO. 87-LAO-134, DATED APRIL 28, 1987, BETWEEN THE UNITED STATES OF AMERICA AND TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.

12.    RESALE OF ELECTRIC SERVICE

12.1    The Contractor understands and agrees that, upon execution of this Contract:

12.1.1    The benefits of Federal power shall be made available to its consumers at rates that are established at the lowest possible level consistent with sound business principles, in an open and public manner, and the Contractor will so demonstrate to the Contracting Officer upon request.

12.1.2    Consumers receiving the benefits of Federal power will be supplied with information such that they can separately identify the composite energy and capacity costs, stated in mills per kWh, of Federal power and non-Federal power.

12.2    The Contractor may demonstrate compliance with this Resale Section by having its members make available to its customers, no later than 90 days after the end of each Summer Season and each Winter Season, a statement which separately identifies the Contractor's unit costs for Federal power and for non-Federal power, and the magnitude and type of other costs charged to the Contractor's customers during the previous season. The Contractor may make this information available to its customers by including the informational statement with the customer's power bill, by publishing the information in a newspaper of general circulation in the area served by the Contractor, or by any other method mutually agreed upon between Western and the Contractor. A copy of each seasonal statement shall also be provided to Western. Upon request the Contractor will provide the supporting information for its seasonal statement to Western.

12.3    The Contractor will have its members furnish to the Contracting Officer, the information of the United States, a copy of each schedule of resale rates in effect on the date of execution of this Contract and, upon adoption, a copy of each schedule of rates hereafter adopted.

12.4    The Contractor will have its members to the extent that different rules are not prescribed by State laws or by State or Federal agencies, maintain

1 - 1

proper books of account in accordance with the Uniform System of Accounts prescribed for public utilities and licensees by the Federal Energy Regulatory Commission.

12.5    The Contractor agrees to implement the distribution principles of Section 12.1 in its wholesale power contracts which include resale of Federal power upon modification or amendment thereof and all such subsequent wholesale power contracts upon execution thereof.

12.6    Failure to comply with the provisions of this Resale Section may result in the loss of all or a part of the resources committed to the Contractor under this Contract, as conclusively determined by Western's Administrator. The Contractor will be given written notice of noncompliance with this Section and will be given opportunity to comment prior to any final action by Western.

1 - 2

Document Accession #: 20220107-5229    Filed Date: 01/07/2022

# Exhibit No. TGT-0018

**Tri-State Rate Schedule No. 281**

**for Contract Termination Payment**

**Methodology and Procedures**

## Tri-State Generation and Transmission Association, Inc.
### Rate Schedule for Contract Termination Payment Methodology and Procedures

Tri-State Generation and Transmission Association, Inc.'s ("Tri-State") Utility Member[1] Contract Termination Payment ("CTP") is the amount of money a withdrawing Utility Member must pay to Tri-State so that remaining Utility Members are kept financially whole by the Utility Member's exit from Tri-State. The CTP is designed to allow a Utility Member to terminate its wholesale electric service contract ("WESC") with Tri-State, while leaving the remaining Utility Members financially unaffected. The following provisions set out the methodology that Tri-State will employ to calculate CTPs for its Utility Members ("CTP Methodology") and certain procedural terms governing the provision of CTPs and Utility Member withdrawal from Tri-State.

## I.  CTP METHODOLOGY PROCEDURES

### A.  Contract Termination

In order to terminate a Utility Member's WESC and its membership in Tri-State, a Utility Member must comply with the following requirements:

1.  provide a two-year advance notice of its intent to withdraw from Tri-State and terminate its WESC; and

2.  pay its CTP to Tri-State on the date of withdrawal, as calculated pursuant to the CTP Methodology.

Tri-State's Board of Directors has no discretion to prevent a Utility Member from terminating its membership in Tri-State, so long as the withdrawing Utility Member complies with the above requirements.

### B.  Annual CTP Calculations

Tri-State will provide CTP calculations to each of its Utility Members on or about April 1 of each year. A CTP calculation will remain valid through March 31 of the following year ("CTP Effective Period"). At any time during the CTP Effective Period, a Utility Member may provide written notice to Tri-State of its intent to terminate its WESC and withdraw from Tri-State at the then-effective CTP amount. Tri-State will not charge Utility Members for providing annual CTP calculations.

### C.  Timing of Withdrawal

A Utility Member that has provided written notice of withdrawal to Tri-State will terminate its WESC and membership in Tri-State effective on the first day of the month immediately following the second anniversary of its notice of withdrawal to Tri-State, or on such other date as Tri-State and the Utility Member agree ("Designated Withdrawal Date").

---

[1] The terms "Utility Member" and "Member" are used interchangeably in this rate schedule.

Appellate Case: 24-9538     Document: 66-1     Date Filed: 10/07/2024     Page: 128
Document Docket No.ER21-2818-000-5229     Filed Date: 01/07/2022

Exhibit No. TGT-0018
Page 2 of 11

### D. Data Inputs and Operating Assumptions

Tri-State will provide to each Utility Member the inputs used to calculate the Utility Member's CTP. The inputs used in the CTP Methodology shall be obtained from readily available and updated data sources, including the Federal Energy Regulatory Commission's ("FERC") Electric Quarterly Reports ("EQR"), Department of Energy-Energy Information Administration ("EIA") reports, Tri-State Eastern and Western Interconnect Open Access Transmission Tariff rates, Treasury Department and Federal Reserve Board data, and the Utility Member's individual load and patronage capital account information.

## II. CTP METHODOLOGY

### A. CTP Methodology

Under the CTP Methodology, a departing Utility Member's CTP shall be the *greater* of:

(1)  $(\sum_{n=1}^{n=L} Revenue\ Stream\ Estimate/(1+i)^{\wedge}(n-0.5))$, which is the net present value of Tri-State's estimated lost revenues that result from the Utility Member's departure prior to the expiration of its WESC. The Revenue Stream Estimate is equal to Gross Revenue Loss minus (i) the incremental revenues that Tri-State would receive from selling the withdrawing Utility Member's load into the wholesale market, (ii) any subsequent revenue Tri-State would receive from the departing Utility Member if the Utility Member becomes an Open Access Transmission Tariff ("OATT") customer, and (iii) the present value of the departing Utility Member's accrued, unpaid patronage capital balance; or

(2)  the departing Utility Member's Debt Covenant Obligation ("DCO"), which is the departing Utility Member's *pro rata* share of Tri-State's total debt and other obligations.

### B. Definitions of Terms

- **L** = expiration date of the withdrawing Utility Member's WESC (12/31/2050) minus the date of the Utility Member's withdrawal from Tri-State (measured in years).

- **Revenue Stream Estimate ("RSE")** = Gross Revenue Loss – Competitive Market Value Estimate – OATT Revenue Estimate – Patronage Capital Credit, where:

  o **Gross Revenue Loss ("GRL"):**

    ▪ **For an all-requirements Utility Member served under the current WESC.** GRL equals average annual Tri-State revenue as measured by the withdrawing Utility Member's most recent three-year wholesale electric service purchases from Tri-State (the sum of revenues derived from the then applicable Schedule A (Class A) wholesale generation and

2

transmission rate, LDR (Load Development and Retention Rate or contracts), and Schedule S (Standby Service Rate)). The Class A revenue component for the years 2018-2020 will be reduced by four percent in recognition of the Stated Rate settlement agreement.

- ▪ *For Utility Members served under a Partial Requirements Electric Service Contract ("PRESC") within the most recent three years*. GRL equals the sum of Parts One and Two. Part One is the average Tri-State revenue from the withdrawing Utility Member's most recent three-year purchases of transmission service under Schedule A, plus revenues from any LDR contract and Schedule S service. Part Two is the average annual revenue associated with PRESC generation service derived from Schedule A over the most recent three years, if applicable. If a Utility Member has been served under a PRESC for one full fiscal year (where a fiscal year coincides with Tri-State's annual budgeting process), Part Two generation revenue shall be used from that year. If a Utility Member has been served under PRESC for two full fiscal years, Part Two generation revenue shall be the average of these two years. A withdrawing Utility Member must have been served under the PRESC for at least one full fiscal year to be eligible for treatment under this paragraph; otherwise, the Utility Member's RSE will be the most recent three-year wholesale electric service purchases from Tri-State, as provided in the immediately preceding paragraph. The Class A revenue component for the years 2018-2020 will be reduced by four percent in recognition of the settlement agreement approved by the Federal Energy Regulatory Commission in *Tri-State Generation and Transmission Ass'n, Inc.*, 176 FERC ¶ 61,068 (2021).

- o *Competitive Market Value Estimate ("CMVE")*: the estimated annual revenue Tri-State will receive by selling the withdrawing Utility Member's load into the wholesale power market. A departing all-requirements Utility Member's load is the average of the sum of energy in megawatt-hours (MWh) purchased from Tri-State during the most recent three-year period under Schedules A and S, and any LDR contracts. A departing partial requirements Utility Member's load is the average amount of energy (MWh) purchased from Tri-State during the most recent three-year period under Schedule A (as adjusted for partial requirements consistent with the determination of GRL), Schedule S, and any LDR contracts. For each year of L, a withdrawing Utility Member's load is multiplied by the applicable forecasted market price ($/MWh).

- o *OATT Revenue Estimate ("ORE")*: the estimated annual OATT revenue Tri-State will receive from the withdrawing Utility Member. A withdrawing Utility Member's transmission demand (kW – TPP/MCP)[2] equals the average of the

---

[2] TPP-MCP means the Utility Member coincident peak demand during the Tri-State peak period as defined in Schedule A.

sum of TPP/MCP billing units during the most recent three-year period under Schedule A, Schedule S, and any LDR contract sales.  In each year of L, the withdrawing Utility Member's demand billing units are multiplied by the forecasted OATT rate ($/kW-mo.).  Unless otherwise agreed between Tri-State and a withdrawing Utility Member, the Utility Member is assumed to continue taking 100% of its transmission service from Tri-State through December 31, 2050.  A withdrawing Utility Member taking less than 100% of its future transmission service from Tri-State will have a lower ORE and a higher CTP.

o **_Patronage Capital Credit ("PCC")_**: the net present value of the departing Utility Member's patronage capital balance, amortized over L or 20 years, whichever is greater.

o **_Interest or Discount Rate ("i")_**: the average of the most recent three years' Daily Yield Curve Rate on 30-year U.S. Treasury Bonds plus the option-adjusted spread on U.S. corporate bonds with a Standard & Poor ("S&P") credit rating the same as Tri-State.

o **_Year ("n")_**: full year, in sequence, beginning with "1" through "L".  For each year, this variable is reduced by one-half to conform with the half-year convention used in discounting.  The half-year convention assumes that the annual RSE occurs evenly over the course of the year; therefore, the discount adjustment is applied at mid-year rather than year-end.

o **_Debt Covenant Obligation ("DCO")_**: the withdrawing Utility Member's *pro rata* portion (*i.e.*, its percentage of Tri-State's total Utility Member Revenues during the most recent calendar year) of Tri-State's indebtedness and other obligations on an unconsolidated basis at the time of the Utility Member's departure.  Indebtedness and other obligations shall include all of Tri-State's debt and liabilities (except regulatory liabilities).

**C.    Summary of Key Inputs and Variables**

| Variable | Description | Calculation |
|---|---|---|
| L | WESC Termination Date (12/31/2050) less – Utility Member Departure Date (in years) | Example: Utility Member exits 1/1/2025<br><br>Round to full years [12/31/2050 – 1/1/2025 = 26 years] |
| GRL | For, all-requirements Utility Members, the most recent three-year average Tri-State revenue derived from the sum of Schedule A, Schedule S, and any | For the most recent three full fiscal years, the sum of revenue associated with the departing Utility Member, divided by three. |

| Variable | Description | Calculation |
|---|---|---|
|  | LDR contract services. For the years 2018-2020, Class A revenue will be reduced by 4%.<br><br>For partial requirements Utility Members, the sum of Parts One and Two, where Part One is average Tri-State annual revenue derived from the transmission component of the most recent three years of Schedule A, Schedule S, and LDR contract revenues; and Part Two is the average of the most recent three years of generation revenue under PRESC, as applicable. Usage under PRESC will be based on historical actuals and averaged by the number of applicable years, up to three years. For the years 2018-2020, Class A revenue will be reduced by 4%. | $$\sum_{1}^{3} Member\ Revenue\ /3$$ |
| CMVE – Year (n=0) – Initial Market Price Estimate ("IMPE") | Most recent 3-year historical average of Tri-State and Public Service Company of Colorado wholesale market transactions as reported by FERC Electric Quarterly Reports.<br><br>FERC Tariff References:[3]<br>- First Revised Rate Schedule, FERC No. 6 | *See* Explanatory Note 1 |

---

[3] The FERC Tariff References described herein refer to the rate schedules in effect when a CTP is calculated pursuant to the CTP Methodology.

| Variable | Description | Calculation |
|---|---|---|
| | - Rate Schedule for Power Sales Second Revised Volume No. 6<br><br>- Market-Based Rate Tariff, FERC Electric Tariff<br><br>- NPU (Non-Public Utility) | |
| CMVE – Escalation | EIA Annual Electric Power Projections by Electricity Market Module Region (WECC/Rockies) – Prices by Service Category (2020 cents per kilowatt-hour) – Generation. | *See* Explanatory Note 2 |
| ORE – Year (n=0) – Current Weighted OATT Rate ("CWO") | Current East/ West OATT rates weighted by applicable Utility Member Load in the eastern and western interconnects. | *See* Explanatory Note 3 |
| ORE – Escalation | EIA Annual Electric Power Projections by Electricity Market Module Region (WECC/Rockies) – Prices by Service Category (2020 cents per kilowatt-hour) – Transmission. | *See* Explanatory Note 4 |
| PCC | Amortized over L, but not less than 20 years | *See* Explanatory Note 5 |
| "$i$" | Based on Tri-State's current credit rating as reported by S&P, equal to the average Daily Treasury | *See* Explanatory Note 6 |

| Variable | Description | Calculation |
|---|---|---|
|  | Yield Curve Rates for 30-year bonds plus BBB-rated US Corporate Index Option |  |
| "n" | Sequential year of RSE | "n" = 1,2,3,4,5, etc. to L |
| DCO | *Pro rata* Share of Tri-State's indebtedness and other obligations, excluding regulatory liabilities | The amount sufficient to avoid a Utility Member exit being included in the calculation of a "Member Termination Event" under Tri-State's 2014 and 2017 Note Purchase Agreements. |

**D.     Explanatory Notes**

1.  FERC EQR reports available at https://eqrreportviewer.ferc.gov/ (as may be modified by FERC).  Analysis relies on the reported market transactions for "Tri-State Generation and Transmission Association, Inc." and "Public Service Company of Colorado" initially over the calendar years 2018-2020.  To reflect current market pricing, the data set used to calculate IMPE includes the following market-based tariffs identified in the field "FERC tariff reference":

    a.   First Revised Rate Schedule, FERC No. 6;

    b.   Rate Schedule for Power Sales Second Revised Volume No. 6;

    c.   Market-Based Rate Tariff, FERC Electric Tariff; and

    d.   Non-Public Utility ("NPU").

For each transaction, the average market price expressed in dollars per megawatt hour ($/MWH) is calculated by dividing "total transaction charge" by the total of "transaction quantity" where "rate units" = "$/MWH" or "$/KWH".  Because transactions are expressed in $/MWH or $/KWH, a "rate units" adjustment is required so that all information is reported on a $/MWH basis. Total transaction costs include sales based on energy, capacity, or fixed fees.  To simplify the calculation and produce an IMPE that reflects market pricing most accurately, revenues from all transactions are summed and divided by total reported energy quantities.  For each year of the most recent three-year period that is used to determine the IMPE, the average rate is calculated by dividing "total transaction charge" by the total of "transaction quantity" where "rate units" = "$/MWH" to calculate an average $/MWH charge. The IMPE is the simple average of the market price for each year as follows:

$$IMPE = \frac{Market\ Price_{yr1} + Market\ Price_{yr2} + Market\ Price_{yr3}}{3}$$

*Where:*

Appellate Case: 24-9538    Document: 66-1    Date Filed: 10/07/2024    Page: 134
Document No.:20211228-5229    Docket No. ER21-2818-000    Filed Date: 01/07/2022    Exhibit No. TGT-0018

Page 8 of 11

$$Market\ Price_{yr\,(n)} = \frac{\begin{array}{c}\left(Total\ Transaction\ Charges\ (\$) - Total\ Transmission\ Charges\ (\$)\right)_{TriState\ yr\,(n)} + \\ \left(Total\ Transaction\ Charges\ (\$) - Total\ Transmission\ Charges\ (\$)\right)_{PSCo\ yr\,(n)}\end{array}}{\begin{array}{c}Total\ Transaction\ Quantities\ (MWH)_{TriState\ yr\,(n)} + \\ Total\ Transaction\ Quantities\ (MWH)_{PSCO\ yr\,(n)}\end{array}}$$

Some transactions are fixed fee or capacity-related, and therefore do not have energy quantities. For these transactions, the dollar value is included in the IMPE calculation without billing units. This approach -- adding transaction revenue to the IMPE numerator while holding the denominator constant, increases the average market price ($/MWH) to include the value of capacity and fixed price transactions. The substantial majority of EQR transactions included in the IMPE calculation are based on energy billing units and include a price that reflects the value of demand and energy. Therefore, the market price as expressed in $/MWH, includes both capacity and energy components excluding transmission.

2. IMPE is escalated using the most recently published *EIA Annual Energy Outlook 2021 Table 54*: Electric Power Projections by Electricity Market Module Region, Reference case, Western Electricity Coordinating Council / Rockies, available online at https://www.eia.gov/outlooks/aeo/data/browser/#/?id=62-AEO2021&region=5-24&cases=ref2021 (as may be modified from time to time).

Escalation rate is determined by applying year-to-year change in electricity utility prices per "Prices by Service Category – Generation (2020 cents per kilowatt-hour)" to Initial Market Price Estimate.

$$Annual\ Escalation\ Rate\ (Year\ 1) = \frac{Year\ 1\ EIA\ Generation\ Price}{Year\ 0\ EIA\ Generation\ Price}$$

$$Annual\ Escalation\ Rate\ (Year\ 2) = \frac{Year\ 2\ EIA\ Generation\ Price}{Year\ 1\ EIA\ Generation\ Price}$$

$$Annual\ Escalation\ Rate\ (Year\ n) = \frac{Year\ (n)\ EIA\ Generation}{Year\ (n-1)\ EIA\ Generation}$$

For each forecast year, the annual market price estimate is equal to the IMPE times the applicable annual escalation rate as follows:

| Year | Market Price | Annual Escalation Rate | Market Price Estimate |
|------|-------------|------------------------|----------------------|
| 0 | Initial Market Price Estimate | N/A | Initial Market Price Estimate |
| 1 | Market Price Estimate (Yr. 1) | $Annual\ Escalation\ Rate\ (Year\ 1)$ $= \dfrac{Year\ 1\ EIA\ Generation\ Price}{Year\ 0\ EIA\ Generation\ Price}$ | Initial Market Price Estimate * Annual Escalation Rate (Yr. 1) |

| 2 | Market Price Estimate (Yr. 2) | $Annual\ Escalation\ Rate\ (Year\ 2)$ $= \dfrac{Year\ 2\ EIA\ Generation\ Price}{Year\ 1\ EIA\ Generation\ Price}$ | (Yr. 1) Market Price Estimate * Annual Escalation Rate (Yr. 2) |
| n | Market Price Estimate (Yr. n) | $Annual\ Escalation\ Rate\ (Year\ (n))$ $= \dfrac{Year\ (n)\ EIA\ Generation\ Price}{Year\ (n-1)\ EIA\ Generation\ Price}$ | (Yr. n-1) Market Price Estimate * Annual Escalation Rate (Yr. (n)) |

Forecast market prices are applied to withdrawing Member's load over the same three-year period that is used in the determination of GRL.

$$Departing\ Member's\ Load = \left(\frac{\sum_1^3 Member\ Load\ (GRL)\ (MWH)}{3}\right)$$

For each year (n) over period L, annual CMVEs associated with wholesale power market sales equal withdrawing Member's Load multiplied by the Market Price Estimate in Year (n) as follows:

$$Departing\ Member's\ Load\ (MWH)\ (Year\ (n))\ X\ Market\ Price\ Estimate\ (Year\ (n))$$

3. Eastern and Western Interconnect OATT rates currently in effect are weighted by withdrawing Member Load in each region as follows:

$$[(Current\ Western\ Interconnect\ Effective\ OATT\ Rate\ X\ Member\ Load\ in\ Western\ Interconnect\ (MWH)) + (Current\ Eastern\ Interconnect\ Effective\ OATT\ Rate\ X\ Member\ Load\ in\ Eastern\ Interconnect\ (MWH))]\ /\ Total\ Member\ Load\ (MWH)$$

Where:

Member Load in Western Interconnect (MWH) =
$$\sum_1^3 \frac{Member\ Load\ in\ Western\ Interconnect\ (MWH)\ over\ the\ the\ same\ period\ as\ GRL}{3}$$

Member Load in Eastern Interconnect (MWH) =
$$\sum_1^3 \frac{Member\ Load\ in\ Eastern\ Interconnect\ (MWH)\ over\ the\ the\ same\ period\ as\ GRL}{3}$$

Total Member Load (MWH) =
$$\sum_1^3 \frac{Total\ Member\ Load\ (MWH)\ over\ the\ the\ same\ period\ as\ GRL}{3}$$

Note that for each Utility Member, total load is categorized as either eastern or western based on the region where the majority of load is served.

4. CWO is escalated using the most recently published *EIA Annual Energy Outlook 2021* Table 54: Electric Power Projections by Electricity Market Module Region, Reference case, Western Electricity Coordinating Council / Rockies, available online at

Appellate Case: 24-9538   Document: 66-1   Date Filed: 10/07/2024   Page: 136
Document Docket No. ER21-2818-000-5229      Filed Date: 01/07/2022      Exhibit No. TGT-0018

Page 10 of 11

https://www.eia.gov/outlooks/aeo/data/browser/#/?id=62-AEO2021&region=5-24&cases=ref2021 (as may be modified from time to time).

Escalation rate is determined by applying year-to-year change in electricity utility prices per "Prices by Service Category – Transmission (2020 cents per kilowatt hour)" to initial weighted OATT rate.

$$Annual\ Escalation\ Rate\ (Year\ 1) = \frac{Year\ 1\ EIA\ Transmission\ Price}{Year\ 0\ EIA\ Transmission\ Price}$$

$$Annual\ Escalation\ Rate\ (Year\ 2) = \frac{Year\ 2\ EIA\ Transmission\ Price}{Year\ 1\ EIA\ Transmission\ Price}$$

$$Annual\ Escalation\ Rate\ (Year\ (n)) = \frac{Year\ (n)\ EIA\ Transmission}{Year\ (n-1)\ EIA\ Transmission}$$

For each forecast year, the OATT rate is equal to the initial weighted OATT rate times the applicable annual escalation rate as follows:

| Year | Market Price | Annual Escalation Rate | Market Price Estimate |
|------|-------------|------------------------|----------------------|
| 0 | CWO | N/A | CWO |
| 1 | Forecasted OATT (Yr. 1) | $Annual\ Escalation\ Rate\ (Year\ 1) = \frac{Year\ 1\ EIA\ Transmission\ Price}{Year\ 0\ EIA\ Transmission\ Price}$ | CWO * Annual Escalation Rate (Yr. 1) |
| 2 | Forecasted OATT (Yr. 2) | $Annual\ Escalation\ Rate\ (Year\ 2) = \frac{Year\ 2\ EIA\ Transmission\ Price}{Year\ 1\ EIA\ Transmission\ Price}$ | (Yr. 1) OATT * Annual Escalation Rate (Yr. 2) |
| n | Forecasted OATT (Yr. n) | $Annual\ Escalation\ Rate\ (Year\ (n)) = \frac{Year\ n\ EIA\ Transmission\ Price}{Year\ (n-1)\ EIA\ Transmission\ Price}$ | (Yr. (n-1)) OATT * Annual Escalation Rate (Yr. (n)) |

Forecast OATT rates are applied to withdrawing Utility Member's load over the same three-year period that is used in the GRL and the percentage of Utility Member load to be served by Tri-State's transmission system over L.

$$Departing\ Member's\ Transmission\ Load =$$
$$\left[\left(\frac{\sum_1^3 Member\ Load\ (GRL)\ (kW-mo.(TPP-MPC))}{3}\right)\right] X\ \%\ of\ Member\ Load\ to\ be\ Served\ by$$
Tri-State's Transmission System over L

For each year (n) over period L, annual ORE associated with OATT revenues equal Departing Member's Load multiplied by the OATT Rate Estimate in Year (n) as follows:

$$Departing\ Member's\ Transmission\ Load\ (kW-mo.(TPP-MPC))\ (Year\ (n))\ X\ OATT\ Rate\ Estimate\ (Year\ (n))$$

5. A departing Member's accrued by unpaid Patronage Capital as of departure date will be amortized over L as follows:

$$Annual\ Patonage\ Capital\ Amortization\ Amount =$$
$$\frac{Current\ Patronage\ Capital\ Balance\ (from\ Tri-State's\ most\ recent\ financial\ statements)}{L\ or\ 20\ (whichever\ is\ greater)}$$

6. Interest or Discount Rate ($i$) used in present value calculations equals Daily Treasury Yield Curve Rates plus the simple average BBB US Corporate Index Option-Adjusted Spread (for Tri-State's current credit rating from S&P), with both components averaged over the same period as the RES.

Daily Treasury Yield Curve Rates are available at https://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=yield (as may be modified from time to time).

BBB US Corporate Index Option-Adjusted Spread available from "Economic Research Federal Reserve Bank of St. Louis" at https://fred.stlouisfed.org/series/BAMLC0A4CBBB#0 (as may be modified from time to time).

# Exhibit No. TGT-0019

**Tri-State Bylaws Amended and Restated**

**April 3, 2019**

Docket No. ER21-2818-000                                    Exhibit No. TGT-0019
                                                           Page 1 of 15

# RATE SCHEDULE FERC NO. 259

**TRI-STATE GENERATION & TRANSMISSION ASSOCIATION, INC.**

**ARTICLE I - MEMBERSHIP**

**AMENDED AND RESTATED ON APRIL 3, 2019**

**BYLAWS**
**OF**
**TRI-STATE GENERATION AND**
**TRANSMISSION ASSOCIATION, INC.**

**As Amended and Restated by**
**the Members on April 3, 2019**

**ARTICLE I**
**MEMBERSHIP**

Section 1:  Membership. Applicants for membership in this Corporation shall be eligible for membership by:

(a)     Executing a written application for membership and agreeing to pay the membership subscription applicable to the class of membership, if any, established by the Board of Directors from time to time;

(b)     Agreeing to purchase from this Corporation electric power and energy as hereinafter specified in Section 3 of this Article I; and

(c)     Subject to Sections 6 and 7 of Article II of these Bylaws, agreeing to comply with and be bound by the Articles of Incorporation and Bylaws of this Corporation and any rules and regulations that relate to or concern the governance, oversight or management of this Corporation as adopted by the Board of Directors.

Each member of this Corporation existing as of the date of these Bylaws shall be and continue to be a member of this Corporation, until withdrawal, expulsion or termination of such membership as contemplated herein.  Subject to the foregoing, no applicant shall become a member unless and until it has been accepted for membership by the Board of Directors or the members. No member may hold more than one membership in this Corporation, and no membership in this Corporation shall be transferable. Each member shall be entitled to one (1) vote and no more upon each matter submitted to vote at a meeting of the members.

Section 2: Additional Membership Classes.  Notwithstanding any other provision of these Bylaws to the contrary, the Board of Directors may establish one or more classes of membership in addition to the existing all-requirements class of membership.  Such additional membership classes may include, without limitation, one or more partial requirements membership classes whereby a member who chooses to be a member of that class shall assume responsibility for meeting a portion of its load requirements. Members may choose their class of membership subject to any terms and conditions of membership and rights and preferences and limitations on the rights and preferences of the members of each additional class of membership as the Board of Directors establishes from time to time.  Such rights and preferences and limitations on the rights and preferences may differ between membership classes and may be different for individual members within an additional class of membership. Provided however, that representation on the Board of Directors of any additional class of membership will be determined by a vote of the  members of this Corporation at a meeting of the members of this Corporation.

Section3:  Purchase of Electric Power and Energy.

(a)     Unless otherwise specified by written agreement, or by the terms of these Bylaws, each member shall terminate any contract which it may have for the purchase of electric power and energy from any other supplier when electric power and energy becomes available from this Corporation or as soon thereafter as it may legally do so, and shall purchase from this Corporation electric power and energy as provided in the member's contract with the Corporation. Each member shall pay therefor monthly at rates or on a basis to be determined from time to time in accordance with these Bylaws. In connection with such purchase, each member and this Corporation expressly disclaim any intent or agreement to be a partnership, joint venture, single or joint

Docket No. ER21-2818-000                                    Exhibit No. TGT-0019

Page 3 of 15

enterprise, or any other business form except that of a cooperative corporation and member.

(b)    It is expressly understood that amounts paid for electric power and energy in excess of the cost of service are furnished by members as capital in this Corporation, and not as profit of or to this Corporation, and each member shall be credited with capital so furnished as provided in these Bylaws. Each member shall also pay all amounts owed by such member to this Corporation as and when the same shall become due and payable.

(c)    The rates for electric power and energy and for any other services provided by this Corporation may be different for different classes of membership and may be different for individual members within an additional class of membership.

(d)    Existing members shall continue to purchase from this Corporation and this Corporation shall continue to sell to such members electric power and energy in accordance with the terms and conditions of the all-requirements contracts existing as of the date of these Bylaws, and as such all-requirements contracts may be amended or replaced by another all-requirements contract until (i) such all-requirements contract is terminated or expires in accordance with its terms or (ii) is modified, amended or replaced due to a change in the member's membership class.

<u>Section 4:  Withdrawal, Expulsion, Termination and Reinstatement of Membership</u>.

(a)    A member may withdraw from membership upon compliance with such equitable terms and conditions as the Board of Directors may prescribe provided, however, that no member shall be permitted to withdraw until it has met all its contractual obligations to this Corporation. The Board of Directors may, by the affirmative vote of not less than two-thirds (2/3) of all the directors, expel any member who fails to comply with any of the provisions of the Articles of Incorporation, Bylaws, or rules and regulations adopted by the Board of Directors from time to time, but only if such member shall have been given written notice by the Secretary of this Corporation that such failure makes it liable for expulsion from membership, and such failure shall have continued for at least ten (10) days after such notice was given. Any expelled member may be reinstated by vote of the Board or by vote of the members at any annual or special meeting.

(b)    Upon withdrawal, cessation of existence, or expulsion of a member, the membership of such member shall thereupon terminate. Termination of membership in any manner shall not release a member from any debts due this Corporation nor impair the obligations of a member under any contract with this Corporation.

(c)    The Board of Directors shall have authority to prescribe equitable terms and conditions to be applied when a member withdraws from membership, ceases existence, or is expelled from membership, and such may be done by policy or otherwise and may include procedures for the establishment of a trust fund to receive on behalf of such member's patrons all patronage capital as this Corporation may from time to time distribute to all of its members, or in lieu thereof procedures whereby a member proposing to withdraw from membership or ceases existence or who is expelled from membership, may elect to receive a discounted amount of patronage capital which has been allocated at the time of such withdrawal, cessation of existence, or expulsion from membership.

**ARTICLE II**
**RIGHTS AND LIABILITIES OF MEMBERS**

Section 1:  Property Interest of Members.  Members shall have no individual or separate interest in the property or assets of this Corporation, except that upon dissolution, after (a) all debts and liabilities of this Corporation shall have been paid, and (b) all capital furnished through patronage shall have been returned, as provided in these Bylaws, the remaining property and assets of this Corporation shall be distributed among the members in the proportion which the aggregate patronage of each bears to the total patronage of all members and former members pursuant to the provisions of applicable law.

Section 2:  Non-Liability For Debts of Corporation.  The private property of the members shall be exempt from execution or other liability for the debts of this Corporation and no member shall be liable or responsible for any debts or liabilities of this Corporation.

Section 3:  Operation of Member's System.  Except to the extent that failure shall be due to a cause beyond its control (such as failure of facilities, flood, earthquake, storm, fire, lightning, epidemic, war, riot, civil disturbance, labor disturbance, sabotage, inability to obtain permits, licenses, rights-of-way or authorizations from any local, state or federal agency or any person, or  restraint by court or public authority), which by exercise of due foresight the member could not have reasonably been expected to avoid, and which by exercise of due diligence it shall be unable to overcome, each member shall continuously operate and maintain its system for the full term of its contract with this Corporation, using reasonable diligence to supply therefrom to patrons within its service area (without contraction due to acts of omission of the member) electric energy provided by this Corporation pursuant to the contract.  This provision is enforceable by specific performance and/or injunction.

Section 4:  Transfers by a Member.  A member shall not take or suffer to be taken, with respect to a person or entity other than another member, any steps for reorganization or to consolidate with or merge into any corporation, or to dissolve and wind up its affairs, or to sell, lease, transfer or otherwise dispose of all or a substantial portion of its assets without approval of the Board of Directors.  The Board of Directors shall grant such approval if (a) either (i) the member pays and discharges this Corporation from further liability with respect to that member's proportionate share (as fairly apportioned by the Board) of this Corporation's long-term obligations (such as promissory notes, purchased electric energy, fuel, plant or equipment leases and the like) which have been incurred by this Corporation in order to have available electric energy service assuming compliance with these Bylaws; or (ii) the transferee or surviving corporation, as the case may be, is legally, financially and technically capable of performing the member's obligations and assumes, by delivery to this Corporation of a written instrument (satisfactory in form to this Corporation), all of the member's obligations; (b) the transfer will not make obtaining by this Corporation of debt capital unduly more difficult, expensive or burdensome; and (c) other conditions reasonably set by the Board of Directors to financially protect this Corporation and its other members or required by or on behalf of the holders of any long-term debt obligations then outstanding are met.

Section 5:  Debt Responsibility.  Each member shall pay all amounts owed by it to this Corporation as and when the same shall become due and payable. Any amount owed by a member to this Corporation shall first be deducted and offset against any payment or distribution by this Corporation of (a) capital furnished by or allocated to the member pursuant to Article VII of these Bylaws, (b) refunds with respect to revenues paid by the member for services provided by this Corporation, and (c) other amounts that may be owed to that member.

Section 6:  Independent Operation.  This Corporation and member agree that the Corporation shall independently operate and maintain an electricity generation and transmission system and that the member will independently operate and maintain a separate electricity distribution system. This Corporation and member each acknowledge that standards, rules and/or regulations concerning the operation and maintenance of their separate systems are different and are the product of government and industry sources that apply separately to the two different systems, and that each will be solely responsible for undertaking reasonable efforts to operate and maintain their independent systems consistent with sound practices as derived from the standards, rules and/or regulations that apply to each separately.

Section 7:  Control.  This Corporation and member each acknowledge that the Corporation has no control over or the right, ability or authority to control the electric facilities, power lines, operations or maintenance practices of the member and that others, including the member's own governing board, management, member-customers and regulators, if any, control the member and are best situated to exercise control, oversight and/or guidance of the member's operations and maintenance practices.

## ARTICLE III
## MEETINGS OF MEMBERS

Section 1:  Annual Meeting.  The annual meeting of the members of this Corporation shall be held prior to September 30 of each year, and in any such location within any state where any of the members serve, the exact date and location to be determined by the Board of Directors. Failure to hold the annual meeting at the designated time shall not work a forfeiture or dissolution of this Corporation.

Section 2:  Special Meetings.  Special meetings of the members of this Corporation shall be held at the place, time and date specified in the notice of the meeting. A special meeting may be called by (a) a resolution of the Board of Directors, upon a written request signed by any ten (10) directors, (b) by the Chairman and President, or (c) by twenty-five percent (25%) of the members by written petition submitted to the Chairman and President. It shall thereupon be the duty of the Secretary to cause notice of such meeting to be given as hereinafter provided.

Section 3:  Notice of Meetings.  Notice of a meeting of the members shall state the time, date, place, and in the case of a special meeting, purpose of the special meeting. The notice of a meeting of the members must be delivered by the Secretary at least thirty (30) days, but no more than sixty (60) days, before the date of the meeting, either personally, by appropriate telecommunication methods or by mail, to each member at the direction of the Chairman and President or the Secretary or the persons calling the meeting. If mailed, such notice shall be deemed delivered ten (10) days after it is deposited in the United States mail, postage paid and addressed to the member at its address as it appears on the records of this Corporation. Failure of any member to receive such notice shall not invalidate any action taken by the members at such meeting.

Section 4:  Delegates.  Each member shall be entitled to select one of its directors, trustees or general manager (which may, but is not required to be, the same person as the member's director serving on the Board), to act as the delegate, and alternate delegate or alternate delegates, at meetings of the members of this Corporation. Such delegate or alternate delegate(s) when so selected shall continue to be the delegate or alternate(s), respectively, of such member until he or she shall resign or cease to be a director, trustee or general manager of the member or the member shall have selected a successor delegate or alternate(s) and shall have notified the Secretary of this Corporation by a written instrument executed in the name of the member through its proper officer or officers. In the event any member shall fail to select a delegate or alternate delegate(s) as herein provided or the delegate or alternate(s) selected by such member are unable or unwilling to serve or for any cause fail to so serve, the President of the member shall serve as its representative and cast its vote.

Section 5:  Quorum.  The presence of delegates representing at least a majority of the members shall constitute a quorum for the transaction of business at meetings of the members.  If less than a quorum is present at any meeting, a majority of those delegates present in person may adjourn the meeting from time to time without further notice.

Section 6:  Voting.  At all meetings of the members at which a quorum is present, all questions shall be decided by a vote of a majority of the members voting thereon except as otherwise provided by law, the Articles of Incorporation or these Bylaws.  Each member shall be entitled to only one (1) vote upon each matter submitted to a vote at a meeting of the members. In the event the delegate of a member is absent, or is unable or refuses to act, the alternate delegate(s) designated by such member shall act in his or her stead and shall cast the vote of such member. However, if both the delegate and the alternate delegate(s) of such member are absent, or are unable or refuse to act, then the President of such member may represent and cast the vote of such member as provided in Section 4 of this Article.  No individual may represent more than one member.

## ARTICLE IV
## DIRECTORS

<u>Section 1:  General Powers</u>.  The business and affairs of this Corporation shall be managed by a Board of Directors which shall exercise all of the powers of this Corporation except such as are by law, the Articles of Incorporation or these Bylaws conferred upon or reserved to the members.

<u>Section 2:  Qualifications; Removal</u>.  No person shall be eligible to become or remain a director of this Corporation who is not a director, trustee or general manager of a member of this Corporation. The Board of Directors may remove any director for cause, which includes but is not limited to, a director holding office in violation of this Section.

<u>Section 3:  Election and Certification</u>.  Except as provided in Section 4 hereof, each member shall elect one (1) of its directors, trustees or its general manager to serve on the Board of Directors of this Corporation.  Each member shall certify the name of such person to this Corporation by means of the Secretary of each member promptly informing the Secretary of this Corporation in writing of such person's name.

<u>Section 4:  Tenure of Office</u>. Each director shall serve until his or her member elects some other person to serve and the fact of such election is certified to this Corporation by such member in writing; provided, however, that a person shall be eligible to be elected a director, and shall be eligible to remain a director, only if he or she has the qualifications set forth in these Bylaws.

Each existing director shall be deemed elected by the member of which he or she is a director, trustee or general manager unless such director's member elects some other person in accordance with the provisions of Section 3 hereof and the fact of such election is certified to this Corporation by such member in writing.

<u>Section 5:  Vacancies</u>.  A vacancy occurring in the Board of Directors shall be filled by the member losing representation because of the vacancy, electing some other person in accordance with the provisions of Section 3 hereof and certifying the fact of such election to this Corporation in writing.

<u>Section 6:  Compensation</u>. Directors shall receive no salary for their services, as directors, except that by resolution of the Board of Directors a fixed sum and expenses of attendance, if any, may be allowed for attendance at each regular or special meeting of the Board of Directors and for attendance at each local, state, regional, and national meeting, hearing or convention of other organizations in which this Corporation has subscribed to membership under Section 1 of Article XI of these Bylaws, and for attendance at other meetings, hearings, or conventions where directors are acting on behalf of this Corporation  and within the scope of their authority as directors of this Corporation.  The purpose of authorizing directors to attend such meetings, hearings, and conventions shall be to permit them to do and perform all acts and things and to execute all powers which may be necessary, convenient or appropriate to accomplish the purpose for which this Corporation is organized.  No director shall receive compensation for serving this Corporation in any other capacity, nor shall any close relative of a director receive compensation for serving this Corporation, unless payment and amount of compensation shall be specifically authorized by a vote of the members or the service by such director or close relative shall have been certified by the Board of Directors as an emergency measure; provided, however, this Corporation may provide a per diem compensation and reimbursement of out-of-pocket expenses for the Chairman and President, and for any other officer or director of this Corporation who is specifically authorized by the Board to undertake a specific assignment because the Chairman and President is unable to do so, so long as such compensation and expenses are reasonable in amount, are for services rendered to this Corporation and are expenses incurred in connection with said services, and that such services are in addition to services rendered as a director. Notwithstanding the foregoing, any per diem compensation which is authorized for additional services shall not be more than 25% greater than this Corporation's per diem compensation for its directors.

<u>Section 7:  Action Taken Without a Meeting</u>.  Notwithstanding any other provision hereof, any action required by law to be taken at a meeting of the Board of Directors of this Corporation, or any action which may be taken at a meeting of the Board of Directors of this Corporation, may be taken without such meeting if a consent in writing, setting forth the action taken, shall be signed by all of the directors entitled to vote with respect to the subject matter thereof.  Such consent shall have the same force and effect as a unanimous vote of such directors.

## ARTICLE V
## MEETINGS OF DIRECTORS

<u>Section 1: Regular Meetings</u>.  A regular meeting of the Board of Directors shall be held without notice, immediately after, and at the same place as the annual meeting of the members.  Regular meetings of the Board of Directors shall be held at least 12 times in each year at such times and places as the Board of Directors may provide.  Such regular meetings may be held without notice other than appropriate Board action at a meeting fixing the time and place thereof. Meetings may be conducted by telephonic or video conference.

<u>Section 2: Special Meetings</u>.  Special meetings of the Board of Directors may be called by the Chairman and President or a majority of the directors, and it shall thereupon be the duty of the Secretary to cause notice of such meeting to be given as hereinafter provided.  The Chairman and President or the directors calling the meeting shall fix the time and place for the holding of the meeting.

<u>Section 3: Notice of Directors' Meetings</u>.  Written notice of the time, place and purpose of any special meeting of the Board of Directors shall be delivered to each director not less than five (5) days previous thereto, either personally, by appropriate telecommunications methods or by mail, by or at the direction of the Secretary, or upon a default in duty by the Secretary, by the Chairman and President or the directors calling the meeting.  If mailed, such notice shall be deemed to be delivered five (5) days after it is deposited in the United States mail and addressed to the director at his or her address as it appears on the records of this Corporation with postage thereon prepaid.

<u>Section 4: Quorum</u>.  A majority of the directors shall constitute a quorum; provided, that if less than such majority of the directors is present at said meeting, a majority of the directors present may adjourn the meeting from time to time; and provided further, that the Secretary shall notify any absent directors of the time and place of such adjourned meeting.  The act of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

<u>Section 5: Presence of Others</u>.  The Board of Directors may, at its option, exclude any person, other than a director, from a meeting of the Board of Directors.

## ARTICLE VI
## OFFICERS

<u>Section 1: Number</u>.  The officers of this Corporation shall be a Chairman and President, Vice-Chairman, Secretary, Treasurer, two or more Assistant Secretaries and such other officers as may be determined by the Board of Directors from time to time.

<u>Section 2: Election and Term of Office</u>.  The officers shall be elected by secret ballot, annually by and from the Board of Directors at the meeting of the Board of Directors held immediately after the annual meeting of the members.  If the election of officers shall not be held at such meeting, such election shall be held as soon thereafter as conveniently may be.  Each officer shall hold office until the first meeting of the Board of Directors following the next succeeding annual meeting of the members or until such officer's successor shall have been elected and shall have qualified.  A vacancy in any office shall be filled by the Board of Directors for the unexpired portion of the term.

<u>Section 3: Removal of Officers by the Board of Directors</u>.  Any officer elected or appointed by the Board of Directors may be removed by the Board of Directors (1) if the officer ceases to be a board member for whatever reason, or (2) whenever in its judgment the best interest of this Corporation will be served thereby.  In addition, any director may request removal of an officer by filing with the Secretary such a written list of reasons for removal together with a petition signed by at least twenty-five percent (25%) of the directors.  The officer involved shall be informed in writing of the reasons at least thirty (30) days prior to the Board meeting at which removal is to be considered, and shall have an opportunity to be present or represented by counsel at the meeting and to present relevant evidence, and the director or directors seeking removal of such officer shall have the same opportunity.

<u>Section 4:  Chairman and President</u>.  The Chairman and President shall:

     (a)    Be the principal executive officer of this Corporation and, unless otherwise determined by the members or the Board of Directors, shall preside at all meetings of the members and the Board of Directors;

     (b)    Sign any deeds, mortgages, deeds of trust, notes, bonds, contracts or other instruments authorized by the Board of Directors to be executed, except in cases in which the signing and execution thereof shall be expressly delegated by the Board of Directors or by these Bylaws to some other officer or agent of this Corporation, or shall be required by law to be otherwise signed or executed; and

     (c)    In general perform all duties incident to the office of Chairman and President and such other duties as may be prescribed by the Board of Directors from time to time.

<u>Section 5:  Vice-Chairman</u>.  In the absence of the Chairman and President, or in the event of the Chairman and President's inability or refusal to act, the Vice-Chairman shall perform the duties of the Chairman and President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Chairman and President.  The Vice-Chairman shall also perform such other duties as from time to time may be assigned to the Vice-Chairman by the Board of Directors.

<u>Section 6:  Secretary</u>.  The Secretary shall:

     (a)    See that the minutes of the meetings of the members and of the Board of Directors are kept in one or more books provided for the purpose;

     (b)    See that all notices are duly given in accordance with these Bylaws or as required by law;

     (c)    See that the corporate seal is affixed to all documents, the execution of which on behalf of this Corporation under its seal is duly authorized in accordance with the provisions of these Bylaws;

     (d)    See that a register of the names and post office addresses of all members is kept;

     (e)    See that the books and records of this Corporation are kept as required by law;

     (f)    See that there is kept on file at all times at the office of this Corporation a complete copy of the Articles of Incorporation and Bylaws of this Corporation containing all amendments thereto (which copy shall always be open to the inspection of any member), and at the expense of this Corporation that there is forwarded a copy of the articles and bylaws and all amendments thereto to each member and to each delegate who requests the same; and

     (g)    In general perform all duties incident to the office of Secretary and such other duties as from time to time may be assigned to the Secretary by the Board of Directors.

<u>Section 7:  Treasurer</u>.  The Treasurer shall:

     (a)    Have general charge and custody of and be generally responsible for all funds and securities of this Corporation;

     (b)    Be generally responsible for the receipt of and the issuance of receipts for all monies due and payable to this Corporation, and for the deposit of all such monies in the name of this Corporation in accordance with the provisions of these Bylaws; and

       (c)    In general perform all the duties incident to the office of Treasurer and such other duties as from time to time may be assigned to the Treasurer by the Board of Directors.

<u>Section 8:  Chief Executive Officer</u>.  The Board of Directors may appoint a Chief Executive Officer who may be, but who shall not be required to be, a member of any member of this Corporation, and who shall perform such duties and shall exercise such authority as the Board of Directors may from time to time vest in such Chief Executive Officer.  The Chief Executive Officer may not serve as a director of this Corporation.

<u>Section 9:  Assistant Secretaries</u>.  The Board of Directors shall appoint at least two Assistant Secretaries, each of whom shall be a Board member, who shall assist the Secretary in performing the duties of that office.  An Assistant Secretary, unless otherwise directed by the Board or the Secretary, may give all notices and attest to all documents of this Corporation in the stead of the Secretary, reporting to the Secretary with respect to all actions taken in his or her stead.

<u>Section 10:  Bonds of Officers</u>.  The Treasurer and any other officer or agent of this  Corporation charged with responsibility for the custody of any of its funds or property shall (at this Corporation's expense) give bond in such sum and with such surety as the Board of Directors shall determine.  The Board of Directors in its discretion may also require any other officer, agent or employee of this Corporation to give bond in such amount with such surety as it shall determine.

<u>Section 11:  Compensation</u>.  The powers, duties and compensation of officers and agents shall be generally determined by the Board of Directors, subject to the provisions of these Bylaws and applicable state law with respect to compensation for directors, and close relatives of directors.

<u>Section 12: Reports</u>.  The officers of this Corporation shall submit at each annual meeting of the members reports covering the business of this Corporation for the previous fiscal year.  Such reports shall set forth the condition of this Corporation at the close of such fiscal year.

<u>Section 13:  Executive Committee</u>.  An Executive Committee shall be established, consisting of nine (9) persons, namely the Chairman and President, the Vice-Chairman, the Secretary, the Treasurer and two Assistant Secretaries of this Corporation at any time duly elected by the Board of Directors and then holding office, plus three (3) members at large elected by and from the Board of Directors.  At all times, at least two (2) Committee members shall be directors representing former members of Plains Electric Generation and Transmission Cooperative, Inc.; at least one (1) Committee member shall be a director representing a member headquartered in Colorado; at least one (1) Committee member shall be a director representing a member headquartered in Wyoming; and at least one (1) Committee member shall be a director representing a member headquartered in Nebraska. The Executive Committee, subject to applicable law, shall have the power to act for and in the place of the Board of Directors at any duly called meeting of the Board of Directors at which a quorum is found not to be present, and also in the event of the necessity of taking action under any circumstances that the Executive Committee shall consider and make a formal finding that a situation exists requiring action before a meeting of the Board of Directors can be called, but only if a majority of the members of the Committee are present and at least five (5) of the Committee members shall vote in agreement upon any action taken by the Committee.  It shall be the duty of the Secretary of the Corporation to prepare minutes of all meetings and actions of the Executive Committee, to record the same as a part of the minutes and records of the Board of Directors, and, after each such meeting or action, to promptly provide a copy of the minutes to each member of the Board of Directors.

<div align="center">

**ARTICLE VII**
**OPERATION AS A COOPERATIVE CORPORATION**

</div>

<u>Section 1:  Cooperative Corporation</u>. The Corporation and members agree that the Corporation is and shall organize as a cooperative corporation under the laws of the State of Colorado. No other business form arising from the relationship between the Corporation and the member is agreed to, intended or permitted, including without limitation partnership, joint venture, single or joint enterprise, nor is any agency, fiduciary or similar relationship agreed to, intended or permitted.  The sole relationship between this Corporation and each member shall be that of a cooperative corporation and member as provided by Colorado statutory law.

<div align="center">

8
V1-141

</div>

**Section 2:   Interest or Dividends on Capital Prohibited**.  The Corporation shall at all times be operated on a cooperative non-profit basis for the mutual benefit of its members.  No interest or dividends shall be paid or payable by the Corporation on any capital furnished by its members.

**Section 3:  Patronage Capital in Connection With Furnishing Electric Energy**.  In the furnishing of electric energy the Corporation's operations shall be so conducted that all members will through their patronage furnish capital for the Corporation.  In order to induce patronage and to assure that the Corporation will operate on a non-profit basis, the Corporation is obligated to account on a patronage basis to all its members for all amounts received and receivable from the furnishing of electric power and energy in excess of the sum of (a) operating costs and expenses properly chargeable against the furnishing of electric power and energy, (b) amounts required to offset any losses incurred during the current or any prior fiscal year, and (c) adjustments to reserves or deferred credit accounts for the purpose of stabilizing margins and rate increases from year to year. The sum of subparagraphs (a), (b) and (c) shall be identified as "operating costs and expenses" for purposes of this Article.  All amounts in excess of operating costs and expenses at the moment of receipt by the Corporation are received with the understanding that they are furnished by the members as capital and are not profit to or from the Corporation or its operations.  The Corporation is obligated to allocate by credits, to a capital account for each member, all such amounts in excess of operating costs and expenses.  The books and records of the Corporation shall be set up and kept in such a manner that at the end of each fiscal year the amount of capital, if any, so furnished by each member is clearly reflected and credited in an appropriate record to the capital account of each member, and the Corporation shall, within a reasonable time after the close of the fiscal year, notify each member of the amount of capital so credited to such member's account.  All such amounts credited to the capital account of any member shall have the same status as though they had been paid to such member in cash in pursuance of a legal obligation to do so and such member had then furnished the Corporation corresponding amounts for capital.

All other amounts received by the Corporation from its operations in excess of costs and expenses shall, insofar as permitted by law, be used to offset any losses incurred during the current or any prior fiscal year; and to the extent not needed for that purpose, allocated to its members on a patronage basis, and any amount so allocated shall be included as a part of the capital credited to the accounts of members, as herein provided.

Allocation units may be established by the Board of Directors on a reasonable and equitable basis.  If allocation units are established, the Board of Directors shall adopt such reasonable and equitable accounting procedures as will, in the Board's judgment, equitably allocate among such allocation units this Corporation's items of income, gain, expense and loss.  The Board of Directors may establish procedures under which a net loss incurred within an allocation unit may be offset against the net margins earned by another allocation unit or units and the right, if any, of such other allocation unit or units to recoup such offset out of future net margins of the allocation unit that incurred the net loss.  The Corporation shall give reasonable notice to each member of the effect of such offset on its capital credit allocation.

In the event of dissolution or liquidation of the Corporation, after all outstanding indebtedness of the Corporation shall have been paid, outstanding capital credits shall be retired without priority on a pro rata basis before any payments are made on account of property rights of members.  If, at any time prior to dissolution or liquidation, the Board of Directors shall determine that the financial condition of the Corporation will not be impaired thereby, the capital then credited to members' accounts may be retired in full or in part and such may be done by policy or otherwise.

Capital credited to the account of each member shall be assignable only on the books of the Corporation pursuant to written instruction from the assignor and only to successors in interest in the business or the physical assets of such member unless the Board of Directors, acting under policies of general application, shall determine otherwise.

The members of the Corporation, by dealing with the Corporation, acknowledge that the terms and provisions of the Articles of Incorporation and Bylaws shall constitute and be a contract between the Corporation and each member and both the Corporation and the member are bound by such contract, as fully as though each member had individually signed a separate instrument containing such terms and provisions.  The provisions of this article of the Bylaws shall be called to the attention of each member of the Corporation by keeping a copy of such Bylaws available for inspection by any member in the Corporation's office.

**ARTICLE VIII**
**DISPOSITION OF PROPERTY**

This Corporation may not sell, mortgage, lease or otherwise dispose of or encumber all or any substantial portion of its property unless such sale, mortgage, lease or other disposition or encumbrance is authorized at a meeting of the members thereof by the affirmative vote of not less than two-thirds (2/3) of all the members of this Corporation, and unless the notice of such proposed sale, mortgage, lease or other disposition or encumbrance shall have been contained in the notice of the meeting. It is understood, however, that this Article shall not apply to a merger or consolidation of this Corporation with any other cooperative corporation, and it is further understood that, notwithstanding anything herein contained, the Board of Directors of this Corporation, without the authorization by the members thereof, shall have full power and authority to authorize the execution and delivery of a mortgage or mortgages or a deed or deeds of trust upon, or the pledging or encumbering of, any or all the property, assets, rights, privileges, licenses, franchises, and permits or other things of value of this Corporation, whether acquired or to be acquired and wherever situated, as well as the revenues and income therefrom, all upon such terms and conditions as the Board of Directors shall determine, to secure any indebtedness of this Corporation.

**ARTICLE IX**
**SEAL**

The corporate seal of this Corporation shall be in such form as may be approved by the Board of Directors from time to time.

**ARTICLE X**
**FINANCIAL TRANSACTIONS**

Section 1: Contracts. Except as otherwise provided in these Bylaws, the Board of Directors may authorize any officer or officers, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of this Corporation, and such authority may be general or confined to specific instances.

Section 2: Checks, Drafts, Etc. All checks, drafts or other orders for the payment of money, and all notes, bonds or other evidences of indebtedness issued in the name of this Corporation shall be signed by such officer or officers, agent or agents, employee or employees of this Corporation and in such manner as shall from time to time be determined by resolution of the Board of Directors.

Section 3: Deposits. All funds of this Corporation shall be deposited from time to time to the credit of this Corporation in such financial institutions selected by the Board of Directors. Such financial institutions must have deposits insured. In addition, funds of this Corporation also may be deposited in such investment securities or funds as the Board of Directors may elect.

Section 4: Fiscal Year. The fiscal year of this Corporation shall begin on the first day of January of each year and shall end on the 31st day of December of the same year.

**ARTICLE XI**
**MISCELLANEOUS**

Section 1: Membership in Other Organizations. This Corporation may become a member of or purchase stock in any other organization without an affirmative vote of the members, upon an express determination by the Board of Directors that such membership or purchase of stock is in the best interests of this Corporation.

Section 2: Interested Transactions. No contract or other transaction between this Corporation and a member shall be affected or invalidated by reason of the mere fact that any one (or more) of the Board members, officers or other members of the management of this Corporation is (or are) interested in or is (or are) a member(s), trustee(s), officer(s), or employee(s) of such member or of a cooperative corporation, nonprofit corporation, partnership, joint venture, trust, unincorporated association or other entity in which the member is interested or is (or are) a patron(s) or interested in a patron(s) of such member. Such an interested Board member may be counted for the

purpose of determining the presence of a quorum, and he or she may participate in any discussion and the voting relating to such a contract or other transaction. Nothing herein shall affect, however, that Board member's responsibility to perform his or her duties in good faith, in a manner the Board member believes to be not opposed to the best interest of this Corporation and otherwise in accordance with applicable law.

Section 3:  Waiver of Notice.  Any member, delegate or director may waive in writing any notice of a meeting required to be given by these Bylaws.  The attendance of a member, delegate or director at any meeting shall constitute a waiver of notice of such meeting by such member, delegate, or director, except in case a member, delegate, or director shall attend a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting has not been lawfully called or convened.

Section 4:  Accounting System and Reports.  The Board of Directors shall cause to be established and maintained a complete accounting system which, among other things, shall conform to Generally Accepted Accounting Principles (GAAP) and to the applicable laws and rules and regulations of any regulatory body having jurisdiction and applicable provisions of this Corporation's loan contracts.  The Board of Directors also shall, after the close of each fiscal year, cause to be made a full and complete audit of the accounts, books and financial condition of this Corporation as of the end of each fiscal year.  Such audit reports shall be submitted to the members at the next following annual meeting.

Section 5:  Indemnification:

    (a)    Officers', Board Members' and Employee's Indemnification.  Subject to paragraphs (c), (d) and (e) of this Section 5, this Corporation shall indemnify any person who is or was a Board member, Officer or employee of this Corporation and any person who, while a Board member or Officer of this Corporation, is or was serving at the request of this Corporation as a director, Officer, partner, employee or agent of another cooperative or of a foreign or domestic corporation or nonprofit corporation, partnership, joint venture, trust, unincorporated enterprise or employee benefit plan or trust, and who is made a  party to any action, suit or proceeding, civil or criminal, by reason of holding or having held such office or position.

    (b)    Agents' Indemnification.   Subject to paragraphs (c), (d) and (e) of this Section 5, this Corporation may indemnify any person, other than a Board member, an Officer or employee acting as such, who has or had an agency relationship with this Corporation and who is made a party to any action, suit or proceeding, civil or criminal, by reason of service during the course of such relationship, including service at the request of this Corporation as a trustee, Officer, partner, employee or agent of another cooperative or of a foreign or domestic corporation or nonprofit corporation, partnership, joint venture, trust, unincorporated association, other incorporated or unincorporated enterprise or employee benefit plan or trust.

    (c)    Indemnification Disqualification.  A Board member, Officer or other person shall not be indemnified in connection with a proceeding by or in the right of this Corporation in which he or she was adjudged liable to this Corporation.  A Board member, Officer or other person shall, further, not be indemnified in connection with any proceeding charging improper personal benefit derived by him or her, whether or not involving action in an official capacity, in which he or she was adjudged to be liable on the basis that the personal benefit was improperly derived. There shall be no indemnification unless the Board finds that the indemnitee:

        (i)    conducted himself or herself in good faith;

        (ii)    reasonably believed (I) in the case of conduct in an official capacity, that his or her conduct was in the best interests of this Corporation, and (II) in all other cases, that his or her conduct was at least not opposed to the best interests of this Corporation; and

(iii)      in the case of any criminal proceeding, had no reasonable cause to believe the person's conduct was unlawful.

Termination of any proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall not, of itself, be determinative that the person is disqualified from receiving indemnification.

(d)    <u>Indemnification Amount</u>.  Indemnification shall, pursuant to paragraph (a), and may pursuant to paragraph (b), be made against judgments, penalties, fines, settlements and compromises, cost and expenses, including attorneys' fees, reasonably incurred by or on behalf of the indemnitee in connection with the defense of such proceeding. Reasonable expenses incurred by a Board member, Officer or other person who is a party to a proceeding may be paid or reimbursed by this Corporation in advance of the final disposition of such proceeding if:

(i)       such person furnishes this Corporation with a written affirmation of his or her good faith belief that he or she is not disqualified from receiving indemnification under paragraph (c) of this Section;

(ii)      such person furnishes to this Corporation a written undertaking by or on behalf of the person to repay such amount if it shall ultimately be determined that he or she is disqualified or, in the case of a person other than a Board member or an Officer acting as such, not fully indemnified in the Board's discretion; and

(iii)     a determination is made that the facts then known to those making the determination would not preclude indemnification.

(e)    <u>Indemnification Procedure</u>.  No indemnification under paragraphs (a) and (b) of this Section 5 shall be made unless authorized in the specific case after a determination has been made that indemnification is permissible in accordance with applicable state law and these Bylaws. Such determination shall be made:

(i)       by the Board by a majority vote of a quorum of Board members not at the time parties to the proceeding;

(ii)      if such a quorum cannot be attained, by a majority vote of a committee of the Board duly designated to act in the matter by a majority vote of the full Board, in which designated Board members who are parties may participate, and consisting solely of two or more Board members not at the time parties to the proceeding;

(iii)     by special legal counsel, selected by the Board or a committee thereof by vote as set forth in subparagraphs (i) or (ii) of this paragraph (e) or, if the requisite quorum of the full Board cannot be obtained therefor and such committee cannot be established, by a majority vote of the full Board, in which selection Board members who are parties may participate; or

(iv)     pursuant to a resolution of a majority of the members present and voting at any annual or special meeting.

Authorization of indemnification and determination as to the amount thereof shall be made in the same manner as the permissibility determination, except that if the permissibility determination is made by special legal counsel, authorization and amount determination shall be made in a manner specified in paragraph (e)(iii) of this Section 5 for the selection of such counsel.

### ARTICLE XII
### AMENDMENTS

These Bylaws may be altered, amended or repealed by the members of this Corporation at any regular or special meeting provided that the notice of such meeting shall have contained a copy of the proposed alteration, amendment or repeal.  At any such meeting, the proposed alteration, amendment or repeal may be amended by the affirmative vote of a majority of the members of this Corporation.  These Bylaws may also be altered, amended or repealed by the affirmative vote of not less than two-thirds (2/3) of the members of the Board of Directors at any regular or special meeting of said Board, provided that written notice of the proposed alteration, amendment or repeal shall be mailed to each member of the Board of Directors and each member of this Corporation not less than forty-five (45) days before the date of such meeting.  The directors, at such meeting, may amend the proposed alteration, amendment or repeal, but the same shall not become effective until written notice thereof has been mailed to each member of this Corporation not less than forty-five (45) days before the effective date thereof.  At any time prior to the date of such meeting or prior to the effective date of such amended alteration, amendment or repeal, any ten (10) or more members of this Corporation may file a written resolution with the Secretary of this Corporation in protest of the proposed alteration, amendment or repeal of these Bylaws or of the amended alteration, amendment or repeal of these Bylaws, and in such event, said alteration, amendment or repeal of these Bylaws, or said amended alteration, amendment or repeal of these Bylaws, shall be of no validity unless approved by the members of this Corporation as heretofore provided.

Any ten (10) or more members of this Corporation may file a written resolution with the Secretary of this Corporation proposing an alteration, amendment or repeal of these Bylaws, and upon such resolutions being filed, the proposed alteration, amendment or repeal shall be placed upon the agenda of the next regular meeting of the Board of Directors for consideration and determination by the Board of Directors in the manner above described.  If the determination of the Board of Directors is in the negative, the proposed alteration, amendment or repeal shall be placed upon the agenda of the next regular or special meeting of the members of this Corporation and submitted to the members of this Corporation for consideration and determination at such meeting.  If the aforesaid resolution is not received by the Secretary of this Corporation in time sufficient to permit such resolution to be timely considered and determined by the Board of Directors prior to the next regular or special meeting of the members of this Corporation, then the proposal shall be noticed and submitted directly to the members of this Corporation in the manner just described.

### ARTICLE XIII
### MERGER OR CONSOLIDATION

In the event of a merger or consolidation of two or more members of this Corporation, any member which thereby will cease to exist may, if it wishes, prior to such time, transfer to the surviving or new member its right to elect a director to the Board of Directors of this Corporation, and such right shall continue to exist, if the transferee member so wishes, for a period of not to exceed three (3) years from the date of the merger or consolidation.

If a member which will cease to exist chooses to transfer its right to elect a director to the Board of Directors of this Corporation to the surviving or new member, the transferee member shall have the right to elect a person to fill such position, if the transferee member so wishes, for a period of not to exceed three (3) years from the date of the merger or consolidation.

Each person so elected shall be entitled to one (1) vote and no more upon each matter submitted to a vote at a meeting of the Board of Directors.  In situations where the presence or vote of a majority of directors is required, the presence of each such person shall be counted in determining whether or not a quorum exists, and the vote of each such person shall be counted in determining whether or not the necessary vote has been obtained.

Notwithstanding the foregoing, in the event of a consolidation of two or more members of this Corporation, and in the event one or more of such members transfers its right to elect a director to the Board of Directors of this Corporation to the new member, the new member will not have more votes, in total, than the number of rights assigned to it by the member(s) which will cease to exist.

In the event a member does not merge into or consolidate with another member, but instead sells all or substantially all of its assets to another member and thereupon ceases to exist, the foregoing provisions of this Article shall apply to such transaction.

ϖ ʋ ϖ

# Exhibit No. TGT-0056

## Direct Testimony of Lori L. O'Flaherty

\*    \*    \*

1    give rise to a material adverse effect. "Material Adverse Change" or "MAC" clauses are

2    standard in most loan agreements and are usually intended to protect banks from events

3    that cannot be anticipated. In this provision, the MAC clause makes it clear that the banks

4    knew that changes to the WESCs and other Organization Documents would likely have a

5    'material adverse effect", but at the time this document was created, the banks could not

6    anticipate exactly how this change might occur. In this instance the MAC is defined as a

7    negative covenant.

8  **Q.**   **Do you believe provisions in other agreements also are relevant?**

9    Yes. The CoBank Term Loan agreement dated June 24, 2020, includes the same

10   provision (also numbered Section 7.08) as was discussed above. It also includes an

11   "Additional or More Restrictive Member Termination Provision" (Section 6.17) that

12   requires notice by the borrower to the Lenders, and automatic inclusion by reference in

13   the CoBank credit agreement.

14         The CFC Term Loan Agreement dated June 24, 2020, contains the following

15   provision (Section 2.01):

16         N. Wholesale Power Contracts. The Wholesale Power Contracts
17         are in full force and effect and are legal, valid and binding upon the
18         Borrower and enforceable against the Borrower in accordance with
19         their respective terms. The Borrower has not been informed of any
20         condition or circumstance that would impair any Member's ability
21         to perform its obligations under any Wholesale Power Contract to
22         which it is a party and that could reasonably be expected (either
23         individually or in the aggregate) to result in a Material Adverse
24         Effect, except as disclosed on Borrower's Annual Report on Form
25         10-K for the Fiscal Year ended December 31, 2019, filed with the
26         SEC on March 12, 2020.

1    Q.    **Can you identify other provisions in Tri-State's loan agreements you believe relate**

2          **to this question?**

3    A.    Yes. Each credit agreement confirms that Tri-State's Member WESCs are the source of

4          funds for debt repayment, evidenced in various ways. That is, the WESCs are held by the

5          lenders as primary collateral for borrowed funds. As noted above, without the WESCs,

6          Tri-State could not access the credit markets to fund its operations. Tri-State does not

7          have a direct retail service base. Thus, its only access to its ultimate customers is through

8          the WESCs it has with each of its utility members.

9    Q.    **Can you explain the significance of a "Member Termination Event" as defined in**

10         **some of the loan agreements?**

11   A.    Yes. Certain loan agreements may require a prepayment of debt, if a "Member

12         Termination Event" occurs. While the CFC revolving credit agreement does not have

13         prepayment penalties *per se*, because it is a short term revolving line of credit with no

14         longer term fixed rate debt, Section 2.05 of the CoBank Term Loan Agreement and

15         Section 3.07 of the CFC Term Loan Agreement provide for a prepayment in connection

16         with a "Member Termination Event". These provisions both require that Tri-State "offer"

17         to prepay the lenders' ratable portion of principal, plus accrued interest, on the

18         outstanding loans, in the event a "Member Termination Event" occurs. It is noteworthy

19         that a make-whole amount is not required under this circumstance, which demonstrates

20         that the lenders view this requirement to be necessary for their protection. The lack of a

21         make-whole or other type of prepayment penalty under any circumstance is very unusual,

22         particularly where (as here) pre-payment penalties must be paid under both loan

23         agreements for all other voluntary prepayments. The provisions of the Note Purchase

1    Agreement dated October 31, 2014, also includes this provision without a make-whole

2    prepayment penalty, exceedingly rare for private placement lenders.

3     Tri-State will have limited flexibility as it relates to a required prepayment, and the

4    remaining debt capital package may not meet Tri-States' needs. The potential for these

5    offered prepayments is specifically addressed in the event of a "Member Termination

6    Event" capturing Lender concern in the event this were to happen. Finally, as discussed

7    previously, Section 7.08 of the CFC syndicated revolving line of credit is key. This

8    provision makes it incumbent on Tri-State not to alter or terminate a WESC if Tri-State

9    could not pass all remaining costs and expenses through the remaining members. It is

10   unlikely that many Lenders would waive this provision, since the remaining members

11   would then represent the only source of repayment for indebtedness

12       While Tri-States' major credit agreements carry the same or similar financial

13   covenants described above, these are significantly fewer than would generally be found

14   in a leveraged credit. These looser covenants are consistent with Tri-State's current

15   investment grade rating. Covenants are generally looser in an investment grade credit, as

16   the overall margin of safety in an investment grade loan makes it less likely that a bank's

17   position will be eroded.

18       Financial covenants also include a version of a Debt Service Coverage ratio and a

19   debt to cap ratio, each of which could be triggered under certain financial considerations

20   which might accompany a member withdrawal.

\* \* \*

# Exhibit No. TGT-0001 REV 2

## Direct Testimony of Duane Highley

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| **Tri-State Generation and Transmission** | ) | **Docket Nos.  ER21-2818-000** |
| **Association, Inc.** | ) | **EL22-4-000** |
| | ) | **(consolidated)** |

**PREPARED DIRECT TESTIMONY**

**OF**

**DUANE D. HIGHLEY**

**ON BEHALF OF**

**TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.**

**March 9, 2022**

Docket No. ER21-2818-000
Exhibit No. TGT-0001 REV 2
Page 2 of 37

### SUMMARY OF THE PREPARED DIRECT TESTIMONY
### OF DUANE D. HIGHLEY

  Mr. Highley is Tri-State's Chief Executive Officer. Mr. Highley's testimony discusses the origins of the Rural Electric Cooperative Program which provides important context for the issues in this proceeding. Mr. Highley then provides a summary of Tri-State's history and its interstate generation and transmission system. His testimony describes Tri-State's decision to become a public utility subject to the Commission's jurisdiction and, finally, provides an overview of the Modified Contract Termination Payment Methodology that is the subject of this proceeding.

Docket No. ER21-2818-000
Exhibit No. TGT-0001 REV 2
Page 3 of 37

## TABLE OF EXHIBITS

The prepared testimony of Duane D. Highley is Exhibit No. TGT-0001. These exhibits accompany this testimony:

| Exhibit Number | Description | Confidentiality Designation |
|---|---|---|
| Exhibit No. TGT-0002 | Duane D. Highley, Statement of Qualifications | PUBLIC |

Docket No. ER21-2818-000
Exhibit No. TGT-0001 REV 2
Page 4 of 37

**TABLE OF CONTENTS**

**I.**   INTRODUCTION. ................................................................................................ 5

**II.**   THE ORIGINS OF THE RURAL ELECTRIC COOPERATIVE PROGRAM. ............. 11

**III.**   TRI-STATE HISTORY AND OVERVIEW. ................................................... 14

**IV.**   TRI-STATE'S DECISION TO MOVE TO FERC JURISDICTION. ............................ 26

**V.**   MODIFIED CTP METHODOLOGY ............................................................... 34

Docket No. ER21-2818-000
Exhibit No. TGT-0001 REV 2
Page 5 of 37

**UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION**

| | | | |
|---|---|---|---|
| Tri-State Generation and Transmission Association, Inc. | ) ) ) | Docket Nos. | **ER21-2818-000 EL22-4-000 (consolidated)** |

**PREPARED DIRECT TESTIMONY OF DUANE D. HIGHLEY
ON BEHALF OF
TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.**

1         **I.        INTRODUCTION.**

2    **Q.    Please state your name, title, and business address?**

3    A.    My name is Duane D. Highley. I am the Chief Executive Officer ("CEO") of Tri-State

4         Generation and Transmission, Association, Inc. My business address is 1100 West 116th

5         Avenue, Westminster, Colorado 80234.

6    **Q.    Please summarize your educational background.**

7    A.    I earned a Bachelor of Science degree in Electrical Engineering and a Master of Science

8         degree in Engineering Management, both from Missouri University of Science and

9         Technology (then University of Missouri-Rolla). I also completed the Executive Program

10        at the University of Virginia's Darden School of Management and the Harvard Business

11        School's Advanced Management Program.

12   **Q.    Please describe your professional experience in the electric utility industry.**

13   A.    I am a Registered Professional Engineer in Missouri, and have over 39 years of

14        professional experience leading energy portfolio transitions with large electric power

15        supply cooperatives.

1          I began my professional career as a resource planning engineer with Associated

2     Electric Cooperative ("Associated"), a generation and transmission ("G&T") cooperative

3     serving six other G&Ts which, in turn, served 51 retail electric distribution cooperatives

4     in Iowa, Missouri, and Oklahoma. Collectively, Associated and its members serve over 1

5     million ultimate consumers. During my 28 years with Associated, I held increasingly

6     responsible positions, supervising transmission planning, resource planning, power

7     marketing, power generation operations, mining reclamation operations, and plant

8     construction, ultimately holding the position of Senior Vice President.

9          In 2011, I accepted the position as President and CEO of two organizations:

10    Arkansas Electric Cooperative Corporation, a state-regulated G&T cooperative serving

11    17 retail distribution cooperatives with over 1 million ultimate consumers, and Arkansas

12    Electric Cooperatives, Inc., a national utility service cooperative with multiple

13    subsidiaries providing utility equipment sales, warehouse management, right-of-way

14    management, transformer manufacturing, smart grid research and development, utility-

15    scale solar and battery storage development, and electric vehicle charging infrastructure.

16         In April 2019, I accepted the position as Tri-State's CEO. A statement of my

17    qualifications is provided as Exhibit No. TGT-0002.

18  **Q.    What is the purpose of your testimony?**

19  A.    My testimony discusses the origin of the Rural Electric Cooperative Program and Tri-

20        State's role in fulfilling the objectives of that program. I provide an overview of Tri-

21        State's interstate generation and transmission system, and discuss Tri-State's decision to

22        become a public utility subject to the Commission's jurisdiction. With that background, I

1      provide an overview of the Modified Contract Termination Payment Methodology

2      ("Modified CTP Methodology") that is at issue in this proceeding. I will also introduce

3      the other witnesses providing testimony on Tri-State's behalf.

4  **Q.**    **Have you previously submitted testimony before this Commission?**

5  A.    I have not.

6  **Q.**    **In addition to your direct testimony, what other information are you sponsoring at**

7      **this time?**

8  A.    In addition to my direct testimony, I am sponsoring the following exhibit:

9        • Exhibit No. TGT-0002 – Duane D. Highley, Statement of Qualifications

10  **Q.**    **Please summarize Tri-State's position with respect to the Modified Contract**

11      **Termination Payment Methodology that is the subject of this proceeding.**

12  A.    Each of Tri-State's 42 Utility Members has signed a wholesale electric service contract

13      ("WESC") under which the Member has committed to purchase substantially all of its

14      wholesale electric requirements from Tri-State for the next 29 years, *i.e.*, through

15      December 31, 2050. See, e.g., Exhibit No. TGT-0005, § 12. Tri-State believes that a

16      Utility Member that elects to terminate its WESC prematurely should pay a contract

17      termination payment ("CTP") that puts Tri-State and its remaining Utility Members in the

18      same financial position they would have been in had the withdrawing Utility Member

19      honored its WESC through its stated term. We propose that Member CTPs be calculated

20      according to Tri-State's Rate Schedule FERC No. 281,[1] which establishes Tri-State's

---

[1] *Tri-State Generation and Transmission Ass'n, Inc.*, 177 FERC ¶ 61,059 (2021).

1  Modified CTP Methodology and the terms under which Tri-State Utility Members may

2  terminate their WESCs and their membership in Tri-State.

3  **Q.    Is Tri-State presenting testimony from any other witnesses in support of the**

4  **Modified CTP Methodology?**

5  A.   Yes. Bradford Nebergall, Tri-State's Senior Vice President, Energy Management, will

6  describe Tri-State's Member WESCs, including Tri-State's contractual obligation to

7  ensure sufficient generation resources to meet the Utility Members' needs. Mr. Nebergall

8  will provide an overview of Tri-State's generation resources and the process by which

9  Tri-State plans for and secures sufficient generation resources to meet its Utility

10  Members' wholesale electricity requirements. Mr. Nebergall will describe the nature of

11  Tri-State's generation costs, and the extent to which they are fixed or variable. He will

12  also describe the history of Tri-State Utility Member withdrawals. Finally, Mr. Nebergall

13  will provide testimony about the Modified CTP Methodology as it relates to Tri-State's

14  generation resources and resource planning.

15  Joel K. Bladow, Tri-State's Senior Vice President, Transmission, will provide an

16  overview of Tri-State's transmission system, and how the transmission system is planned,

17  built, and maintained. He will describe how Tri-State recovers the costs associated with

18  its transmission system, both under its Class A Member rate and its Open Access

19  Transmission Tariff. Finally, Mr. Bladow will discuss the effect of Utility Member

20  withdrawals upon Tri-State's ability to recover the costs associated with its transmission

21  system, and how the Modified CTP Methodology, if approved, will affect Tri-State's

22  transmission system planning and operations.

1        Patrick L. Bridges, Tri-State's Senior Vice President and Chief Financial Officer,

2        will describe Tri-State's organizational and capital structure, the importance of debt

3        financing to Tri-State and other G&T cooperatives, and how the Utility Members'

4        WESCs make it possible for Tri-State's to operate as a going concern and secure debt

5        financing at reasonable rates and on reasonable terms. Mr. Bridges will describe Tri-

6        State's loan agreements with lenders, the debt covenants in those agreements, and how a

7        Utility Member's withdrawal may trigger certain Tri-State obligations, including required

8        debt prepayments and prepayment penalties. He will also discuss the financial

9        consequences to Tri-State if Utility Members may shed their WESC obligations without

10       paying a sufficient CTP upon withdrawal from Tri-State. Mr. Bridges will also describe

11       the importance of Tri-State's credit rating, and how the Commission-approved CTP

12       methodology will affect Tri-State's credit rating and its ability to secure future debt

13       financing. Finally, Mr. Bridges will explain the philosophy underlying Tri-State's

14       Modified CTP Methodology, and discuss how and why the "Debt Covenant Obligation"

15       component of the Modified CTP Methodology protects Tri-State from potential loan

16       defaults that could otherwise be caused by the withdrawal of one or more Tri-State Utility

17       Members.

18        Joseph A. Mancinelli is a Director and President Emeritus of NewGen Strategies

19       and Solutions, LLC, a management consulting firm providing economic, strategic,

20       stakeholder, and sustainability services to public and private sector utilities. Mr.

21       Mancinelli will describe Tri-State's Modified CTP Methodology, and explain why it

22       establishes a just, reasonable, and non-discriminatory method for the calculation of a

1    contract termination payment for a Utility Member that terminates its WESC prematurely

2    and withdraws from Tri-State.

3        Daniel J. Aschenbach is a partner at AGVP Advisory, a consulting firm that

4    provides credit and risk advice to utilities throughout the United States. Before founding

5    AGVP Advisory in 2019, Mr. Aschenbach was Senior Vice President and credit officer at

6    Moody's Investors Service, one of three principal credit rating agencies in the United

7    States. Mr. Aschenbach will provide background information on credit rating agencies,

8    and explain how credit ratings are used, who relies upon them, and their importance to

9    Tri-State and other G&T cooperatives. Mr. Aschenbach will discuss Tri-State's historical

10   credit ratings and how they have been influenced by the threatened and actual departure

11   of Tri-State Utility Members. He will also explain how a FERC-approved CTP

12   methodology can be expected to influence Tri-State's future credit ratings.

13       Lori O'Flaherty is a retired banking executive with over 35 years of experience

14   analyzing, granting, and approving commercial loans. Before her retirement in 2016, Ms.

15   O'Flaherty spent the previous 20 years as an executive with CoBank, ACB, a major

16   financial institution that extends credit to rural electric cooperatives, including Tri-State

17   and other G&T cooperatives. Ms. O'Flaherty will testify about the importance of member

18   WESCs to financial institutions who extend credit to G&Ts, how WESC terminations can

19   affect a G&T's existing and future borrowing, and how a Commission-approved CTP

20   methodology is likely to affect Tri-State's current and future borrowing.

1    II.        **THE ORIGINS OF THE RURAL ELECTRIC COOPERATIVE PROGRAM.**

2    Q.    **You testified previously that you have spent your 39+ year professional career**

3            **working for G&T cooperatives, most recently Tri-State. What is a G&T cooperative**

4            **and why do they exist?**

5    A.    To gain an understanding of why G&T cooperatives exist, one must first understand the

6            history of rural electrification in the United States. Today, most of our country's farms

7            have electric service and many are served by small, consumer-owned, rural cooperatives.

8            But in the 1930s, only 10 percent of the nation's farms were connected to the electricity

9            grid. The lack of electricity in rural areas kept their economies dependent on agriculture,

10           and it created substantial hardship for rural Americans.

11   Q.    **Why wasn't rural America served with electricity in the early decades of the 20th**

12           **century?**

13   A.    America's electric service originally was provided by for-profit, investor owned utilities

14           ("IOUs"). Because of the sparse rural population and the high cost of providing service to

15           relatively few customers over a large geographic area, IOUs did not perceive it to be

16           profitable to extend service to most of rural America—so they did not.

17   Q.    **How was electricity brought to rural America?**

18   A.    Over time, Congress became concerned that IOUs had failed to extend electric service to

19           the rural communities of America, and it determined that the national interest would be

20           served by encouraging the rural use of electricity. In 1936, Congress enacted legislation

21           to supply electric power to rural America. The Rural Electrification Act of 1936 (the

1    "REA Act")[2] created the Rural Electrification Administration ("REA") and provided for

2    loans that would enable rural communities to obtain electricity service. The objective was

3    to provide electricity to the sparsely settled areas which IOUs had not found it profitable

4    to serve. To this end, Congress authorized REA to extend long-term low-interest loans to

5    approved non-profit cooperatives organized and owned by their consumer members,

6    usually farmers, who could not obtain electricity from any other source. Acting in

7    response to the REA Act, communities across rural America formed REA-financed non-

8    profit electrical distribution cooperatives.

9    **Q.    What is a "distribution" cooperative?**

10   **A.**   A distribution cooperative is a not-for-profit entity owned by its member-consumers. A

11   distribution cooperative builds, operates, and maintains a system to "distribute"

12   electricity to the end users who own the cooperative.

13   **Q.    Do distribution cooperatives generate electricity?**

14   A.    As a general matter, no. Distribution cooperatives acquire their electricity at wholesale

15   through bulk purchases. They then sell the electricity at retail to their own member-

16   consumers. In some instances, distribution cooperatives own and operate distributed

17   energy facilities, typically small-scale solar power or other renewable energy facilities,

18   that provide a limited supply of electricity as a supplement to the cooperative's wholesale

19   power supply.

---

[2] Ch. 432, 49 Stat. 1363 (codified, as amended, at 7 U.S.C. §§ 901–950b).

1   **Q.**     **Was the REA program successful in helping bring the benefits of electricity to rural**

2          **America?**

3   A.     Yes. The REA program is one of the most successful federal government programs

4          enacted during the Great Depression, bringing electricity to rural areas and improving the

5          standard of living for rural families across America. Within two years, the program

6          brought electricity to 1.5 million farms in 45 states.

7   **Q.**     **Is the history of rural electrification and the REA Act set forth in published court**

8          **opinions?**

9   **A.**     Yes. For example, see *Salt River Project Agricultural Improvement and Power District v.*

10         *Federal Power Commission*, 391 F.2d 470, 473 (D.C. Cir. 1968); *Tri-State Generation*

11         *and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 352-53 (10th

12         Cir. 1986) ("*Shoshone I*"); *Fuchs v. Rural Electric Convenience Cooperative, Inc.*, 858

13         F.2d 1210 1212-13, n.8 (7th Cir.1988); *United States v. Southwestern Elec. Co-op., Inc.*,

14         869 F.2d 310, 313 (7th Cir. 1989); and *Tri-State v. Shoshone River Power, Inc.*, 874 F.2d

15         1346 (10th Cir. 1989) ("*Shoshone II*").

16   **Q.**     **In the early years of their existence, how did distribution cooperatives obtain the**

17          **electricity they needed to serve their member-consumers?**

18   **A.**     Many distribution cooperatives purchased their wholesale electricity at preferential rates

19         from federal hydropower projects. Distribution cooperatives sometimes also purchased

20         power at wholesale from IOUs or municipal electric utilities, typically on somewhat less

21         favorable terms.

1   **Q.**   **As the nation's rural areas became more heavily populated, did distribution**

2        **cooperatives face the prospect of running out of adequate supplies of wholesale**

3        **power?**

4   **A.**   Yes, they did. Distribution cooperatives addressed this problem by forming, owning and

5        operating G&T cooperatives. A G&T is a cooperative whose members are rural electric

6        distribution cooperatives. The G&T's member-consumers band together to create a

7        second level cooperative that generates and/or purchases electricity, transmits the

8        electricity to and sells it to the distribution cooperatives members on a not for profit basis.

9                 **III.    TRI-STATE HISTORY AND OVERVIEW.**

10   **Q.**   **How does Tri-State fit into the rural electric cooperative program history you just**

11        **described?**

12   A.   Tri-State and its Utility Members represent an example of the challenges, motivations,

13        and solutions that gave rise to the rural electric cooperative program and how it has

14        evolved to meet the needs of rural electric consumers today.

15   **Q.**   **When was Tri-State established?**

16   A:   Tri-State was incorporated in 1952.

17   **Q.**   **Why was Tri-State established?**

18   A.   Consistent with the rural electric cooperative program history I discussed, in the early

19        1950s, rural distribution cooperatives in Colorado, Wyoming, and Nebraska lacked an

20        assured long term supply of wholesale electricity to meet their future requirements. In

21        late 1951, discussions began among 15 rural electric cooperatives in those states, one of

22        which was United Power (then known as Union Rural Electric Association), about the

1     adequacy of power supplied to them by the United States Bureau of Reclamation

2     ("BoR"). Subsequently, the cooperatives determined that the supply of federal power on

3     which they had historically relied would not meet their needs as growing cooperatives.

4     The cooperatives decided that actions should be taken to ensure adequate power supplies

5     for the future.

6           In May of 1952, to secure a reliable long-term source of wholesale power for their

7     member-consumers, the cooperatives[3] banded together to form Tri-State. Tri-State

8     originally had 24 Utility Members. It later grew to have 44 Utility Members before the

9     withdrawal of Kit Carson Electric Cooperative in 2016 and Delta Montrose Electric

10    Association ("DMEA") in 2020.

11    **Q.**     **Is Tri-State's formation and early history described in published court opinions?**

12    A.     Yes. See *Shoshone I*, 805 F.2d at 353; and *Shoshone II*, 874 F.2d at 1348-49.

13    **Q.**     **Please describe Tri-State's corporate structure.**

14    A.     Tri-State is a multi-state, regional, generation and transmission cooperative corporation

15          that operates on a not-for-profit basis in interstate commerce. As a wholesale power

16          cooperative, Tri-State is owned and governed by its Members.

17    **Q.**     **How is Tri-State governed?**

18    A.     Subject to federal and state regulatory authority, Tri-State is governed by a 42-person,

19          democratically elected Board of Directors, with one director elected by each Utility

---

[3] In Nebraska, rural electric distribution cooperatives operate as public power districts. Tri-State has six public power district Utility Members. Each serves retail customers in its own certificated area of western Nebraska.

1    Member. Board members live in the rural areas the Utility Members serve. Tri-State's

2    Board is directly accountable to its Members, and the Utility Members are directly

3    accountable to their own member-consumers and ratepayers. All Tri-State Members have

4    a vote on issues as set forth in Tri-State's Bylaws.

5    **Q.    Please describe Tri-State's present membership.**

6    A.    Tri-State has 45 Members – 42 Class A Utility Members and three Non-Utility Members.

7    Tri-State's Utility Members consist of rural electric distribution cooperatives and public

8    power districts which, like Tri-State, also operate on a not-for-profit basis. Tri-State's

9    Utility Members include 11 New Mexico distribution cooperatives, 17 Colorado

10    distribution cooperatives, eight Wyoming distribution cooperatives, and two distribution

11    cooperatives and four public power districts in Nebraska. Besides providing retail electric

12    service in these four states, certain of Tri-State's Utility Members provide retail service

13    that extends into Arizona, Utah, and Montana. Tri-State's three Non-Utility Members are

14    all in Colorado.

15    **Q.    How is Tri-State different from an investor-owned utility?**

16    A.    Tri-State is a wholesale electric power supplier—an aggregator of its Utility Members'

17    loads. Tri-State buys and generates electric power, and transmits, delivers, and sells

18    electricity to its Utility Members in interstate commerce. The Utility Members, in turn,

19    distribute and resell the electricity they purchase at wholesale from Tri-State to their own

20    retail, member-owners/consumers. Unlike an IOU, Tri-State has no retail consumers or

21    exclusive service territory established by any regulatory authority. In short, Tri-State's

22    Utility Members serve retail consumers but Tri-State does not.

1          Membership in Tri-State is governed through contracts, by-laws, and policies. In

2          contrast to the customers of an IOU, which is a regulated monopoly within its designated

3          service territory, each of Tri-State's Members voluntarily chose to become a Member of

4          Tri-State, to be subject to its Bylaws and Board Policies, and to enter into a WESC with

5          Tri-State.

6  **Q.**    **Does Tri-State operate its business for the purpose of generating a profit?**

7  A.    No, it does not. As a cooperative, Tri-State has no shareholders. Tri-State's owners are its

8          Members, not shareholders, and Tri-State does not seek to generate a profit for outside

9          investors. Because it is owned and controlled by its own customers, Tri-State's goal is to

10         keep its rates low, not high. Instead of attempting to generate a profit, Tri-State seeks to

11         recover its costs on a system-wide basis, and maintains a reasonable reserve consistent

12         with applicable regulatory and financial requirements. If there is any excess of revenues

13         over expenses, Tri-State returns it to its Members as patronage capital. The Members

14         directly benefit from any margins that Tri-State earns, and are directly harmed by any

15         losses Tri-State incurs.

16           In contrast, a for-profit, IOU is a provider of retail electric service and exists

17         expressly to generate profit for its shareholders. It generates and buys electric power,

18         transmits that power, often in intrastate commerce, and sells the power to its wholesale

19         and retail customers. Any profits earned by an IOU are enjoyed by its shareholders, and

20         profits earned by an IOU are distributed to and enjoyed by its shareholders, who may or

21         may not purchase electricity from the IOU.

1   **Q.**     **What is Tri-State's corporate mission?**

2   A.     Tri-State's mission today is essentially the same as when it was formed in 1952 – to

3           provide its Utility Members a reliable, affordable, and responsible supply of electricity in

4           accordance with cooperative principles.

5   **Q.**     **Can you provide examples of actions Tri-State has taken consistent with its**

6           **corporate mission?**

7   A.     Yes. For example, when concerns arose in 1954 regarding the Utility Members' ability to

8           obtain sufficient preference power from the BoR, the Utility Members negotiated a

9           master contract among themselves that enabled them to make long-term, firm

10          commitments to BoR for preference power purchases. Under the contract, the Utility

11          Members transferred their BoR power allotments to Tri-State which, in turn, resold the

12          power to the Utility Members. Tri-State managed the risk associated with these

13          commitments by aggregating the load of all Utility Members as the basis for the take-or-

14          pay commitment to BoR.

15             The role of Tri-State acting for the collective benefit of its Members was

16          illustrated again in 1957 when the first all-requirements contracts—WESCs—were

17          executed between Tri-State and its Utility Members. The WESCs not only governed the

18          purchase and sale of power between Tri-State and its Utility Members, the 35-year term

19          of the WESCs provided a solid foundation for the cooperative by creating a reliable

20          revenue stream that improved Tri-State's bargaining power for securing financing and

21          building generation and transmission facilities to serve all of its Utility Members. In fact,

1    the Rural Electrification Administration would not have made loans to Tri-State unless its

2    Members entered into long-term agreements.

3        As these actions indicate, in the early years Tri-State met most of its Utility

4    Members' needs through contractual arrangements and power purchases on behalf of its

5    collective membership. However, by the early 1960s it became apparent that Tri-State

6    would need to evolve from a "paper G&T" and develop its own generation and

7    transmission facilities to meet the growing needs of its Utility Members and their

8    respective member-consumers.

9    **Q.**    **Can you provide examples of early facilities Tri-State constructed to serve its**

10        **members?**

11   A.    Early facilities built by Tri-State to serve all of its Members included Tri-State's first

12       transmission line project (Stegall-Sidney 230 kV) in 1965, construction of its first

13       generation plant (the Republican River Station in Wray, Colorado) in 1975, and

14       construction of the David A. Hamil DC Tie in 1976 connecting the western and eastern

15       grids. Tri-State constructed these and many other facilities over the last 70 years to

16       ensure its ability to provide its Utility Members safe, reliable, affordable, and responsible

17       electricity. All of these investments were made based on the long-term needs identified

18       by the Utility Members themselves, and were financed based on the security provided by

19       the WESCs with Tri-State.

20   **Q.**    **Please provide an overview of Tri-State's current generation resources.**

21   A.    Tri-State owns or has interests in three coal-fired and six natural gas and/or oil-fired

22       generation resources: Craig Generating Station, located near Craig, Colorado; Laramie

1    River Generating Station, located near Wheatland, Wyoming; Springerville Generating

2    Station Unit 3, located near Springerville, Arizona; J.M. Shafer Generating Station,

3    located near Fort Lupton, Colorado; Rifle Generating Station, located near Rifle,

4    Colorado; Limon Generating Station, located near Limon, Colorado; Knutson Generating

5    Station, located near Brighton, Colorado; Pyramid Generating Station, located near

6    Lordsburg, New Mexico; and Burlington Generating Station, located near Burlington,

7    Colorado.

8            Tri-State also has a number of power purchase agreements that entitle it to energy

9    and capacity used to serve its Utility Members. Specifically, Tri-State has two power

10    purchase contracts with Basin Electric Power Cooperative of which Tri-State is a

11    member, two power purchase contracts with the Western Area Power Administration,

12    and certain other small power purchase contracts that vary from year-to-year and by

13    season. In addition, Tri-State is the buyer in renewable energy power purchase

14    agreements with 15 existing or planned utility scale wind and solar facilities totaling

15    nearly 1,500 MW of capacity. Finally, Tri-State has several small hydropower purchase

16    agreements. Mr. Nebergall discusses Tri-State's resource portfolio and resource planning

17    in greater detail in his direct testimony.

18    **Q.    Please provide an overview of Tri-State's current interstate transmission system.**

19    A.    Unlike many investor-owned electric utilities, distribution cooperatives, and even other

20         generation and transmission cooperatives, Tri-State operates an interstate electric

21         transmission system that spans the four states in which its Utility Members are located.

22         To ensure that it can meet its Utility Members' needs, Tri-State owns or operates over

1    5,792 miles of high voltage electric transmission lines, and there are 416 substations and

2    switchyards that Tri-State owns or in which it has a major equipment ownership interest.

3    As an interstate transmission owner and operator, Tri-State's transmission facilities are

4    interconnected with those of numerous other electric utilities in the region. Mr. Bladow

5    discusses Tri-State's transmission system and transmission planning in greater detail in

6    his direct testimony.

7    **Q.    You previously mentioned that the facilities comprising Tri-State's generation and**

8    **transmission system were financed based on the security provided by the Utility**

9    **Members' WESCs. Does each utility member have a WESC with Tri-State?**

10    A.    Yes, although the circumstances under which each Utility Member entered into its WESC

11    are somewhat different. In the case of Tri-State's founding Utility Members, each signed

12    its WESC after the creation of Tri-State per the developments I discussed earlier. For

13    those Utility Members that were previously members of Colorado-Ute Electric

14    Association ("Colorado-Ute"), their pre-existing WESC with Colorado-Ute was assigned

15    to Tri-State following Colorado-Ute's bankruptcy and each of these Utility Members

16    subsequently signed a new WESC with Tri-State. Similarly, for those Utility Members

17    that were previously members of Plains Electric Generation and Transmission

18    Cooperative ("Plains"), their pre-existing WESC with Plains was assigned to Tri-State at

19    the time of Plains' merger with Tri-State and each Utility Member signed a new WESC

20    with Tri-State in 2001. Each of Tri-State's other Utility Members signed a WESC when it

21    joined Tri-State.

1   **Q.**    **Have the Utility Members' renewed and extended their WESCs over time?**

2   A.    Yes. All of Tri-State's current Utility Members' WESCs have been renewed and their

3         terms extended multiple times during Tri-State's history, most recently in 2007. Tri-State

4         and its Member Systems wanted to continue a relationship that had been mutually

5         beneficial over the years. In addition and as noted previously, revenue to be received by

6         Tri-State under the WESCs was, and is, an important source of collateral which Tri-State

7         pledges to lenders to finance the construction, operation, and maintenance of Tri-State's

8         generation and transmission system.

9   **Q.**    **Please explain the role and importance of the WESCs.**

10  A.    There are two major roles the WESCs fulfill. First, they set forth the primary obligations

11        between Tri-State and each of its Utility Members; that is, with certain exceptions, each

12        Utility Member will purchase from Tri-State all of its wholesale electric power

13        requirements, and Tri-State will supply all of those requirements. These mutual

14        obligations ensure a reliable power supply for the Utility Members and enable Tri-State

15        to efficiently plan its generation and transmission system to meet the Utility Members

16        needs into the future. Second, the long-term, all requirements nature of the WESCs

17        provides a reliable revenue stream to fund Tri-State's operations and to secure repayment

18        of Tri-State's debt obligations.

19          Given that all of the Utility Members have essentially the same WESC as each

20        other, these shared and interdependent obligations define the Utility Members'

21        relationship with Tri-State and with each other. The WESCs, together with Tri-State's

Docket No. ER21-2818-000
Exhibit No. TGT-0001 REV 2
Page 23 of 37

1       Articles of Incorporation and Bylaws, are the foundation of the generation and

2       transmission cooperative business model.

3   **Q.    You mentioned previously that, unlike an IOU, Tri-State has no certificated**

4       **monopoly service territory. Does that pose financial challenges for Tri-State?**

5   A.   Yes, it does. An IOU's certificated monopoly service territory provides it with a

6       relatively secure and stable source of revenue, which in turn supports the IOU's ability to

7       operate its business and to finance its operations by issuing stock and borrowing money.

8       Because Tri-State has no monopoly service territory, no one is required by law to

9       purchase electricity from Tri-State. Without an assured source of revenue, Tri-State could

10      not raise capital to finance its operations. That is why Tri-State has a long term, all-

11      requirements WESC with each of its Utility Members. The WESCs serve as Tri-State's

12      financial backbone, providing the revenue necessary to plan, build, operate, and maintain

13      Tri-State's generation and transmission system, pay its debts and other financial

14      obligations, and provide services to its Utility Members. The WESCs and the revenue

15      stream they generate are pledged to Tri-State's lenders, providing assurance that Tri-State

16      can earn sufficient future revenue to service and repay its debts and meet its ongoing and

17      future operating expenses. The WESCs are therefore essential to Tri-State's very

18      existence. Mr. Bridges discusses the role and importance of the WESCs in greater detail

19      in his direct testimony.

Docket No. ER21-2818-000
Exhibit No. TGT-0001 REV 2
Page 24 of 37

1 **Q.** **In addition to the facilities that Tri-State has invested in over the years, can you**

2 **provide examples of other actions Tri-State has taken to ensure a sufficient, reliable,**

3 **and responsible power supply for its Utility Members?**

4 A. Yes. In July 2019, the Tri-State Board decided that the Association would pursue a

5 transition to a cleaner energy portfolio by developing a Responsible Energy Plan

6 ("REP"). That decision led to Tri-State's announcement in January, 2020 of: plans to

7 close all of Tri-State's coal-fired generation in Colorado and New Mexico by 2030; the

8 addition of more than one gigawatt of new wind and solar resources; continued efforts to

9 increase Utility Member contract flexibility and provide more options for local renewable

10 generation; and a commitment to work toward Colorado Governor Jared Polis's goal of

11 100% clean energy resources in Colorado by 2040. These actions will enable Tri-State,

12 and its Colorado Utility Members in particular, to meet the relevant states' greenhouse

13 gas emission reduction goals and to comply with existing state renewable energy standard

14 requirements while continuing to ensure that Tri-State can provide reliable, affordable,

15 and responsible electricity to all of its Utility Members.

16 Regarding increased contract flexibility and more options for local renewable

17 generation by Utility Members, something United Power has emphasized, in November

18 2019 the Tri-State Board expanded the opportunities for Tri-State's Utility Members and

19 the rural communities they serve to participate in community solar projects. Under the

20 Board-approved community solar program, community solar projects will not be

21 included in the 5% self-generation provision of the WESC. If all of Tri-State's Utility

22 Members participated in the program, this would result in a total of 63 MW of

1    community solar projects. It is worth noting that the community solar proposal was

2    presented and advanced by Tri-State's Utility Member Poudre Valley Rural Electric

3    Association working through the Tri-State Board's Contract Committee. This is further

4    evidence of how the Tri-State Board is responding to the interests of its Utility Members.

5  **Q.   What progress has Tri-State made so far under its REP?**

6  A.   Contrary to the criticisms that Tri-State has made no progress, or is reluctant or even

7    refuses to change, Tri-State has made tremendous progress in its transition to clean

8    energy and its transformation into a 21st century generation and transmission cooperative.

9    I previously mentioned the 15 renewable energy projects from which Tri-State has

10   contracted to purchase power. These projects will provide nearly 1,500 MW of new clean

11   energy to meet the needs of Tri-State's Utility Members. By 2024, the power from these

12   and other clean energy resources will mean that 50% of the wholesale power delivered to

13   Tri-State's Utility Members will come from clean energy resources. Under Tri-State's

14   2020 Electric Resource Plan submitted to the Colorado Public Utilities Commission, by

15   2030 70% of the wholesale power delivered to Tri-State's Utility Members will come

16   from clean energy resources and Tri-State will reduce its carbon dioxide emissions by

17   80% compared to 2005 levels. Tri-State is also taking steps to ensure that it has the

18   transmission resources necessary to implement this clean energy vision. Tri-State has

19   joined the Southwest Power Pool's Western Energy Imbalance Service and is working

20   toward participation in a regional transmission organization soon. Tri-State has made this

21   progress while at the same time working toward its goal of reducing wholesale power

22   rates to its Utility Members by 8% by the end of 2023. These changes are in direct

1      response to Tri-State's Utility Members' desire for an affordable, reliable, cleaner power

2      supply that complies with state and federal regulatory requirements.

3  **Q.**  **Why is this background information relevant to the issues in this proceeding?**

4  A.  While other G&T cooperatives are subject to the Commission's jurisdiction, Tri-State is a

5      relative newcomer to the Commission at least regarding the issues involved in this

6      proceeding. To the best of my knowledge, none of the other G&T cooperatives subject to

7      the Commission's jurisdiction have filed a tariff governing Members' withdrawal from

8      the cooperative and the calculation of an appropriate withdrawal payment. Since such

9      withdrawal payment must consider the investments made by a cooperative on behalf of

10     all of its members, it is also appropriate to present at least a high level overview of the

11     generation and transmission system that Tri-State has developed and invested in over the

12     years to fulfill its obligation to meet the present and future needs of its Utility Members.

13     Under these circumstances, it is important for the Commission to understand what Tri-

14     State is, why it exists, the relationship between Tri-State and its Utility Members and

15     between and among the Utility Members themselves, and the interstate generation and

16     transmission system that serves the Utility Members.

17     **IV.**    **TRI-STATE'S DECISION TO MOVE TO FERC JURISDICTION.**

18  **Q.**  **Why did Tri-State choose to become a FERC jurisdictional utility?**

19  A.  That is an important question the answer to which requires some background. While I am

20     not a lawyer, it is my understanding that historically Tri-State was exempt from

21     Commission jurisdiction because it fell within certain jurisdictional exemptions in the

22     Federal Power Act. At the same time, the states in which Tri-State operated did not

1    regulate or only lightly regulated Tri-State. For many years, this regulatory framework

2    made sense and worked well for Tri-State in terms of its mission of providing affordable

3    and reliable power its Utility Members in multiple states.

4        In recent years, however, things changed. Some state legislatures and utility

5    regulatory commissions adopted various renewable energy standards and greenhouse gas

6    emission reduction requirements applicable to Tri-State and its Utility Members, while

7    other states took no similar steps. As a practical matter, these differing state requirements

8    created challenges for Tri-State given it operates one, interconnected, interstate,

9    generation and transmission system to meet its Utility Members' needs without regard to

10    the state in which they are located. These differing state requirements also presented

11    challenges for the cooperative model under which all costs incurred by Tri-State are

12    shared by all Utility Members through Tri-State's "postage stamp" wholesale rate; that is,

13    consistent with cooperative principles, regardless of whether a particular cost is incurred

14    to comply with a particular state's requirement, Tri-State's Utility Members in all four

15    states share in that cost through their wholesale rate paid to Tri-State.

16        Things also changed in terms of the needs and desires of Tri-State's Utility

17    Members. Given the wide differences between Tri-State's rural and suburban Utility

18    Members, between Tri-State's small and large Utility Members, the economic and

19    demographic differences among Utility Members' respective retail customers, and the

20    differences between the various Utility Members' load profiles and forecasts, differences

21    emerged among the Utility Members themselves in terms of their needs and desires and

22    preferred pace of change. Some Utility Members were experiencing rapid growth and

1    were interested in more flexibility to meet their own member-customers' needs through

2    local renewable energy resources, while other Utility Members still looked primarily to

3    Tri-State for the reliable and affordable power supply it had historically provided to them

4    and to meet applicable state requirements.

5           These dynamics combined to create the possibility that Tri-State would face

6    different regulatory treatment in different states, the results of which would, at a

7    minimum, complicate Tri-State's cooperative operations – which is what happened. For

8    example, in 2012 following a Tri-State Board approved change to Tri-State's wholesale

9    rate design, three of Tri-State's New Mexico Utility Members filed a protest with the

10    New Mexico Public Regulation Commission (the "New Mexico Commission") in which

11    they requested review of Tri-State's wholesale rate and a suspension preventing the rate

12    from going into effect. This protest was followed by a similar, related protest in 2013 and

13    a series of interrelated New Mexico Commission and federal court proceedings

14    pertaining to Tri-State's wholesale rate and the New Mexico Commission's jurisdiction

15    over it. During these proceedings, Tri-State's new wholesale rate was suspended and

16    prevented from going into effect in New Mexico which resulted in an under-recovery of

17    $42,687,412 million in rates paid by the New Mexico Utility Members and a

18    commensurate cost-shift to Tri-State's Utility Members in Colorado, Nebraska, and

19    Wyoming.

20           Similarly, in 2013, three of Tri-State's Colorado Utility Members filed a formal

21    complaint at the Colorado Public Utilities Commission (the "Colorado Commission")

22    alleging that the same new wholesale rate design was unjust, unreasonable, preferential,

1    and discriminatory. Although the Colorado Commission had not historically regulated

2    Tri-State's wholesale rates, and despite Tri-State's arguments that this was a contract

3    rather than a rate matter, the Colorado Commission asserted jurisdiction over the

4    complaint. Ultimately, Tri-State and its complaining Utility Members reached a

5    negotiated resolution, the formal complaint was withdrawn, and the proceeding was

6    dismissed without a decision by the Colorado Commission.

7         These New Mexico and Colorado regulatory proceedings indicated that state

8    utility commissions would insert themselves into matters related to or affecting Tri-

9    State's wholesale rate. This prompted Tri-State to consider various alternatives, including

10   jurisdictional alternatives, to address the risk of disparate state regulatory treatment

11   regarding wholesale rates.

12        This risk was highlighted again in 2018 when Tri-State's Colorado Utility

13   Member DMEA filed a formal complaint with the Colorado Commission alleging that an

14   "exit charge" set by Tri-State for DMEA to terminate its WESC and withdraw from Tri-

15   State was unjust, unreasonable, and discriminatory, and requesting that the Colorado

16   Commission determine an "exit charge" for DMEA. Despite Tri-State's arguments that

17   the Colorado Commission lacked jurisdiction to decide this contract dispute and that

18   DMEA's complaint was outside the Colorado Commission's statutory rate jurisdiction,

19   the Commission again asserted jurisdiction over the complaint. Tri-State and DMEA

20   ultimately reached a negotiated resolution of this dispute and the formal complaint was

21   dismissed without a decision by the Colorado Commission. As this Commission later

22   recognized in its August, 2020 Order Addressing Arguments Raised on Rehearing, and

1    Setting Aside Prior Order, In Part, "Tri-State's assessment of an exit charge constitutes a

2    Commission-jurisdictional rate subject to our exclusive jurisdiction."[4]  This state

3    regulatory proceeding again emphasized the need to secure one regulatory forum where

4    Tri-State wholesale rate issues affecting Utility Members in four states, including issues

5    related to Utility Member withdrawals, could be fairly adjudicated.

6    **Q.**    **In view of what you described, what steps did Tri-State take to become a public**

7           **utility subject to this commission's jurisdiction?**

8    A.    Following appropriate approvals by Tri-State's membership and Tri-State's Board of

9           Directors, on September 3, 2019, Tri-State added the first of three Non-Utility Members,

10          the result of which was to eliminate the exemption from Commission jurisdiction I

11          mentioned previously.

12   **Q.**    **In so doing, was Tri-State trying to avoid regulation?**

13   A.    No, to the contrary, Tri-State was specifically seeking jurisdiction by the one regulator

14          that could consider all of the varying, and sometimes competing, state and Utility

15          Member interests—this Commission.

16   **Q.**    **Why did Tri-State file a CTP methodology?**

17   A.    Over Tri-State's almost 70 year history, Utility Members have occasionally sought to

18          terminate their WESCs before the stated expiration date, sometimes decades before. Tri-

19          State addressed these requests case-by-case, dedicating significant staff time and

20          resources to determine an appropriate termination payment. For example, I previously

---

[4] *Tri-State Generation and Transmission Ass'n, Inc.*, 172 FERC ¶ 61,173, P 31 (2020).

1    mentioned DMEA's complaint to the Colorado Commission concerning an "exit charge".

2    To resolve that dispute, Tri-State engaged in extensive negotiations with DMEA and

3    ultimately reached a "black box" agreement on the terms of DMEA's withdrawal from

4    Tri-State, including the payment DMEA would make to terminate its WESC. In my

5    opinion, that negotiated resolution was in the best interest of Tri-State and its Members

6    since it avoided the risk of the Colorado Commission establishing a harmfully low "exit

7    charge" which may well have prompted other Colorado Utility Members to pursue

8    similar exit charges. While Tri-State was able to negotiate a resolution of the DMEA

9    withdrawal dispute, calculation of an appropriate payment is complicated, unique to the

10   circumstances of each potential withdrawal, and has led to disputes with and among

11   Utility Members and, sometimes, protracted and expensive litigation. Mr. Nebergall

12   discusses the Utility Member withdrawals in greater detail in his direct testimony.

13         Tri-State first experienced this during the mid-1980s when its Member Shoshone

14   River Power, Inc. sought to terminate its WESC through a sale of its assets to an investor-

15   owned utility. Shoshone's asset sale and purported WESC termination resulted in several

16   years of litigation before the Wyoming Public Service Commission and in the Wyoming

17   state and federal courts. The Shoshone situation recurred in 2009 with the proposed

18   withdrawal of five Tri-State utility Members in Nebraska, once again in 2016 with the

19   withdrawal of Kit Carson Electric Cooperative, a New Mexico Utility Member, and yet

20   again in 2019 with the proposed withdrawal of Colorado Utility Member DMEA. As with

21   Shoshone, the proposed early termination of the Nebraska Members' and DMEA's

22   WESCs resulted in expensive and protracted litigation.

1       In November of 2019, two of Tri-State's Colorado Utility Members—United

2   Power and La Plata Electric Association—filed formal complaints at the Colorado

3   Commission asking it to determine an "exit charge" that would be required for them to

4   terminate their WESCs and withdraw from Tri-State. La Plata and United Power filed

5   these complaints months after Tri-State had made its initial set of rate filings at this

6   Commission and had become subject to this Commission's jurisdiction. In my view, they

7   did this, as Colorado-based Utility Members, to seek more favorable treatment from the

8   Colorado Commission than from this Commission which is required to treat all

9   ratepayers fairly and equally regardless of the state in which they are located. I also think

10  it is noteworthy that many of Tri-State's non-Colorado Utility Members recognized that

11  the outcome of the La Plata and United Power complaints could adversely affect them

12  and moved to intervene in the proceeding; however, the Colorado Commission denied all

13  of these requests.

14      I would note that throughout its history, Tri-State has applied a consistent

15  philosophy when addressing Utility Member withdrawals. Tri-State has always believed

16  and continues to believe that, given the interrelated and interdependent nature of the

17  WESCs and the commitments Utility Members have made to each other within Tri-

18  State's cooperative structure, when one Utility Member seeks to terminate its WESC

19  early and withdraw from Tri-State, that termination and withdrawal should not harm Tri-

20  State's remaining Utility Members.

21      Given the risk of inconsistent state regulation and the Colorado Commission's

22  then-ongoing assertion of jurisdiction over the La Plata and United Power complaints,

1    and consistent with the Commission's decision on Tri-State's Petition for Declaratory

2    Order, Tri-State filed its original CTP tariff to bring the Utility Member withdrawal issue

3    squarely before the Commission and within the Commission's exclusive jurisdiction.[5]

4  **Q.**    **Why has Tri-State proposed that this Commission approve a standardized method**

5        **for computing contract termination payments?**

6  A.    A standardized CTP methodology establishes an orderly and equitable process that favors

7        no Utility Member or group of Utility Members in one state over those in another state.

8        An approved CTP methodology prevents the potential cross-subsidization of one Tri-

9        State Utility Member or group of Utility Members by others. Absent a Commission-

10       approved CTP methodology, each of the four states in which Tri-State operates could

11       seek to impose its own CTP methodology favoring Tri-State's Utility Members in its own

12       state to the detriment of all others – as it appears the Colorado Commission was prepared

13       to do.

---

[5] *Tri-State Generation and Transmission Ass'n, Inc.*, 170 FERC ¶ 61,224, P 121 (2020)("A ruling by the Colorado PUC on those complaints would not be preempted unless and until such ruling conflicts with a Commission-approved tariff or agreement that establishes how Tri-State's exit charges will be calculated. We note that Tri-State has not yet filed, and the Commission has not yet approved, a methodology for determining Tri-State's exit charges. If Tri-State seeks to place matters regarding its exit charges before the Commission, it should make an appropriate filing at the Commission, which could include a filing setting forth a methodology for determining such charges.").

| | V. | MODIFIED CTP METHODOLOGY. |

1

2  **Q.**  **When did Tri-State first file a CTP tariff?**

3  A.  Tri-State filed its original CTP tariff, designated as Rate Schedule FERC No. 281, on

4  April 13, 2020, in Commission Docket No. ER20-1559-000. The Commission accepted

5  the tariff for filing on June 12, 2020, suspended it for a nominal period, to become

6  effective June 13, 2020, subject to refund, and initiated hearing and settlement judge

7  procedures.[6]

8  **Q.**  **What was the basic philosophy underlying Tri-State's original CTP tariff?**

9  A.  The fundamental principle was that a departing Utility Member's CTP must keep Tri-

10  State and the remaining Utility Members "whole," *i.e.*, keep them in the same financial

11  position they would have been had the withdrawing Utility Member fulfilled its

12  contractual obligations under the WESC for the remainder of its stated term.

13  **Q.**  **Please explain why the "make whole" CTP philosophy is so important from Tri-**

14  **State's perspective.**

15  A.  As Tri-State's CFO Patrick Bridges explains more fully in his testimony, Tri-State's

16  generation and transmission system is financed, constructed, and operated based on the

17  expectation and the requirement that it serve all of its full-requirements Utility Members

18  for the entire term of their WESCs (*i.e.*, through 2050). When one or more Utility

19  Members leave, the smaller number of remaining Utility Members must still shoulder the

20  burden of operating and maintaining the entire system. Accordingly, Tri-State's original

---

[6] *Tri-State Generation and Transmission Ass'n, Inc*., 171 FERC ¶ 61,207 (2020).

1       CTP Methodology quantified the revenues Tri-State would have been contractually

2       entitled to collect over the remaining term of the departing Utility Member's WESC,

3       considering avoidable costs and offsetting revenue streams over the remainder of the

4       term, and ensured that Tri-State could service its debts.

5    **Q.**     **Has Tri-State filed amendments to its original CTP tariff?**

6    A.     Yes. Tri-State filed its Modified CTP Methodology on September 1, 2021.[7]

7    **Q.**     **Has the Commission accepted the Modified CTP Methodology?**

8    A.     Yes. The Commission accepted Tri-State's revisions to Rate Schedule FERC No. 281 for

9       filing, subject to refund, and set them for hearing.[8]

10   **Q.**     **Why did Tri-State file revisions to its original CTP methodology?**

11   A.     The original CTP methodology relied upon detailed and complex modeling to produce

12      highly accurate CTPs. However, the methodology was complicated, time-consuming,

13      member-specific, and dynamic. CTP calculations had to be performed for one Utility

14      Member at a time, and the withdrawal of any Utility Member affected the CTP

15      calculation for the next requesting Utility Member, and so on. The original methodology

16      could not rapidly produce simultaneous CTPs in response to multiple Utility Member

17      inquiries. Because it relied, in part, upon proprietary forecasting tools, the original CTP

18      methodology produced results that could not easily be replicated by Utility Members.

---

[7] *Tri-State Generation and Transmission Ass'n, Inc.*, Revisions to Rate Schedule FERC No. 281 (Modified CTP Methodology), Docket No. ER21-2818-000.

[8] *Tri-State Generation and Transmission Ass'n, Inc.,* 177 FERC ¶ 61,059, at P 1 (2021).

1      Therefore, and in response to the Commission's June 17, 2021 Order to Show Cause,[9] its

2      August 19, 2021 Order Denying Motion to Hold Proceeding in Abeyance,[10] and feedback

3      from certain of its Members, Tri-State developed the Modified CTP Methodology.

4    **Q.   What are the principal similarities and differences between Tri-State's original CTP**

5         **methodology and the Modified CTP Methodology?**

6    A.   Like its predecessor, the Modified CTP Methodology is based upon a "make whole"

7         philosophy. However, as compared to the original CTP methodology, the Modified CTP

8         Methodology is transparent and easy to replicate, eschewing subjective assumptions and

9         forecasts and relying instead upon historical member power purchases, historical power

10        sale transactions, and readily-accessible published U.S. government forecasts. Another

11        key difference is that the Modified CTP Methodology provides a departing Utility

12        Member with an immediate credit for its ownership interest in Tri-State (*i.e.*, its

13        patronage capital) and credits the departing Utility Member with the OATT-related

14        revenues reasonably expected to be received by Tri-State if the departing Utility Member

15        becomes a Tri-State OATT customer after its withdrawal.

16   **Q.   Does the Modified CTP Methodology address concerns regarding transparency,**

17        **verifiability, subjectivity, and potential bias?**

18   A.   Yes. The Modified CTP Methodology does not rely upon or use proprietary forecasting

19        tools to calculate CTPs. Instead, inputs used in the Modified CTP Methodology are

---

[9] *Tri-State Generation and Transmission Ass'n, Inc.*, 175 FERC ¶ 61,229, P 1 (2021).

[10] *Tri-State Generation and Transmission Ass'n, Inc.*, 176 FERC ¶ 61,105, P 1 (2021).

Docket No. ER21-2818-000
Exhibit No. TGT-0001 REV 2
Page 37 of 37

1       readily available data sources, including FERC Electric Quarterly Reports, Energy

2       Information Administration reports, Tri-State Eastern and Western Interconnection

3       OATT rates, Tri-State balance sheet data, and Treasury Department data, and the Utility

4       Members' own load and patronage capital account information. The Modified CTP

5       Methodology, can, therefore, be replicated by Tri-State's Utility Members without the

6       need to access proprietary modeling software. The Modified CTP Methodology contains

7       clear and objective contract termination procedures that will permit an orderly and

8       equitable exit process for Utility Members that wish to withdraw from Tri-State. It allows

9       a Utility Member to exit upon simply providing the requisite notice and paying the

10      calculated CTP.

11  **Q.**   **Do other Tri-State witnesses describe the Modified CTP Methodology in greater**

12      **detail?**

13  A.     Yes, Pat Bridges and Joe Mancinelli both do so.

14  **Q.**   **Does this conclude your testimony?**

15  A.     Yes.

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 7, 2022.

_____

Duane Highley

# Exhibit No. TGT-0003 REV

## Direct Testimony of Brad Nebergall

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| Tri-State Generation and Transmission | ) | Docket Nos. | ER21-2818-000 |
| Association, Inc. | ) | | EL22-4-000 |
| | ) | | (consolidated) |

PREPARED DIRECT TESTIMONY

OF

BRAD NEBERGALL

ON BEHALF OF

TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.

March 9, 2022

Docket No. ER21-2818-000
Exhibit No. TGT-0003 REV
Page 2 of 41

### SUMMARY OF THE PREPARED DIRECT TESTIMONY
### OF BRAD NEBERGALL

Brad Nebergall is Tri-State's Senior Vice President, Energy Management. In his direct testimony, Mr. Nebergall discusses Tri-State's contractual arrangements with its Utility Members and the resource planning, existing resources, and associated costs Tri-State employs and incurs to serve its Utility Members with substantially all of their energy and demand requirements.

First, Mr. Nebergall discusses the Wholesale Electric Service Agreements which govern the terms and conditions of service that Tri-State provides to its Utility Members. He explains the purpose of these agreements, the history of their execution, and the binding reciprocal obligations they create both for the Utility Members and the membership. Mr. Nebergall then provides an overview of the history of member contract termination events. Mr. Nebergall describes each of the instances in relevant history where a member has sought to withdraw from and terminate its obligations to Tri-State. Mr. Nebergall explains how the courts have upheld, and how withdrawals have generally abided by, a "make whole" principle that ensures the membership is not harmed in situations where a member has reneged on its contractual obligations.

Next, Mr. Nebergall explains the resource planning process that Tri-State employs in order to ensure that it has adequate generation and transmission resources to serve current and future Utility Member load. As part of this discussion, Mr. Nebergall addresses the collaborative planning processes and state-mandated resource planning efforts that Tri-State engages in, as well as certain geographic and member self-supply considerations Tri-State relies on to ensure accurate results. Mr. Nebergall then provides an overview of Tri-State's existing generation and transmission resources and the changing nature of Tri-State's system. Mr. Nebergall explains the difference between Tri-State's owned, leased, and contracted generation resources, and provides an overview of the transmission arrangements that Tri-State procures, both through third parties and through its own transmission arm, to serve Utility Members.

Finally, Mr. Nebergall concludes with a discussion of some of the costs that Tri-State incurs to provide service to its Utility Members, particularly with respect to its generation and transmission resources. Mr. Nebergall explains how these costs are shared among Utility Members, describes the extent to which these costs are avoidable in the event of load reductions, and finally opines on how these and other costs should be considered in the event of Utility Member withdrawal.

Docket No. ER21-2818-000
Exhibit No. TGT-0003 REV
Page 3 of 41

**TABLE OF EXHIBITS**

The prepared testimony of Brad Nebergall is Exhibit No. TGT-0003. These exhibits accompany this testimony:

| Exhibit Number | Description | Confidentiality Designation |
|---|---|---|
| Exhibit No. TGT-0004 | Resume of Brad Nebergall | PUBLIC |
| Exhibit No. TGT-0005 | Representative Wholesale Electric Service Contract between Tri-State and Big Horn Rural Electric Company | PUBLIC |
| Exhibit No. TGT-0006 | Tri-State Resource Planning Regions | PUBLIC |
| Exhibit No. TGT-0007 | Tri-State Generation Resource List | PUBLIC |
| Exhibit No. TGT-0008 | Tri-State Generation Resource Map | PUBLIC |

Docket No. ER21-2818-000
Exhibit No. TGT-0003 REV
Page 4 of 41

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 5

II.     WHOLESALE ELECTRIC SERVICE CONTRACTS ...................................................... 7

III.    HISTORY OF MEMBER WITHDRAWAL .................................................................. 12

IV.     RESOURCE PLANNING ........................................................................................... 19

V.      GENERATION AND TRANSMISSION RESOURCES ................................................. 24

VI.     RESOURCE COSTS AND AVOIDABILITY ............................................................... 32

Docket No. ER21-2818-000
Exhibit No. TGT-0003 REV
Page 5 of 41

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| Tri-State Generation and Transmission | ) | **Docket Nos.  ER21-2818-000** |
| Association, Inc. | ) | **EL22-4-000** |
| | ) | **(consolidated)** |

**PREPARED DIRECT TESTIMONY OF BRAD NEBERGALL**
**ON BEHALF OF**
**TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.**

1              **I.      INTRODUCTION**

2    **Q.     Please state your name, title, and business address.**

3    **A.**    My Name is Brad Nebergall. I am employed by Tri-State Generation and Transmission

4            Association, Inc. ("Tri-State") as the Senior Vice President, Energy Management. My

5            business address is 1100 W. 116th Avenue, Westminster, CO 80234.

6    **Q.     Please summarize your educational background and experience in the electric utility**

7            **industry prior to joining Tri-State.**

8    **A.**    I graduated from Iowa State University with a B.S. in Business Administration and a

9            focus in finance. I also have an MBA from the University of Houston. Prior to joining

10           Tri-State, I first worked for several years in commercial banking. In 1986, I began

11           working for a predecessor of Enron Corp., and for approximately 20 years served various

12           roles within the Enron corporate structure. Some of my work included founding Enron's

13           natural gas trading business in England, co-founding a NOx and $SO_2$ credits trading

14           initiative, and managing Enron's Midwest Region power, natural gas, and diesel sales. I

15           continued to work for Enron Renewable Energy Corporation after the Enron bankruptcy

16           in 2001, where I oversaw commercial and operational activities for 28 operational wind

17           farm projects. A copy of my resume is provided as Exhibit No. TGT-0004.

Docket No. ER21-2818-000
Exhibit No. TGT-0003 REV
Page 6 of 41

1    **Q.    Please summarize your experience with Tri-State, including your current role and**

2    **responsibilities.**

3    A.    I started with Tri-State in 2007. In 2008, I was promoted to my current role as Tri-State's

4    Senior Vice President, Energy Management, where my team and I are responsible for

5    Tri-State's marketing, energy trading, origination, risk management, resource dispatch,

6    corporate development, and resource planning functions. These activities are targeted at

7    ensuring that Tri-State has access to sufficient generation and transmission resources to

8    meet its long-term power supply obligations to the Tri-State membership. My

9    responsibilities require that I have knowledge of Tri-State's operations, strategic

10    initiatives, costs, long-term power supply obligations to members, and financial

11    arrangements. I also am required to stay informed of market and industry trends related to

12    various power market prices, operating costs such as fuel prices, transmission capacity

13    pricing, and Tri-State's capital expenses.

14    **Q.    Have you previously submitted testimony before this Commission?**

15    A.    Yes. I have submitted testimony supporting initial rate filings before this Commission in

16    Tri-State's Stated Rate and Wholesale Electric Service Agreement ("WESC")

17    proceedings in Docket Nos. ER20-676-000 and ER20-683-000, respectively. I have not

18    previously submitted prepared testimony in the context of hearing procedures before this

19    Commission.

20    **Q.    What is the purpose of your testimony on behalf of Tri-State in this proceeding?**

21    A.    The purpose of my testimony is four-fold. First, I explain the WESCs that exist between

22    Tri-State and each of its Utility Members. Second, I discuss historical Utility Member

1    withdrawal events. Third, I address how Tri-State has planned, constructed, procured, and

2    maintained its generation resource portfolio and transmission capacity rights in reliance

3    upon the power supply and procurement commitments contained in the WESCs. Last, I

4    describe the costs associated with Tri-State's generation and transmission service

5    agreements and discuss how recovery of these costs would be impacted should a Utility

6    Member renege on its contractual obligations under the WESC.

7                    II.    **WHOLESALE ELECTRIC SERVICE CONTRACTS**

8    **Q.    Please briefly describe the WESCs.**

9    **A.**    The WESCs are long-term wholesale electric services contracts that Tri-State has entered

10    into with each of its Utility Members. Under the WESCs, Tri-State is obligated to

11    provide, and Utility Members have committed to purchase, all of the capacity and energy

12    needed to satisfy each Utility Member's retail service requirements aside from certain

13    self-supply exemptions. These are commonly known as "all-requirements" contracts. The

14    WESCs were each executed in 2007 and extend through December 31, 2050, and

15    thereafter until terminated by either party with two years' written notice of intent to

16    terminate. Generation and transmission cooperatives across the country rely on similar

17    all-requirements generation and transmission contracts to serve power to rural America.

18    As noted above, Tri-State filed the WESCs in Docket No. ER20-683-000, and each has

19    been accepted by the Commission as Rate Schedule FERC Nos. 1-6 and 8-43. Aside from

20    Utility Member-specific information contained in the schedules to the WESCs, the terms

21    and conditions of service are identical among these contracts. A representative WESC

1    between Big Horn Rural Electric Company, Rate Schedule FERC No. 1, is provided as

2    Exhibit No. TGT-0005.

3    **Q.**    **From your perspective, what is the purpose of the WESCs?**

4    **A.**    As a general matter, generation and transmission cooperatives were formed across the

5    country to ensure that rural America had comparable access to affordable, reliable, long-

6    term electric service as provided by investor-owned utilities in more profitable service

7    territories. Tri-State's rural distribution cooperatives and public power districts joined

8    Tri-State to create economies of scale and buying power in order to cost-effectively

9    finance, construct, and procure electric power supply. The WESCs represent the

10   contractual commitment among the Utility Members to share in these long-term costs and

11   benefits and to hedge against market volatility that Utility Members would be exposed to

12   if they were to purchase their requirements on the spot market.

13       For the Utility Members, the WESCs contractually ensure access to a long-term

14   reliable source of wholesale electricity. This is because the WESCs contractually obligate

15   Tri-State to supply substantially all of the Member's electricity requirements through the

16   term of the contracts. For Tri-State, the WESCs provide an assured source of future

17   revenue that makes its provision of wholesale electric service possible. Revenue from the

18   WESCs allows Tri-State to secure billions of dollars of debt financing needed to plan,

19   build, operate, and procure generation and transmission resources for the benefit of the

20   Utility Members.

21       It is important to understand that the WESCs are a long-term exchange of costs

22   and benefits among the membership. Given the length of these contracts, the value of the

1    services compared to market prices changes over time. Additionally, Utility Members

2    each have unique cost profiles for service that can change over time. Accordingly, there

3    are times when it is more profitable to serve a particular Utility Member, and times when

4    it is less profitable to do so. Notwithstanding, the WESCs guarantee service over an

5    extended period, which affords protection to Utility Members in times of unfavorable

6    economics and commits Utility Members to share in the costs when their comparative

7    economics are more favorable.

8  Q.   **Will you provide a brief history of the contractual arrangements between Tri-State**

9      **and its Utility Members?**

10  A.   Tri-State originally entered into all-requirements contracts with its Utility Members at

11     different times. Tri-State's founding Utility Members have had all-requirements

12     contractual arrangements with Tri-State since 1957 or earlier. Other Utility Members

13     entered into all-requirements contracts with Tri-State thereafter.

14         In 1992, several Utility Members joined Tri-State and executed all-requirements

15     contracts following the bankruptcy of Colorado-Ute Electric Association, Inc.

16     ("Colorado-Ute"), a generation and transmission cooperative with members in Colorado.

17     As part of the bankruptcy proceeding, Colorado-Ute's members were given the right to

18     choose a new source of wholesale power services, through the markets, long-term

19     bilateral contracts, or otherwise. Of 14 then-existing Colorado-Ute members, four chose

20     to enter into long-term wholesale power agreements with Public Service Company of

21     Colorado. The remaining 10 members chose to become Tri-State Utility Members.

1        In 2000, Tri-State completed a merger with Plains Electric Generation and

2    Transmission Cooperative ("Plains") in New Mexico. I understand that, preceding the

3    merger, Plains was experiencing financial difficulties. After exploring various solutions,

4    including entering into arrangements with Enron, Public Service Company of New

5    Mexico ("PNM"), and Tri-State, 12 of Plains' 13 members chose to become members of

6    Tri-State, and one member chose to enter into power supply arrangements with PNM.

7    Tri-State assumed the existing Plains contracts with each of the 12 members and

8    executed new contracts with those members in 2001.

9        Since the time these contracts were originally entered into, the contracts have

10   been re-executed numerous times to extend the term of the contracts. Throughout the

11   decades, contracts were updated and modified slightly to incorporate new terms, such as

12   an ability for Utility Members to self-supply up to five percent of their requirements. All-

13   requirements contracts were generally re-executed in 1965, 1995, and 2001. Most

14   recently, in 2007, each Utility Member was given the option to extend the term of their

15   WESC from 2040 to 2050 and each of the current Utility Members elected to do so.

16  **Q.**    **Were these contract extensions and re-executions voluntary?**

17  **A.**    Yes. There was and is no contractual or other obligation requiring that a Utility Member

18          to extend its contract. The Utility Member is simply obligated to fulfill its commitments

19          through the term of the existing agreement. In fact, in 2007, two former Utility Members,

20          Kit Carson Electric Cooperative ("Kit Carson") and Delta Montrose Electric Association,

21          Inc. ("DMEA"), chose not to re-execute and extend their all-requirements contracts. In

1      that instance, both Kit Carson and DMEA retained their pre-existing contracts with terms

2      extending through 2040.

3    **Q.**    **Do the WESCs allow Tri-State or its Utility Members to terminate or reduce their**

4        **respective requirements obligations prior to December 31, 2050?**

5    **A.**    No. The WESCs do not provide a unilateral right for either Tri-State or a Utility Member

6        to terminate the WESC or reduce their power supply/procurement obligations early. Tri-

7        State may not stop providing all-requirements service to any Utility Member without

8        violating the WESC, nor may any Utility Member reduce or terminate its supply

9        obligations from Tri-State without violating the WESC.

10   **Q.**    **Do any of Tri-State's governing documents provide for Utility Member withdrawal?**

11   **A.**    Article I, Section 4 of Tri-State's Bylaws, on file with the Commission as Rate Schedule

12       FERC No. 259 and submitted in this proceeding as Exhibit No. TGT-0019, provides that

13       a Utility Member "may withdraw from membership upon compliance with such equitable

14       terms and conditions as the Board of Directors may prescribe provided, however, that no

15       member shall be permitted to withdraw until it has met all its contractual obligations to"

16       Tri-State. Tri-State's Board of Directors approved the Contract Termination Payment

17       Methodology and Procedures as the prescribed terms and conditions necessary to ensure

18       that a Utility Member meets its contractual obligations to Tri-State.

19   **Q.**    **To be clear, do either the WESCs or Tri-State's governing documents allow Tri-State**

20       **to terminate a WESC or a Utility Member's membership in the cooperative?**

21   **A.**    No, there is no such process or provision that would allow Tri-State to unilaterally

22       terminate a Utility Member's WESC or membership in Tri-State. Article I, Section 4 of

1    Tri-State's Bylaws provides that the Board of Directors may expel a member only for

2    "fail[ure] to comply with any of the provisions of the Articles of Incorporation, Bylaws,

3    or rules and regulations adopted by the Board of Directors from time to time." Whereas

4    the Contract Termination Payment Methodology and Procedures at issue in this

5    proceeding provide a process for a Utility Member to terminate its obligations, no such

6    process or provision allows Tri-State to terminate its obligations without cause.

7    **III.    HISTORY OF MEMBER WITHDRAWAL**

8    **Q.    Have any of Tri-State's Utility Members, past or present, sought to terminate their**

9    **contractual arrangements with Tri-State?**

10    **A.**    Yes. Tri-State has existed for nearly 70 years. During that time, various Utility Members

11    have sought to withdraw from Tri-State. As a general matter, attempts to withdraw were

12    of less consequence early in Tri-State's history. This is because Tri-State was a smaller

13    enterprise with substantially less borrowing and less generation, transmission, and third-

14    party obligations earlier on. However, as Tri-State borrowed money, constructed assets,

15    and entered into long-term transmission and power purchase agreements, the

16    commitments contained in Utility Member contracts became much more important. In his

17    direct testimony, Exhibit No. TGT-0001, Duane D. Highley, Tri-State's Chief Executive

18    Officer, provides some examples of Tri-State's early borrowing and construction

19    activities.

20    Today, the financial commitments contained in the WESCs are critical to Tri-

21    State's financing and ability to provide cost-effective, long-term, power supply to the

22    Utility Members. The WESCs are often referred to as the financial backbone of the

1    cooperative. These concepts are further described in the direct testimony of Mr. Highley,

2    as well as the direct testimonies of Patrick L. Bridges, Tri-State Senior Vice President

3    and Chief Financial Officer, Exhibit No. TGT-0016, Lori L. O'Flaherty, former CoBank,

4    ACB executive, Exhibit No. TGT-0056, and Daniel J. Aschenbach, President of AGVP

5    Advisory, Exhibit No. TGT-0047.

6    **Q.    Can you elaborate?**

7    **A.**    Yes. There have been approximately six different instances in which 12 different current

8    and former Utility Members have sought to withdraw since the mid-1980s. This does not

9    include the conditional, non-binding notices of withdrawal that have been submitted to

10    Tri-State as part of the Contract Termination Payment Methodology and Procedures at

11    issue in this proceeding.

12    Shoshone, Garland

13    In 1985, Shoshone River Power, Inc. ("Shoshone") and Garland Power & Light Co.

14    ("Garland") attempted to terminate their long-term power contracts with Tri-State which

15    extended through December 31, 2020. Unbeknownst to Tri-State, Shoshone and Garland

16    agreed to sell their distribution system assets to a third-party, Pacific Power & Light Co.

17    ("Pacific"). Shoshone and Garland then advised Tri-State that, due to this sale of

18    distribution system assets, they would no longer require wholesale electric service from

19    Tri-State, as Pacific would now be responsible for such service. Tri-State sought to enjoin

20    the sales. This was successful regarding the Garland transaction, the asset sale was then

21    abandoned, and Garland continues to be a Utility Member of Tri-State today. The

22    Shoshone sale, however, was consummated due to a short gap in court-issued injunctions.

1    Tri-State therefore sued both Shoshone and Pacific and was awarded substantial

2    damages. I understand that the damages calculation the appellate court approved is

3    generally consistent with the "make whole" approach underlying the Contract

4    Termination Payment Methodology at issue in this proceeding.

5    Sheridan-Johnson

6    Next, in 1996, a then-current Utility Member of Tri-State, Sheridan-Johnson Rural

7    Electrification Association ("Sheridan-Johnson") proposed to merge with a neighboring

8    distribution cooperative, Tri-County Electric Association ("Tri-County"). Tri-County was

9    a member of another generation and transmission cooperative, Basin Electric Power

10   Cooperative ("Basin"), and, under the terms of the proposed merger, Tri-County would

11   be the surviving entity and would continue to fulfill its contractual procurement

12   obligations to Basin. In order to accommodate this merger, Basin and Tri-State agreed to

13   an arrangement where Basin would purchase from Tri-State, at Tri-State's Utility

14   Member rates, all of the electricity that Sheridan-Johnson would otherwise have

15   purchased from Tri-State during the term of Sheridan-Johnson's contract with Tri-State.

16   This arrangement made Tri-State financially whole given that Basin continued to

17   purchase all of the requirements that Sheridan-Johnson had committed to procure from

18   Tri-State. Despite the merger, this was not a situation in which a Utility Member avoided

19   its obligations under an all-requirements contract.

20   NPSIG

21   In 2009, five of Tri-State's Utility Members in Nebraska, referred to as the Nebraska

22   Power Supply Issues Group ("NPSIG"), sought to procure power elsewhere and

1    withdraw from Tri-State. Tri-State's Board of Directors prescribed terms and conditions

2    for the NPSIG Utility Members' withdrawal, which included a substantial payment of

3    approximately $220 million among the group. This amount was consistent with a "make

4    whole" calculation. The NPSIG Utility Members sued Tri-State (though one Utility

5    Member withdrew from the lawsuit). A jury verdict was ultimately awarded in Tri-State's

6    favor on every disputed issue and the lawsuit was dismissed by a federal court. The

7    NPSIG Utility Members abandoned their attempt to withdraw from Tri-State and

8    continue to be Tri-State Utility Members today.

9    <u>Kit Carson</u>

10   In 2014, Kit Carson sought to withdraw from Tri-State to seek alternative power supply

11   arrangements. Kit Carson requested that the Tri-State Board of Directors provide the

12   terms and conditions of withdrawal, and the Board of Directors instructed Tri-State staff

13   to negotiate a buyout number with Kit Carson. Further, as required in each WESC, Tri-

14   State is obligated to convene a Contract Committee at least every five years to review the

15   contracts. In late 2014, Tri-State convened a Contract Committee of the membership to

16   discuss several issues, including member withdrawal. The Contract Committee chose to

17   engage several outside consultants to review withdrawal methodologies. The preferred

18   methodology was a "make whole" mark-to-market methodology.

19   Tri-State staff therefore developed a mark-to-market withdrawal payment amount

20   generally consistent with the "make whole" philosophy as adopted by the courts in the

21   Shoshone exit dispute. Through the course of various discussions, Kit Carson made Tri-

22   State aware of certain inaccuracies in the forecast data that it had provided to Tri-State,

1   specifically around the impending closure of a large mine and retail customer in Kit

2   Carson's service territory. Tri-State also eventually took into consideration the Clean

3   Power Plan that was proposed and then became law during the withdrawal negotiations.

4   Based on these and other considerations, Tri-State modified the inputs to its mark-to-

5   market methodology and arrived at a buyout payment of $37,000,000, plus the forfeiture

6   of $12,465,933 of patronage capital, which was both consistent with a "make whole"

7   approach and satisfactory to Kit Carson.

8   It should be noted that, as stated above, Kit Carson chose not to extend its all-

9   requirements contract with Tri-State in 2007. Accordingly, the remaining term of the

10  contract for purposes of the buyout calculation was 10 years shorter than it would have

11  been for most other Utility Members.

12  Kit Carson and Tri-State reached an agreement on the buyout number, based on the

13  mark-to-market methodology, as well as other terms and conditions, all of which was

14  approved by Tri-State's Board of Directors. Kit Carson withdrew from Tri-State in June

15  of 2016.

16  <u>DMEA</u>

17  In 2017, DMEA sought to withdraw from Tri-State and similarly entered into negotiations

18  with Tri-State staff regarding the terms and conditions of exit. Tri-State provided a

19  calculation based on the same mark-to-market, "make whole", methodology. However

20  DMEA and Tri-State were not able to reach an agreement on the payment that would be

21  required for DMEA to terminate its contractual obligations to Tri-State. DMEA then filed

22  a complaint against Tri-State with the Colorado Public Utilities Commission ("Colorado

1    Commission"). DMEA also filed a complaint pursuant to Tri-State's Board of Directors

2    Policy No. 316, and an extensive Board of Directors hearing was held in July 2018. Though

3    I was not directly involved in the ultimate disposition of this matter, Tri-State and DMEA

4    reached a black-box agreement on the terms and conditions for DMEA's withdrawal, and

5    DMEA withdrew its complaint prior to Colorado Commission action. Mr. Highley's direct

6    testimony provides additional context around this negotiated outcome. Though these

7    events largely took place prior to Tri-State becoming Commission-jurisdictional, various

8    filings were made with and approved by the Commission to effectuate DMEA's

9    withdrawal.

10   <u>United Power and LPEA</u>

11   Most recently, La Plata Electric Association ("LPEA") and United Power, Inc. ("United

12   Power") similarly expressed interest in withdrawal. On November 5 and 6, 2019,

13   respectively, after Tri-State made initial filings and became subject to this Commission's

14   jurisdiction, LPEA and United Power each filed formal complaints at the Colorado

15   Commission alleging that Tri-State had failed to provide them a just, reasonable, and

16   non-discriminatory "exit charge" and requesting that the Colorado Commission

17   determine such an "exit charge" pursuant to which each could terminate its WESC and

18   withdraw from Tri-State. These complaints were filed in Colorado Commission

19   Proceeding Nos. 19F-0620E & 19F-0621E. Despite Tri-State's arguments that this

20   Commission, rather than the Colorado Commission, had exclusive jurisdiction over the

21   matter, the Colorado Commission asserted jurisdiction over the complaints. An

22   evidentiary hearing was held in May 2020, after which an administrative law judge

1    decision was rendered. However, on August 28, 2020, before the Colorado Commission

2    could consider the recommended decision, this Commission issued its order finding that

3    Tri-State's assessment of an exit charge is a Commission-jurisdictional rate subject to the

4    Commission's exclusive jurisdiction. Accordingly, on November 5, 2021 the Colorado

5    Commission found that it was without jurisdiction to proceed and dismissed LPEA's and

6    United Power's complaints.

7    **Q.    How do these exit scenarios relate to the Contract Termination Payment**

8    **Methodology and Procedures at issue in this proceeding?**

9    **A.**    As noted above, the Utility Member withdrawal scenarios that Tri-State has managed

10    over the past 35 or more years largely resulted in either some sort of "make whole"

11    payment, either by court order or agreement, or the Utility Member chose not to

12    withdraw. In one instance, Tri-State did negotiate a black-box settlement which resolved

13    a myriad of issues and disputes, including complicated issues surrounding state

14    regulatory issues with rate implications for the entire membership. Again, Mr. Highley

15    discusses that settlement in his direct testimony. I understand that the Contract

16    Termination Payment Methodology and Procedures at issue here are consistent with the

17    "make whole" philosophy that courts have consistently applied when members of Tri-

18    State have attempted to terminate their WESCs prematurely. In these instances, courts

19    generally prohibited early termination or required the departing member to pay a

20    termination payment that left the remaining members financially unharmed. The present

21    situation is unique, however. Here, for the first time, a regulatory body with an obligation

22    to consider the interests of all Tri-State Utility Members and their ratepayers will

1    determine the terms and conditions under which Utility Member may unilaterally shed its

2    WESC obligations.

3                          **IV.    RESOURCE PLANNING**

4    **Q.    Please explain how Tri-State ensures that it has sufficient transmission and**

5    **generation resources to meet Utility Member demand.**

6    **A.**    Tri-State engages in a collaborative resource planning process, referred to as a "single

7    entity" concept, to ensure that it is able to satisfy Utility Member requirements and meet

8    state and Utility Member resource goals. Through Utility Member representatives on Tri-

9    State's Board of Directors and direct interaction with Utility Member staff, Tri-State

10   works closely with the Utility Members to plan for, and then develop, build, and purchase

11   the generation and transmission resources needed to meet Utility Member requirements.

12   Tri-State works with Utility Members both in the context of internal planning efforts as

13   well as state resource planning proceedings. This process ensures that both Tri-State and

14   the Utility Members are able to comply with their obligations regarding provision and

15   receipt of all-requirements power as set out in the WESCs.

16   **Q.    Please elaborate.**

17   **A.**    Tri-State has planned its transmission and generation resource portfolio with the specific

18   purpose of ensuring that it has the ability to reliably serve its Utility Members' long-term

19   contractual requirements at the lowest cost possible and with Utility Member and

20   regulatory resource mix goals in mind. Given that the WESCs extend through 2050, and

21   in light of Tri-State's obligations under Section 1(b) of the WESCs to "use reasonable

22   diligence to provide a constant and uninterrupted supply of electric service" to the Utility

1    Members, Tri-State must engage in extensive long-term planning efforts. As a general

2    matter, Tri-State plans, finances, constructs, and procures transmission and utility-scale

3    generation on a time horizon between 10 and 40 years.

4          As part of this single entity planning process, Utility Members are annually

5    requested to submit to Tri-State a Form 345 which details several years of historical

6    monthly energy and demand data as well as five- and 10-year annual energy and demand

7    forecasts for the large commercial customer class. On a monthly basis, Utility Members

8    are also asked to submit a Form 7 to Tri-State which details energy usage and average

9    pricing across nine different retail customer classes. Tri-State analyzes and refines the

10   provided information and, along with weather, economic, and demographic data, uses the

11   information in statistical models to produce Tri-State's Utility Member load forecasts.

12   These forecasts predict energy and demand through the contract period, i.e., through

13   2050. The results are presented to Utility Members for review and input, after which the

14   energy and demand forecasts may be adjusted, as needed. Utility Members are provided

15   with a report, including forecasted energy and demand, upon request.

16          In addition to the above, Tri-State has regular discussions with Utility Member

17   CEOs, general managers, and other staff, to work through and address planning issues,

18   exchange feedback, and so on. In short, the Utility Members are integral to Tri-State's

19   generation and transmission planning efforts.

20   **Q.**   **Please further explain how Tri-State uses this information for resource planning**

21         **purposes.**

1    **A.**    The results of Tri-State's load forecasting efforts, again, based upon Utility Member

2    submissions, form the basis for Tri-State's long-term resource procurement planning. The

3    results help Tri-State determine the peak demand and hourly energy profiles of the Utility

4    Member requirements that Tri-State will supply. Tri-State's peak demand varies by

5    Utility Member and region, with some Utility Members experiencing peak demand in the

6    winter, and others experiencing a summer peak. These factors, including regional

7    transmission availability, regulatory constraints, hourly energy needs, regional forecasted

8    peak demand, and aggregate peak demand, are all incorporated into expansion planning

9    and dispatch models to create detailed plans for how Tri-State builds and procures

10    transmission and generation to meet peak demands.

11    It should be noted that Tri-State is subject to certain resource planning and

12    procurement obligations in the State of Colorado. Tri-State's resource planning work

13    feeds into a resource plan, approved by the Colorado Commission, that considers

14    resource needs over a 10-year time horizon. The approved resource plan results in

15    obligations to issue a request for proposals and receive bids for near-term resources. This

16    process is discussed further later in my testimony.

17    **Q.**    **Why is regional peak demand and transmission availability considered in Tri-**

18    **State's resource planning?**

19    Tri-State operates over a four-state service territory, serving Utility Members in

20    Colorado, Nebraska, New Mexico, and Wyoming. As noted above, Utility Member load

21    characteristics, and thus Tri-State's wholesale power supply obligations, vary across that

22    footprint. Additionally, various transmission constraints exist within Tri-State's service

1     territory, including with respect to known Total of Transfer ("TOT") constrained paths.

2     Accordingly, generation resources available in one area may not be an effective supply

3     source for load in another area. Tri-State's modeling takes these factors into

4     consideration so that Tri-State can match supply and demand in a way that maximizes

5     reliability and minimizes unnecessary costs. Graphics showing how Tri-State divides its

6     resource planning into discrete regions based on these variables, and strategically locates

7     its supply, are provided as Exhibit No. TGT-0006. Page one of Exhibit No. TGT-0006

8     shows Tri-State's differing regional peak loads and the TOTs that exist across the Tri-

9     State service territory. Page two of Exhibit No. TGT-0006 shows the load forecasting

10    regions that Tri-State considers due to these regional characteristics.

11  **Q.**   **Does Tri-State's resource planning process include consideration of Utility Member**

12       **self-supply?**

13  **A.**   Yes, Tri-State includes Utility Member self-supply in its resource planning processes in

14       order to efficiently plan for future needs and to minimize unnecessary generation and

15       transmission procurement. Tri-State has on file with the Commission four different

16       programs which allow a Utility Member to self-supply power: (1) Board Policy No. 115,

17       Rate Schedule FERC No. 260, which, pursuant to Section 1(a) of the WESCs, allows a

18       Utility Member to self-supply up to five percent of its requirements through owned or

19       controlled distributed or renewable generation resources; (2) Board Policy No. 119, Rate

20       Schedule FERC No. 313, which allows a Utility Member to self-supply the lesser of

21       4,600,000 kilowatt-hours of energy or two percent of its annual requirements from certain

22       community solar projects; (3) Tri-State's partial requirements program, Rate Schedule

1    FERC Nos. 310 and 318, which allows Utility Members to participate in open season

2    processes to buy down their contractual requirements pursuant to a specified buy-down

3    payment methodology; and (4) the Contract Termination Payment Methodology and

4    Procedures, Rate Schedule FERC No. 281, at issue in this proceeding.

5         With respect to items (1) and (2), Tri-State's resource planning considers known

6    and forecasted energy and demand associated with Utility Member Board Policy Nos.

7    115 and 119 projects. Notwithstanding, because Tri-State is required to supply all power

8    requirements above production from these renewable and distributed generation projects,

9    including when those projects are not in service, Tri-State must plan its generation and

10   transmission resources to ensure that it is able to provide uninterrupted power supply,

11   regardless of the approved resources that Utility Members may employ. In light of that

12   fact, and because projects constructed under Board Policy Nos. 115 and 119 are generally

13   intermittent resources, Tri-State's resource planning processes consider the carbon

14   reduction implications of such projects and use the projects to better understand net

15   energy profiles to be served, but cannot rely on such projects to substantially offset

16   capacity needs.

17        With respect to item (3), Tri-State's resource planning processes also take into

18   account requirements reductions that have been awarded in an open season, including the

19   amount of the reduction allocated to the Utility Member and the power supply option that

20   the Utility Member has chosen. Tri-State completed an open season in Spring of 2021

21   whereby three Utility Members were awarded a total of 203 megawatts ("MW") of self-

22   supply flexibility. Depending upon the type of supply that a Utility Member has selected,

1    firm or non-firm, Tri-State has different responsibilities to plan for the provision of

2    backup power, which is taken into account when considering partial requirements in

3    resource planning.

4         With respect to item (4), Tri-State has recently received conditional notice(s) of

5    termination under the currently effective Contract Termination Payment Methodology

6    and Procedures from three Utility Members. However, my understanding is that this is

7    subject to an ongoing dispute before this Commission, with Tri-State and many Utility

8    Members challenging the validity of a conditional notice. Because of the conditional

9    nature of the notices, Tri-State is unable to determine whether it will be required to

10   supply the relevant Utility Member(s) with all-requirements service through 2050 or not.

11   Therefore, Tri-State cannot meaningfully incorporate these conditional notices into its

12   resource planning process, as doing so may risk an inability to serve the Utility Member's

13   and the cooperative's demands in the event the notice is withdrawn.

14              **V.    GENERATION AND TRANSMISSION RESOURCES**

15   **Q.    Can you please provide an overview of Tri-State's generation portfolio?**

16   **A.**   Tri-State's generation resource portfolio is made up of (1) ownership and leasehold

17   interests in generation facilities, and (2) an extensive collection of long-term power

18   purchase agreements ("PPAs"). Tri-State uses both categories of generation resources to

19   meet its power supply obligations to Utility Members.

20   Generating Facilities

21   Tri-State has ownership and leasehold interests in nine different generating stations

22   (inclusive of multiple units) with a combined nameplate capacity of approximately 4,700

1    MW. Constructed between 1977 and 2006, these generators have depreciable lives

2    extending as far as 2066. Below is a brief description of each facility:

3        • <u>Burlington Generating Station</u>, a two-unit, approximately 130 MW, oil-fired,

4          simple cycle, combustion turbine facility in Burlington, CO;

5        • <u>Craig Generating Station</u>, a three-unit, approximately 1,430 MW, coal-fired

6          electric generating facility near Craig, CO – Tri-State owns a 24 percent interest

7          in Craig Units 1 and 2, and a 100 percent interest in Craig Unit 3;

8        • <u>Frank R. Knutson Generating Station</u>, a two-unit, approximately 155 MW, natural

9          gas and oil-fired, simple cycle, combustion turbine facility near Brighton, CO;

10      • <u>Laramie River Generating Station</u>, a three-unit, approximately 1,710 MW coal-

11        fired generation facility near Wheatland, WY – Tri-State owns a 28.5 percent

12        interest in the facility through its participation in the Missouri Basin Power

13        Project;

14      • <u>Limon Generating Station</u>, a two-unit, approximately 155 MW, natural gas and

15        oil-fired simple cycle combustion turbine facility near Limon, CO;

16      • <u>Pyramid Generating Station</u>, a four-unit, approximately 185 MW, natural gas and

17        oil-fired, simple cycle, combustion turbine facility near Lordsburg, NM;

18      • <u>Rifle Generating Station</u>, an approximately 85 MW, natural gas-fueled,

19        combined-cycle power plant near Rifle, CO;

20      • <u>Springerville Generating Station Unit 3</u>, an approximately 458 MW coal-fired

21        electric generating unit that is part of the four-unit generation station near

22        Springerville, AZ – 100 percent of Unit 3 is leased by Tri-State;

1       • <u>J.M. Shafer Generating Station</u>, an approximately 400 MW natural gas-fired,

2         combined-cycle power plant near Fort Lupton, CO.

3  For simplicity, the figures reference above refer to total nameplate capacity of the station

4  or unit. Based upon seasonal variability, Tri-State's respective ownership rights, and

5  other factors, Tri-State's actual ability to use this capacity at any time is more realistically

6  limited to approximately 2,400 MW.

7  <u>Power Purchase Agreements</u>

8  In addition to its owned and leased assets, Tri-State presently controls approximately

9  2,100 MW of capacity through 27 long-term, firm PPAs and allocations.

10     In the Eastern Interconnection, Tri-State takes all-requirements electric and

11  transmission service from Basin, a generation and transmission cooperative of which Tri-

12  State is a member. Pursuant to rates and contractual terms on file with the Commission,

13  Basin serves all of Tri-State's electric power needs at defined delivery points in the

14  Eastern Interconnection.

15     The remaining 26 PPAs are used by Tri-State to serve Utility Member load in the

16  Western Interconnection. The largest individual contracts include a contract rate of

17  delivery PPA with Basin and two PPAs with Western Area Power Administration

18  ("WAPA"). The amount of power purchased under these contracts varies from year-to-

19  year and by season. In addition, Tri-State has 19 different wind and solar PPAs

20  representing approximately 670 MW and 825 MW of nameplate capacity, respectively.

21  Finally, Tri-State has several small hydropower purchase agreements totaling

22  approximately 30 MW of additional nameplate capacity. These PPAs were entered into

1    as early as 1989, though most are newer, having become effective between 2010 and

2    2020. These active PPAs represent firm, ongoing purchase obligations through 2022, on

3    the short end, with the longest-term agreements extending through 2057. Tri-State also

4    makes market purchases of power as needed.

5          A listing of Tri-State's generation assets and long-term PPAs, including the useful

6    lives of the facilities and the term of the contracts, is provided herewith as Exhibit No.

7    TGT-0007. Additional information on Tri-State's generation resources is available in Tri-

8    State's market-based rate filings made before this Commission.

9    **Q.**    **Where are Tri-State's generation resources located?**

10    **A.**    Tri-State's generation resources are spread across Tri-State's four-state service territory.

11    As noted above, Tri-State's planning processes take into account regional transmission

12    constraints, Utility Member load characteristics, etc., which help inform where generation

13    resources are developed and procured. A map of Tri-State's generation resources,

14    including owned, leased, and purchased power, is provided herewith as Exhibit No. TGT-

15    0008.

16    **Q.**    **How are Tri-State's generation resources changing?**

17    Tri-State is actively engaged in a major shift towards cleaner, renewable energy supply.

18    Since 2016, Tri-State has retired more than 416 MW of coal-fired capacity. Tri-State,

19    along with other relevant resource co-owners, has committed to retire nearly 450

20    additional MW of coal-fired generation by 2025, and nearly 1,000 MW more by 2030. To

21    replace this capacity, since 2018, Tri-State has entered into eight contracts representing

22    over 1,000 MW of new renewable energy development and offtake to come online by

1    2024. This is in addition to more than 475 MW of existing wind, solar, and hydroelectric

2    capacity that Tri-State controls. The new contracts include over 300 MW of wind

3    capacity that reached commercial operation in 2021, and approximately 750 MW of

4    capacity from solar arrays with anticipated commercial operation dates in 2023. These

5    additional contract rights are also shown in Exhibit No. TGT-0008.

6    **Q.**    **What prompted these changes?**

7    **A.**    Tri-State's changing resource mix stems from both Tri-State's Responsible Energy Plan

8        as well as state environmental and resource planning requirements. The Responsible

9        Energy Plan, developed at the direction of Tri-State's Board of Directors, sets out Utility

10       Member-driven goals to reduce emissions through targeted coal generation and mine

11       closures and to serve 50 percent of Tri-State's power supply to serve Utility Member load

12       from renewable resources by 2024. Mr. Highley provides additional details and context

13       surrounding the Responsible Energy Plan in his direct testimony.

14       In addition, Tri-State's energy transition is responsive to state environmental and

15       resource planning requirements. Each of New Mexico and Colorado have identified

16       specific emissions reductions goals. In Colorado, pursuant to Colorado Commission

17       rules, Tri-State is engaged in a multi-phase Electric Resource Planning ("ERP") process.

18       See Colorado Commission Proceeding No. 20A-0528E. During Phase I of the ERP, Tri-

19       State, with input from various stakeholders, has generated alternative resource plans

20       through 2040. Tri-State's revised preferred plan, built around a goal of reducing

21       greenhouse gas emissions in regard to wholesale electricity sales in Colorado by 80

22       percent from 2005 levels by 2030, includes the addition of nearly 2,400 MW of

1        additional capacity from renewables, electric storage resources, and a single natural gas

2        combined cycle generator, all of which would come online between 2025 and 2030. In

3        Phase II of the ERP, which is expected to begin in Spring 2022, the Colorado

4        Commission will approve a resource plan for Tri-State. Once approved, the plan will

5        obligate Tri-State to work towards procuring some portion of the resources identified in

6        Phase I as a result of a request for proposals and bid evaluation process completed on the

7        timelines for Phase II set out by Colorado Commission order(s). Given the lead time for

8        renewable development and procurement, Tri-State may be directed to enter into

9        contractual arrangements for additional renewable and other capacity in the near term.

10   Q.   **How does Tri-State procure transmission and distribution services to supply power**

11       **from its generation resources to its Utility Members?**

12   A.   Tri-State relies on a collection of contractual transmission rights that it uses to supply

13       power from its generation resources to its Utility Members' distribution systems. These

14       contractual rights include point-to-point, network, distribution, and other services on both

15       Tri-State's owned transmission and distribution facilities as well as third-party systems.

16       Like with generation resources, transmission and interconnection rights needed to ensure

17       that Tri-State is able to meet peak Utility Member demands are forecasted through Tri-

18       State's resource planning processes, including the ERP process discussed above. With

19       demand forecasts and new generation resources in mind, Tri-State's merchant function

20       ("Tri-State Merchant"), in some cases working with generation developers, works with

21       relevant transmission providers, including Tri-State's own transmission arm ("Tri-State

1     Transmission"), to study transmission and interconnection solutions and procure or

2     develop new transmission capacity to meet these needs.

3  **Q.**    **Please explain Tri-State's transmission agreements for service on its owned**

4      **facilities.**

5  **A.**    Pursuant to the Commission's standards of conduct for transmission providers, Tri-State

6     Transmission is functionally separate and independent from Tri-State Merchant. Tri-State

7     Transmission is a transmission service provider pursuant to the terms of its Open Access

8     Transmission Tariff ("OATT"), and Tri-State Merchant acts as a functionally separate

9     transmission services customer. Accordingly, based on known and forecasted

10     transmission needs, Tri-State Merchant enters into transmission service agreements,

11     including necessary study agreements, with Tri-State Transmission under its Open

12     Access Transmission Tariff to procure capacity needed to schedule power to meet Utility

13     Member demand. In his direct testimony, Exhibit No. TGT-0009, Joel K. Bladow, Tri-

14     State's Senior Vice President, Transmission, describes Tri-State's owned interstate

15     transmission system.

16     Tri-State Merchant currently has approximately eight point-to-point agreements in place

17     for service on Tri-State's owned transmission facilities, including both long-term and

18     short-term, and firm and non-firm reservations. Tri-State Merchant also takes network

19     integration transmission service from Tri-State Transmission.

20  **Q.**    **Please describe Tri-State's third-party transmission and distribution service**

21      **agreements.**

1   **A.**   As Mr. Bladow explains in his direct testimony, Tri-State's transmission system extends

2        across a large geographic area and interconnects with transmission facilities owned by at

3        least eleven different service providers. When more cost-effective, advantageous, or

4        otherwise necessary (e.g., due to location of load) to procure transmission service from a

5        third-party transmission provider rather than construct assets itself, Tri-State Merchant

6        will enter into transmission service agreements with those third parties. Presently, Tri-

7        State has point-to-point, network, and other transmission service agreements in place

8        with numerous different entities, all of which are used to ensure that Tri-State has

9        adequate transmission capabilities to serve Utility Member demand.

10        In the Eastern Interconnection, Tri-State takes all-requirements electric and

11        transmission service from Basin, a generation and transmission cooperative of which Tri-

12        State is a member. Pursuant to rates and contractual terms on file with the Commission,

13        Basin serves all of Tri-State's electric power needs at defined delivery points in the

14        Eastern Interconnection. Tri-State supplements these services with non-OATT delivery

15        facilities and other third-party transmission rights to deliver the power to Utility Member

16        distribution systems.

17        In the Western Interconnection, Tri-State is a customer under nearly 70

18        transmission and distribution service agreements with a range of different service

19        providers, including WAPA, Tucson Electric Power Company, Public Service Company

20        of Colorado, Public Service Company of New Mexico, Platte River Power Authority, El

21        Paso Electric Company, Black Hills Colorado Electric, PacifiCorp, Nebraska Public

22        Power District, certain Tri-State Utility Members (such as La Plata Electric Association,

1     Mountain View Electric Association, and Jemez Mountains Electric Cooperative), Basin,

2     the Missouri Basin Power Project (in which Tri-State and Basin are members), Avista

3     Utilities, Colorado Springs Utilities, Arizona Public Service, Deseret Power Electric

4     Cooperative, Bonneville Power Administration, the City of Farmington–New Mexico,

5     NorthWestern Energy, and Salt River Project. Services under these contracts include

6     network integration transmission service, point to point transmission service, distribution

7     wheeling services, ancillary services, etc., all provided pursuant to open access

8     transmission tariffs, grandfathered agreements, and non-jurisdictional distribution

9     agreements. These agreements entitle Tri-State to substantial transmission rights across a

10     broad geographic area, vary in their rates and terms and conditions of service, and extend

11     as far out as 2050.

## VI.  RESOURCE COSTS AND AVOIDABILITY

13  **Q.**  **What types of costs does Tri-State incur with respect to its transmission and**

14     **generation resources?**

15     Broadly speaking, Tri-State's generation-related costs can be classified as fuel, operation

16     and maintenance, depreciation and capital, purchased power, and wheeling  For

17     ratemaking purposes or other analyses, generation costs can be classified differently

18     and/or further sub-functionalized into more discrete categories based on resource types,

19     other cost drivers, etc., but that level of detail is not necessarily relevant for Contract

20     Termination Payment purposes. Below is a brief overview of each category:

21     • <u>Fuel</u> – Tri-State incurs costs under various arrangements for the supply of fuel,

22       including natural gas, oil, and coal, to power its owned and leased generation

1  facilities. Costs for coal handling, waste disposal, related property taxes and

2  insurance, etc., are also included in this category.

3  • Operation and Maintenance – These costs encompass the operation and maintenance

4  of Tri-State's owned and leased generation facilities, including the labor needed to

5  run and maintain the facilities, materials and supplies, safety expenses, water, related

6  taxes and insurance, etc.

7  • Depreciation and Capital – Depreciation and capital costs are those costs related to

8  the initial investment and major additions to generation assets. Those costs are

9  depreciated over the life of the facilities through annualized depreciation expense.

10  • Purchased Power – These are the costs that Tri-State incurs under its PPAs and any

11  other short-term market procurements.

12  • Wheeling – The costs that Tri-State Merchant incurs under its various transmission

13  and distribution service agreements.

14  **Q.**  **Can you please describe Tri-State's total generation costs?**

15  **A.**  Yes. A breakdown of the actual costs that Tri-State incurred in 2020, the most recent

16  historical year with complete available data, is shown in the table below.

| Cost Category | FY 2020 Actual Costs |
|---|---|
| Fuel | $234,844,295 |
| Operation and Maintenance | $171,187,941 |
| Depreciation and Capital | $77,846,503* |
| Purchased Power | $335,814,276 |
| Wheeling | $188,003,213 |

\* Reflects FY 2020 depreciation expense only. An additional $30,079,674 in
capital costs were incurred in 2020 that will be depreciated in future periods.

1  **Q.**    **How are these generation and transmission costs spread among Tri-State's Utility**

2          **Members?**

3  **A.**    As a cooperative, Tri-State's rates for wholesale power and transmission services under

4          the WESCs have generally been designed to socialize costs among the Utility Members

5          consistent with their demand and energy needs. Tri-State's current Utility Member rates

6          are filed with the Commission and subject to a black-box settlement. Notwithstanding,

7          the above costs are generally considered to be recovered through Tri-State's generation

8          demand charge, transmission demand charge, and energy charge, as follows: Generation

9          Demand generally consists of operation and maintenance, depreciation and capital, and

10         certain purchased power costs (specifically where such costs are broken into energy and

11         demand components in the PPA); Transmission Demand generally includes wheeling

12         expense; and Energy generally includes fuel and purchased power costs (aside from those

13         included in Generation Demand, as referenced above).

14  **Q.**   **Does Tri-State make third-party sales using its generation resources?**

15  **A.**   Yes. Tri-State takes advantage of third-party resale opportunities when appropriate.

16         These sales include: (1) short-term, bilateral market sales; (2) participation in two energy

17         imbalance markets, specifically Southwest Power Pool's Western Energy Imbalance

18         Service ("WEIS") market and the California Independent System Operator's Western

19         Energy Imbalance Market ("WEIM"); and (3) limited long-term, firm, third-party, sales.

1        With respect to the first category, because there is no formal organized energy or

2        capacity market that covers the majority of Tri-State's service territory, many of Tri-

3        State's resale opportunities are short-term, bilateral sales at known trading hubs. While

4        Tri-State has announced plans, and has been working for some time, to bring a fully

5        developed organized market to its service territory, for the time being, Tri-State takes

6        advantage of term, balance of month, day-ahead, and real-time trading within proximate

7        Balancing Authority Areas. Some of these trading hubs include Laramie River Station,

8        Four Corners, Ault, Craig, Dave Johnston, Stegall West, San Juan, Midway, Story,

9        Springerville, and Palo Verde. Bilateral trading occurs and is settled directly with

10        approved counterparties. Tri-State also utilizes the Intercontinental Exchange trading

11        platform for short-term transactions.

12        Additionally, Tri-State recently became a market participant in both the WEIS

13        and WEIM markets. These types of imbalance markets allow the market operator to

14        utilize the lowest-cost participant uncommitted generation and transmission resources to

15        balance resources and load on a five-minute ahead basis. Tri-State's resources in the

16        Western Area Colorado Missouri Balancing Authority participate in the WEIS, whereas

17        Tri-State's resources that are physically located or pseudo-tied into the PNM Balancing

18        Authority participate in the WEIM.

19        Last, Tri-State does make limited long-term firm sales to entities other than

20        Utility Members, and does try to respond to requests for proposals when possible, though

21        it is rare due largely to market inactivity. Currently, Tri-State has one such ongoing

1    contractual sale whereby it sells 100 MW of capacity to Salt River Project through

2    August 2036.

3  **Q.**    **How are these sales factored into Utility Member rates?**

4  **A.**    Non-Utility Member power sales are generally reflected as a reduction to the generation

5    costs included in Utility Member rates. Tri-State's 2020 total revenue from such sales

6    was approximately $93.3 million.

7  **Q.**    **To what extent are Tri-State's generation costs avoidable in the event of Utility**

8    **Member exit?**

9  **A.**    As explained above, Tri-State's generation and transmission resources are planned,

10    constructed, and procured to serve Utility Members through the term of the WESCs.

11    Many of Tri-State's generation costs, including capital investment costs, financing costs,

12    and purchased power costs, cannot simply be avoided in the event a Utility Member were

13    to renege on its long-term power supply obligations. With respect to these types of costs,

14    Tri-State has already expended capital in anticipation of its service obligations, or else

15    has entered into loan, lease, and PPA arrangements creating long-term, mandatory costs.

16    For that reason, most purchased power and all depreciation/capital costs are generally

17    viewed as unavoidable.

18        Notably, Tri-State's renewable PPAs and one of its PPAs with Basin are generally

19    considered "must take" or "take-or-pay". As is common with these sorts of agreements,

20    Tri-State is effectively obligated to purchase the full output from the relevant facility up

21    to the specific maximum output. This is true regardless of whether Tri-State is able to use

22    the power produced by the facility or must curtail production. In addition, particularly

1    with respect to Tri-State's wind PPAs, in the event Tri-State directs the seller to curtail

2    production, Tri-State is obligated not only to pay the rate for energy production, but also

3    additional amounts to compensate the seller for lost production tax credit and other

4    federal, state, and local taxes. In short, Tri-State cannot avoid its PPA costs in the event

5    of Utility Member withdrawal, and, in fact, would likely pay more in the event of Utility

6    Member withdrawal than it otherwise would due to curtailed production.

7         Notwithstanding, decreases in Tri-State's service obligations can result in some

8    generation cost savings and offsetting power sales opportunities. For example, some (but

9    not all) of Tri-State's variable power generation and fuel costs can be reduced if Tri-State

10    is not required to generate as much power to serve Utility Member needs. Tri-State will

11    be unable to avoid certain coal handling, property tax, insurance, and similar costs, but

12    otherwise may be able to decrease its overall exposure.

13         Tri-State, with adequate notice, could also begin to modify its resource plans to

14    make larger scale changes, such as retiring or selling generation assets before it otherwise

15    might. That said, because Tri-State's service obligations are to 42 different Utility

16    Members spread across a broad geographic area, these options are subject to Utility

17    Member-specific analysis, based on load obligations, geography, market conditions, and

18    so on.

19         Finally, with decreased power service obligations, Tri-State may be able to utilize

20    its capacity in the market and thereby recoup some or all of its lost revenues through

21    resale, though this is not necessarily the case. Whereas the WESCs create long-term

22    guaranteed load-service obligations, Tri-State's ability to resell to third parties is

1    dependent upon numerous factors, including market conditions, transmission constraints,

2    etc. In fact, it should be noted that Tri-State's non-Utility Member resale volume has

3    declined precipitously over the past 15 years. For context, in 2007, Tri-State sold

4    approximately 5.2 million megawatt-hours of energy to non-Utility Members,

5    representing approximately 28 percent of total energy sales volume. In 2020, however,

6    these figures declined to approximately 1.6 million megawatt-hours, representing only 9

7    percent of total sales. Based on these realities, market resale of power is not an equal

8    financial substitute for Utility Member service under the WESCs.

9    **Q.**    **To what extent are transmission and distribution service costs avoidable in the event**

10    **of Utility Member exit?**

11    **A.**    The answer to this question depends on the type of service, Tri-State's continuing need

12    for the service, and market demand for the specific contractual rights.

13    With respect to Tri-State's point-to-point transmission rights, Tri-State would

14    likely be unable to avoid or mitigate the applicable costs through the term of the

15    agreement. This is for a few reasons. First, despite a Utility Member exit, Tri-State's use

16    of point-to-point reservations is generally related to managing the transmission system

17    overall, not for the benefit of a specific Utility Member. As such, Tri-State will likely

18    continue to have need for its point-to-point reservations from an overall system

19    management perspective, despite an individual Utility Member withdrawing from the

20    cooperative. Second, given that point-to-point agreements reserve specific paths unique

21    to Tri-State's system needs, these agreements may not be valuable to third-parties or even

22    an exiting Utility Member. Accordingly, the associated costs should not generally be

1    viewed as avoidable, and would require Utility Member-specific analysis to truly

2    understand if resale or other mitigation options exist.

3         With respect to Tri-State's network and related ancillary service procurements,

4    Tri-State may have more ability to avoid those costs in the event of a Utility Member

5    departure. All of the Utility Members have at least some load that is served by network

6    service agreements, and all Utility Member load is subject to ancillary service costs.

7    Based on experience with prior departures, I believe that Tri-State would be able to work

8    with transmission providers and Balancing Authorities to remove Utility Member-

9    specific delivery points from network and ancillary service agreements, thus creating cost

10   savings.

11   **Q.    At a high level, how would a Utility Member exit impact generation and**

12   **transmission cost sharing among the Utility Members?**

13   **A.**    As explained above, many of Tri-State's generation and transmission costs are

14   unavoidable. In the event a Utility Member were to terminate its WESC and renege on its

15   contractual power procurement obligations, Tri-State would continue to be responsible for

16   repaying lenders, honoring its contractual power purchase obligations and transmission

17   arrangements, and so on. These costs, to the extent they cannot be mitigated, are ongoing

18   obligations through the term of the relevant agreements.

19        Accordingly, any costs that Tri-State is unable to recoup through resale of

20   otherwise committed power at prices above its operating costs, must be passed on to

21   other Utility Members through rates. The ultimate result is that remaining Utility

22   Members, those who have respected their contractual obligations, will be allocated

1    additional costs through the generation demand, transmission demand, and energy

2    components of the rates, as applicable, and therefore will pay increased rates for the same

3    service.

4    **Q.**    **In your opinion, would a contract termination payment based on unavoidable**

5    **"stranded" costs adequately compensate remaining Utility Members in the event of**

6    **a Utility Member withdrawal.**

7    **A.**    No it would not. "Stranded" costs are costs Tri-State has incurred and will no longer be

8    able to recover as a result of a Member's withdrawal. To be sure, these costs must be

9    included in any calculation of a departing Utility Member's contract termination

10    payment. As noted, to the extent Tri-State's costs cannot be avoided or mitigated,

11    stranded costs reflect a direct and immediate cost shift if not adequately recovered

12    through a contract termination payment. As these costs were all incurred based on Tri-

13    State planning and procuring its resources to serve contractual load obligations, a Utility

14    Member reneging on its contractual obligations should not be allowed to simply shift

15    these costs to its fellow Utility Members.

16    However, a contract termination payment limited to the reimbursement of

17    "stranded" costs will not protect remaining Tri-State Members from financial harm. For

18    one thing, Utility Member departures without contemporaneous "make whole" payments

19    will likely cause Tri-State to incur very substantial new costs, as Tri-State witness Lori

20    O'Flaherty explains in her direct testimony. For example, if a Utility Member departure

21    causes Tri-State to suffer a credit rating downgrade or experience a loan covenant default,

22    Tri-State will incur very substantial additional borrowing and other costs that will

Docket No. ER21-2818-000
Exhibit No. TGT-0003 REV
Page 41 of 41

1    necessarily be borne by remaining Utility Members. Although these new costs are by no

2    means "stranded," they are real and cannot be ignored.

3         Moreover, a payment of "stranded" costs alone cannot compensate the

4    membership for the bargained-for, contractual value that is lost when a Utility Member

5    terminates its WESC. As I have explained, a generation and transmission cooperative

6    shares costs and benefits among a membership to create economies of scale and reduce

7    average total costs. These are the benefits Tri-State's Utility Members considered and

8    relied upon when they chose to become Utility Members, and when they executed and re-

9    executed their long term WESCs. Unless a contract termination payment ensures that

10   remaining Utility Members are not impacted from a rate perspective by another Utility

11   Member's departure, remaining Utility Members will be deprived, at least in part, of the

12   economic advantages that made participation in Tri-State attractive in the first place.

13   Consistent with the approach taken by the courts with respect to prior withdrawals, a

14   contract termination payment must consider not just stranded costs, but also the revenues

15   a Utility Member committed to the entire membership by signing a long-term WESC.

16   **Q.    Does this conclude your testimony?**

17   **A.**    Yes.

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 7, 2022.

Brad Nebergall

# Exhibit No. TGT-0009 REV

## Direct Testimony of Joel K. Bladow

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | | |
|---|---|---|---|
| **Tri-State Generation and Transmission** | ) | **Docket Nos.** | **ER21-2818-000** |
| **Association, Inc.** | ) | | **EL22-4-000** |
| | ) | | **(consolidated)** |

**PREPARED DIRECT TESTIMONY**

**OF**

**JOEL K. BLADOW**

**ON BEHALF OF**

**TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.**

**March 9, 2022**

\* \* \*

1        Tri-State owns or operates more than 5,792 miles of high voltage transmission

2        lines, and there are 416 substations and switchyards that Tri-State owns or in which it has

3        a major equipment ownership interest. Tri-State's interstate transmission facilities are

4        interconnected with those of other utilities, including WAPA, Nebraska Public Power

5        District, Black Hills Colorado Electric, Inc., PacifiCorp, Public Service Company of

6        Colorado, Platte River Power Authority, Colorado Springs Utilities, Basin Electric Power

7        Cooperative, Tucson Electric Power, Public Service Company of New Mexico, El Paso

8        Electric, CORE, and Deseret Generation & Transmission Cooperative.

9        The majority of Tri-State's transmission facilities operate in the Western

10        Interconnection where the Western Electricity Coordinating Council ("WECC") is the

11        regional entity responsible for monitoring compliance with reliability standards. A small

12        portion of Tri-State's transmission facilities support its loads in the Eastern

13        Interconnection and are under the functional control of the Southwest Power Pool.

14        Exhibit No. TGT-0011 is a map of Tri-State's interstate transmission system which also

15        illustrates the geographic diversity of Tri-State's Utility Member loads that it must serve

16        and the generating resources used to do so along with the related transmission constraints.

17  **Q.**    **Please explain "Tri-State Merchant," and how it relates to "Tri-State**

18        **Transmission."**

19  A.    Tri-State Merchant is the marketing function of Tri-State responsible for planning and

20        originations regarding energy, capacity, and transmission service necessary to serve

21        Utility Member load along with related generation dispatch, scheduling, and settlements

22        activity. Tri-State Merchant works with transmission providers, including Tri-State's

1    transmission function ("Tri-State Transmission") to procure network, Point-to-Point

2    ("PTP"), and other transmission services used to schedule and deliver power to Tri-

3    State's Utility Members. Tri-State Merchant and Tri-State Transmission are functionally

4    separated in compliance with the Commission's standards of conduct for transmission

5    providers. Where Tri-State Transmission provides transmission services consistent with

6    its OATT, Tri-State Merchant is one of Tri-State Transmission's customers which

7    procures such services on the Utility Members' behalf.

8    **Q:**   **Please provide details of the transmission lines Tri-State owns.**

9    A:    The high-voltage transmission lines in Tri-State's transmission system includes

10    approximately: 1,100 miles of 345 kV lines, 1,198 miles of 230 kV lines; 173 miles of

11    138 kV lines, 3,266 miles of 115 kV lines, and 56 miles of 69 kV lines. Most of the 345

12    kV lines are owned jointly with other utilities. Tri-State is an ownership participant in the

13    Missouri Basin Power Project (Laramie River Generating Station) and the Yampa Project

14    (Craig Station Units 1 and 2) transmission systems and has ownership interests or

15    capacity rights in several other transmission line projects.

16    **III. TRI-STATE'S TRANSMISSION PLANNING PROCESS.**

17    **Q.**   **How does Tri-State plan and develop new transmission projects?**

18    A.    Tri-State's transmission planning process is intended to facilitate the timely and

19    coordinated development of transmission infrastructure that maintains system reliability

20    and meets OATT customer needs, while continuing to provide reliable, responsible, cost-

21    based electric power to its 42 Utility Members consistent with Tri-State's contractual

22    obligations under the Wholesale Electric Service Contracts ("WESC") with its Utility

1    Members. With Utility Members in four states, Tri-State is a regional power provider and

2    must also plan its transmission system to meet the legislative, regulatory, and public

3    policy requirements in each state in which it operates. Therefore, the primary objectives

4    of Tri-State's transmission planning process are to meet the needs of network and PTP

5    transmission customers, maintain reliability, accommodate load growth, and coordinate

6    interconnections, all consistent with applicable legal requirements.

7         The key elements of Tri-State's transmission planning process are: maintaining

8    safe, reliable electric service to its members at the lowest possible cost; improving

9    efficiency of electric system operations; providing open and non-discriminatory access to

10   its transmission facilities; and planning new transmission infrastructure in a coordinated,

11   open, transparent and participatory manner.

12        Tri-State's primary planning activities center on preparing the 10-Year Capital

13   Construction Plan for approval by the Tri-State Board. Annually each Utility Member

14   provides Tri-State its long-range work plans and, more often, information related to

15   developments on the Utility Member's electrical system that result in changes or load

16   increases due to new or existing points of delivery. Tri-State then performs power

17   requirements studies and load addition studies, as required. Tri-State prepares long-range

18   plans and annual work plans in coordination with the plans of its Utility Members. These

19   plans feed into the 10-Year Capital Construction Plan.

20        All projects in Tri-State's 10-Year Capital Construction Plan adhere to North

21   American Electric Reliability Corporation and WECC Standards and Criteria, FERC

22   Order No. 890 Planning Principles, coordinated regional planning principles, and criteria

1   outlined in state utility regulatory commission regulations. Based on this process, each

2   year Tri-State develops a 10-year transmission plan that assesses future transmission

3   needs to serve load and integrate generation resources. The transmission component of

4   this plan is developed in conjunction with WestConnect and other regional and sub-

5   regional transmission planning organizations recognized by WECC.

6   **Q.    What studies does Tri-State undertake as part of its transmission planning process?**

7   A.    Tri-State implements its transmission planning process through various studies,

8         including: studies related to new delivery points or modifications to existing delivery

9         points, transmission extension studies, reliability studies (for both bulk electric system

10        infrastructure and sub-transmission systems), system impact studies, transmission service

11        requests, generator interconnection studies, facilities studies, and economic studies.

12  **Q.    How are the needs of Tri-State's Utility Members factored into the transmission**

13        **planning process?**

14  A.    For this question, it is helpful to consider Tri-State's Utility Members' needs from two

15        perspectives; first at a local level and second at the regional transmission level.

16             At a local level, Tri-State works closely with its Utility Members to plan, develop,

17        and build a transmission system that serves all Utility Members' load centers reliably and

18        dependably. Tri-State and its Utility Members work together to identify potential changes

19        in their loads or requirements for new or modified local transmission facilities to provide

20        adequate capacity, proper voltage, and/or redundancy. Decisions regarding system

21        additions or expansions are then made jointly between Tri-State and a Utility Member

1    with the clear understanding that the Utility Member will continue to perform its

2    obligations under its WESC with Tri-State.

3         The planning process used between Tri-State and the Utility Members is referred

4    to as a "single entity concept" which, at a high level, means that Tri-State and its Utility

5    Members make planning decisions as though the transmission facilities are owned by

6    only one party. This concept is applied to yield the least total cost to meet the identified

7    needs including, as applicable, costs associated with capital, operations, losses,

8    transmission service, and maintenance. For example, when there are reliability or load

9    serving issues, Tri-State and the Utility Member jointly study potential alternatives to

10   identify the best balance of cost and performance that can be implemented, regardless of

11   who ultimately pays for and owns the facilities.

12        There are two Board policies that provide direction to Tri-State's staff related to

13   transmission service to Utility Members. Board Policy 109 addresses service standard

14   levels and Board Policy 110 establishes rules governing the extension of transmission

15   facilities by Tri-State to its Utility Members. These policies are attached to my testimony

16   as Exhibit No. TGT-0012 and Exhibit No. TGT-0013, respectively. Transmission

17   planning at the local level generally results in transmission projects that either directly tie

18   to or are in the same area as a Utility Member's service territory.

19        At a regional level, Tri-State plans and constructs transmission facilities to allow

20   Tri-State Merchant to efficiently and economically utilize both Tri-State and Utility

21   Member generation resources to serve their loads. With the Utility Members' load

22   forecast information, Tri-State plans and, consistent with good utility practice, endeavors

1    to construct and place into service regional transmission facilities with sufficient transfer

2    capability to deliver the generation resources to the Utility Members' service territories.

3    Transmission planning at the regional level generally results in projects that provide

4    benefits across multiple states within Tri-State's four state region. While these types of

5    projects benefit all members, from a pro rata basis, they typically benefit those Utility

6    Members serving high-growth growth areas. In many cases, the new generation and

7    corresponding transmission are sited in different areas than the Utility Member's service

8    territory, sometimes in different states.

9    **Q.**    **How does Tri-State determine the capacity of new transmission facilities built to**

10    **serve forecasted utility member needs?**

11    A.    Because of the time required to permit and construct transmission facilities, Tri-State

12    works with its Utility Members to understand their forecasted loads and construct its

13    entire transmission system in anticipation of these new loads and corresponding

14    generation resources if necessary. Accordingly, Tri-State must size and construct

15    transmission projects to not only ensure the continued reliability of the transmission

16    system, but also to ensure that it meets its all-requirements contractual obligations to its

17    Utility Members. For example, under Tri-State's Utility Members WESCs, Tri-State is

18    obligated to "use reasonable diligence to provide a constant and uninterrupted supply of

19    electric service." To meet this obligation to its utility Members, Tri-State must make sure

20    its transmission system is adequate.

❋    ❋    ❋

# Exhibit No. TGT-0016 REV

## Direct Testimony of Patrick Bridges

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | | |
|---|---|---|---|
| Tri-State Generation and Transmission | ) | Docket Nos. | ER21-2818-000 |
| Association, Inc. | ) | | EL22-4-000 |
| | ) | | (consolidated) |

PREPARED DIRECT TESTIMONY

OF

PATRICK L. BRIDGES

ON BEHALF OF

TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.

March 9, 2022

### SUMMARY OF THE PREPARED DIRECT TESTIMONY
### OF PATRICK L. BRIDGES

Mr. Bridges is Tri-State's Senior Vice President and Chief Financial Officer. His testimony provides background on Tri-State's organizational and capital structure, and a discussion of Tri-States dependence for its financial and operational viability on Member Wholesale Electric Service Contracts ("WESCs").

Section III of Mr. Bridges' testimony describes the covenants and other provisions in Tri-State's debt agreements that could be implicated by a Member withdrawal, and how the early termination of a Member's WESC will likely affect Tri-State's debt agreements.

Section IV of his testimony discusses the importance of credit ratings to Tri-State, and the likely impact on Tri-State's ratings and ability to borrow money at reasonable cost (and on reasonable terms) that would result from a Contract Termination Payment ("CTP") permitting Members to terminate their WESCs on something other than a "make whole" basis.

Section V of his testimony sets out Tri-State's approach to developing a CTP methodology, and why Tri-State's believes that if a Member wants to withdraw from membership and terminate its WESC before its term expires in 2050, it should have to pay a CTP that puts Tri-State and its remaining Members in the same financial position they would have been in had the withdrawing Member honored its WESC through its stated term.

Section VI describes the Modified CTP Methodology Tri-State filed in Rate Schedule No. 281.

Section VII of his testimony explains why Tri-State modified its earlier filed approach.

Finally, Section VIII of his testimony explains how to calculate the CTP under the DCO component of the Modified CTP Methodology.

Docket No. ER21-2818-000
Exhibit No. TGT-0016 REV
Page 3 of 46

## TABLE OF EXHIBITS

The prepared testimony of Patrick L. Bridges is Exhibit No. TGT-0016. These exhibits accompany this testimony:

| Exhibit Number | Description | Confidentiality Designation |
|---|---|---|
| TGT-0017 | Patrick L. Bridges CV | PUBLIC |
| TGT-0018 | Modified CTP Methodology, Tri-State Rate Schedule No. 281 | PUBLIC |
| TGT-0019 | Tri-State's Bylaws, Rate Schedule No. 259 | PUBLIC |
| TGT-0020 | Tri-State 2020 Patronage Capital Balance by Member | PUBLIC |
| TGT-0021 | Tri-State Form 10-Q for period ended September 30, 2021 | PUBLIC |
| TGT-0022 | Tri-State Unconsolidated Balance Sheet for period ended September 30, 2021 | PUBLIC |
| TGT-0023 | Master First Mortgage Indenture, Deed of Trust and Security Agreement (12/15/99) | PUBLIC |
| TGT-0024 | Tri-State Debt Outstanding as of September 30, 2021 | PUBLIC |
| TGT-0025 | Series 2014B Note Purchase Agreement (10/31/14) | PUBLIC |
| TGT-0026 | Series 2017A Note Purchase Agreement (11/16/17) | PUBLIC |
| TGT-0027 | Term Loan Agreement – 2020 (6/24/20) | PUBLIC |
| TGT-0028 | Loan Agreement between Tri-State and CFC (6/24/20) | PUBLIC |
| TGT-0029 | Credit Agreement - $650M Revolving Credit Facilities | PUBLIC |
| TGT-0030 | Tri-State's Member Percentage Share of Total Member Revenue for Fiscal Year 2020 | PUBLIC |
| TGT-0031 | Prepayment "Make Whole" Amount | PUBLIC |
| TGT-0032 | Debt Agreement Provision Flow Chart | PUBLIC |
| TGT-0089 | Fitch Ratings Report, January 11, 2012 | PUBLIC |
| TGT-0090 | Moody's Rating Methodology, December 2009 | PUBLIC |
| TGT-0091 | S&P's Credit Perspective, May 3, 2002 | PUBLIC |
| TGT-0092 | S&P's Rating Methodology, November 2, 2006 | PUBLIC |

Docket No. ER21-2818-000
Exhibit No. TGT-0016 REV
Page 4 of 46

## TABLE OF CONTENTS

I.      INTRODUCTION. .............................................................................................. 5

II.     TRI-STATE'S ORGANIZATIONAL AND CAPITAL STRUCTURE. ............................ 9

III.    RELEVANT COVENANTS AND OTHER PROVISIONS IN TRI-STATES DEBT
        AGREEMENTS................................................................................................. 18

IV.     THE POTENTIAL IMPACTS ON TRI-STATE FROM CREDIT RATING
        DOWNGRADES. .............................................................................................. 31

V.      TRI-STATE'S APPROACH TO DEVELOPING A CONTRACT TERMINATION
        PAYMENT METHODOLOGY. ............................................................................ 35

VI.     THE MODIFIED CTP METHODOLOGY.............................................................. 37

VII.    TRI-STATE'S DECISION TO FILE A MODIFIED CTP METHODOLOGY. .............. 41

VIII.   THE MODIFIED CTP METHODOLOGY'S DCO COMPONENT.............................. 45

Docket No. ER21-2818-000
Exhibit No. TGT-0016 REV
Page 5 of 46

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | | |
|---|---|---|---|
| Tri-State Generation and Transmission | ) | Docket Nos. | **ER21-2818-000** |
| Association, Inc. | ) | | **EL22-4-000** |
| | ) | | **(consolidated)** |

**PREPARED DIRECT TESTIMONY OF PATRICK L. BRIDGES**
**ON BEHALF OF**
**TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.**

1 **I.      INTRODUCTION.**

2  **Q.**    **Please state your name, title, and business address?**

3  A.    My name is Patrick L. Bridges. I am Senior Vice President and Chief Financial Officer

4         for Tri-State Generation and Transmission, Association, Inc. My business address is 1100

5         West 116th Avenue, Westminster, Colorado 80234.

6  **Q.**    **Please summarize your educational background and experience in the electric utility**

7         **industry?**

8  A.    I graduated with a Bachelor of Business Administration degree from West Texas State

9         University (now West Texas A&M University) in 1982 with a double major in finance

10        and economics. I later received a Master of Business Administration degree from that

11        same university, with an emphasis in finance. I also received a Master of Science degree

12        in Applied Economics from the University of Texas at Dallas, where I completed all

13        required coursework for a Ph.D. in Economics but did not complete a dissertation and

14        receive a doctorate degree.

15             I am a Chartered Financial Analyst and a Certified Public Accountant. I have been

16        Tri-State's Senior Vice-President and Chief Financial Officer since January, 2009. In that

1    role, I have responsibility for Tri-State's financing, accounting, financial forecasting, and

2    some other non-financial areas. Part of my responsibility involves interaction with Tri-

3    State's actual and prospective lenders and the credit rating agencies that rate Tri-State's

4    debt.

5        A copy of my resume is provided as Exhibit No. TGT-0017.

6        I have been closely involved for over thirty years in the financing of electric

7    utilities. I have managed the issuance of over $3 billion of long-term debt both in the

8    public and private markets, as well as numerous negotiations of revolving lines of credit.

9    In the conduct of these financings, I have dealt closely with debt investors, commercial

10   bankers, and at times regulators. I periodically meet with these constituents in order to

11   inform them of events at, and plans of, Tri-State that are important to their assessment of

12   an investment in Tri-State.

13       From 2013 to 2019, I also served as the Audit Committee Financial Expert on the

14   board of directors of the National Rural Utilities Cooperative Finance Corporation

15   ("CFC"). CFC is a finance company that raises funds in the capital markets and then

16   lends those funds primarily to electric cooperatives, including Tri-State and several of

17   Tri-State's Utility Members. In my capacity as a CFC director, I periodically reviewed

18   and approved recommendations from CFC staff regarding loan requests from electric

19   cooperatives.

20       CFC has a very comprehensive evaluation process for each borrower and each

21   loan. In that process, CFC conducts a thorough analysis and then assigns a Borrower Risk

22   Rating and a Loan Risk Rating to each existing and potential loan. The purpose of these

1   ratings is to assess the probability that a loan's principal and interest will be repaid as

2   agreed upon in the loan documents. As a Board member, it was my responsibility to read

3   and understand these analyses so that I could make a well-informed decision regarding

4   loans that were presented to the board for approval.

5   **Q.   What is the purpose of your testimony?**

6   A.   My testimony explains Tri-State's Modified Contract Termination Payment ("CTP")

7   Methodology ("Modified CTP Methodology") filed as Tri-State Rate Schedule No. 281.

8   Exhibit No. TGT-0018. My testimony also provides background needed to properly

9   evaluate the Modified CTP Methodology, including an overview of Tri-State's

10   organizational and financial structure, and of its dependence on Member Wholesale

11   Electric Service Contracts ("WESCs") for its financial and operational viability. I also

12   discuss how the early termination of a Member's WESC will likely affect Tri-State's loan

13   agreements, credit ratings, and ability to borrow money at reasonable cost and on

14   reasonable terms. Finally, I explain why a Member that wants to withdraw and terminate

15   its WESC prematurely should have to pay a CTP that puts Tri-State and its remaining

16   Members in the same financial position they would have been in had the withdrawing

17   Member honored its WESC through its stated term.

18   **Q.   Have you previously submitted testimony before this Commission?**

19   A.   On April 13, 2020, I submitted testimony in Docket No. ER20-1559-000 supporting Tri-

20   State's Rate Schedule FERC No. 281, which established a CTP methodology for Tri-

21   State Utility Members. See Tri-State Generation and Transmission Association, Inc.,

22   Docket No. ER20-1559-000, Initial Filing of Rate Schedule FERC No. 281, Exhibit No.

1    TS-PAB. On September 1, 2021, I submitted testimony in Docket No. ER21-2818-000

2    supporting the Modified CTP Methodology. See Tri-State Generation and Transmission

3    Association, Inc., Docket No. ER21-2818-000, Filing of Rate Schedule FERC No. 281,

4    Exhibit No. TS-PAB-1.

5    **Q.    In addition to your direct testimony, what other information are you sponsoring at**

6    **this time?**

7    A.    In addition to my direct testimony, I am sponsoring the following exhibits:

8         • Exhibit No. TGT-0017, Patrick L. Bridges CV

9         • Exhibit No. TGT-0018, Modified CTP Methodology, Tri-State Rate Schedule No.

10           281

11        • Exhibit No. TGT-0019, Tri-State's Bylaws, Rate Schedule No. 259

12        • Exhibit No. TGT-0020, Tri-State 2020 Patronage Capital Balance by Member

13        • Exhibit No. TGT-0021, Tri-State Form 10-Q for period ended September 30,

14           2021

15        • Exhibit No. TGT-0022, Tri-State Unconsolidated Balance Sheet for period ended

16           September 30, 2021

17        • Exhibit No. TGT-0023, Master First Mortgage Indenture, Deed of Trust and

18           Security Agreement (12/15/99)

19        • Exhibit No. TGT-0024, Tri-State Debt Outstanding as of September 30, 2021

20        • Exhibit No. TGT-0025, Series 2014B Note Purchase Agreement (10/31/14)

21        • Exhibit No. TGT-0026, Series 2017A Note Purchase Agreement (11/16/17)

22        • Exhibit No. TGT-0027, Term Loan Agreement – 2020 (6/24/20)

1        •    Exhibit No. TGT-0028, Loan Agreement between Tri-State and CFC (6/24/20)

2        •    Exhibit No. TGT-0029, Credit Agreement - $650M Revolving Credit Facilities

3        •    Exhibit No. TGT-0030, Tri-State's Member Percentage Share of Total Member

4             Revenue for Fiscal Year 2020

5        •    Exhibit No. TGT-0031, Prepayment "Make Whole" Amount

6        •    Exhibit No. TGT-0032, Debt Agreement Provision Flow Chart

7        •    Exhibit No. TGT-0089, Fitch Ratings Report, January 11, 2012

8        •    Exhibit No. TGT-0090, Moody's Rating Methodology, December 2009

9        •    Exhibit No. TGT-0091, S&P's Credit Perspectives, May 3, 2002

10       •    Exhibit No. TGT-0092, S&P's Rating Methodology, November 2, 2006

11    **II.**      **TRI-STATE'S ORGANIZATIONAL AND CAPITAL STRUCTURE.**

12   **Q.**    **Please describe Tri-State's organizational structure?**

13   A.    Tri-State either wholly or partially owns several subsidiaries. The most material of which

14        are the Springerville Unit 3 partnership (51% owned by Tri-State), Elk Ridge Mining and

15        Reclamation (100% owned by Tri-State), and Thermo Cogeneration Partnership (100%

16        owned by Tri-State, but as of 2021 it, including its assets and liabilities, are now part of

17        Tri-State and it no longer exists). The financial statements that Tri-State files with the

18        Securities Exchange Commission ("SEC") are consolidated statements which reflect the

19        sum total of Tri-State and all of its subsidiaries. Tri-State also prepares unconsolidated

20        financial statements for each company for FERC filings, debt and indenture compliance,

21        and internal use. The importance of this distinction between consolidated and

1    unconsolidated financial statements will become apparent later in my testimony in

2    reference to debt covenants

3    **Q.**    **Please describe Tri-State's capital structure?**

4    A.    Tri-State's capital structure currently consists of approximately 75% debt and 25%

5    equity, in the form of member patronage capital. Tri-State uses debt financing more

6    significantly than equity financing—a capital structure common among G&Ts. Tri-State

7    relies on debt financing to supplement internally generated cash flow for capital projects

8    to build, operate, improve, and maintain Tri-State's generation and transmission facilities

9    to benefit the Members.

10    **Q.**    **How does Tri-State raise equity capital?**

11    A.    As a cooperative, and unlike an investor-owned utility ("IOU"), Tri-State cannot issue

12    common stock to investors. Instead, the Utility Members of Tri-State contribute equity

13    capital to Tri-State through the rates they pay for wholesale electric service. Non-utility

14    Members contribute equity capital through rates they pay or charge for rent or other

15    services. Tri-State's bylaws require margins (the excess of Tri-State's revenues over

16    operating costs) to be received by Tri-State with the understanding that they "are

17    furnished by the Members as capital in this Corporation [Tri-State], and not as profit of or

18    to this Corporation." Tri-State's Bylaws, Article I, Section 2(b), Rate Schedule No. 259,

19    Exhibit No. TGT-0019. These cumulative equity contributions from Members are termed

20    "patronage capital." Patronage capital contributions are accumulated over time by Tri-

21    State and may eventually be returned to the Members in cash as capital credits, consistent

22    with the Tri-State bylaws, which state that "capital then credited to Members' accounts

1    may be retired in full or in part." Tri-State's Bylaws, Article VII, Section 3, Rate

2    Schedule No. 259, Exhibit No. TGT-0019.

3    **Q:**    **Does Tri-State maintain patronage capital allocated to Members in the form of**

4    **cash?**

5    A:    No. For a cooperative like Tri-State, patronage capital is like the retained earnings of a

6    for-profit corporation. Tri-State does not maintain the Members' allocated but yet

7    unreturned patronage capital in a cash account or "lockbox." Instead, these funds are

8    invested to provide wholesale electric service to Utility Members.

9    **Q:**    **What amount of patronage capital has been allocated to each Tri-State Member?**

10    A:    Exhibit No. TGT-0020 is a table listing the patronage capital balance for each Member as

11    of December 31, 2020. Final patronage capital allocations for 2021 will be presented to

12    the Board of Directors for review and approval in March 2022, after Tri-State's financial

13    statements have been reviewed by our independent auditors. I will be able to update this

14    information at that time.

15    **Q:**    **When Tri-State retires its patronage capital through cash distributions to Members,**

16    **does it pay interest on the previously allocated but unpaid patronage capital?**

17    A:    No. Tri-State's bylaws state that "no interest or dividends shall be paid or payable by the

18    Corporation on any capital furnished by its members." Tri-State's Bylaws, art. VII, sec.

19    2, Rate Schedule No. 259, Exhibit No. TGT-0019. Therefore, when Tri-State returns

20    patronage capital to its Members, it does so with no additional return. This follows

21    general cooperative practice, because Members are both owners and customers of the

22    cooperative. Members do however receive a benefit from their investment in Tri-State

1    through lower rates than would otherwise occur if Tri-State secured equity capital from

2    sources requiring a return on investment.

3    **Q.    What is the timeline under which Tri-State typically retires its patronage capital**

4    **through cash distributions to Members?**

5    A.    Patronage capital is not returned immediately when allocated. Each year the Board

6    decides the total amount that can be distributed to members to retire old patronage

7    capital. Patronage capital is then typically retired on a first-in first-out basis—so the

8    oldest patronage capital allocations are returned first. Historically, Tri-State retires

9    patronage capital only after it has been held for many years. For example, in the

10   distribution for 2020, Tri-State retired patronage capital allocated to members 17 years

11   earlier. This year the Tri-State Board determined to reduce the amount of patronage

12   capital returned to members, when compared to amounts returned in previous years. This

13   action will naturally result in a longer period of time over which the patronage capital

14   will be returned. At any moment, the economic value of a Member's patronage capital

15   balance is therefore not worth its face amount, but instead is worth a discounted amount

16   since it will be returned to members over many years rather than in one lump sum.

17   **Q.    What is the current amount of Tri-State's debt?**

18   A.    Tri-State's financial statements for the quarter ending September 30, 2021, are attached

19   as Exhibit No. TGT-0021. These are the most recent financial statements available. I can

20   supplement my testimony with end of year numbers when Tri-State finalizes its audited

21   financial statements for all of 2021 in March. On a consolidated basis (including Tri-State

1    subsidiaries), the financial statements show that Tri-State had $3.2 billion in debt as of

2    September 30, 2021.

3    **Q.    Does Tri-State have financial obligations other than debt?**

4    A.    Yes. In addition to debt, Tri-State has hundreds of millions of dollars in other liabilities

5        and obligations. On an unconsolidated basis, Tri-State, as of September 30, 2021, had

6        other liabilities of about $1.35 billion, of which approximately $175 million are

7        regulatory liabilities that will eventually be passed back to Tri-State's utility members.

8        Exhibit No. TGT-0022. Tri-State is also a party to numerous long-term power purchase

9        agreements with renewable energy and other generators. Obligations under these

10        agreements are not reflected on Tri-State's balance sheet.

11    **Q:    Why does Tri-State have so much debt?**

12    A:    The generation and transmission of electricity is a highly capital-intensive business. As of

13        September 30, 2021, Tri-State had total assets of approximately $5 billion, most of which

14        are generation and transmission assets. Tri-State supplies most of the power requirements

15        for each of its Utility Members using a portfolio of resources, including generation and

16        transmission facilities owned by Tri-State and its subsidiaries, long-term purchase

17        contracts and short-term energy purchases. Using debt allows Tri-State to spread the

18        capital cost of these resources over their useful lives instead of funding them all up-front.

19    **Q.    Does Tri-State have plans for additional capital spending in the near future?**

20    A.    Yes. Tri-State's 2022 long-term financial forecast projects spending of $3.4 billion on

21        capital projects during the ten-year period between 2022 and 2031. Tri-State plans to

22        spend about 62% of this amount on transmission projects, about 31% on new generating

Docket No. ER21-2818-000
Exhibit No. TGT-0016 REV
Page 14 of 46

1    facilities and maintenance for existing generation and mining facilities, and the remaining

2    7% on general plant.

3  **Q.**  **Does Tri-State's capital structure differ from the capital structure of the typical**

4       **investor-owned utility?**

5  A.  Yes. Like most other G&Ts, Tri-State has a capital structure comprised more of debt than

6       equity. Tri-State's capital structure is currently about 75% debt and about 25% equity,

7       whereas IOUs commonly have capital structures with 40% debt to 60% equity. As a non-

8       profit, Member-owned, and Member-controlled cooperative, Tri-State cannot raise

9       capital through issuing stock. Tri-State historically has had a more leveraged capital

10      structure than an IOU while still maintaining investment grade bond ratings (and

11      enjoying the lower interest rates that come with them) because of the guaranteed

12      revenues from the long-term Member WESCs.

13         Since Tri-State's sole source of equity comes from the net margins it earns, Tri-

14      State in theory could raise additional equity capital by charging higher wholesale

15      electricity rates to its Utility Members. Tri-State would then earn higher margins and

16      could accumulate additional retained margin (which cooperatives like Tri-State retain as

17      the Members' patronage capital). However, if Tri-State increased its rates to accumulate

18      equity capital in lieu of debt capital, the Utility Members who own and control Tri-State

19      would needlessly bear an additional financial burden.

20         For example, Tri-State's near-term increase in electricity rates would need to be

21      high and burdensome to the Members if Tri-State attempted to finance the $3.4 billion in

22      capital projects it plans to complete by 2031 by accumulating retained margin from its

1   Members. The far more efficient and equitable way for Tri-State to obtain necessary

2   capital is to borrow it from third-party lenders. As a result, and again like other G&Ts,

3   Tri-State's borrowing costs are substantial—about 11% of its total annual expenses.

4   **Q.    Please describe Tri-State's debt structure?**

5   A.    Tri-State borrows funds from a number of different sources: commercial paper,

6   borrowings under a revolving credit facility, private placement notes, SEC-registered

7   debt, loans from commercial and cooperative banks, 144A bonds, lease obligation bonds,

8   etc. Each issuance of debt is evidenced by a written agreement specifying the terms of the

9   debt. The most important of these agreements is Tri-State's Master Indenture. Master

10   First Mortgage Indenture, Deed of Trust and Security Agreement (12/15/99), Exhibit No.

11   TGT-0023.

12        The vast majority of Tri-State's debt is governed by the terms of the Master

13   Indenture, even if there are supplemental agreements. The Master Indenture sets terms

14   and conditions with which Tri-State must comply. One example of these terms and

15   conditions is the setting of financial covenants such as the Debt Service Ratio and Equity

16   Capitalization Ratio. Exhibit No. TGT-0023, Sec. 1.02 "Debt Service Ratio." "Equity

17   Capitalization Ratio". Potentially the most important provision in the Master Indenture is

18   the pledge of essentially all of Tri-State's property as collateral for the debt. Included in

19   this pledged collateral are the WESCs between Tri-State and each of its 42 Utility

20   Members.

21   **Q.    What are the largest categories of Tri-State's debt?**

22   A.    The largest categories of Tri-State's debt (as of September 30, 2021) are:

1    (1) Securities and Exchange Commission registered and publicly traded long-term

2    debt in the amount of $746 million;

3    • Master First Mortgage Indenture, Deed of Trust and Security Agreement

4        (12/15/99), Exhibit No. TGT-0023.

5    (2) 144A bonds, Series 2010A in the amount of $500 million;

6    (3) Private placement debt issued to accredited investors totaling $870 million;

7    • Series 2014B Note Purchase Agreement (10/31/14), Exhibit No. TGT-0025.

8    • Series 2017A Note Purchase Agreement (11/16/17), Exhibit No. TGT-0026.

9    (4) Loans from CoBank in the amount of approximately $505 million;

10    • Term Loan Agreement – 2020 (6/24/20), Exhibit No. TGT-0027.

11    (5) Loans from CFC in the amount of approximately $261 million;

12    • Loan Agreement between Tri-State and CFC (6/24/20), Exhibit No. TGT-

13        0028.

14    (6) Springerville Lease Obligation Bonds in the amount of approximately $293

15    million; and

16    (7) Other bonds in the amount of approximately $47 million.

17    Tri-State Debt Outstanding as of September 30, 2021, Exhibit No. TGT-0024. Above, I

18    have identified and included as exhibits key debt agreements. These are just

19    representative examples, and there are other agreements I have not included. Also,

20    regarding the items I have included, there may be related supplements, amendments, and

21    schedules omitted that are not relevant to my testimony.

1          Tri-State also has a commercial paper program which allows for up to $500

2    million to be issued to various investors on a short-term basis, supported by a revolving

3    credit facility. And, Tri-State has an agreement with a syndicate of commercial banks

4    (the "Credit Agreement") that provides access to $650 million in credit.

5          • Credit Agreement - $650M Revolving Credit Facilities, Exhibit No. TGT-0029.

6          As of September 30, 2021, there was no outstanding commercial paper balance

7    and no amount owed under the Credit Agreement.

8    **Q.**   **Do Tri-State's lenders rely on the WESCs to secure Tri-State's repayment of debt?**

9    A.    Yes. The WESCs and the revenues they generate are pledged to Tri-State's lenders to

10         provide assurance that Tri-State can earn sufficient future revenue to repay its debt

11         obligations. For Tri-State and other G&Ts, the long-term Member WESCs make debt-

12         financing possible. Unlike an IOU, Tri-State has no certificated service territory

13         encompassing future ratepayers without contracts for service. Without the assured cash

14         flow resulting from the WESCs, Tri-State could not obtain debt financing in the capital

15         markets at any reasonable cost, and perhaps not at all. Indeed, lenders typically require

16         the WESCs to be in force throughout the term of any loan. In fact, beginning in 2010 the

17         U.S. Rural Utility Service, who at that time was Tri-State's largest lender, required that

18         any new loans to Tri-State would be bifurcated into an amount related to the two member

19         WESCs with 2040 termination dates and an amount related to the remaining WESCs

20         which had 2050 termination dates. Loans related to the 2040 WESCs could not have final

21         maturities that extended beyond 2040.

1          Also, if not for the WESCs, credit rating agencies would assign far lower ratings

2          to Tri-State than they presently do, and Tri-State would be forced to pay much higher

3          interest on its debt–if it could secure debt financing at all.

4   **Q.**   **Do you believe Members understood when they signed their WESCs that Tri-State**

5          **would pledge the future revenue it would receive from them under the WESCs to**

6          **lenders to secure loan payments?**

7   A.   They either knew or should have known this. The WESCs contain explicit recitals on

8          these points, and the Utility Members presumably read them before signing. For an

9          example of this language, see Exhibit No. TGT-0005 (Nebergall) at page 2-3.

10  **III.**   **RELEVANT COVENANTS AND OTHER PROVISIONS IN TRI-STATES DEBT**

11          **AGREEMENTS.**

12  **Q.**   **Do some of Tri-State's lenders require that a Member terminating its WESC**

13          **prematurely pay its pro rata portion of Tri-State's debt?**

14  A.   Yes, under the circumstances I discuss below, if a withdrawing Utility Member fails to

15          pay its "pro rata portion" of Tri-State's "Indebtedness and other obligations", Tri-State

16          may be compelled to offer to repay money borrowed from lenders earlier than would

17          otherwise be required. The lenders who demanded these provisions in their lending

18          agreements are understandably focused on Tri-State's ability to repay its loans after a

19          Member terminates its WESC. The lenders' focus is not necessarily on making sure the

20          remaining Members are made "financially whole" by a Member's early WESC

21          termination, or whether Tri-State is able to continue to provide generation and

22          transmission service to its remaining Utility Members after the lenders have been repaid.

1   **Q.**   **Why are these provisions in the debt agreements?**

2   A.   This requirement was first included in a Note Purchase Agreement in April of 2009. Prior

3      to that time, none of Tri-State's debt agreements addressed the issue of a member

4      terminating its WESC early. Prior to, and concurrent with, the execution of the 2009

5      agreement, and the issuance of the related debt, several of Tri-State's Nebraska members

6      were seeking either lower rates from Tri-State or early termination of their WESCs. This

7      dispute eventually culminated in a complaint filed in the U.S. District Court of Nebraska,

8      leading to a jury trial. I believe that the presence of this dispute at the time that the 2009

9      Note Purchase Agreement was being negotiated was the direct cause of the prepayment

10     provision. Since that time, Tri-State has entered into two subsequent Note Purchase

11     Agreements, and several bank agreements, and we have been unsuccessful in having that

12     language removed from subsequent documents.

13  **Q.**  **Could the premature termination of a Member's WESC require Tri-State to pre-**

14      **pay debt?**

15  A.   Yes. Tri-State's lenders impose a number of different contractual obligations on Tri-State

16     relating to its financial status and performance. Such obligations, sometimes called "debt

17     covenants," are common in financing agreements for G&Ts and other borrowers. Some

18     of these obligations concern debt service coverage and the borrower's equity to total

19     capitalization ratios. With Tri-State, the importance of the WESCs has also caused

20     lenders to require Tri-State to take (or have prohibited Tri-State from taking) certain

21     actions relating to the Member WESCs.

1  Q.  **How could Tri-State's debt covenants require it to make a debt prepayment if a**

2  **Member terminates its WESC?**

3  A.  As explained previously, Tri-State had about $870 million of private placement debt as of

4  September 30, 2021. This debt is evidenced by two note purchase agreements: (1) a 2014

5  Note Purchase Agreement, Exhibit No. TGT-0025; and (2) a 2017 Note Purchase

6  Agreement, Exhibit No. TGT-0026 (collectively the "NPAs").

7  Each of the NPAs contains a Section 8.15, titled "Member Termination Event."

8  Section 8.15 provides that, if a Member Termination Event occurs, Tri-State must offer to

9  pre-pay to the note holders a Member Termination Event Prepayment Amount (the

10  "Payment Amount"). Exhibit No. TGT-0025, Sec. 8.15; Exhibit No. TGT-0026.

11  A "Member Termination Event" happens when Tri-State releases or terminates a

12  Member's payment obligation under the WESC and (1) the cumulative percentage share

13  of Company revenue for the departing Member and any previous departed Member (who

14  left) during the life of the agreement equals or exceeds 20%, and (2) the departing

15  member does not pay to the Company its "pro rata portion of Indebtedness and other

16  obligations of the Company." Exhibit No. TGT-0025, Schedule B "Member Termination

17  Event"; Exhibit No. TGT-0026, Schedule B "Member Termination Event".

18  Q.  **So a Member Termination Event can only happen once Members representing 20%**

19  **or more of Tri-State revenue terminate their WESCs?**

20  A.  Yes.

1    **Q.**    **How do you calculate a Member's revenue share?**

2    A.    The definition of "Member Termination Event" provides a Member's "percentage share

3          of total member revenues" that is that Member's portion of the total Member revenues

4          from the fiscal year most recently ended before the departure. Exhibit No. TGT-0025,

5          Schedule B "Member Termination Event"; Exhibit No. TGT-0026, Schedule B "Member

6          Termination Event".

7    **Q:**    **Based on that approach, what are the current percentage revenue shares for each**

8          **Member?**

9    A:    Exhibit No. TGT-0030 shows the "percentage share of total member revenues" for each

10         of Tri-State's Members for Fiscal Year 2020, which is the most recent information

11         available.

12   **Q.**    **Have any Tri-State Members withdrawn since the NPAs closed?**

13   A:    Yes, Kit Carson Electric Cooperative ("KCEC") withdrew from Tri-State effective June

14         30, 2016. That was after the 2014 NPA's closing date, but before the 2017 NPA's closing

15         date. So its "percentage share of total member revenues" from the year before it left

16         would be included under any Section 8.15 calculation for the 2017 NPA, but not under

17         the 2014 NPA. Delta Montrose Electric Association ("DMEA") withdrew effective June

18         30, 2020 (see *Tri-State Generation and Transmission Ass'n, Inc.*, 171 FERC ¶ 61,202

19         (Jun. 9, 2020), after the closing date of both NPAs. So its "percentage share of total

20         member revenues" from the year before it left would be included in the Section 8.15

21         calculation for both NPAs.

Docket No. ER21-2818-000
Exhibit No. TGT-0016 REV
Page 22 of 46

1   Q:      **What were the withdrawing Members' percentages of Member sales in the year**

2           **prior to their withdrawals?**

3   A:      KCEC's percentage of Tri-State's Member revenues was 1.78% in 2015, the fiscal year

4           before it withdrew. DMEA's percentage of Tri-State's 2019 Member sales was 3.24%.

5   Q:      **Did KCEC and DMEA pay their "pro rata portion of Indebtedness and other**

6           **obligations" under the NPAs?**

7   A:      No, they did not, but due to their small size neither departure resulted in a "Member

8           Termination Event."

9   Q:      **Did the previous withdrawals trigger a default or prepayment obligation under any**

10          **of the NPAs?**

11  A:      No. Even when combined with the previous withdrawal of KCEC in 2016, the

12          withdrawal of DMEA did not trigger Tri-State's pre-payment obligation under the NPAs.

13          This is because the KCEC and DMEA percentages together total 5.02%—less than the

14          20% threshold in the 2014 and 2017 NPAs.

15  Q:      **Could the future withdrawal of any single Member trigger a "Member Termination**

16          **Event"?**

17  A:      Yes. The withdrawals of KCEC (1.78%), DMEA (3.24%) and largest remaining Member,

18          United (17.99%) together would total above the 20% threshold under both the NPAs. If

19          United withdrew as a Member without paying to Tri-State more than its pro rata portion

20          of Tri-State's Indebtedness and other obligations, it would be a Member Termination

21          Event.

Docket No. ER21-2818-000
Exhibit No. TGT-0016 REV
Page 23 of 46

1    **Q:**    **Have any Members provided notice they intend to leave?**

2    A:    Yes. United, Poudre Valley, and Northwest have all filed notices they intend to withdraw

3    as Members effective January 1, 2024. United, Poudre Valley, and Northwest represented

4    17.99%, 8.42%, and 0.55% of Tri-States' 2020 member revenues, for a total of 26.96%

5    of Tri-State's 2020 member revenues. Exhibit No. TGT-0030.

6    **Q:**    **Would it be a Member Termination Event if these Members withdrew?**

7    A.    If the Members who have provided termination notices all left without paying to Tri-State

8    at least their pro rata portions of Tri-State's Indebtedness and other obligations, the

9    departures would easily exceed the 20% level required to trigger a Member Termination

10    Event.

11    **Q.**    **So how do you believe lenders will calculate any Member's "pro rata portions of**

12    **Tri-State's indebtedness and other obligations"?**

13    A.    The term "pro rata portion" is not directly defined in the NPAs. However, it is logical to

14    assume lenders would determine the "pro rata portion" of "Indebtedness and other

15    obligations" in the same manner as required in the NPAs to determine the 20% trigger,

16    which, as noted above, is the "member's percentage share of the total member revenues

17    of the Company determined for the fiscal year most recently ended". Exhibit No. TGT-

18    0025, Schedule B "Member Termination Event"; Exhibit No. TGT-0026, Schedule B

19    "Member Termination Event".

1   **Q:    Under the NPAs, what is included in "indebtedness and other obligations of the**

2   **company outstanding"?**

3   A.    The NPAs define "Indebtedness" by incorporating the definition of "debt" from the

4   Master Indenture. Exhibit No. TGT-0025, Schedule B "Indebtedness"; Exhibit No. TGT-

5   0026, Schedule B "Indebtedness". The indenture defines debt to include borrowed funds

6   and lease obligations" Exhibit No. TGT-0023, Sec. 1.01 "Debt".

7   The term "other obligations of the Company" is not directly defined. However,

8   Section 19.2 of the NPAs states, "All accounting terms used herein which are not

9   expressly defined in this Agreement have the meanings respectively given to them in

10   accordance with Accounting Requirements. Except as otherwise specifically provided

11   herein, (a) all computations made pursuant to this Agreement shall be made in

12   accordance with Accounting Requirements." Exhibit No. TGT-0025, Sec. 19.2; Exhibit

13   No. TGT-0026, Sec. 19.2. The term "Accounting Requirements" is defined in the Master

14   Indenture as "the system of accounts prescribed by FERC." Exhibit No. TGT-0023, Sec.

15   1.01 "Accounting Requirements". Therefore, I believe it is logical to conclude that the

16   term "other obligations" would have the meaning normally given to it under the FERC

17   chart of accounts, which would be all obligations reported on Tri-State's balance sheet.

18   **Q:    Under the NPAs, is the amount of Tri-State's "indebtedness and other obligations"**

19   **computed on a consolidated or an unconsolidated basis?**

20   A:    As I mentioned previously, for financial reporting purposes Tri-State "consolidates" its

21   financial statements. That means the financial results from Tri-State's subsidiaries is

22   included as if the subsidiary assets were directly owned by Tri-State and the subsidiaries

1     liabilities were direct liabilities of Tri-State. When financial statements are

2     unconsolidated, the financial statements do not include the detailed assets and liabilities

3     of each subsidiary but only one net number representing the parent company's (i.e., Tri-

4     State's) equity investment in the subsidiaries.

5           The phrase at issue for this calculation is "Indebtedness and other obligations of

6     the Company." Company is capitalized, which means it is a defined term. Under the

7     definitions in the NPAs, "Company" means Tri-State Generation and Transmission

8     Association, Inc. Exhibit No. TGT-0025, Schedule B "Company"; Exhibit No. TGT-

9     0026, Schedule B "Company". The NPAs have a separate definition, "Controlled Entity"

10    for Tri-State's subsidiaries. Exhibit No. TGT-0025, Schedule B "Controlled Entity";

11    Exhibit No. TGT-0026, Schedule B "Controlled Entity". I understand the reference in the

12    phrase to "Indebtedness and other obligations of the Company" with no reference to the

13    "Controlled Entities" means we look at the finances of the Company only in this

14    calculation—or on an "unconsolidated" basis.

15  **Q.**    **Do any of Tri-State's other loan agreements contain covenants that are potentially**

16        **triggered by the early termination of a Member's WESC?**

17  A.    Yes. Some of Tri-State's loan agreements with CFC and CoBank contain Member

18        Termination Event provisions substantially similar to those in the NPAs. Exhibit No.

19        TGT-0027, Sec. 6.17 (CoBank); Exhibit No. TGT-0028, Sec. 3.07 (CFC).

1    **Q.**    **If a "Member Termination Event" occurs under the 2014 and/or 2017 NPAs, the**

2            **CoBank loan, and the CFC loan, what happens?**

3    A.    If a Member Termination Event happens, Tri-State would have to make what the

4            agreements call a "Member Termination Event Prepayment Amount." The required pre-

5            payment would vary depending upon three primary factors: (1) the fiscal year in which a

6            Member withdraws, (2) the pro rata share of total relevant Member revenues (the

7            "Percentage") of Members who have withdrawn, and (3) the debt outstanding at the time

8            of the triggering event.

9               If a Member Termination Event occurs, Tri-State must offer to pre-pay a total

10          under the applicable agreements of at least $219 million (This is 20% of the $1.095

11          billion outstanding principal balance on these loans as of September 30, 2021.) If a

12          Member Termination Event happened, the actual number could be higher because it is

13          based on the actual percentage of the departing members—which could quite possibly

14          exceed 20%.

15    **Q.**    **Based on your experience, what do you expect from the lenders if Tri-State has to**

16          **make a pre-payment offer?**

17    A.    In my opinion, the lenders would probably accept Tri-State's offer to make the pre-

18          payment. They negotiated the covenant to protect themselves from Member departures

19          that financially weaken Tri-State. There is no reason to believe they would not take

20          advantage of the protection they negotiated for if that situation actually happens.

| | | |
|---|---|---|
| 1 | **Q.** | **If a debt prepayment obligation is triggered under the NPAs, is Tri-State's liability** |
| 2 | | **under its other lending agreements impacted?** |
| 3 | A. | Very likely, yes. That is because some or all of Tri-State's other lenders would likely |
| 4 | | assert that a Member Termination Event under Section 8.15 of an NPA constitutes an |
| 5 | | event of default under other Tri-State lending agreements. |
| 6 | **Q.** | **Please explain why?** |
| 7 | **A.** | Tri-State's various lending agreements, include the Credit Agreement and loan |
| 8 | | agreements with CoBank, contain the same or essentially the same cross-default |
| 9 | | provisions. Section 8.01(e) of those agreements say that if certain events happen under |
| 10 | | the NPAs, or other Tri-State lending agreements, there is a default under the Credit |
| 11 | | Agreement and the CoBank Agreements. Exhibit No. TGT-0029 (Credit Agreement); |
| 12 | | Exhibit No. TGT-0027 (CoBank). Section 8.01(e) provides that a cross-default occurs |
| 13 | | specifically if under other agreements "any other event occurs, the effect of which failure |
| 14 | | is to cause, or permit. . . . **an offer to repurchase, repay**." Exhibit No. TGT-0029 (Credit |
| 15 | | Agreement); Exhibit No. TGT-0027 (CoBank) (emphasis added). |
| 16 | | Tri-State's lenders will probably assert that the existence of a Member |
| 17 | | Termination Event under Section 8.15 of the NPAs, which would cause Tri-State to have |
| 18 | | to make an offer to prepay, would constitute a default under these cross-default |
| 19 | | provisions. |
| 20 | Q: | **How would a default under the credit agreement and CoBank agreements affect** |
| 21 | | **Tri-State and its Members?** |

1  A:    A default under the Credit Agreement and CoBank Agreements could cause extreme

2        financial difficulty for Tri-State. For example, Tri-State has borrowed about $505 million

3        under the CoBank Agreements. A cross-default under Section 8.01(e) of the CoBank

4        Agreements would allow CoBank to accelerate the entire $505 million debt, declaring the

5        entire amount immediately due. Exhibit No. TGT-0027, Sec. 8.02(b). Further, Tri-State

6        could not borrow under its Credit Agreement, could not effectively support outstanding

7        commercial paper, could not issue new commercial paper, and could not rollover its

8        existing commercial paper.

9  **Q:    What would happen if Tri-State failed to timely pay its lenders amounts that might**

10       **become due and payable under the provisions you just discussed?**

11 A:    Tri-State would need to timely pay all amounts that might become due under Section

12       8.15 of the NPAs, the CoBank loan agreements, and the CFC loan agreements, as well as

13       under Section 8.01 of the Credit Agreement and CoBank Agreements. If Tri-State failed

14       to do so, its lenders could also assert that Tri-State had defaulted under Tri-State's Master

15       Indenture. Such a default would likely lead to acceleration of the remainder of Tri-State's

16       debt and the Springerville Lease in a collective amount exceeding $3.2 billion. Such an

17       event would be catastrophic to Tri-State—potentially leading to bankruptcy.

18            It is extremely difficult, if not altogether impossible, for a company to borrow

19       money from investors when it is in default under its existing loan agreements. Even if

20       Tri-State somehow secured financing under such conditions, it would come at high

21       interest rates and carry restrictive terms.

1  **Q:**    **How would this affect Tri-State's Members?**

2  A:    In a bankruptcy scenario, the Members' equity investment in Tri-State (*i.e.,* their

3       allocated but unreturned patronage capital balance) could be wiped out. This amount

4       exceeds $1 billion. Even in a workout scenario in which Tri-State avoided bankruptcy,

5       the Members' equity investment could be impaired significantly. In either case, Tri-

6       State's cost of providing generation and transmission service, and therefore the wholesale

7       electricity rates charged to its Members, would increase, and perhaps substantially so.

8          Tri-State has not had an increase in its standard Class A electricity rate for its

9       Members in the last four years, reduced its Class A rate by 2% earlier in 2021, and has

10      committed to a further 2% reduction in 2022. One of the most immediate and important

11      results of any severe negative financial impact on Tri-State would, however, almost

12      certainly be a very substantial rate increase for Tri-State's Members.

13 **Q.**    **Are any other provisions in Tri-State's lending agreements impacted by WESC**

14       **terminations?**

15 A.    Yes, one of Tri-State's credit agreements contains a provision (Negative Covenant 7.08)

16       that states:

17          Tri-State shall not, directly or indirectly modify, supplement or
18          waive any provision of any Wholesale Power Contract…unless such
19          modification, supplement or waiver could not reasonably be
20          expected to prevent the Borrower from setting its rates thereunder
21          to recover all of its costs and expenses to the extent not covered by
22          other moneys available to the borrower or terminate any Wholesale
23          Power Contract unless such termination could not reasonably be
24          expected to prevent the Borrower from setting its rates under the
25          remaining Wholesale Power Contracts to recover all of its costs and
26          expenses to the extent not covered by other moneys available to the
27          Borrower.

1  Exhibit No. TGT-0029, Sec. 7.08. The CoBank loan agreements contain substantially

2  similar language. Exhibit No. TGT-0027, Sec. 7.08. If a significant portion of Tri-State's

3  Members terminated their WESCs without making the remainder of the membership

4  financially whole, it would likely trigger Negative Covenant 7.08, particularly if the CTP

5  amount is relatively low, because Tri-State then likely could not increase rates to the

6  remaining Members to recover the costs shifted from the withdrawing Members to those

7  remaining.

8  **Q.    Are any other provisions in the loan agreements implicated by a Member**

9  **withdrawal?**

10 A.   There are prepayment penalty provisions in several Tri-State's loan agreements. These

11      provisions guarantee the lenders—if a loan prepayment occurs—a return on investment

12      in excess of what they would have achieved had Tri-State repaid the loan according to its

13      original terms. See for example Exhibit No. TGT-0027 (CoBank), Sec. 2.04 and Exhibit

14      No. TGT-0028 (CFC), Schedule 5. So, if Tri-State makes a voluntary loan prepayment

15      using CTP fee funds, it must pay an additional "make whole" amount to the lender

16      beyond the loan principal prepayment. As of September 30, 2021, the total make-whole

17      premiums on Tri-State's debt exceed $1 billion. Exhibit No. TGT-0031.

18 **Q.    Anything else?**

19 A.   The Credit Agreement and NPAs contain "Change in Control" language implicated if a

20      majority of the Members existing on the date of the agreement cease to be Members.

21      Exhibit No. TGT-0025 (2014 NPA); Exhibit No. TGT-0026 (2017 NPA), Sec. 8.7;

22      Exhibit No. TGT-0029 (Credit Agreement), Sec. 8.01(m).

1    **Q:**    **In summary, is it true that in lending agreements under which Tri-State borrows**

2        **money, contractual provisions address the early termination of the WESCs?**

3    A:    Yes.

4    **Q:**    **And Tri-State might violate those contractual provisions and suffer severe financial**

5        **consequences if a Member WESC is terminated without sufficient monetary**

6        **compensation to Tri-State?**

7    A:    Yes.

8    **Q.**    **Have you directed the preparation of a chart showing these potential impacts?**

9    A.    Yes, Exhibit No. TGT-0032 accompanying my testimony shows in graphical form the

10       potential issues I describe above.

11    **IV.**    **THE POTENTIAL IMPACTS ON TRI-STATE FROM CREDIT RATING**

12          **DOWNGRADES.**

13    **Q.**    **Is Tri-State's debt rated by credit rating agencies and, if so, which ones?**

14    A.    Yes. The three major debt rating firms in the United States are Standard & Poor's

15       ("S&P"), Moody's, and Fitch Ratings (collectively, the "Ratings Agencies"). The Ratings

16       Agencies issue credit opinions concerning Tri-State, and they assign ratings to Tri-State's

17       debt.

18    **Q.**    **Are these credit ratings important to Tri-State's financial health?**

19    A.    Yes, they are extremely important. Tri-State operates in a capital-intensive industry and

20       debt comprises most of Tri-State's capital structure. This makes it critically important for

21       Tri-State to protect its credit rating and its ability to borrow at reasonable cost and on

1    reasonable terms. To keep its wholesale electric rates to Members low, Tri-State must

2    maintain a strong credit history and profile.

3  **Q.**    **In their determination of Tri-State's credit rating, what is your understanding**

4    **about whether the rating agencies place importance on the Member WESCs?**

5  **A.**    Yes, they all do. In their industry outlooks and credit opinions, the Ratings Agencies

6    consistently point to the WESCs as a key aspect of credit support for G&Ts in general

7    and Tri-State in particular. For example, Fitch Ratings has stated: "The power sales

8    contracts between a wholesale power supplier and its distribution customer are among the

9    most important factors supporting the credit rating of a wholesale power system."[1]

10   Likewise, Moody's has noted that the long-term WESCs between G&Ts and their

11   Members provide G&Ts with assurance that costs and capital investment can be

12   recovered from rates charged to customers.[2] S&P has stated that "an important element of

13   security for the debt that G&Ts issue to procure capacity is the full requirements contract

14   that distribution Members sign with a G&T to provide all of their power needs."[3]

15  **Q**    **What ratings do the rating agencies presently assign to Tri-State's debt?**

16  A.    Tri-State's debt currently enjoys investment-grade ratings, as shown by the following

17    chart:

---

[1] Fitch Ratings, U.S. Public Power Rating Criteria, p. 11 (January 2012), Exhibit No. TGT-0089.

[2] Moody's Investor Service, Global Corporate Finance: U.S. Electric Generation & Transmission Cooperatives Rating Methodology, p. 7 (December 2009), Exhibit No. TGT-0090.

[3] Standard & Poor's Credit Perspectives for U.S. Electric Cooperatives, p. 4 (May 2002) , Exhibit No. TGT-0091. *See also* Standard & Poor's Rating Methodology for U.S. Power Cooperatives: An Overview, p. 4 (November 2006), Exhibit No. TGT-0092.

| Rating Agency | Rating Date | Debt Type | Rating | Outlook |
|---|---|---|---|---|
| S&P | April 9, 2021 | Senior Secured | BBB+ | Stable |
| | | Issuer Rating | BBB+ | Stable |
| | | Short Term | A-2 | |
| Moody's | May 6, 2021 | Senior Secured | A3 | Stable |
| | | Issuer Rating | Baa1 | Stable |
| Fitch | June 23, 2021 | Senior Secured | A- | Stable |
| | | Senior Unsecured | A- | Stable |
| | | Short Term | F-1 | |

1

2　**Q.　Would a decline in its credit rating have any financial impact upon Tri-State?**

3　A.　Yes. If the ratings on Tri-State's debt declined, then Tri-State's interest expense and other

4　　　debt-related expenses would increase. Because Tri-State is a cooperative operating not

5　　　for profit, this would cause higher wholesale rates for Tri-State's Utility Members.

6　　　　　First, issuing long term debt in the capital markets would be more expensive for

7　　　Tri-State as its credit rating dropped. Depending on market conditions, each drop in

8　　　rating would increase Tri-State's interest rate exposure by 10 to 50 basis points (0.10% to

9　　　0.50%)—so long as Tri-State maintained investment grade ratings (at least BBB-/Baa3).

10　　A credit rating decline below investment grade would have a far greater negative impact

11　　on Tri-State's borrowing costs. On a $300 million debt issue (the minimum size to

12　　achieve index eligibility in the public market), an interest rate increase of 10 to 50 basis

13　　points translates to increased annual interest costs ranging from $300,000 to $1,500,000.

14　　And the lower Tri-State's credit rating falls, the greater the likelihood that lenders will

15　　require increasingly restrictive loan terms.

16　　　　　Second, in November 2019, Standard and Poor's lowered Tri-State's issuer rating

17　　from "A" to "A-". This had a resultant impact on our short-term rating, lowering it from

18　　"A-1 to "A-2". This caused Tri-State to now be a "Tier-2" issuer in the commercial paper

19　　market, which has already increased our cost of commercial paper 10 to 15 basis points.

1    In 2021, S&P downgraded Tri-State's long-term debt rating from A- to BBB+. A further

2    downgrade of Tri-State's rating to "BBB- / Baa3" would cause Tri-State to become a

3    "Tier-3" CP issuer. Since the Tier-3 market is very limited, it is uncertain whether Tri-

4    State could find buyers for its CP and if it could, the cost would increase significantly.

5        Third, a credit downgrade would cause an immediate increase in the cost of Tri-

6    State's revolving credit facility. The cost of maintaining and using that facility is based

7    on a credit quality grid. If Tri-State's credit rating dropped one level, the loan

8    commitment fee would increase by approximately $165,000 annually. Additional credit

9    rating decreases would continue to increase the commitment fee under this facility.

10       Tri-State currently has approximately $450 million of variable rate debt

11   outstanding. This is debt for which the interest rate is reset periodically (e.g., every 30

12   days, 60 days, etc.) Therefore, a credit downgrade would have a near-immediate impact

13   on the interest rates Tri-State pays for this debt. An increase of only 50 basis points

14   would result in an increase in Tri-State's annual interest expense of $2.25 million.

15   Additionally, Tri-State anticipates issuing significant amounts of long-term debt over the

16   next decade in order to finance the capital projects necessary to provide service to its

17   members. Our current long term financial forecast projects total long-term debt issuances

18   of $2.1 billion over the next decade. A 50-basis point increase in the cost of this debt

19   would increase Tri-State's annual interest expense by $10.5 million. If Tri-State's credit

20   rating was to decrease below investment grade, its incremental cost of borrowing could

21   easily increase by 250 basis points or more. This amount would result in higher interest

22   expense for both variable and fixed rate debt of $62.5 million each year.

1    **Q.    Have the rating agencies commented on the potential termination of Tri-State**

2    **Member WESCs?**

3    A.    Yes. All three Rating Agencies have commented upon actions leading to the potential

4    termination of Member WESCs, characterizing such events as credit negative events for

5    Tri-State. I understand the testimony of Dan Aschenbach addresses this topic.

6    **Q.    In your opinion, what is likely to happen to Tri-State's credit rating if Members can**

7    **terminate their WESCs without making the type of "make whole" payment you**

8    **discuss later in your testimony?**

9    A.    I meet personally with the primary Tri-State analyst from each of the Rating Agencies at

10    least annually. I also confer by telephone several times a year with other Rating Agency

11    representatives. Based on these conversations, I believe that the Rating Agencies are

12    watching these proceedings closely and would view such an event as an extremely

13    negative development for Tri-State's finances and credit rating. I believe they would, at

14    the very least, lower some or all their ratings on Tri-State's debt. This would cause the

15    type of increased financing costs I discussed, which in turn would create a need for Tri-

16    State to increase rates for the remaining utility Members, creating additional financial

17    burden for them and for their member-consumers.

18    **V.    TRI-STATE'S APPROACH TO DEVELOPING A CONTRACT TERMINATION**

19    **PAYMENT METHODOLOGY.**

20    **Q.    What was Tri-State's philosophy in developing its CTP methodology?**

21    A.    Each of Tri-State's Utility Members voluntarily assumed a contractual obligation to

22    purchase from Tri-State at least 95% of its wholesale electricity requirements through

1      December 31, 2050. The CTP methodology provides a basis for a disaffected Member to

2      walk away from this contractual commitment and withdraw from Tri-State membership.

3      Given the Members have no contractual ability to terminate their WESCs, Tri-State

4      believes that any Member should be able to terminate only in a manner that ensures the

5      remaining Members are left financially unharmed. A Member seeking premature

6      termination of its WESC should pay a CTP that keeps Tri-State and its remaining

7      Members financially whole.

8   **Q.**   **Please explain what you mean by a payment that makes Tri-State and the remaining**

9      **Members "financially whole"?**

10  A.   Making Tri-State and its remaining Members "financially whole" means putting them in

11     close to the same position financially as if the withdrawing Member had honored its

12     WESC for the entire agreed upon contract term (through December 31, 2050).

13  **Q.**   **Would the amount of a withdrawing Member's CTP affect the future wholesale**

14     **electricity rates remaining Tri-State Members will have to pay?**

15  A.   Yes, it does. A "make whole" CTP puts Tri-State and its remaining Members in the same

16     financial position as if the departing Member had continued to honor its WESC

17     throughout its remaining term. However, a CTP that is lower than the "make whole"

18     amount will cause a rate increase to Tri-State's remaining Members. Tri-State supports a

19     "make whole" CTP philosophy because it believes a departing Member's decision not to

20     honor its long-term contractual obligation should not cause remaining Tri-State Members

21     to pay higher wholesale electric service rates than they would otherwise have to pay.

1 **Q.** **If a departing Member pays a CTP in the amount of its pro rata share of Tri-State's**

2 **debt and other obligations, will remaining Members be made financially whole?**

3 A. No, a CTP in that amount would not make remaining Members financially whole.

4 **Q.** **Why not?**

5 A. A "make whole" CTP requires more than just a payment by the withdrawing Member of

6 its pro rata share of Tri-State's debts and other obligations as of the exit date. The mutual

7 commitment of Tri-State's Members under their WESCs entails not just a commitment to

8 share in the servicing of present debt, but also to share in all the costs of sustaining Tri-

9 State through 2050. This includes not only debt and equity costs, but also ongoing

10 operating, maintenance, administrative, and general costs. Tri-State's entire system was

11 built upon the expectation and the requirement that it be prepared to serve all of its full-

12 requirements customers for the entire term of their full-requirement contracts. When one

13 or more Members leave, a smaller number of remaining Members must bear the burden

14 of operating and maintaining the Tri-State system. Prepaying current outstanding

15 indebtedness might save Tri-State from immediate credit default or bankruptcy, but it

16 would not provide for Tri-State's ongoing sustainability, which is what every Utility

17 Member committed to do through December 31, 2050, with its WESC.

18 <center>**VI.     THE MODIFIED CTP METHODOLOGY.**</center>

19 **Q.** **Please summarize the Modified CTP Methodology?**

20 A. A departing Member's CTP calculated under the Modified CTP Methodology is the

21 greater of:

Docket No. ER21-2818-000
Exhibit No. TGT-0016 REV
Page 38 of 46

1          (1) the net present value of Tri-State's estimated lost revenues that result from the

2              Member's departure prior to the expiration of its WESC *minus* (i) the incremental

3              revenues that Tri-State would receive from selling the departing Member's load

4              into the wholesale market; (ii) any subsequent open access transmission tariff

5              ("OATT") revenue Tri-State would receive from the departing Member; and (iii)

6              the present value of the departing Member's accrued, unpaid patronage capital

7              balance; or

8          (2) the departing Member's *pro rata* share of Tri-State's total debt and other

9              obligations.

10     Tri-State Rate Schedule No. 281, Exhibit No. TGT-0018.

11     I will call the first calculation method the lost net revenue component and the second the

12     DCO component.

13 **Q.     What other aspects are there to the Modified CTP Methodology?**

14 A.    The Modified CTP Methodology also includes a simple set of procedures. To withdraw,

15     Members must provide an unconditional, two-year advance notice of its intent to

16     withdraw from Tri-State and terminate its WESC, and pay its CTP to Tri-State on the

17     date of withdrawal. Tri-State Rate Schedule No. 281, Exhibit No. TGT-0018. Tri-State's

18     Board of Directors has no discretion to prevent a Utility Member from terminating its

19     membership in Tri-State, so long as the withdrawing Utility Member complies with the

20     requirements. Tri-State Rate Schedule No. 281, Exhibit No. TGT-0018.

1    **Q.**    **If the Modified CTP Methodology is approved, will Tri-State regularly provide CTP**

2            **calculations to Members?**

3    A.    Yes, the rate schedule provides: "Tri-State will provide CTP calculations to each of its

4            Utility Members on or about April 1 of each year. A CTP calculation will remain valid

5            through March 31 of the following year ("CTP Effective Period"). At any time during the

6            CTP Effective Period, a Utility Member may provide written notice to Tri-State of its

7            intent to terminate its WESC and withdraw from Tri-State at the then-effective CTP

8            amount. Tri-State will not charge Utility Members for providing annual CTP

9            calculations." Tri-State Rate Schedule No. 281, Exhibit No. TGT-0018.

10   **Q.**    **What is the timing for a withdrawal?**

11   A.    Rate Schedule No. 281 provides: "A Utility Member that has provided written notice of

12           withdrawal to Tri-State will terminate its WESC and membership in Tri-State effective

13           on the first day of the month immediately following the second anniversary of its notice

14           of withdrawal to Tri-State, or on such other date as Tri-State and the Utility Member

15           agree ("Designated Withdrawal Date")." Tri-State Rate Schedule No. 281, Exhibit No.

16           TGT-0018.

17   **Q.**    **What types of inputs does Tri-State use in the Modified CTP Methodology, and how**

18           **can Members get them?**

19   A.    The methodology provides "Tri-State will provide to each Utility Member the inputs used

20           to calculate the Utility Member's CTP. The inputs used in the CTP Methodology shall be

21           obtained from readily available and updated data sources, including FERC's Electric

22           Quarterly Reports ("EQR"), Department of Energy-Energy Information Administration

1     ("EIA") reports, Tri-State Eastern and Western Interconnect Open Access Transmission

2     Tariff rates, Treasury Department and Federal Reserve Board data, and the Utility

3     Member's individual load and patronage capital account information." Tri-State Rate

4     Schedule No. 281, Exhibit No. TGT-0018. For the DCO component, Tri-State uses

5     information from its financial statements and historical Member-revenue share data.

6     **Q.**     **Why is the Modified CTP Methodology structured to require payment of the larger**

7     **of the two amounts?**

8     A.     The methodology requires the fee to be the greater of the two approaches to permit the

9     DCO component to act as a floor to ensure the CTP can never be low enough to cause a

10     Member Termination Event. Typically, one would expect the CTP calculated under the

11     lost net revenue component to be greater than the amount under the DCO component,

12     which means the fee would avoid a Member Termination Event. However, if market

13     prices for power increase to where they are in parity with Tri-State's A-40 stated rate, a

14     Member's CTP as calculated under the lost net revenue component could be a nominal

15     amount, or even zero. Under those circumstances, the DCO component acts as a floor to

16     prevent a Member's departure from creating a loan covenant default.

17     **Q.**     **What are the essential features of the Modified CTP Methodology?**

18     A.     The Modified CTP Methodology:

19     •     incorporates a shortened two-year notice period for Members seeking to terminate

20     their WESCs prematurely;

21     •     eliminates Tri-State Board of Directors' discretion over Member withdrawal and

22     WESC termination;

1         •   relies upon data inputs known by or readily accessible to Members;

2         •   can be replicated by Members without the need to access proprietary modeling

3            software or Tri-State's Long Term Financial Forecast ("LTFF");

4         •   allows each Tri-State Member to receive its CTP calculation annually with no

5            charges, fees, or delay; and

6         •   provides clear and transparent exit procedures for Members evaluating whether to

7            remain as Tri-State Members.

8    **Q.**    **Will Members be charged a fee to obtain Modified CTP Calculation amounts?**

9    A:    No. CTPs will be provided to Members annually without charge.

10    **Q.**    **Under the Modified CTP Methodology, does the Tri-State board have the right to**

11       **veto a Member exit?**

12    **A.**    No, the Board cannot prevent a Member from departing if the Member has provided two

13       years notice of its early WESC termination and paid its CTP as calculated under the

14       Modified CTP Methodology.

15    **Q.**    **Does the accompanying testimony of Joe Mancinelli explain the mechanics of the**

16       **Modified CTP Methodology in even greater detail?**

17    **A.**    Yes, it does.

18      **VII.**    **TRI-STATE'S DECISION TO FILE A MODIFIED CTP METHODOLOGY.**

19    **Q.**    **Did Tri-State modify the CTP methodology it originally filed?**

20    A.    Yes, the current rate is a modified approach from its original Marked-to-Market ("MtM")

21       approach.

1  **Q.**   **Why did Tri-State modify its CTP methodology?**

2  A.   Tri-State's initial MtM CTP Methodology was just and reasonable, and in many ways a

3       superior methodology for determining the fair and reasonable exit charge for a Member

4       who wishes to terminate its full-requirements WESC. Through detailed modeling, the

5       MtM CTP Methodology considered the financial impact of the Member's WESC

6       termination and mitigating factors, and it selected the lowest possible CTP for a departing

7       Member while still leaving remaining Members unharmed. However, it was complicated,

8       time-consuming, Member-specific, and dynamic. The calculation had to be performed for

9       one Member at a time, and the early termination of any Member's WESC affected the

10      CTP calculation for the next requesting Member.

11          Although the MtM CTP Methodology was approved by a majority of

12      representatives of Tri-State's Members, it drew heavy criticism from several Members,

13      and ultimately the Commission, mainly because interested Members could not obtain

14      simultaneous and prompt CTP calculations to fully evaluate their potential withdrawal.

15      To address the limitations of the MtM CTP Methodology, Tri-State developed the

16      Modified CTP Methodology, which also comports with Tri-State's Bylaws.

17          The Bylaws provide that Members may withdraw from Tri-State if they comply

18      with "such equitable terms and conditions as the [Tri-State Board of Directors] may

19      prescribe" and meet all contractual obligations to Tri-State before withdrawal. Tri-State's

20      Bylaws, Article I, Section 4(a), Rate Schedule No. 259, Exhibit No. TGT-0019. The

21      Modified CTP Methodology provides a just and reasonable rate tariff for calculating

1    CTPs for Tri-State utility Members, while protecting the financial interests of remaining

2    Members when a utility Member elects early termination of its long-term WESC.

3    **Q.    Please explain the similarities between Tri-State's first CTP methodology and the**

4    **Modified CTP Methodology?**

5    A.    Both CTP methodologies are based upon a "make whole" philosophy, meaning each

6    calculates the fee a withdrawing Tri-State Member must pay at an amount that will keep

7    remaining Members remain financially unharmed. The Modified CTP Methodology is

8    not as accurate in doing this as the MtM approach, but it is a reasonable way of

9    calculating a "make whole" CTP that is transparent and based upon objective and

10    publicly available government forecasts.

11    **Q.    What are the principal differences between the two CTP methodologies?**

12    A.    The principal difference between the two methods is their varying degrees of complexity

13    and member specificity. The MtM CTP Methodology was relatively complex and

14    Member-specific, relied upon Tri-State's LTFF and proprietary software and forecasting

15    tools to compute a withdrawing Member's CTP. As compared to the MtM CTP

16    Methodology, the Modified CTP Methodology is transparent and easy to replicate,

17    eschewing subjective assumptions and forecasts and relying instead upon historical

18    Member power purchases, historical power sale transactions, and readily accessible

19    published U.S. government price forecasts.

20    Another key difference is that the Modified CTP Methodology provides a

21    departing Member with an immediate credit for its ownership interest in Tri-State (*i.e.*, its

22    patronage capital). Also, the Modified CTP Methodology explicitly ensures that a

1    departing Member's CTP is at least sufficient to prevent a default under Tri-State's credit

2    agreements. The MtM CTP Methodology did not provide this assurance.

3          The Modified CTP Methodology also contains clear and objective procedures for

4    Members to obtain their CTP calculation without delay or charge, and a clear path to

5    terminate their WESCs should they do so. Under the Modified CTP Methodology, these

6    procedures are part of a single tariff, making it easier for Members to evaluate and plan

7    an early WESC termination should they so elect. The Modified CTP methodology (1)

8    eliminates any charge, application fee, or waiting time for the CTP calculation for that

9    Member; (2) eliminates subjectivity and discretion by allowing any Member willing to

10    pay the CTP and terminate its WESC without further approval of Tri-State's Board of

11    Directors; (3) reduces the notice time for a Member exit to two years; (4) provides exiting

12    Members with an immediate payment or credit for the net present value of their

13    patronage capital; and (5) credits the departing Member with all reasonably expected

14    OATT-related revenues expected to be received by Tri-State from that Member after its

15    withdrawal.

16  **Q.**    **Please explain how the Modified CTP Methodology is more transparent than the**

17        **original CTP methodology?**

18  A.    The MtM CTP Methodology relied upon projections of a departing Member's future

19    power purchases, Tri-State's LTFF, and other proprietary tools to forecast the revenue

20    Tri-State would have received from the departing Member in each of the remaining years

21    of the WESC term, if the Member remained. Recognizing that a Member's departure may

22    also result in offsetting financial benefits to Tri-State—either through reduced operation

1    and maintenance expenses, revenue from the sale of power that would have been used to

2    supply the departing Member's requirements, or both—the MtM CTP Methodology

3    employed a complicated and member-specific analysis of how Tri-State would react to

4    the Member's departure so as to mitigate resulting financial harm to Tri-State. The

5    Modified CTP Methodology is more transparent because it does not rely on the LTFF or

6    proprietary forecasting tools, and instead uses historical Member power purchases,

7    reported historical power sale transactions, and readily accessible U.S. government price

8    forecasts.

9    **VIII.    THE MODIFIED CTP METHODOLOGY'S DCO COMPONENT.**

10   **Q.    Why did Tri-State include a DCO component in the Modified CTP Methodology?**

11   A.    As I described earlier, Tri-State faces a potentially catastrophic result if a Member

12   Termination Event occurs under the NPAs and under other agreements with similar

13   provisions. In modifying its CTP methodology, Tri-State added the DCO component to

14   address this risk. Typically, one would expect the CTP calculated under the lost net

15   revenue component to be sufficient to avoid a Member Termination Event. However, if

16   market prices for power increase to where they are in parity with Tri-State's A-40 stated

17   rate, a Member's CTP as calculated under the lost net revenue component could be a

18   nominal amount, or even zero. Under those circumstances, the DCO component acts as a

19   floor to prevent a Member's departure from creating a loan covenant default.

20   **Q.    How do you calculate the CTP under the DCO component?**

21   A.    The DCO component of the Modified CTP Methodology is based on the debt covenant

22   language and is summarized in the rate as "[t]he amount sufficient to avoid a Utility

Docket No. ER21-2818-000
Exhibit No. TGT-0016 REV
Page 46 of 46

1    Member exit being included in the calculation of a "Member Termination Event" under

2    Tri-State's 2014 and 2017 Note Purchase Agreements." Tri-State Rate Schedule No. 281

3    at 7, Exhibit No. TGT-0018.

4           The DCO component calculates a CTP in the amount of "the departing Member's

5    *pro rata* share of Tri-State's total debt and other obligations." Tri-State Rate Schedule

6    No. 281 at 2, Exhibit No. TGT-0018. Consistent with my above discussion of the debt

7    covenant language, the Modified CTP Methodology describes this calculation as: "the

8    withdrawing Utility Member's *pro rata* portion (*i.e.*, its percentage of Tri-State's total

9    Utility Member Revenues during the most recent calendar year) of Tri-State's

10   indebtedness and other obligations on an unconsolidated basis at the time of the Utility

11   Member's departure. Indebtedness and other obligations shall include all of Tri-State's

12   debt and liabilities (except regulatory liabilities)." Tri-State Rate Schedule No. 281 at 4**,**

13   Exhibit No. TGT-0018.

14   **Q.**   **Does this conclude your testimony?**

15   A.    Yes.

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 7, 2022.

Patrick Bridges